1   LUKE W. COLE, California Bar No. 145,505
    CAROLINE FARRELL, California Bar No. 202,871
2   BRENT J. NEWELL, California Bar No. 210,312
    Center on Race, Poverty, & the Environment
3   450 Geary Street, Suite 500
    San Francisco, CA, 94102
4   415/346-4179  •  fax 415/346-8723

5   NANCY S. WAINWRIGHT, Alaska Bar No. 8711071
    Law Offices of Nancy S. Wainwright
6   13030 Back Road, Suite 555
    Anchorage, AK 99515-3538
7   907/345-5595• fax 907/345-3629

8   Attorneys for Plaintiff

9

10

11

12                    IN THE UNITED STATES DISTRICT COURT

13              FOR THE DISTRICT OF ALASKA AT ANCHORAGE

14   ENOCH ADAMS, JR., LEROY ADAMS,               Case No. A04-049 CV (JWS)
     ANDREW KOENIG, JERRY NORTON,
15   DAVID SWAN, and JOSEPH SWAN,                 **ENOCH ADAMS, JR., LEROY
                                                  ADAMS, ANDREW KOENIG,**
16          Plaintiffs                            **JERRY NORTON, AND
                                                  JOSEPH SWAN'S REPLY**
17          v.                                    **MEMORANDUM OF POINTS
                                                  AND AUTHORITIES IN**
18   TECK COMINCO ALASKA INCORPORATED,            **SUPPORT OF MOTION FOR
                                                  PARTIAL SUMMARY**
19          Defendant.                            **JUDGMENT**

20

21

22

23

24

25

26

27              **ORIGINAL LOCATED IN FOLDER
                BEHIND FILE**

28
    Adams Plaintiffs' Reply Memorandum in
    Support of Motion for Partial Summary Judgment

FILED

DEC 0 9 2005

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By_____ Deputy

124

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   ADAMS MEETS THE STANDING REQUIREMENTS TO BRING THIS
      CITIZEN SUIT UNDER THE CLEAN WATER ACT . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    Adams has suffered an "injury in fact" as a result of Teck Cominco's
            permit violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            1.    There is a reasonable basis to fear cyanide in the streams . . . . . . . . . . . . 7

            2.    There is a reasonable basis to fear TDS in the streams . . . . . . . . . . . . . . 9

                  a.    TDS in the effluent is toxic . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                  b.    The permit violations alleged in this suit are the
                        end-of-pipe permit violations . . . . . . . . . . . . . . . . . . . . . . . . . 10

                  c.    Teck Cominco has exceeded the 1500 mg/l
                        in-stream limit as well . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            3.    The caselaw Teck Cominco cites supports Adams here . . . . . . . . . . . . 11

      B.    The injury suffered by Adams is fairly traceable to Teck Cominco's permit
            violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            1.    Adams establishes a causal connection between the harms
                  alleged and the violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            2.    Teck Cominco admits its discharge reaches Kivalina . . . . . . . . . . . . . . 18

            3.    Adams has shown the temporal connection between the
                  violations and the harm alleged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                  a.    Teck Cominco violated its permits for more than a
                        decade before this litigation commenced . . . . . . . . . . . . . . . . . . 21

                  b.    Teck Cominco discharged TDS at high levels even
                        before the 1998 permit regulated TDS . . . . . . . . . . . . . . . . . . . . 22

                  c.    The plaintiffs have repeatedly testified about the temporal
                        connection between Teck Cominco's illegal discharges
                        and the harms they experience . . . . . . . . . . . . . . . . . . . . . . . . . 23

      C.    The injuries suffered by Adams are redressable by this suit . . . . . . . . . . . . . . 26

            1.    The harm to plaintiffs – the violations alleged in this suit –
                  are redressable by this Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

1
2

         2.     Injunctive relief, civil penalties and attorneys fees would all redress the plaintiffs' injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

         3.     Plaintiffs have repeatedly testified that their claims are redressable . . . . 29

3
4

III.    THIS COURT HAS JURISDICTION AS THE VIOLATIONS ARE ONGOING AND CAPABLE OF REPETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

5

IV.    A NOTE ON DOCUMENTATION OF THE VIOLATIONS . . . . . . . . . . . . . . . . . . . . . 33

6

    A.    The DMR excerpts are authenticated by Kivalina IRA Council officials . . . . . . 34

7

    B.    Plaintiffs' counsel authenticates the exhibits at issue . . . . . . . . . . . . . . . . . . . . . 35

8

    C.    The DMR excerpts are authenticated by Teck Cominco itself . . . . . . . . . . . . . 37

9

V.    TECK COMINCO CANNOT IMPEACH ITS OWN DMRS . . . . . . . . . . . . . . . . . . . . . 37

10

    A.    The Ninth Circuit does not allow defendants to impeach their DMRs . . . . . . . . 38

11
12

    B.    This Court has held, in this case, that Teck Cominco may not impeach its DMRs through revisions . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

VI.    THERE ARE NO DISPUTED ISSUES OF MATERIAL FACT . . . . . . . . . . . . . . . . . 41

13
14
15

VI.    THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON THE 618 VIOLATIONS OF THE TOTAL DISSOLVED SOLIDS DAILY MAXIMUM PERMIT LIMIT AND THE 618 VIOLATIONS OF THE TDS MONTHLY AVERAGE PERMIT LIMIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

16
17

    A.    "Regulatory mootness" is not applicable here, where there is not actual mootness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

18

         1.     Teck Cominco bears the burden of proving mootness . . . . . . . . . . . . . . 49

19

         2.     Teck Cominco's cases are inapposite . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

20

         3.     Teck Cominco presents no evidence that the allegedly mooting events have occurred – and cannot, because they are all speculative . . . . . . . . . 53

21

    B.    Judicial estoppel does not apply to this case . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

22

    C.    Teck Cominco's end-of-pipe TDS violations are ongoing . . . . . . . . . . . . . . . . 56

23

         1.     The violations of the 1998 permit condition were ongoing when this suit was filed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

24
25

         2.     Teck Cominco has also violated the new permit limitations for TDS . . . 57

    D.    This Court should enter summary judgment for Adams on all TDS violations . 58

26
27

VII.   THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON THE 16 VIOLATIONS OF THE CYANIDE DAILY MAXIMUM LIMIT . . . . . . . 58

28

1

2      A.    The June 2000 DMR proves the June 10, 2000 violation . . . . . . . . . . . . . . . . . 59

3      B.    The August 2001 DMR proves the August 13 and August 20, 2001 violations . 60

4      C.    The September 2002 DMR proves the September 30, 2002 violation . . . . . . . . 61

5      D.    The daily cyanide permit violations were ongoing when this suit was filed . . . . 62

6      E.    The cyanide violations are not moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

7   VIII.  THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS
        ON THE 418 VIOLATIONS OF THE CYANIDE MONTHLY AVERAGE LIMIT . . . 64

8      A.    The IML defense is contrary to the law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

9      B.    Teck Cominco violated even the Interim Minimum Level on 91 occasions . . . . 70

10          1.    The June 2000 DMR proves the monthly violations of the IML . . . . . . . 70

11          2.    The August 2001 DMR proves the monthly violations of the IML . . . . . 71

12          3.    The September 2002 DMR proves the monthly violations of the IML . . 71

13      C.    The daily cyanide permit violations were ongoing when this suit was filed . . . . 71

14      D.    The monthly cyanide violations are not moot . . . . . . . . . . . . . . . . . . . . . . . . . . 72

15   IX.   THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON
        THE FOUR VIOLATIONS OF THE WHOLE EFFLUENT TOXICITY
16       REPORTING REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

17   X.    THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS
        ON THE NINE VIOLATIONS OF THE WHOLE EFFLUENT TOXICITY DAILY
18       MAXIMUM PERMIT LIMIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

19      A.    Teck Cominco's daily Whole Effluent Toxicity (WET) violations are ongoing . 75

20      B.    All the claims are supported by admissible evidence . . . . . . . . . . . . . . . . . . . . . 77

21          1.    The original DMRs prove the WET violations . . . . . . . . . . . . . . . . . . . . 77

22          2.    The revised DMRs continue to report WET violations . . . . . . . . . . . . . . 78

23          3.    The DMR revision was not legal under EPA regulations . . . . . . . . . . . . 80

24      C.    Teck Cominco reported a daily WET violation in August 2002 . . . . . . . . . . . . 81

25      D.    Adams has proven nine daily WET claims, plus the additional
             reporting violation from the revised DMR . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

26   XI.   THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS
27       ON THE 199 VIOLATIONS OF THE WHOLE EFFLUENT TOXICITY

28

1        MONTHLY AVERAGE PERMIT LIMIT ................................. 82

2      A.    Teck Cominco's monthly Whole Effluent Toxicity (WET)
             violations are ongoing ............................................. 83

3

4      B.    All the claims are supported by admissible evidence ..................... 84

5           1.     The original DMRs prove the WET violations .................... 84

6           2.     The revised DMRs continue to report WET violations .............. 85

     C.    Teck Cominco reported a monthly WET violation in August 2002 .......... 86

7      D.    Adams has proven 199 monthly WET claims, plus the additional reporting
             violation from the revised DMR ..................................... 87

8

9   XII.   THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS
         ON THE THREE VIOLATIONS FOR UNPERMITTED DISCHARGES TO THE

10         TUNDRA AT THE MINE SITE .......................................... 87

11   XIII.   THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS
         ON ONE MONITORING AND REPORTING VIOLATION AT THE MINE SITE ... 89

12      A.    Teck Cominco admits failing to report the volume of mine drainage
13             on July 12, 2001 .................................................. 89

14      B.    Teck Cominco's monitoring and reporting violations are ongoing ........... 90

15   XIV.   THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR
         ADAMS ON THREE VIOLATIONS OF THE PORT SITE PERMIT ............. 91

16      A.    Teck Cominco admits the two unpermitted discharges at the Port Site ........ 91

17      B.    Teck Cominco admits the Total Suspended Solids violation ............... 94

18      C.    Summary judgment should be entered for Adams on the three port
19             violations as they are ongoing ...................................... 95

20   XV.   THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR
         ADAMS ON THE 45 VIOLATIONS OF THE COMPLIANCE ORDERS BY

21         CONSENT ........................................................... 95

22      A.    The Compliance Order violations are ongoing or capable of repetition ....... 97

23      B.    The Compliance Order violations are not moot .......................... 97

24      C.    The Compliance Order violations are not judicially estopped .............. 99

25      D.    The Compliance Order violations are easily redressed by this Court ........ 99

26      E.    Teck Cominco may not impeach its own DMRs in the Compliance
            Order context either .............................................. 99

27

28

F.   The DMRs and Teck Cominco's admissions in its Opposition prove
the specific Compliance Order violations alleged . . . . . . . . . . . . . . . . . . . . . . . 101

1.   Teck Cominco's July 1999 DMR proves the July 27, 1999
violation at Station 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

2.   Teck Cominco's July 2001 DMR and its Opposition prove
the July 25, 2001 violation at Station 7 . . . . . . . . . . . . . . . . . . . . . . . . 101

3.   Teck Cominco's July 1999 DMR proves the 19 violations from
July 1999 at Station 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

4.   Teck Cominco admits the September 12, 1999 violation at Station 10 . 102

5.   Teck Cominco admits the June 24, 2002 violation at Station 10 . . . . . 102

XVI.  TECK COMINCO'S PERMIT VIOLATIONS CONSTITUTE 1,926 DAYS
OF VIOLATIONS FOR PURPOSES OF ASSESSING PENALTIES UNDER THE
CLEAN WATER ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

XVIII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

1

**TABLE OF AUTHORITIES**

2

<u>**Federal Cases**</u>

3

4   *Alaska State Snowmobile Ass'n v. Babbitt*, 79 F. Supp. 2d 1116 (D. Ak. 1999) . . . . . . . . . 28-29

5   *Atlantic States Legal Foundation v. Tyson Foods*, 897 F.2d 1128 (11th Cir. 1990) . . . . 102-103

6   *Carr v. Alta Verde, Indus.*, 931 F.2d 1055 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 74, 83

7   *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 791 F.2d 304
        (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46, 64

8
    *Communities for a Better Environment v. Tosco Refining Co., Inc.*, 2001
9       U.S. Dist. LEXIS 1161 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

10  *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351 (8th Cir. 1998) . . . . . . . . 49

11  *Donato v. Metropolitan Life Ins. Co.*, 230 B.R. 418 (N.D.Cal. 1999). . . . . . . . . . . . . . . . . . . 99

12  *Ecological Rights Foundation v. Pacific Lumber Company*, 230 F.3d 1141
        (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

13
    *Friends of the Earth v. Facet Enterprises, Inc.*, 618 F.Supp. 532 (W.D.N.Y. 1984) . . . . . . . . 91
14
    *Friends of the Earth v. Gaston Copper Recycling*, 204 F.3d 149 (4th Cir. 2000). . . . . . . . . . 27
15
    *Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . 5, 6, 11, 16, 28, 47
16
    *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987). . . . . . . . 33, 47
17
    *Hawaii's Thousand Friends v. Honolulu*, 821 F. Supp. 1368 (D.Haw. 1993)). . . . . . . . . . . . . . 3
18
    *Interstate Fire & Cas. Co. v. Underwriters at Lloyd's*, 139 F.3d 1234 (9th Cir. 1998)). . . . . . . 99
19
    *Los Angeles v. Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
20
    *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
21
    *Massachusetts Public Interest Research Group v. ICI Americas Inc.*, 777 F. Supp.
22      1032 (D. Mass. 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 52

23  *Mississippi River Revival, Inc. v. City of Minneapolis*, 319 F.3d 1013 (8th Cir. 2003) . . . . 50, 51

24  *Mumford Cove Ass'n v. Town of Groton*, 640 F. Supp. 392 (D.Conn. 1986) . . . . . . . . . . . . 3, 17

25  *Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 995
        (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 97, 98
26
    *Northwest Environmental Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995) . . . . . . . 51
27

28

*Public Interest Research Group v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64
    (3[d] Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22, 40, 58, 68

*San Francisco Baykeeper v. Tosco Corp.*, 309 F.3d 1153 (9th Cir. 2002)) . . . . . . . . . . . . . 28, 51

*Save Our Bays & Beaches v. City and County of Honolulu*, 904 F. Supp. 1098
    (D.Haw. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Sierra Club v. Chevron U.S.A. Inc.*, 834 F.2d 1517 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . 68

*Sierra Club of Mississippi v.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sierra Club v. Union Oil Co.*, 813 F.2d 1480 (9th Cir. 1987) ("*Sierra Club I*") . . 3, 38, 40, 41, 76

*Sierra Club v. Union Oil Co.,* 853 F.2d 667 (9th Cir. 1988) (*"Sierra Club II"*) . . . . . . . . 33, 49

*Sierra Club v. Union Oil Co.*, 716 F. Supp. 429 (N.D. Cal. 1988) . . . . . . . . . . . 53, 57, 64, 72, 75

*Solinger v. A&M Records*, 586 F.2d 1304 (9th Circuit 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Student Pub. Interest Research v. Georgia-Pacific*, 615 F. Supp. 1419
    (D.N.J. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*U.S. v. Aluminum Co. of America*, 824 F. Supp. 640 (E.D. Tex. 1993) . . . . . . . . . . . . . . . . 38

*United States v. Cominco Alaska Incorporated*, A97-0267-CV(JKS) . . . . . . . . . . . . . . . . . 21

## Statutes

33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

33 U.S.C. § 1319(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

33 U.S.C. § 1342(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

33 U.S.C. § 1365(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

33 U.S.C. § 1369(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 70

## Regulations

40 C.F.R. § 122.41(4)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

I.    **INTRODUCTION**

Plaintiffs Enoch Adams, Jr., Leroy Adams, Andrew Koenig, Jerry Norton and Joseph Swan, Sr. (collectively "Adams") filed their Partial Motion for Summary Judgment ("Motion") seeking summary.judgment on 1,951 of the violations alleged in this suit on July 1, 2005 [Docket 72]. Teck Cominco filed is Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Opposition") on October 3, 2005. Adams here replies. This Clean Water Act citizen enforcement suit, brought by Adams to address Teck Cominco's failures to comply with the discharge limits set by its National Pollutant Discharge Elimination System ("NPDES") permits for its Red Dog mine site and port site in northwest Alaska, seeks an injunction, declaratory relief, civil penalties, and attorneys fees.

As Adams pointed out in its Motion, conceptually, this is a very simple case. Teck Cominco has a mine site permit and a port site permit. Both permits require Teck Cominco to document and report its compliance, or lack of compliance, to the U.S. Environmental Protection Agency ("EPA") in monthly Discharge Monitoring Reports ("DMRs"). Teck Cominco must also separately notify EPA if it has violated the permits. Using only Teck Cominco's own DMRs and its notifications of violations filed with the EPA, Adams has documented more than 4,080 permit violations by Teck Cominco over the years 1998-2003. This suit by Adams seeks penalties for the 2,309 violations that are ongoing or capable of repetition. To narrow the issues which must be resolved at trial, this motion for partial summary judgment establishes Adams' standing and Teck Cominco's liability for 1,926 violations.

This case is about two essential facts: Teck Cominco itself submitted DMRs to EPA pursuant to its permit, and the DMRs disclosed thousands of violations of its permit terms over a course of years. Teck Cominco now attempts to disown those DMRs. Teck Cominco's arguments proceed primarily down a well-defined path of evasion of its responsibilities. A few examples illustrate the point.

Teck Cominco argues that while it did violate its permit, the permit will – it believes – change soon so that the violations will no longer be violations in the future. Therefore, because

1    it anticipates that permit terms *may* be relaxed in the future, Teck Cominco argues its past

2    violations should be forgiven because, apparently, there is no possibility that Teck Cominco will

3    again violate its permit terms in spite of a history of almost continuous violations. *See, e.g.*,

4    Opposition at 15 ("At issue here is whether an *anticipated* change to Teck Cominco's NPDES

5    permit, changing the point of compliance and, ultimately, relaxing its TDS effluent limitations

6    during grayling spawning season, renders plaintiffs' claims for alleged violations moot as there is

7    no evidence that Teck Cominco has or will violate the *expected* new NPDES permit during

8    grayling spawning season." (emphasis added)).

9        In another instance, Teck Cominco argues that the permit terms it agreed to abide by were

10   "wrongly" decided and that so it decided to use a more "correct" approach. So, for instance, it

11   argues that while the permit requires the use of the "total cyanide analytical method" to measure

12   cyanide levels and Teck Cominco violated its permits using that method, its actions should be

13   excused because had the more correct method been used, there would have been no violations.

14   Opposition at 46.

15       Yet another line of argument holds that Teck Cominco suddenly realized, as much as *six*

16   *years* after the original DMRs were submitted, and after suit was filed, that the original DMRs

17   which showed violations were erroneous and needed to be corrected to show that the violations,

18   in fact, did not occur. Opposition at 54. Teck Cominco continues in the same vein, arguing that

19   while Teck Cominco violated its permit, it has made changes to its procedures and now its past

20   violations should be forgiven because, again apparently, it is unlikely to violate the permit again

21   in the future in spite of its unfortunate record of violations. Opposition at 60. Other arguments

22   offer various other excuses: Even though Teck Cominco violated its permit, the violation did not

23   cause any harm, *see, e.g.*, Opposition at 89; although the permit requires certain actions, the

24   permit should not be taken literally; supposedly unforeseeable or uncontrollable factors

25   prevented compliance, *see, e.g.*, Opposition at 92-94.

26       All of Teck Cominco's excuses, and the wealth of extraneous information thrown into the

27   Opposition, are an attempt to obscure the simple, undisputed facts: Teck Cominco's permits

28

1   impose certain discharge limits and other requirements, and Teck Cominco itself admitted

2   violations of those permit terms. Teck Cominco's extensive recitation of the history of its

3   violations, complete with multiple excuses, explanations and denials, is not relevant. The Clean

4   Water Act is a strict liability statute: to establish a violation of the Act, Adams need only prove

5   that Teck Cominco violated the terms and conditions of its NPDES permit. *See* 33 U.S.C. §

6   1311(a), 1342(k); *see also Hawaii's Thousand Friends v. Honolulu*, 821 F. Supp. 1368, 1392 (D.

7   Haw. 1993) ("Courts throughout the country have held that NPDES compliance is a matter of

8   strict liability, and a defendant's intent and good faith are irrelevant to the liability issue"); *Sierra*

9   *Club v. Union Oil Co. of Cal.*, 813 F.2d 1480, 1490-1491 (9th Cir. 1987), *vacated for*

10  *reconsideration*, 485 U.S. 931 (1988), *reinstated & amended*, 853 F.2d 667 (9th Cir. 1988)

11  (hereafter "*Sierra Club I*") (whether violations are de minimis or "rare" is irrelevant to liability);

12  *Mumford Cove Ass'n v. Town of Groton*, 640 F. Supp. 392, 395 (D. Conn. 1986) (violations are

13  not excusable because they are "technical" or insignificant, and fault, intent and environmental

14  harm are relevant only with respect to remedies).

15      Adams structures this reply memorandum in six parts. First, Adams demonstrates that

16  plaintiffs have standing to bring this suit: they have injury in fact, traceable to Teck Cominco and

17  redressable by this Court. Second, Adams briefly discusses the caselaw on ongoing violations,

18  which demonstrates that all violations are ongoing. Third, Adams notes that all of the

19  documentation and evidence of the violations alleged in the Motion and in this Reply is

20  admissible. Fourth, Adams explains that Ninth Circuit case law prohibits Teck Cominco from

21  impeaching its own DMRs in this suit. Fifth, Adams emphasizes that there are no disputed

22  material issues of fact. Finally, Adams explains how Teck Cominco's own admissions in this

23  case, in the previous case brought by the Kivalina Relocation Planning Committee ("KRPC")

24  and in Teck Cominco's self-monitoring reports and disclosures to the EPA prove 1,926 of the

25  violations of Teck Cominco's permits alleged in this action. In doing so, Adams dispatches with

26  each of Teck Cominco's defenses and attempts at obfuscation.

27      Because of Adams's difficulty in following Teck Cominco's argument, Adams has

28

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment      - 3 -

1    created the roadmap below to assist the Court in matching up the arguments in the Opposition

2    and this reply for each parameter at issue.[1]

3

4                              **Roadmap to the Violations**

| | Motion | Opposition | Reply |
|---|---|---|---|
| *The 1,898 Mine Site Violations* | | | |
| TDS Daily (622 violations) | 27 | 27-29 | 43-58 |
| TDS Monthly (622 violations) | 28 | 27-29 | 43-58 |
| Cyanide Daily (16 violations) | 29 | 40-50, 55-57 | 58-64 |
| Cyanide Monthly (418 violations) | 29 | 40-55, 57-58 | 64-72 |
| WET reporting (4 violations) | 29 | 62-65, 67-68 | 73-74 |
| WET Daily (9 violations) | 30 | 63-68 | 74-82 |
| WET Monthly (199 violations) | 30 | 63-68 | 82-87 |
| Unpermitted Discharges (3 violations) | 30 | 69-73 | 87-88 |
| Monitoring and Reporting (5 violations) | 31 | 73-80, 95-97 | 89-91 |
| *The five violations of the Port Site Permit* | | | |
| Unpermitted Discharges (2 violations) | 32 | 80-87 | 91-94 |
| TSS Daily (1 violation) | 33 | 87-89 | 94-95 |
| Monitoring and Reporting (2 violations) | 33 | 89-95 | 91 |
| *The 48 violations of the COBCs* | 34 | 30-40 | 95-102 |

As in the Motion, Adams has sequentially numbered each exhibit with a unique number.

_____

[1]Teck Cominco's (mis)organization of its Opposition has made it difficult to respond to with clarity. Its failure label or paginate *any* of its exhibits (as required by Local Rule 10.1(c)) makes it almost impossible to cite with precision to the documents it has attached to that Opposition, or even sometimes to tell which documents are which exhibit. Finally, its use of separate declarations of the same declarant (Mark Thompson, four separate declarations) makes it tough to cite to specific paragraphs or exhibits to the Thompson declaration(s); for example, there are four separate "Exhibit 1 to Thompson declaration," including one, attached to Thompson's monitoring and reporting declaration, which is actually three separate documents.

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment          - 4 -

1    Exhibit numbers 66-175 were attached to the Motion, filed July 1, 2005. This Reply is supported

2    by Exhibit numbers 190 to 307. (The other exhibit numbers pertain to various motions before the

3    Court.)

4    **II.    ADAMS MEETS THE STANDING REQUIREMENTS TO BRING THIS
         CITIZEN SUIT UNDER THE CLEAN WATER ACT.**

5

6        In their Motion, the Adams plaintiffs demonstrated their standing to bring this Clean

7    Water Act suit: they alleged personal injury in fact which can be fairly traced to the defendant

8    Teck Cominco's conduct and is likely to be redressed by the requested relief. Teck Cominco

9    attempts to attack each prong of Adams standing – injury, traceability, and redressability. Each

10   of Teck Cominco's attempts ignores both the facts of this case and the controlling caselaw on

11   standing, and each should be rejected. The Adams plaintiffs have standing to pursue this case.

12       Adams has a reasonable fear of Teck Cominco's pollution: it is toxic, it enters the Wulik

13   River, and it has changed the way plaintiffs interact with and enjoy their environment. This harm

14   is directly attributable to Teck Cominco, the only industrial polluter in an otherwise pristine

15   wilderness area in remote, rural Alaska. And the harm is redressable by this Court, through

16   injunctive and declaratory relief, and through penalties and attorneys fees to deter future

17   violations.

18       **A.    Adams has suffered an "injury in fact" as a result of Teck Cominco's permit
              violations.**

19       As Adams noted in its Motion, the Supreme Court has held that environmental plaintiffs

20   establish "injury in fact" by demonstrating that "they use the affected area and are persons 'for

21   whom the aesthetic or recreational value of the area will be lessened'" by the defendant's

22   challenged activity. *Friends of the Earth v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S.

23   167, 183 (2000) (hereafter "*Laidlaw*"); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555,

24   562-63 (1992) ("the desire to use or observe an animal species, even for purely esthetic purposes,

25   is undeniably a cognizable interest for purposes of standing"). To establish such "injury in fact"

26   to their recreational and aesthetic interests, the plaintiffs need not prove actual environmental

27   harm, but instead show that they have curtailed their use of the area in question due to

28

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment        - 5 -

1   "reasonable concerns" about the harmful effects of discharged pollution. *Laidlaw*, 528 U.S. at

2   181, 184. Plaintiffs need only show that they have been "injured in [their] use of a particular area

3   because of concerns about violations of environmental laws." *Ecological Rights Foundation v.*

4   *Pacific Lumber Company*, 230 F.3d 1141, 1151 (9th Cir. 2000) (hereafter "*Ecological Rights*

5   *Foundation*").

6          As the extensive testimony in the declarations attached to the Motion [Docket 72]

7   demonstrate, Kivalina residents Enoch Adams, Leroy Adams, Andrew Koenig, Jerry Norton and

8   Joseph Swan easily satisfy the Ninth Circuit requirements for "injury in fact."[2] Their reasonable

9   fears of Teck Cominco's illegal discharges have led them to curtail significant life activities, like

10  hunting and fishing in the Wulik and drinking water from that river.[3] Adams offers detailed

11  testimony of each of the plaintiffs that there have been changes in their drinking water,[4] declines

12  in subsistence fish resources,[5] and a change in the pattern and abundance of marine[6] and terrestrial

13  mammals[7] since Teck Cominco began its illegal discharges. These observations by local

14  residents, who rely on the land and water for their subsistence, are not hypothetical or

15  conjectural. Concerns about Teck Cominco's illegal discharges into the tributaries of the Wulik

16  River, and into the Chukchi Sea, have not only injured plaintiffs' aesthetic and recreational

17

18      [2]*See* Declaration of Enoch Adams ("E. Adams dec."), ¶¶ 6, 12, 17-18; Declaration of
Leroy Adams ("L. Adams dec."), ¶ 17; Declaration of Jerry Norton ("J. Norton dec."), ¶ 15;

19  Declaration of Joseph Swan ("J. Swan dec."), ¶¶ 4, 11-12; Declaration of Andrew Koenig ("A.
Koenig dec."), ¶ 8. Each of these declarations was filed with the Motion [Docket 72] on July 1,

20  2005.

21      [3]E. Adams dec., ¶¶ 5-6, 10-11; L. Adams dec., ¶ 4, 7, 8, 17; J. Norton dec., ¶¶ 4, 7, 9, 13,

22  15; J. Swan dec., ¶¶ 3, 7, 8, 10, 11; A. Koenig dec., ¶¶ 4.

23      [4]E. Adams dec., ¶¶ 5-6; L. Adams dec., ¶ 4; J. Norton dec., ¶¶ 3-4; J. Swan dec., ¶¶ 3-4;
A. Koenig dec., ¶¶ 3-4.

24
        [5]E. Adams dec., ¶ 10; L. Adams dec., ¶ 7; J. Swan dec., ¶ 7.
25

26      [6]E. Adams dec., ¶ 16.

27      [7]E. Adams dec., ¶¶ 10-12, 17; L. Adams dec., ¶¶ 7-10, 12, 14-15; J. Norton dec., ¶¶ 5, 9,
11-12; J. Swan dec., ¶¶ 7-11; A. Koenig dec., ¶¶ 6-9.

28

1   enjoyment of the area – changing their experience of their environment – but have impaired

2   sources of daily subsistence. These harms are more than sufficient to satisfy the "injury in fact"

3   component of standing.

4        In the face of this testimony, Teck Cominco asserts that Adams has suffered no injury in

5   fact because, "with respect to many of their claims, the plaintiffs cannot possibly show that their

6   claimed harms are objectively reasonable." Opposition at 98. Teck Cominco apparently

7   concedes that Adams has suffered injury in fact that is concrete, particularized, actual and

8   imminent because of the WET, monitoring and reporting, illegal discharge, and port site

9   violations, as it only asserts that plaintiffs' fear of cyanide and TDS is unreasonable. Opposition

10  at 98-99. Teck Cominco's assertions as to cyanide and TDS are demonstrably wrong, and the

11  caselaw supports Adams's position.

12              **1.    There is a reasonable basis to fear cyanide in the streams.**

13       Teck Cominco's entire argument – "The fact is that there is no credible evidence of any

14  exceedance of Teck Cominco's cyanide limit, and thus no reasonable basis for the plaintiffs to

15  speculate that any discharge of cyanide from the mine has harmed or impacted them in any way"

16  (Opposition at 99) – is specious. There is ample "credible evidence" of numerous cyanide

17  exceedances, as detailed in Sections VII and VIII on cyanide, below. That credible evidence is

18  Teck Cominco's own discharge monitoring reports (DMRs), each of which Teck Cominco

19  certifies with the following statement:

20       I certify under penalty of law that this document and all attachments were prepared under
         my direction or supervision.... Based on my inquiries of the person or persons who
21       manage the system, or those persons directly responsible for gathering the information,
         the information submitted is, to the best of my knowledge and belief, true, accurate and
22       complete.

23  *See, e.g.*, Exhibit 258 to Cole Reply dec.; Exhibit 11 to Thompson TDS dec. (June 2002 DMR).

24  To take just a few representative examples (for a complete canvass of the cyanide violations, see

25  Sections VII and VIII below), here are the statements that Teck Cominco itself certified under

26  penalty of law were "true, accurate and complete":

27       • "A sample collected on June 10, 2002, from Outfall 001 was analyzed to contain 18

28

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment      - 7 -

1    parts per billion (ppb, µg/L) total cyanide.  The daily maximum permit limit concentration for

2    total cyanide is 9 ppb."[8]

3         • "Several quality assurance samples for total cyanide analysis were sent to various

4    analytical laboratories...  The CT&E results exceed the daily maximum permit limits."[9]

5         • "Outfall 001 samples collected on July 22nd and 30th were both analyzed by CT&E

6    Analytical Laboratory to contain a concentration of 10 parts per billion (ppb, µg/L) total

7    cyanide....  Samples collected on July 22nd and 30th exceeded the daily maximum limit and the

8    average of all of the monthly samples exceeded the monthly average limit."[10]

9         Teck Cominco's argument thus collapses under the weight of its own disclosed permit

10   violations.

11        As Adams noted in the Motion, plaintiffs' cyanide expert, Dr. Robert Moran, who has

12   written extensively on cyanide, testifies,

13        Cyanide is a well-known poison, extremely toxic to humans and most forms of aquatic
          and terrestrial life.  In addition, cyanide used at mining sites readily reacts to form other
14        cyanide-related compounds which, while generally less toxic than cyanide itself, are
          nevertheless toxic to aquatic organisms.  It is reasonable for the public to be concerned
15        about the presence of cyanide in the water they drink.  There are even more significant
          reasons for citizens to be concerned about the presence of cyanide and cyanide-related
16        compounds in rivers from which they catch and consume fish. These concerns are
          reasonable even where measured cyanide concentrations (WAD or Total) are as low as a
17        few tens of micrograms per liter.[11]

18   Adams's concerns about illegal cyanide discharges have a reasonable basis.

19        Teck Cominco asserts that even if it were violating its cyanide permit limits, Adams

20   would not have a reasonable basis for fear because one plaintiff mistakenly believed that cyanide

21   caused cancer.  Opposition at 99.  This is simply wrong: Although cyanide does not cause cancer,

22   _____

23        [8]June 2002 DMR, Exhibit 258 to Cole Reply dec.; also Exhibit 11 to Thompson TDS dec,
     filed October 3, 2005.

24
          [9]August 2001 DMR, Exhibit 259 to Cole Reply dec., also Exhibit 5 to Thompson TDS
25   dec.

26        [10]July 2001 DMR, Exhibit 260 to Cole Reply dec., also Exhibit 4 to Thompson TDS dec.

27        [11]Moran dec., ¶15, filed July 1, 2005 with Motion.

28
     Adams Plaintiffs' Reply Memorandum in
     Support of Motion for Partial Summary Judgment      - 8 -

1  it is a potent toxin which harms human health and about which long-term studies have not been

2  conducted. Declaration of Dr. Robert Moran in Support of Reply Memorandum ("Moran Reply

3  dec."), attached, at ¶60. Thus, whether or not it is reasonable to fear that cyanide exposure will

4  lead to cancer, it is reasonable to fear cyanide exposure as a danger to one's health. Moran Reply

5  dec. ¶¶ 49, 55, 56, 57.

6                    **2.     There is a reasonable basis to fear TDS in the streams.**

7          Teck Cominco then asserts that since it has an *in-stream* TDS permit limit, and, it alleges,

8  it has not exceeded that permit limit "since long before this litigation was filed," and "this

9  standard has already been found to be fully protective of the environment, there simply is no

10  basis for the plaintiffs to assert that they have a reasonable fear of harm." Opposition at 99-100.

11  Teck Cominco's argument ignores three critical details: the TDS in its effluent is toxic, the

12  violations at issue here are the *end-of-the-pipe* permit violations, which are ongoing, and Teck

13  Cominco has violated the in-stream limits as well.

14                            **a.     TDS in the effluent is toxic.**

15          At the Red Dog Mine, TDS is the sum of numerous chemical constituents, including

16  forms of numerous metals and metal-like elements such as arsenic, antimony, mercury, together

17  with forms of cyanide such as thiocyanate, cyanate, and various metal-cyanide complexes.

18  Moran Reply dec. ¶26. It is misleading to refer to such wastes as a simple "calcium sulfate based

19  TDS" (Opposition at 3). Moran Reply dec. ¶26. Because of its toxic constituents in the Red Dog

20  effluent, simply because water samples comply with NPDES or other regulatory limits for TDS

21  content does not mean the TDS found in the water is benign or non-toxic. Moran Reply dec.

22  ¶27. Indeed, the TDS in Teck Cominco's effluent is causing between 50 and 100 percent of the

23  toxicity to aquatic organisms measured by Teck Cominco. As Teck Cominco's whole effluent

24  toxicity consultant Kevin Brix testified:

25          Q.  Can you tell me, based on your studies of the Red Dog TIEs [toxicity identification
            evaluations], what the toxicity in the effluent can be attributed to?

26

27          A.  I cannot tell you all of it. I can tell you that approximately half of it, perhaps a little

28

1    bit more, is associated with TDS[.][12]

2    Teck Cominco's most recent DMRs report that TDS is responsible for up to 100 percent of the

3    discharge's toxicity.  Exhibit 191 to Declaration of Enoch Adams in Support of Reply

4    Memorandum ("E. Adams Reply dec."), attached, at 3 (May 2005 DMR).  Teck Cominco's TDS

5    is toxic, and Adams's concern about the ongoing TDS violations is reasonable.

6                    **b.    The permit violations alleged in this suit are the end-of-pipe
                            permit violations.**
7
8            Adams has alleged 1,244 TDS permit violations in this suit, all of them of the end-of-pipe

9    permit limits.  Revised Complaint at ¶¶ 68-77 [Docket 26]; Motion at 27-29.  As Adams explains

10   below in Section VI.C on TDS, these violations have continued after the date of the filing of this

11   suit.  Where the end-of-the-pipe permit violations continue, Teck Cominco's discharge is, by

12   definition, not "fully protective of the environment," as Teck Cominco would have it (Opposition

13   at 99-100), because it is illegal under the Clean Water Act.

14                   **c.    Teck Cominco has exceeded the 1500 mg/l in-stream limit as
                            well.**

15           While the permit violations at issue here are for the end-of-pipe violations, Teck

16   Cominco is also bound by its Compliance Orders by Consent to keep TDS below specified levels

17   in the streams below the outfall.  Teck Cominco points to its alleged compliance with the 1500

18   mg/l level at Station 10 as "evidence" that Adams fear of TDS impacts are not reasonable.

19   However, Adams has documented numerous violations of the 1500 mg/l limit.  While the various

20   violations of the Compliance Orders are detailed below in Section XV, the following statement is

21   just one illustrative example taken from Teck Cominco's June 2002 DMR: "A sample collected

22   on June 24, 2002 from Station 10 was analyzed to contain 1620 parts per million (ppm, mg/l)

23   total dissolved solids (TDS)."  Exhibit 258 to Cole Reply dec., also Exhibit 11 to Thompson

24   TDS dec.  Teck Cominco admits 12 violations of the Compliance Order limit (now its permit

25   limit) at Station 10.  Opposition at 32.  Adams proves an additional 21 violations there in Section

26   _____

27          [12]Deposition of Kevin Brix, taken February 22, 2005 at Washington, D.C. (hereafter
       "Brix depo."), at 137:16-21; attached as Exhibit 262 to Cole Reply dec.

28

1    XV.F, below.  Additionally, Teck Cominco's 2003 permit limits during grayling season,

2    currently stayed by KRPC's appeal, limit TDS at Station 10 to 500 mg/l, a level it has also

3    violated repeatedly.  Section XV documents five violations of that Compliance Order parameter..

4         Thus, Teck Cominco has violated even the new in-stream permit limits, which it claims

5    are in place to protect aquatic life.  The Adams plaintiffs' fear of Teck Cominco's TDS

6    violations is reasonable.

7              **3.    The caselaw Teck Cominco cites supports Adams here.**

8         Teck Cominco cites just two cases in support of its "no injury" argument, *Laidlaw* and

9    *Los Angeles v. Lyons*, 461 U.S. 95 (1983).  Opposition at 98.  These cases support Adams here.

10   As the Supreme Court held in *Laidlaw,* distinguishing *Lyons* from a fact situation in *Laidlaw*

11   very similar to the one here,

12        In the footnote from *Lyons* cited by the dissent, we noted that "the reasonableness of
          Lyons' fear is dependent upon the likelihood of a recurrence of the allegedly unlawful
13        conduct," and that his "subjective apprehensions" that such a recurrence would even *take*
          *place* were not enough to support standing. 461 U.S. at 108, n. 8. Here, in contrast, it is
14        undisputed that Laidlaw's unlawful conduct – discharging pollutants in excess of permit
          limits – was occurring at the time the complaint was filed. Under *Lyons*, then, the only
15        "subjective" issue here is "the reasonableness of [the] fear" that led the affiants to
          respond to that concededly ongoing conduct by refraining from use of the North Tyger
16        River and surrounding areas.... we see nothing "improbable" about the proposition that a
          company's continuous and pervasive illegal discharges of pollutants into a river would
17        cause nearby residents to curtail their recreational use of that waterway and would subject
          them to other economic and aesthetic harms. The proposition is entirely reasonable, the
18        District Court found it was true in this case, and that is enough for injury in fact.

19   *Laidlaw,* 528 U.S. at 184-85.  Here, the conduct is ongoing as well: Teck Cominco has violated

20   both its TDS and cyanide permit limits since this case was filed.  See Sections VI, VII and VIII

21   below.  As in *Laidlaw,* plaintiffs here have offered testimony that Teck Cominco's illegal

22   pollutant discharges have caused them to alter their use and enjoyment of the environment.[13]  In

23   *Laidlaw*, the Supreme Court found testimony nearly identical to that offered by Adams here to

24   constitute injury in fact: "the affidavits and testimony presented by FOE in this case assert that

25   Laidlaw's discharges, and the affiant members' reasonable concerns about the effects of those

26   _____

27        [13]E. Adams dec., ¶¶ 5-6; L. Adams dec., ¶ 4; J. Norton dec., ¶¶ 3-4; J. Swan dec., ¶¶ 3-4;
     A. Koenig dec., ¶¶ 3-4.

28

1    discharges, directly affected those affiants' recreational, aesthetic, and economic interests." *Id.* at

2    183-84. Adams has demonstrated injury in fact.

3    **B.    The injury suffered by Adams is fairly traceable to Teck Cominco's permit violations.**

4

5    The second element of the standing test, the "fairly traceable" requirement, "ensures that

6    there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct."

7    *Gaston Copper*, 204 F.3d at 161. Strict proof of causation is not necessary to meet the threshold

8    jurisdictional requirements of the Clean Water Act. *Ecological Rights Foundation*, 230 F.3d at

9    1152. Plaintiffs need not "show to a scientific certainty that defendant's effluent . . . caused the

10    precise harm suffered by the plaintiffs" or that the defendant's discharge is solely responsible for

11    the harm suffered. *Natural Resources Defense Council v. Southwest Marine, Inc.,* 236 F.3d 985,

12    995 (9th Cir. 2000) (hereafter *"Southwest Marine").* Rather, plaintiffs "must merely show that a

13    defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the

14    specific geographic area of concern," *id.* at 995. Here, Adams has shown just that.[14]

15    Adams' concerns about environmental contamination in this case satisfy what the Ninth

16    Circuit identified in *Ecological Rights Foundation* as the main issue in the causation inquiry:

17    they cannot be attributed to the actions of any third party who is not before the court. Aside from

18    Teck Cominco's mining operation and port site, the area surrounding the Village of Kivalina is a

19    pristine wilderness, and there are no other industries in the area.[15] Teck Cominco is the only

20    discharger of chemical waste into any tributary of the Wulik River,[16] and by its own records it has

21    violated its NPDES permits on thousands of occasions. All of the injuries claimed by Adams

22    began after Teck Cominco began operating the mine and port sites, and all continued between

23    1999 and 2003, the period during which the violations documented in this suit took place.

24

25    [14]E. Adams dec., ¶¶ 5-6; L. Adams dec., ¶ 4; J. Norton dec., ¶¶ 3-4; J. Swan dec., ¶¶ 3-4; A. Koenig dec., ¶¶ 3-4.

26    [15]E. Adams dec., ¶ 18.

27    [16]*Id.*

28

1  Plaintiffs' concerns that their drinking water, hunting grounds and fishing grounds have been
2  contaminated by toxic chemicals can thus be fairly attributed to Teck Cominco's discharges, and
3  not to the action of a party not before the court. *See, e.g., Ecological Rights Foundation*, 230
4  F.3d at 1152.

5       Teck Cominco attacks Adams on the traceability prong, stating the plaintiffs must
6  establish "a fairly traceable connection between the plaintiff's injury and the complained-of
7  conduct of the defendant." Opposition at 100, quoting *Steel Company v. Citizens for a Better*
8  *Environment*, 523 U.S. 83, 103 (1998). Adams has done just that here. Teck Cominco also
9  relies on *Public Interest Research Group v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64 (3d Cir.
10  1990) (hereafter "*Powell Duffryn*"), which also supports Adams here. That case sets forth the
11  rule that

12      In order to demonstrate that they are more than "concerned bystanders," plaintiffs need
        only show that there is a "substantial likelihood" that defendant's conduct caused
13      plaintiffs' harm.... In a Clean Water Act case, this likelihood may be established by
        showing that a defendant has 1) discharged some pollutant in concentrations greater than
14      allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or
        may be adversely affected by the pollutant and that 3) this pollutant causes or *contributes*
15      *to* the kinds of injuries alleged by the plaintiffs.

16  *Id.* at 72 (emphasis added). Here, plaintiffs have met all three *Powell Duffryn* tests: 1) Teck
17  Cominco has admitted it repeatedly violated its permits; 2) it is undisputed that Teck Cominco
18  discharges into tributaries of the Wulik on which plaintiffs rely for their subsistence hunting and
19  fishing and drinking water, and that the pollutants reach Kivalina; and 3) it is undisputed that the
20  pollutants are toxic to aquatic life and can cause injury to humans, and thus contribute to the
21  harm alleged here. Declaration of Ken Fucik in Support of Reply Memorandum ("Fucik Reply
22  dec."), attached, at ¶¶16, 8; Moran Reply dec. ¶¶ 27, 49, 55-57.

23       Teck Cominco makes three arguments in its traceability attack: first, that the plaintiffs
24  "refute any causal connection between alleged harms and the alleged violations," Opposition at
25  100; second, that the mere fact that Teck Cominco discharges upstream from Kivalina does not
26  establish causation, Opposition at 103; and third, that "plaintiffs have failed to show any
27  temporal connection between the alleged violations and the alleged harm." Opposition at 106.

28

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment     - 13 -

1  None of these arguments have merit.

2         **1.    Adams establishes a causal connection between the harms alleged and
               the violations.**

3

4         The Adams plaintiffs have provided specific testimony connecting their harms and Teck

   Cominco's violations of its permits. This is evident in each of the plaintiff's declarations filed

5  with the motion. As Enoch Adams, Jr. testifies,

6

7         I used to obtain my drinking water from the Wulik River. I drank water from the Wulik
          River all my life until recently. *I have noticed changes in my drinking water that I
          attribute to Teck Cominco's illegal discharges into the Middle Fork Red Dog Creek,* a
8         tributary to the Wulik River. In particular, I found my drinking water tasted especially
          bad in the summer of 2002. I got tired of the changes in water quality and in 2002 began
9         to haul my own water from the Kivalina River, about six miles away. ....

10        *Because I know that Teck Cominco has been illegally discharging toxic chemicals
          upstream,* I am concerned about the health risks associated with drinking water from the
11        W[u]lik River. ....

12        I have never seen fish that were discolored before the mine started discharging into
          Middle Fork Red Dog Creek. I worry about what will happen to my health if I eat this
13        discolored fish.  After the mine opened, I have to be very careful about what fish I take
          home to make sure I don't take home any fish that are discolored or have sores on them. I
14        attribute these sores to the illegal discharges that are coming from the mine. I also have
          heard stories of deformed fish from other community members. *I attribute these changes
15        in fish migration and availability to Teck Cominco's illegal discharges into Middle Fork
          Red Dog Creek. ....*

16
          [¶] *Because of Teck Cominco's illegal discharges of chemicals* into the Red Dog Creek, I
17        am concerned about the health risks associated with eating contaminated fish.

18  E. Adams dec., ¶¶5-6, 10-11 (emphasis added). Plaintiff Leroy Adams testifies similarly:

19        I get my drinking water from the Wulik River, but I filter and boil the water before I drink
          it.  The filter reduced lead, zinc, and cadmium, but I have been thinking about getting a
20        reverse osmosis system because *I am worried about the safety of drinking water from the
          Wulik River because of the mine's illegal discharges upstream. ....*

21
          Last fall, we got about twenty tubs, and other years, we have caught about fifty tubs. This
22        is not nearly as much as we used to catch. I know that cadmium affects the survival of
          fish eggs. Ninety percent of the fish eggs used to hatch, now about fifty to sixty percent
23        hatch, and I believe it is because of the toxic chemicals the mine is discharging. *I believe
          the mine is negatively affecting fish eggs because of what they are illegally releasing in
24        the water. ....*

25        I also have seen some abnormalities in the fish such as bigger head size and bigger eggs.
          I liken it to an athlete taking steroids and getting bigger and bigger. *I think these changes
26        are because of the chemicals in the water discharged illegally by the Red Dog mine. ....*

27        [A]ll of these changes make me believe that *the illegal discharges from the mine are*

28
   Adams Plaintiffs' Reply Memorandum in
   Support of Motion for Partial Summary Judgment      - 14 -

1     *poisoning the waters and the animals here.* I cannot enjoy my hunting and fishing as
much because I worry about the contamination of this beautiful area.

2

L. Adams dec. ¶¶4, 7, 8, 17 (emphasis added). Plaintiff Andrew Koenig echoes this testimony:

3

4     I have been concerned about the health risks associated with drinking water from the
Wulik River *ever since I found out about the mine's illegal discharges.* I cannot enjoy
my drinking water as much because I worry that it is contaminated.

5

A. Koenig dec., ¶4 (emphasis added). Plaintiff Jerry Norton testifies similarly:

6

7     *Because I know that the Red Dog mine is illegally discharging toxic chemicals, I am
concerned about the health risks associated with drinking water from the Wulik River.*

8     There used to be lots of fish in the Wulik River before the mine opened. I believe the
number of fish in the Wulik River has decreased because of the chemicals discharged into
9     the water at the mine site. The fish that are caught are much larger now than before the
mine opened. *The fish are abnormally large and it concerns me that the fish have
10     changed in size so much since the mine has been illegally discharging its chemicals.*

11     *Because of the illegal discharges from the Red Dog mine, I am concerned about the
health risks associated with eating contaminated fish.* My uncle used to say that the fish
12     will be the first ones to tell you there is something wrong with the water. Since we eat
the fish and drink the water from the Wulik River, I worry that we will be affected by the
13     pollution next.

14     Beluga whales used to come around the port site in the summer. Since the port site
opened, the whales have moved further up the coast. *I think that the lack of beluga
15     whales in the summer is because of the illegal discharges from Teck Cominco's port
site.*[17]

16

17     All these changes I am noticing tell me that the discharges from the mine are
contaminating this beautiful area here. I worry about this pollution when I am out
hunting and fishing, and I cannot enjoy these activities like I did before.

18

J. Norton dec. ¶¶4, 7, 9, 13, 15 (emphasis added). Finally, plaintiff Joseph Swan testifies in a
19

similar vein:
20

21     I used to get my drinking water from the Wulik River, but after my wife had open heart
surgery, I stopped taking my drinking water from the Wulik River. *I have been worried
about the safety of the water ever since I learned about the illegal discharges from the
22     Red Dog mine.* For the last three years, all the water I use at home comes from the
Kivalina River. I am concerned for those who still drink from the Wulik River in the
23     village or when they are out hunting. ....

24

25

26     [17]This testimony directly refutes Teck Cominco's assertion that "where the plaintiffs
complain that beluga whales now pass by the port further offshore, making them harder to hunt,
27     they assert that this change in their migration pattern is due to noise at the port." Opposition at
102.

28

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment    - 15 -

1    Normally, we catch fish right above and below Ikalukrok creek, but my sons are not
finding fish there now.  Also, we used to find the fish lower in the river, and the fish
2    stayed closer to the mouth.  Last year when I fished, we had to go a lot further up the river
to find them.  In the spring of 2002, we did not catch enough fish to dry in June.  *I believe
3    these changes to the fish migration are because of the mine's permit violations.  The
illegal discharges from the mine is the only thing I can think of that would change the
4    pattern of the fish.* ....

5    The Alaska Department of Fish and Game told us the fish are contaminated and that the
contamination goes into the liver.  Fish and Game told us it is alright to eat the fish, just
6    do not eat the liver.  My wife ate a liver and got very sick.  I am also concerned because
we eat all of the fish, including the fish skin.  Nowadays with the sores that are showing
7    up on the fish, I do not want to eat the fish skin and I am worried that it will damage my
health to eat the fish skin. ....

8
I am worried about eating fish that have been in Red Dog Creek.  I have noticed that the
9    fish have gotten big and fat and that the taste of the fish has changed.  I have also noticed
that the whitefish are getting very big.  In my whole life, I have never seen such big
10   whitefish or Dolly Varden.  The heads of all the fish look smaller, but the body looks
bigger than they used to look.  *I believe that these changes in the fish are because of the
11   mine's illegal discharges.  I believe something in the water is making these changes
occur.*[18] ....

12
Because of all these changes, I worry about contamination when I go fishing, and that
13   makes it hard for me to enjoy my time on the river the way I did before.

14   J. Swan dec. ¶¶3, 7, 8, 10, 11.

15       In addition, Teck Cominco is failing to acknowledge the fact that its effluent has shown

16   toxicity at extremely low levels in violation of its NPDES permit.  Fucik Reply dec. ¶16.  The

17   discharge flows into waters that are used by local residents for recreation and fishing.  Teck

18   Cominco's Mark Thompson has testified that the Red Dog discharge travels to Station 1 on the

19   Wulik River, where the citizens of Kivalina get their water.  Thompson depo. at 189:15-190:9;

20   Cole Reply dec. Exhibit 272.  The pollutants discharged by Teck Cominco – TDS, cyanide,

21   cadmium, among others – are toxic to aquatic life with the latter two having potential human

22   health effects.  This toxicity is measured by the WET test.  As plaintiffs' expert Ken Fucik states,

23       Under such circumstances, it would be inadvisable for local residents to recreate or utilize
these waters or eat fish without a complete knowledge of the causes of toxicity in the Red
24

25
[18]This testimony directly refutes Teck Cominco's assertion in its Opposition that when
26   discussing the differences in fish in the Wulik, "they nowhere assert any causal connection to
violative discharges, but instead only speculate that the cause must be 'chemicals and steroids' in
27   the water."  Opposition at 102.
28

1    Dog discharge and that these contaminants had been removed from their water supply. In
demonstrating a toxic discharge in its WET tests, Teck Cominco had a permit obligation
2    to identify the cause of the toxicity and to take steps to remove such toxicants. Not only
has Teck Cominco failed to eliminate the toxicity but it has only been able to identify
3    50% of the cause of the toxicity in their effluent. Teck Cominco's effluent is made up of
potentially dozens of toxicants that can singly or in combination affect the environment
4    and humans. In spite of the fact that Teck Cominco knew its problems with toxicity
extended beyond regulated toxicants, it has not complied with the NPDES requirement to
5    identify and remove the source of the problem.

6   Fucik Reply dec. ¶16; see also Moran Reply dec. ¶¶27, 29, 55, 57-58.

7        In the face of plaintiffs' testimony, Teck Cominco asserts that Adams "must present

8   evidence showing that harms exist 'to a recognizable extent greater than when the discharges of

9   the [defendant] are within the limits of its NPDES permit.'" Opposition at 100, citing *Sierra*

10  *Club of Mississippi v. City of Jackson*, 136 F. Supp. 2d 620, 628 (S.D. Miss. 2001). Here,

11  Adams has done so, although it need not, as *City of Jackson* is contrary to Ninth Circuit case law

12  on this point. The Ninth Circuit, in *Ecological Rights Foundation*, states that the permit

13  provisions of the CWA are "designed precisely to prevent the irreparable environmental

14  degradation of our nation's water before it occurs" so that it "is not necessary for a plaintiff

15  challenging violations of rules designed to reduce the *risk* of pollution to show the presence of

16  *actual* pollution in order to obtain standing." 230 F.3d at 1152-53 (emphasis original). The

17  Court went on to state that requiring plaintiffs to prove environmental harm "rather than an

18  increased risk based on a violation of the statute, misunderstands the nature of environmental

19  harm, and would undermine enforcement of the Clean Water Act." *Id.* at 1151. As *Ecological*

20  *Rights Foundation* makes clear, Adams need not show actual harm. Moreover, Adams need not

21  prove more than an increased risk of harm based on a violation of the statute, which it has done

22  by showing Teck Cominco's discharges in violation of its permit. See also *Mumford Cove Ass'n*

23  *v. Town of Groton*, 640 F. Supp. at 395:

24      Our Court of Appeals has recognized that enforcement of the Clean Water Act does not
depend upon "establish[ing a] correlation between effluent discharges by particular
25      sources and the quality of the body of water into which the effluent flow[s]." *Hooker*
*Chemicals & Plastics Corporation v. Train*, 537 F.2d 620, 623 (2d Cir. 1976) (footnote
26      omitted). Accordingly, this court must reject any argument that the defendant cannot be
found liable under the Clean Water Act absent proof of a direct causal link between the
27      violations of its NPDES permit and the pollution of Fort Hill Brook and Mumford Cove.

28

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment        - 17 -

1     While the Adams plaintiffs have also identified a variety of ways the mine has an impact

2   on their environment that do not involve its illegal discharges, those observations do not discount

3   their repeated testimony tying their harms to Teck Cominco's illegal discharges and other permit

4   violations. Teck Cominco selectively takes portions from plaintiffs' depositions in 2003 in the

5   KRPC case to try to discredit their testimony in 2005 in this case[19]; however, as the testimony

6   excerpted above demonstrates, the Adams plaintiffs have more than established traceability

7   between the harm they allege and Teck Cominco's illegal behavior.

8                   **2.      Teck Cominco admits its discharge reaches Kivalina.**

9     Teck Cominco next asserts that

10      plaintiffs want the court to merely assume that because the Middle Fork Red Dog Creek
        eventually flows into the Main Stem Red Dog Creek, and because the Main Stem Red
11      Dog Creek eventually flows into Ikalukrok Creek, and because Ikalukrok Creek
        eventually flows into the Wulik River, that the allegedly violative discharges are
12      necessarily traceable to Kivalina's drinking water or other uses of the Wulik River in or
        near Kivalina simply because they submitted a declaration that includes a conclusory
13      assertion that water flowing downstream carries chemicals with it.

14   Opposition at 103. Teck Cominco complains that "as a matter of law, no such inference may be

15   drawn where the plaintiffs have offered no actual proof of traceability." Opposition at 103, citing

16   *Friends of the Earth v. Crown Central Petroleum Corp.*, 95 F.3d 358 (5th Cir. 1996). Teck

17   Cominco ignores not only the law, but also the testimony of its own Senior Environmental

18   Coordinator.

19     Under *Crown Central Petroleum*, in the Fifth Circuit courts need not "assume that an

20   injury is fairly traceable to a defendant's conduct solely on the basis of the observation that water

21   runs downstream." *Id.* at 362. Here, however, there is both expert testimony by Dr. Robert

22   Moran, a mining hydrogeologist, that the chemicals discharged by the mine will actually travel

23

24     [19]Teck Cominco claims that plaintiffs "refute any suggestion that discharges in excess of
25   permit levels" caused harm to the ugruk and the shrimp on which they feed, and states "Joe Swan
     asserts that the presence of lead and zinc – *neither of which are at issue in this litigation* – are the
26   causal factors of any perceived population decrease[.]" Opposition at 102 (emphasis added).
     Teck Cominco omits the fact that one of the violations at issue at the Port is for total suspended
27   solids, which *includes* lead and zinc.

28

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment      - 18 -

1    downstream, and there is testimony by Teck Cominco's own Senior Environmental Coordinator

2    Mark Thompson to the identical effect, that TDS from the mine ends up in Kivalina:

3        Q.  Have you looked at the loading of TDS?

4        A.  I had looked at some loading several years ago.  I haven't looked at anything recently.

5        Q.  Tell me about what you found out several years ago.

6        A.  I looked at the loading and the possible increase in TDS at Station 1, which is the
         location where Kivalina acquires their drinking water, and I believe I determined we
7        contribute roughly 20 milligrams per liter TDS to that water from the mine, along those
         lines.  I don't recall the exact numbers.
8        ....

9        **Q.  So some of your TDS is showing up down where Kivalina gets its water?**

10       **A.  Absolutely.**

11   Thompson depo. at 189:15-190:9 (emphasis added).  The TDS limit in the 1998 permit is 196

12   mg/l.  Opposition at 3.  Teck Cominco routinely discharges over 3500 mg/l of TDS, almost 20

13   times the permitted amount.  If Teck Cominco had abided by its permit and discharged only 196

14   mg/l of TDS at Outfall 001, it would markedly reduce the TDS it sent downstream to Kivalina.

15   Moran Reply dec. ¶59.  The TDS levels at Kivalina are about 200 mg/l,[20] meaning that Teck

16   Cominco is contributing roughly 10 percent of the TDS load in Kivalina.  This is TDS that Teck

17   Cominco itself has traced to the mine's discharge of TDS above its permit limit of 196 mg/l.

18       Mark Thompson also testified that cadmium discharged from the mine traveled

19   downstream to Kivalina: "You put a pound of cadmium in a stream, somewhere you're going to

20   have a pound of cadmium downstream eventually.  It's not going anywhere."  Thompson depo. at

21   231:13-17.  As Dr. Moran concludes, "If Kivalina residents take drinking water from the Wulik

22   River, some contaminants discharged by the mine are likely to be in that water.  It is reasonable

23   for the residents to fear the presence of these contaminants in their drinking water."[21]  The proof

24   of traceability is far from a conclusory allegation as Teck Cominco asserts, but is expert

25

26       [20]*See, e.g.*, Exhibit 196 to E. Adams Reply dec., at page two (water quality results for
         Kivalina, Station 1).

27       [21]Moran dec. ¶41.

28

1  testimony and the admission of Teck Cominco's own senior water quality personnel.

2  Teck Cominco points to water quality data, water quality studies, and natural causes to
3  argue that drinking water standards are not being exceeded in Kivalina. Opposition at 104-106.
4  However, Adams need not offer evidence of actual environmental harm to establish that the
5  plaintiff's injury is fairly traceable to the defendant. Because the permit provisions of the Clean
6  Water Act are prophylactic measures "designed precisely to prevent the irreparable
7  environmental degradation of the nation's water before it occurs," the Ninth Circuit in *Ecological*
8  *Rights Foundation* found that the plaintiffs' diminished enjoyment was fairly traceable to the
9  defendants' illegal discharges even where the injury stemmed solely from the plaintiffs'
10 knowledge of the permit violations, with no evidence of actual environmental harm. 230 F.3d at
11 1152-53. Indeed, the Court held, requiring plaintiffs to prove environmental harm "rather than
12 an increased risk based on a violation of the statute, misunderstands the nature of environmental
13 harm, and would undermine enforcement of the Clean Water Act." *Id.* at 1151. Here, the Adams
14 plaintiffs have an increased risk based on Teck Cominco's violations, making their harm
15 traceable to Teck Cominco. As the Ninth Circuit recognized, "it requires no attenuated chain of
16 conjecture" to find that a plaintiff's use and enjoyment of a waterway would be diminished by a
17 defendant's illegal discharge of pollutants. *Id.* at 1152.

18                    **3.    Adams has shown the temporal connection between the violations and
                            the harm alleged.**

19
20 Teck Cominco also asserts that "to the extent that alleged harms predate alleged
   violations, traceability is simply a factual impossibility. Harms that arose prior to April 1999
21
   cannot possibly be traced to violations that had not yet occurred." Opposition at 106. However,
22
   the fact that plaintiffs were concerned about the harm from Teck Cominco's illegal discharges
23
   *before* the time period of this suit does not make the harm from the discharges that took place
24
   *during* the time period of this suit any less traceable to Teck Cominco. Teck Cominco's
25
   assertion misses the big picture here: Teck Cominco's violations of its permits have been going
26
   on for more than 15 years, and its discharges of high levels of TDS took place even before the
27

28
   Adams Plaintiffs' Reply Memorandum in
   Support of Motion for Partial Summary Judgment       - 20 -

1   permit was modified in 1998 to regulate them.  In addition, Adams has repeatedly made the

2   temporal connection between plaintiffs' harms and Teck Cominco's illegal discharges, as Teck

3   Cominco well knows.

            a.      **Teck Cominco violated its permits for more than a decade**
                    **before this litigation commenced.**

5       Prior to the time period of this suit, the United States took action against Teck Cominco

6   for repeated permit violations in *United States v. Cominco Alaska Incorporated*, A97-0267-

7   CV(JKS) (D. Ak., filed July 14, 1997).  The allegations in the Complaint in that case sound

8   surprisingly familiar, as they parallel the allegations here:

            Cominco repeatedly violated the effluent limits contained in the Mine Site Permit.  The
10          discharge monitoring reports (DMRs) submitted by Cominco show that the effluent limits
            were exceeded for zinc daily maximum, zinc monthly average, cadmium daily maximum,
11          cadmium monthly average and pH on numerous occasions from June 1990 through at
            least June 1993.

12
    Complaint, ¶25 (Exhibit 304 to Cole Reply dec.).  This case resulted in a consent decree and a
13
    substantial penalty against Cominco (now Teck Cominco) (Cole Reply dec. ¶110), but similar
14
    violations continue into the time period of this suit.  The fact that plaintiffs were concerned about
15
    Teck Cominco's illegal discharges that predate the time period of this suit – 1999-2003 – does
16
    not mean that their concern cannot continue into the present to include the violations alleged in
17
    this suit.  To read standing law differently would insulate Teck Cominco from all future
18
    violations simply because plaintiffs were concerned about those same illegal discharges earlier.
19
        *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996), relied on by
20
    Teck Cominco, is easily distinguished.  The case involved motorcycle riders who preferred not to
21
    wear helmets (not Clean Water Act plaintiffs), who had been pulled over for violating the helmet
22
    law before a key case interpreting the law had been decided.  *Id.* at 1495.  Because their suit in
23
    part challenged the vagueness of the determination of that key case, the Court found they had not
24
    suffered any injury traceable to the case when they were pulled over before the case was decided.
25
    *Id.*  That is a far different situation from here, where plaintiffs have been harmed by similar
26
    illegal discharges by Teck Cominco since at least 1990, but have sued to address those from
27

28
    Adams Plaintiffs' Reply Memorandum in
    Support of Motion for Partial Summary Judgment        - 21 -

1    1999-2003. Their harm here is traceable to Teck Cominco's *ongoing* illegal conduct – the

2    conduct has not changed, and the harm and Adams's attendant concern has not changed either.

3        The only other case Teck Cominco cites, *Powell Duffryn*, 913 F.2d 64, also supports

4    Adams here, as discussed above in Section II.B on traceability. The fact that plaintiffs were

5    concerned about the harm from Teck Cominco's illegal discharges before the time period of this

6    suit does not make the harm from the discharges that took place during the time period of this

7    suit any less traceable to Teck Cominco.

8                    **b.    Teck Cominco discharged TDS at high levels even before the
                          1998 permit regulated TDS.**

9
10       Teck Cominco's argument also suffers from the logical fallacy that because the plaintiffs

     feared Teck Cominco's TDS discharges into the river before the time period of this suit (1999-
11
     2003) and when TDS was not regulated by the permit, that they cannot continue to fear those
12
     discharges into the time period of the suit. This is obviously not the case, and the plaintiffs'
13
     ongoing concern about the identical activity by Teck Cominco – concerns which may have begun
14
     before the violations began in 1998 – do not make those concerns any less traceable to Teck
15
     Cominco's illegal discharges. Teck Cominco has discharged high levels of TDS since it began
16
     operation. TDS was not included in the original 1985 permit, and permit limitations for TDS
17
     were imposed for the first time in the 1998 permit. Opposition at 2-3; Affidavit of James Kulas
18
     (attached to Opposition), at ¶5; Kulas depo. at 90:8-15. In response to the new TDS limits, Teck
19
     Cominco did not alter its technology in any way, but instead pursued a change in state regulations
20
     and in its permit. Kulas depo. at 91-92. Thus, it was discharging the same levels of TDS before
21
     the 1998 permit as after the 1998 permit. The plaintiffs concerns about the water quality before
22
     the 1998 permit made that TDS discharge illegal are concerns over the same *behavior* –
23
     discharge of TDS into the tributaries of the Wulik – that is the focus on this suit. Adams has
24
     fairly traced plaintiffs' harms to Teck Cominco's illegal activity.
25

26

27

28

1          c.      **The plaintiffs have repeatedly testified about the temporal**
                   **connection between Teck Cominco's illegal discharges and the**
2                  **harms they experience.**

3      As Teck Cominco well knows – having taken all of the deposition testimony recounted

4  below – the Adams plaintiffs have long made the temporal connection between the harms they

5  witness and Teck Cominco's illegal discharges at the mine and port sites.  To illustrate that

6  plaintiffs trace their injuries to the mine's discharges over the time period of this suit, 1999-2003

7  – and to illustrate Teck Cominco's selective recitation of the facts in its Opposition – Adams

8  here quotes extensively from the deposition testimony by plaintiffs.  Plaintiff Jerry Norton

9  testified in 2003 about one of the staple foods of Kivalina residents' diets, the *ugruk*:

10         Q... The ugruk and the shrimp, when did you first start having a harder time getting
           ugruk at the port?
11
           A    It's now.  I mean, you know, it's now.  Like about two, three years now.
12
           Q    About two or three years?
13
           A    Uh-huh.
14
           Q    Before that, you could always get ugruk at the port?
15
           A    Uh-huh.[22]
16
   Plaintiff Enoch Adams, Jr., testified about the change in taste of the water at Kivalina, and how
17
   he associated that with the permit violations reported by Teck Cominco around the same time:
18
           [Q] Now, from your own perception, when have you noticed or been concerned about the
19         taste of the water?

20         A    In 1999, I believe, is when I stopped getting water from the Wulik River in the
           summertime.   ...
21
           Q... So you do not drink any water from the city of Kivalina tank?
22
           A    No.
23
           Q    And you haven't drank any water from the tanks since 1999?
24

25

26
   _____

27         [22]Deposition of Jerry Norton, taken July 9, 2003 at Kivalina, Alaska, at 64:16-24 (Exhibit
   263 to Cole Reply dec.).
28

1    A   Yes.[23]

2          ....

     A   After finding out from the DMRs that there were exceedances that were way above
3    the permit limits, that we became concerned with the health of the river.

4    Q   And when did you become aware of the DMRs reflecting exceedances?

5    A   I believe it was 1999.

6    Q   So is that about the same time that you felt the taste was objectionable?

7    A   Yes.

8    Q   And where did you see a copy of the DMRs, or how do you get the knowledge about
     the DMRs?
9
     A   Copies are sent to the City and the IRA.
10
     Q   And you actually then read the DMRs?
11
     A   Yes.
12
     Q   And do you recall what exceedances were there that were of concern to you?
13
     A   The total dissolved solids were exceedingly high. I believe they were ten times over,
14   at least ten times over. I know it's 190, the permit limit was about 190, and in the DMRs
     they were reporting 1500. These are parts per million.
15
     Q   And what is your understanding as far as what is TDS, what's in it?
16
     A   It's total dissolved solids. It could be the reagents that are used to separate the lead
17   and zinc from the ore.[24]

18   Mr. Adams also testified about a recent shrimp kill that he associates with the port's discharges.

19       [Q] The shrimp kill, when did the shrimp kill happen?

20   A   I believe it happened two years ago.

21   Q   So that would be in 2001?

22   A   Probably 2001.[25]

23   Mr. Adams also mentioned having to travel further to find fish, and not finding as many fish as

24   _____

25   [23]Deposition of Enoch Adams, taken July 8, 2003 at Kivalina, Alaska, at 45:12-16, 20-25
     (Exhibit 264 to Cole Reply dec.).
26
     [24]*Id.* at 52:25-54:8.
27
     [25]*Id.* at 135:2-6.
28

1   usual, in the past several years:

2       [I]n the fall we do seining. On at least two occasions, I've had to go further up than I've
        had to to find fish.

3
        Q   And when were those two occasions?

4
        A   Let's see. The first one was in 1999, and the other one was in 2000.[26]

5

6           ....

        Q... So you're talking about every year since 1998 the numbers have diminished?

7
        A   Yes, have diminished in that area, the area we knew we would find them.[27]

8
    Plaintiff Leroy Adams echoed Enoch Adams' testimony about declines in fish populations:

9
        Q... You state that you caught less fish last fall, in 2002, than in other years; is that

10      correct?

11      A   That's correct.

12      Q   20 tubs versus 50 tubs?

13      A   Yeah.[28]

14  Each plaintiff has testified that he thinks these changes are a result of Teck Cominco's

15  discharges.[29]

16      As Enoch Adams earlier summarized the causal link in his experience between the

17  declining food sources near Kivalina and the mine's illegal discharges,

18      Occurrences like the shrimp kill, the lesser number of fish each year, the harder time
        finding ugruk, the total lack of beluga, these are all new to Kivalina in my experience.

19      Because the major change in our environment has been the opening of the mine, I

20
    ──────────────
21  [26]*Id.* at 84:18-23.

22  [27]*Id.* at 106: 21-24.

23  [28]Deposition of Leroy Adams, taken July 9, 2003, at Kivalina, Alaska, at 19:17-21
    (Exhibit 265 to Cole Reply dec.); *see also* Deposition of Andrew Koenig, taken July 9, 2003 at

24  Kivalina, Alaska, at 17:18-18:2 (less fish in last two years) (Exhibit 266 to Cole Reply dec.).

25  [29]Leroy Adams KRPC dec. , ¶¶15, 16, 19, Exhibit 276 to Cole Reply dec.; Andrew
    Koenig KRPC dec. ¶¶ 17, 18, 19, Exhibit 277 to Cole Reply dec.; Jerry Norton KRPC dec. ¶¶15,
26  16, 18, 19, 20, Exhibit 278 to Cole Reply dec.; Joe Swan KRPC dec. ¶¶15, 17, 18, Exhibit 279 to
    Cole Reply dec.; Enoch Adams KRPC dec. ¶¶13, 14, 19, 21, 22, 23, Exhibit 280 to Cole Reply
27  dec.

28

1  associate them with the mine. While these changes have been happening since the mine
2  opened, I have noticed many of them occurring in the past five years as well. I believe
   these to be at least in part related to the violations of the mine's permit.[30]

3  This considerable testimony linking Teck Cominco's violations with the changes Kivalina

4  residents are experiencing in their water, fish and other resources is more than enough to

5  establish causation. Adams thus meets the second prong of the Article III individual standing

6  test.[31]

7  **C.    The injuries suffered by Adams are redressable by this suit.**

8  The third and final element of the standing test, redressability, focuses on the plaintiff's

9  injury and the judicial relief sought. On summary judgment, a plaintiff must establish that is

10  "likely, as opposed to merely speculative, that the injury will be redressed by a favorable

11  decision." *Laidlaw*, 528 U.S. at 181. Here, Adams seeks declaratory relief, injunctive relief,

12  civil penalties, and costs. Revised Complaint at ¶¶ 3, 8, 9, prayer at ¶¶1-4. This Court has

13  jurisdiction to issue injunctive relief under 33 U.S.C. § 1365(a)(2), to assess any appropriate civil

14  penalties under § 1319(d), and to award costs and attorneys fees under § 1365(d). Each of the

15  forms of relief sought will redress the harms alleged in the complaint.

16  In the face of this argument, Teck Cominco asserts that "plaintiffs have not shown that

17  alleged injuries are redressable" because "they have provided no facts to suggest that any form of

18  relief can or will redress the plaintiff's *[sic]* concerns about water quality." Opposition at 108.

19  Teck Cominco further asserts that

20  Each of the plaintiffs admitted that full compliance by Teck Cominco with all permit
   requirements would not diminish their fears or the underlying pollution levels in the
21  Wulik River over which this litigation is ostensibly concerned.

22  Opposition at 109. Thus, Teck Cominco concludes, "their admissions demonstrate that they

23

24  [30]E. Adams dec. ¶15.

25  [31]The testimony offered by Teck Cominco of other Kivalina residents such as Bert Adams
   or Austin Swan, or local fisher Phil Driver, is not relevant to the inquiry of *plaintiffs'* standing
26  here. Whether or not other Kivalina residents with an economic relationship with Teck Cominco
   have experienced harm has not bearing on this case, as it is plaintiffs' experience and plaintiffs'
27  injury which must meet Article III requirements.

28

1    cannot establish standing in that redressability is lacking." Opposition at 109.

2        Teck Cominco's argument has no merit. First, Adams need not show that the relief

3    sought here would redress the plaintiffs' concerns about water quality, but whether or not the

4    relief sought here would remedy the *violations of the Clean Water Act and Teck Cominco's*

5    *permits that plaintiffs alleged in this suit.* Second, plaintiffs provided ample facts as part of the

6    Motion for Partial Summary Judgment to indicate that injunctive relief, civil penalties and

7    attorneys fees would all redress the plaintiffs' injuries. Third, Teck Cominco has misrepresented

8    the testimony by plaintiffs, testimony that indicates that the claims alleged in this suit are

9    redressable by this Court. Each argument is detailed below.

10           **1.    The harm to plaintiffs – the violations alleged in this suit – are**
                      **redressable by this Court.**

11

12        To demonstrate redressability, Adams need not show that the relief sought here would

     redress all of the plaintiffs' concerns about water quality, as Teck Cominco asserts. The relief
13
     sought here *would* remedy the violations of the Clean Water Act and Teck Cominco's permits
14
     alleged in this suit. An injunction to prohibit future violations, and civil penalties to both
15
     recognize the significant past illegal behavior and deter future illegal actions, would certainly
16
     redress the violations at issue in this suit. This is not speculative, it is the actual testimony of
17
     plaintiffs.[32]
18
          Injunctive relief is commonly held to redress violations that are ongoing or capable of
19
     repetition, as here. *See Gaston Copper*, 204 F.3d at 162 (finding redressability where plaintiffs
20
     seeking injunctive relief allege "'a continuing violation or the imminence of a future violation' of
21
     the statute at issue"). Civil penalties likewise redress violations:
22
              for a plaintiff who is injured or faces the threat of future injury due to illegal conduct
23            ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its
              recurrence provides a form of redress. Civil penalties can fit that description. To the
24            extent that they encourage defendants to discontinue current violations and deter them
              from committing future ones, they afford redress to citizen plaintiffs who are injured or
25            threatened with injury as a consequence of ongoing unlawful conduct.

26    _____

27        [32]E. Adams Reply dec., ¶¶2-3; *see also* Deposition of Andrew Koenig, May 27, 2005, at
     Kivalina, Alaska ("Koenig 2005 depo."), at 15:4, 20:20-21, Exhibit 269 to Cole Reply dec.
28
     Adams Plaintiffs' Reply Memorandum in
     Support of Motion for Partial Summary Judgment        - 27 -

1    *Laidlaw*, 528 U.S. at 185-186; *see also San Francisco Baykeeper v. Tosco Corp.*, 309 F.3d 1153,

2    1159-60 (9th Cir. 2002). As the Supreme Court put it, "a defendant once hit in its pocketbook

3    will surely think twice before polluting again." *Laidlaw,* 528 U.S. at 186. This same reasoning

4    makes the imposition of attorneys fees a deterrent as well. *Cf. Ecological Rights Foundation*,

5    230 F.3d at 1153 (mootness of injunctive relief does not moot civil penalties and attorneys'  fees

6    as they are "effective relief" from Clean Water Act violations).

7                      **2.      Injunctive relief, civil penalties and attorneys fees would all redress
                              the plaintiffs' injuries.**

8

9          In Adams's Opening Brief, plaintiffs set forth at length the harms endured by the

10   individual plaintiffs, harm which they trace to Teck Cominco's illegal discharges. Motion at 6-

11   15. This testimony, combined with the deposition testimony of plaintiffs,[33] amply demonstrates

12   that the violations alleged here are redressable. Teck Cominco's only legal authority – *Solinger*

13   *v. A&M Records*, 586 F.2d 1304, 1309 (9th Circuit 1978) and *Alaska State Snowmobile Ass'n v.*

14   *Babbitt*, 79 F. Supp. 2d 1116, 1127-28 (D. Ak. 1999) – simply stand for the proposition that

15   plaintiffs' allegations of injury must be non-conclusory; Adams does not disagree, and makes

16   allegations that are detailed and specific. *Solinger* is an anti-trust case of little relevance here.

17   586 F.2d at 1309. *Alaska State Snowmobile Ass'n* is easily distinguished: there, this Court, in

18   analyzing the organizational capacity prong of the standing inquiry, found that the declarations

19   offered by defendant-intervenors "allege in a conclusory fashion that the Park Service's decision

20   violates ANILCA, the Wilderness Act, the APA, and NEPA." 79 F. Supp. 2d at 1127. This

21   Court held that the "averments are conclusory, generalized statements which are insufficient to

22   establish standing." *Id.* The declarations and deposition excerpts offered here are qualitatively

23   different from those described in *Alaska Snowmobile*: they are detailed, first-hand accounts of the

24

25          [33]See Deposition of Jerry Norton, May 27, 2005 ("Norton 2005 depo."), Exhibit 268 to
     Cole Reply dec.; Deposition of Andrew Koenig, May 27, 2005 ("Koenig 2005 depo."), Exhibit
26   269 to Cole Reply dec.; Deposition of Leroy Adams, May 6, 2005 ("L. Adams 2005 depo."),
     Exhibit 270 to Cole Reply dec.; Deposition of Joseph Swan, May 4, 2005 ("Swan 2005 depo."),
27   Exhibit 267 tp Cole Reply dec.

28

1    harm plaintiffs are suffering as a result of Teck Cominco's illegal discharges.[34]  Unlike,

2    apparently, the declarations in *Alaska Snowmobile*, the testimony here is also explicit in

3    addressing the redressability question, as detailed in the next section.

4              **3.    Plaintiffs have repeatedly testified that their claims are redressable.**

5              Finally, Teck Cominco attempts, by a string cite to four of plaintiffs' 2003 depositions

6    and one 2005 deposition, to argue that plaintiffs themselves have testified that their harms are not

7    redressable.  Opposition at 109.  Teck Cominco takes plaintiffs' words out of context, and

8    ignores reams of testimony – elicited by Teck Cominco's own lawyers at depositions in 2005 –

9    that the lawsuit was brought to stop the Clean Water Act violations and that stopping such

10   violations would redress the plaintiffs' injuries.

11             It is presumptuous (and patronizing) of Teck Cominco to assert that the relief that the

12   Adams plaintiffs themselves deem appropriate and have requested in this suit – injunctive relief,

13   civil penalties and attorneys fees, as specified by the Clean Water Act – would not redress their

14   injuries.  Nonetheless, this is the crux of Teck Cominco's argument: that giving Adams the relief

15   it requests will not redress Adams's injury.  This assertion is simply incorrect.  Certainly, a great

16   deal of the damage the mine is inflicting on the ecosystem near Kivalina would not be redressed

17   through an injunction, through civil penalties, or attorneys fees.  However, stopping the *illegal*

18   pollution – the 2,309 violations at issue in this case – would redress the plaintiffs' injuries to the

19   extent possible under the Clean Water Act.  As lead plaintiff Enoch Adams testified,

20             The plaintiffs brought this case to stop Teck Cominco's permit violations. We know it
             will not end all the pollution in the Wulik River from Teck Cominco, but stopping the
21           permit violations would be a good start. Stopping the illegal discharges that we allege in
             this lawsuit would stop some of the harm to the environment I have witnessed from Teck
22

23           [34]*See, e.g,* E. Adams dec., ¶¶ 5-6; L. Adams dec., ¶ 4; J. Norton dec., ¶¶ 3-4; J. Swan dec.,
24   ¶¶ 3-4; A. Koenig dec., ¶¶ 3-4.

25           Adams has also suffered "informational injury" here with respect to the monitoring and
     reporting violations, as it has been deprived the information that Teck Cominco is required by
26   statute to publicly disclose through its DMRs – accurate reporting of the actual discharges from
     the mine and port. E. Adams Reply dec., ¶3. *Cf. Alaska State Snowmobile Ass'n*, 79 F. Supp. 2d
27   at 1128; *Federal Election Commission v. Akins*, 524 U.S. 11, 21 (1998).

28

1    Cominco's activities.[35]

2    Further, contrary to Teck Cominco's assertions, plaintiffs are not just concerned about the Wulik

3    River as drinking water; they are concerned about their subsistence lifestyle, and they are

4    concerned with knowing what the mine is discharging into their environment. As Andrew

5    Koenig testifies, "If Teck Cominco abided by the permit limitations established by EPA, I would

6    feel more comfortable about hunting and fishing up the Wulik River."

7        Contrary to Teck Cominco's unsupported assertions, the actual testimony of plaintiffs

8    themselves makes clear that their injuries would be redressed by the injunctive relief and civil

9    penalties they request. Plaintiff Andrew Koenig was redeposed in 2005. Teck Cominco's

10   attorney, asking different questions, tried to get Mr. Koenig to say that plaintiffs' injuries could

11   not be redressed by the suit. However, as the excerpts below make clear, plaintiffs' concerns can

12   be redressed by this Court:

13       Q.  And what do you expect to achieve by filing this lawsuit?

14       A.  I expect to see that they would quit discharging to the river. If they would check their
          discharge to different route **and stop the violations, that's what I'm concerned about.**

15
         Q.  If there were no more violations and they continued to still discharge to the Wulik
16       river, would that still cause you concern?

17       A.  Well, yes. **If they quit violating the discharge, I might -- I believe that would
          give me a little hope.**

18
     Koenig 2005 depo. 8:14-25, Exhibit 269 to Cole Reply dec. A few minutes later, Teck
19
     Cominco's attorney returned to a similar topic:
20
         Q. ... But what I'm asking you, Andrew, here is what, if anything, that you saw as a
21       member of the subsistence committee since July 2003 caused you to believe that you
         should be filing this lawsuit against Teck Cominco?
22
         A.  What made me concerned, why I want to continue with the lawsuit?
23
         Q.  Yes, please.
24
         A.  **I just want them to stop the violation, and if they would do that.** Otherwise,
25       gosh, you know -- you know, the violations that they have done, we did not know about
         that.
26

27       [35]E. Adams Reply dec. ¶¶2-3.

28

1

Koenig 2005 depo. at 14:21-15:8. Then again:

2

    Q.  What do you expect to achieve out of this lawsuit?

3

4

    A.  I just expect to -- **I just expect them to stop the violations**, or why don't they put their drainage -- there is a place where they can do their drainage in the other creek besides the river.

5

Koenig 2005 depo. at 20:18-23. Teck Cominco's attorney returned to the issue again:

6

7

    Q.  Oh, I'm asking you if there is anything else that you can think of that would help address your concerns about the water that Teck Cominco could be doing now.

8

    A.  **Well, if they stopped their violations** and -- or if they move the wastewater to a creek, wouldn't that count better?  Wouldn't that make me feel better if they quit discharging to our river?

9

10

Koenig 2005 depo. at 22:13-20.

11

Plaintiff Jerry Norton testified similarly in his 2005 deposition:

12

    Q.  How, then, do you think that this lawsuit will help, help resolve your concerns?

13

    A.  Well, **just stop the violations**.

14

    Q.  So if the violations stop, would that cause your concerns --

15

    A.  Yeah. Yes. **Just stop the violations**.

16

    Q.  Stop the violations, and then your concerns --

17

    A.  Yeah.

18

    Q.  -- will go away?

19

    A.  It won't go away because it's already in the river, and it won't go away until the mine stops, but it will -- like -- like the elders said, it will take years for it to clean itself up once the mine closes.

20

21

Norton 2005 depo. at 58:13-59:2, Exhibit 268 to Cole Reply dec.  Jerry Norton hits on a key

22

point here, one that Teck Cominco attempts to use against plaintiffs – that their concerns will

23

continue even if the illegal discharge ceases.  This does not make the illegal discharges

24

unredressable, it just means the river may still be dirty even after the illegal discharge stops.

25

Leroy Adams addressed this point in his 2005 deposition:

26

    Q.  Well, do you think -- say, Red Dog wasn't discharging, would you still be concerned about drinking water from the tank?

27

28

1  A. I would have to say yes.

2  Q. And why is that?

3  A. Because it takes the environment -- it doesn't clean itself off real quick like we desire
   it to. It takes a period of time for it to clean up with the poisons that were discharged, for
4  them to be flushed out to the ocean. It will take time.

5  L. Adams 2005 depo. at 37:1-10, Exhibit 270 to Cole Reply dec. Plaintiffs' understanding and

6  experience of the damage Teck Cominco's illegal discharge has done to their environment is

7  more sophisticated and nuanced than Teck Cominco represents. Each plaintiff has testified that

8  he wants the illegal discharges that are the basis for this suit stopped – making the injury here

9  redressable – but the plaintiffs are also understandably wary about the long-term effects of

10  dumping millions of pounds of pollutants into the streams that feed their drinking water source

11  and which provide the habitat for their subsistence resources. Their concern about the long-term

12  effects of pollution does not mean that the relief requested here – an injunction preventing further

13  illegal discharges, and penalties and attorneys fees which would deter future illegal behavior –

14  would not redress the injuries suffered by the plaintiffs. As Enoch Adams says, "I would feel

15  more comfortable hunting and fishing up the Wulik River if I knew that Teck Cominco was not

16  violating its permits. I would have a greater sense of comfort in using subsistence resources if

17  there were no violations. I would also have much more peace of mind if I knew that Teck

18  Cominco was properly monitoring its discharges and accurately reporting those results, as this

19  allows people in Kivalina to understand what is being discharged into their environment."[36]

20  As the harms alleged here – violations of the Clean Water Act – are redressable, Adams

21  has met the third prong of standing requirements. As plaintiffs have suffered an injury in fact,

22  traceable to Teck Cominco's illegal discharges, and redressable through this suit, they have

23  standing and summary judgment on this point should be entered for Adams.

24  **III.  THIS COURT HAS JURISDICTION AS THE VIOLATIONS ARE ONGOING
        AND CAPABLE OF REPETITION.**

25

26  The Clean Water Act authorizes citizen suits against dischargers "alleged to be in

27  ───────────────
   [36]E. Adams Reply dec. ¶3.

28

1  violation" of their permits.  33 U.S.C. § 1365(a)(1).  The Supreme Court has held that federal

2  jurisdiction over such suits is invoked only where citizens can establish "ongoing violations" by

3  showing "a state of either continuous or intermittent violation – that is, a reasonable likelihood

4  that a past polluter will continue to pollute in the future."  *Gwaltney of Smithfield, Ltd. v.*

5  *Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987) (hereafter "*Gwaltney*").

6          Whether a violation is "ongoing" is to be determined as of the date the suit was filed.  *Id.*

7  at 64-65.  The Ninth Circuit, and every other Circuit to address the issue, has held that citizen-

8  plaintiffs may establish ongoing violations by defendants *either*: "(1) by proving violations that

9  continue on or after the date the complaint is filed, or (2) by adducing evidence from which a

10  reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or

11  sporadic violations."  *Sierra Club v. Union Oil Co.,* 853 F.2d 667, 671 (9th Cir. 1988) (hereafter

12  "*Sierra Club II*").  Furthermore, violations "do not cease to be ongoing until the date when there

13  is *no real likelihood of repetition.*" *Id.* (emphasis original).

14          Here, Teck Cominco has admitted almost all of the violations alleged by Adams, but

15  asserts in each case that the violations are not ongoing or capable of repetition.  Despite this

16  litigation posture, the reality is that Teck Cominco has violated its TDS, cyanide, WET,

17  monitoring and reporting and unpermitted discharge permit conditions since this suit was filed,

18  so all the violations in this motion are ongoing.  Because the admissions and the proof of the

19  ongoing violations are closely connected, Adams addresses the ongoing nature of each set of

20  violations in the section below dedicated to that violation.

21  **IV.    A NOTE ON DOCUMENTATION OF THE VIOLATIONS**

22          Adams's case here is based entirely on the discharge monitoring reports (DMRs) and

23  other documents created by Teck Cominco, which Teck Cominco is required to file with the U.S.

24  EPA.  Each of the violations alleged here is based on Teck Cominco's own reporting of a test

25  value exceeding a permitted level in one of its DMRs, or on Teck Cominco's reporting of some

26  other permit violation.  Thus, Teck Cominco cannot genuinely dispute any of the material facts

27  on which Adams moves for summary judgment, as all facts were generated by Teck Cominco

28

1   itself.

2       Teck Cominco has separately moved to strike many of the exhibits Adams relied on in its

3   Partial Motion for Summary Judgment, asserting they were offered in violation of a discovery

4   stipulation and Order.[37]  To cure any perceived defect in those earlier exhibits, Adams offered in

5   Opposition to that Motion authentication of each disputed DMR exhibit by Kivalina IRA Council

6   officials. *See* Declaration of Colleen Swan in Opposition to Motion to Strike (filed November 2,

7   2005) ("Swan Strike dec."), and Declaration of Jerry Norton in Opposition to Motion to Strike

8   (filed November 2, 2005) ("Norton Strike dec.") (also attached as Exhibits 274 and 275 to Cole

9   Reply dec.). Here, Adams offers the original DMR excerpts it offered in support of its Motion

10  for Partial Summary Judgment, with the requisite language from the discovery stipulation and

11  Order. See Cole Reply dec. ¶¶2-62, Exhibits 198-257. Thus, the DMR excerpts which

12  document each of Teck Cominco's violations alleged in the Summary Judgment Motion are

13  admissible here. As the documents are both independently authenticated and authenticated by

14  Teck Cominco itself under the stipulation and Order, there can be no dispute as to their

15  authenticity. (It is important to note for the record that there was never a *factual* dispute as to

16  these documents, simply a dispute as to whether or not they were appropriately before the Court;

17  that legal question can easily be resolved by the Court as part of the summary judgment process.)

18  The DMRs provide an excellent evidentiary foundation for summary judgment.

19      **A.    The DMR excerpts are authenticated by Kivalina IRA Council officials.**

20      Adams has properly authenticated the DMR excerpts. The Kivalina IRA Council

21  officials, including plaintiff Jerry Norton, the president of the IRA Council, to whom Cominco

22  sends the DMRs every month. Norton Strike Dec. ¶3, Exhibit 275 to Cole Reply dec. President

23  Norton is thus in a perfect position to authenticate the DMR excerpts attached to the Motion and

24  to this Reply.  Under Rule 901(b)(1), Mr. Norton's declaration is testimony of a witness with

25

26      [37]Teck Cominco is not prejudiced by the admission of the documents. Each of the documents was produced by Teck Cominco itself and Teck Cominco is free to challenge the
27  accuracy of the documents as produced by Adams in its opposition and to produce a version of the documents it deems accurate.

28

1  knowledge that a matter is what it is claimed to be. Fed. R. Evid. 901(b)(1). This satisfies the

2  requirement of authentication because it is "sufficient to support a finding that the matter in

3  question is what its proponent claims." Fed. R. Evid. 901(a); *see also* Fed. R. Evid. 901(b).

4       The other Kivalina IRA Council official is Tribal Administrator Colleen Swan, who is the

5  records custodian for the IRA Council.[38] Swan Strike dec. ¶4, Exhibit 274 to Cole Reply dec.

6  As records custodian, she was listed (by position) on Adams's witness list and she is also in a

7  perfect position to authenticate the DMR excerpts attached to the Motion and to this Reply.

8  Because Ms. Swan is the records custodian and her declaration does no more than authenticate

9  the documents, Adams did not need to identify Ms. Swan separately and specifically. As records

10  custodian, Ms. Swan is a witness with knowledge under Rule 901(b)(1), and may properly

11  authenticate the documents in question.

12       Because Mr. Norton receives the DMRs from Teck Cominco and because Ms. Swan is

13  the records custodian of them, their testimony is sufficient to support a finding that the

14  documents in question are what Adams claims they are – Teck Cominco's DMRs.

15       **B.**   **Plaintiffs' counsel authenticates the exhibits at issue.**

16       Each of the disputed documents is also re-authenticated here by Adams's counsel, Luke

17  Cole. Each of the DMR excerpts is an admission by a party-opponent, Teck Cominco Alaska

18  Incorporated, and thus is explicitly excluded from being hearsay by Federal Rules of Evidence

19  Rule 801(d), which is titled, "Statements which are not hearsay." Each DMR excerpt offered fits

20  Rule 801(d)(2)'s definition of a statement which is not hearsay on at least four different grounds:

21  each DMR

22        statement is offered against a party and is (A) the party's own statement, in either an
      individual or representative capacity or (B) a statement of which the party has manifested

23        an adoption or belief in its truth, or (C) a statement by a person authorized by the party to

24

25       [38]Adams identified "Any and all witnesses and records custodians necessary for

26  authentication of documents" in plaintiffs' Final Witness List, at ¶15, p. 2 (filed January 10,
2005). As Colleen Swan testifies, "I supervise the Tribal Office where the DMRs are stored. I

27  am the records custodian for such Tribal records." Swan Strike dec. ¶4, Exhibit 274; see also
Norton Strike dec. ¶4, Exhibit 275.

28

1    make a statement concerning the subject, or (D) a statement by the party's agent or
2    servant concerning a matter within the scope of the agency or employment, made during
     the existence of the relationship[.]

3    Here, the DMR excerpts are, without question, Teck Cominco's own statements. It is required

4    by law to make these statements each month. Mine Site Permit Condition II.C, Exhibit 71 to

5    Cole dec. at 36; 40 C.F.R. §122.41(l)(4)(i). Second, Teck Cominco has "manifested an adoption

6    or belief in its truth," by signing the DMR under penalty of law.[39] Third, the person signing the

7    DMR under penalty of law is authorized by Teck Cominco to make the statement.[40] Finally, it is

8    a statement by the party's agent – the particular employee preparing the DMR – in the scope of

9    employment.[41] There is no requirement that the original copy or duplicate of the document be

10   presented in full, as long as an original or duplicate is provided. Further, there is no requirement

11   that the exhibits cannot be excerpts of larger documents. *See* Fed. R. Evid. 1001, 1002, 1003.

12   The DMRs are not hearsay.

13        The DMRs also fall under the "business records" exception to the hearsay rule; they are

14   "records of regularly conducted activity." *See* Fed. R. Evid. 803(6). The exception applies if the

15   documents were made at or near the time from information transmitted by a person with

16   knowledge, were kept in the course of a regularly conducted business activity, and if it was the

17   regular practice of the business to make the document, record, or data compilation, all as shown

18   by the testimony of the custodian or other qualified witness. *Id.* Here, Teck Cominco creates the

19

20        [39]The language Teck Cominco certifies each month includes the following:

21        I certify under penalty of law that this document and all attachments were prepared under
22        my direction or supervision.... Based on my inquiries of the person or persons who
          manage the system, or those persons directly responsible for gathering the information,
23        the information submitted is, to the best of my knowledge and belief, true, accurate and
          complete.
24

25   *See, e.g.,* Exhibit 258 to Cole Reply dec.; Exhibit 11 to Thompson TDS dec. (June 2002 DMR).

26        [40]See Deposition of Mark Thompson ("Thompson depo."), 31:13-17, Exhibit 272 to Cole
     Reply dec.; Deposition of James Kulas 31:6-7, 33:11-12, Exhibit 273 to Cole Reply dec.
27
          [41]See Thompson depo., at 31:22-25, Exhibit 272 to Cole Reply dec.
28

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment         - 36 -

1   DMRs monthly, they are certified by Teck Cominco staff (a "person with knowledge"),[42] and

2   sent to EPA and other government agencies such as the Kivalina IRA Council.[43]  The DMRs are

3   kept by the Kivalina IRA Council in the course of the Council's regular activities, and it was the

4   regular practice of the Council to keep such records.[44]  Therefore, even were the DMRs hearsay,

5   which they are not, they are admissible under an exception to the hearsay rule.

6           **C.    The DMR excerpts are authenticated by Teck Cominco itself.**

7           In the Cole Reply dec., Adams has set forth the full text of the discovery stipulation and

8   Order that pertains to each of the documents used in this Reply to prove Teck Cominco's

9   violations.  Teck Cominco has authenticated each document through that stipulation and Order,

10  and its earlier discovery responses, and the Cole Reply dec. contains all of the conditions Teck

11  Cominco attached to each document.  As the documents are offered in full compliance with the

12  stipulation and Order, they are admissible here.

13  **V.     TECK COMINCO CANNOT IMPEACH ITS OWN DMRS.**

14          Teck Cominco's central strategy with respect to its cyanide, WET and some TDS

15  violations is to claim that its revised DMRs do not demonstrate any violations.  Opposition 40-

16  41, 50-51, 54-55, 57-58, 67-68.  Teck Cominco's assertions are legally and factually incorrect.

17  Because the same legal argument pertains to Teck Cominco's DMR revisions with respect to

18  cyanide, WET and TDS claims, Adams addresses that legal argument here.[45]

19          Teck Cominco's DMR revisions – many years after the original DMRs were filed – are a

20  post-complaint attempt to deny its own earlier admissions.  As such, they are an attack on its own

21  laboratory results and earlier DMR reporting, a form of impeachment expressly disallowed in this

22

23      [42]Thompson depo., at 31:13-17.

24      [43]Swan Strike dec. ¶3.

25      [44]Norton Strike dec. ¶¶3-4, Swan Strike dec. ¶4.

26      [45]While there are no genuine issues of material fact in dispute, Adams does address
27  several factual inaccuracies in Teck Cominco's argument in the individual sections on cyanide,
    WET and TDS below.

28

1    Circuit and by this Court in a previous Order.

2        **A.    The Ninth Circuit does not allow defendants to impeach their DMRs.**

3        In the Ninth Circuit, a discharger is not allowed to escape liability by impeaching its own

4    DMRs during litigation. *Sierra Club I,* 813 F.2d at 1492. The NPDES program "fundamentally

5    relies on self-monitoring." *Id.* at 1491. Allowing the self-monitoring report to be "prima facie

6    rather than conclusive evidence of an exceedence of a permit limitation" would undermine the

7    purposes of the Clean Water Act by creating "considerable risk [for citizen groups] whenever

8    they initiated a citizen enforcement action" and "rewarding permittees for sloppy laboratory

9    practices." *Id.* at 1492. As the *Sierra Club I* Court explicitly stated, "We conclude that when a

10   permittee's reports indicate that the permittee has exceeded permit limitations, the permittee may

11   not impeach its own reports by showing sampling error." *Id.* By revising its DMRs after the

12   filing of the KRPC litigation and this litigation, Teck Cominco cannot wipe away its pre-

13   complaint reports of violations.

14       As a Court explained in *Student Pub. Interest Research v. Georgia-Pacific Corp.,* 615 F.

15   Supp. 1419, 1429 (D.N.J. 1985),

16       It is well established that records required to be kept by law, such as DMRs, may be
         deemed to be admissions for purposes of establishing civil liability. [citation omitted]
17       Such a practice has been approved for reports kept pursuant to the Clean Water Act.
         *United States v. Ward,* 448 U.S. 242, 254 [] (1980). Consequently, there can be no
18       question that the data disclosed in defendant's DMRs may be accepted as true.

19   The Ninth Circuit has held that to allow a defendant discharger to impeach its own self-

20   monitoring reports "would be sanctioning countless additional hours of NPDES litigation and

21   creating new, complicated factual questions for district courts to resolve." *Sierra Club I,* 813

22   F.2d at 1492. As the Court in *Save Our Bays & Beaches v. City and County of Honolulu,* 904 F.

23   Supp. 1098 (D. Haw. 1994) pointed out: "Because these reports are submitted under penalty of

24   perjury, they constitute admissions of noncompliance which bind the defendant in this

25   proceeding." *Id.* at 1138. Accordingly, courts have consistently found that self-monitoring

26   reports "are 'virtually unassailable.'" *United States v. Aluminum Co. of America,* 824 F. Supp.

27   640, 648 (E.D. Tex. 1993).

28

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment      - 38 -

1    In response to the earlier KRPC litigation and this litigation, Teck Cominco made a

2    wholesale set of revisions to its DMRs in 2003 and again in 2005, often "revising" data that had

3    been submitted to EPA more than five years earlier. Cole Reply dec. ¶84. These post-complaint

4    "amendments" are exactly the type of DMR impeachment the Ninth Circuit forbids, as this Court

5    determined in an earlier Order.

6    The revisions are perhaps most brazen in the cyanide context. On May 19, 2005 – long

7    after the close of document discovery in this case – Teck Cominco amended 15 of its DMRs,

8    from June 1999 to September 2002, to show a different monthly average cyanide number in the

9    DMR's table. Thompson Cyanide dec. ¶¶24-25. Teck Cominco revised 15 out of the 16 DMRs

10   that Adams alleged demonstrated a monthly cyanide violation. Cole Reply dec. ¶85. It did not

11   revise any other DMRs at this time except those which demonstrated cyanide monthly violations.

12   Cole Reply dec. ¶86. In late May 2005, after the document discovery cut-off, as Adams was

13   finishing preparing its summary judgment motion, Teck Cominco sent it 15 new revised DMRs,

14   and subsequently refused to stipulate to the use of the 15 earlier DMRs which it had

15   authenticated in the KRPC litigation. Cole Reply dec. ¶87. Because of an earlier oral agreement

16   between the parties to honor the discovery in the KRPC litigation, Adams had not "re-

17   authenticated" these 15 DMRs in this litigation. Cole Reply dec. ¶88.

18   In its Opposition, Teck Cominco states that it has "been employing both the Total and the

19   WAD [cyanide] methods since before 1998" and that thus it can "demonstrate that the actual

20   Total cyanide tests performed were inaccurate." Opposition at 57. It thus argues that *Sierra*

21   *Club I* should be distinguished because the concern there "that a citizen plaintiff should not bear

22   the risk a defendant might attempt to impeach its DMRs after the citizens suit is filed does not

23   apply here." Opposition at 58. According to Teck Cominco, this is so because "plaintiffs well-

24   knew before they had filed their complaint that Teck Cominco disavowed the Total Method and

25   any analytical results using that test during the 1999-2003 time period, and that Teck Cominco's

26   9 ug/l IML was the only enforceable monthly average limit in the permit." Opposition at 58.

27   This argument fails on two grounds. First, as discussed in more detail below in Section VIII, if

28

1  Teck Cominco did not appeal a provision of its 1998 permit when it had that opportunity, it

2  cannot later challenge it in an enforcement action, exactly what it is attempting to do here.[46]  33

3  U.S.C. §1369(b)(2).  Whether or not Teck Cominco "disavowed the Total Method" is irrelevant,

4  as it did not appeal the permit condition requiring the Total Method when that condition was

5  imposed in 1998.  Cole Reply dec. ¶98.  As the Third Circuit has held, "By failing to challenge a

6  permit in an agency proceeding, [Teck Cominco] has lost 'forever the right to do so, even though

7  that action might eventually result in the imposition of severe civil or criminal penalties.'"

8  *Powell Duffryn,* 913 F.2d at 78, *quoting Texas Mun. Power Agency v. EPA,* 836 F.2d 1482,

9  1484-85 (5th Cir. 1988).  Teck Cominco is bound by the Total cyanide method, whether or not it

10  has "disavowed" it, and thus Adams has the right to enforce that section of the permit without

11  facing Teck Cominco's attempts to discredit the permit condition itself.  33 U.S.C. §1369(b)(2).

12  Second, this situation is identical to *Sierra Club I* because Teck Cominco amended its

13  DMRs on cyanide on May 19, 2005, well after this suit was filed in March 2004.  Teck

14  Cominco's assertion that the concern that Adams would "bear the risk a defendant might attempt

15  to impeach its DMRs after the citizens suit is filed does not apply here" is demonstrably false.

16  Adams, proceeding using Teck Cominco's certified DMRs in sending a 60-day notice letter and

17  filing suit, has borne the risk, and Teck Cominco's post-complaint amendment of its DMRs to

18  sanitize them of 15 of the 16 previously reported monthly cynide violations is exactly the type of

19  litigation behavior prohibited by *Sierra Club I.*  813 F.2d at 1492.

20      **B.    This Court has held, in this case, that Teck Cominco may not impeach its
            DMRs through revisions.**

21

        In its October 28, 2005 "Order from Chambers [Re: Motions at Dockets 41 and 52]"

22

23

24      [46]Teck Cominco complains that "the problem was the lack of an EPA analytical method
    to test for free cyanide, the unreliability of the Total Method when used to analyze complex

25  effluents such as at Red Dog, and the lack of EPA guidance on how to report analytical results
    below the MDL or IML.  None of these problems were created by Teck Cominco."  Opposition

26  at 58.  On the contrary: If Teck Cominco believed these to be problems with the permit
    condition, it could have appealed that permit condition.  It did not.  It cannot now be heard to

27  complain; it has created this "problem" for itself.  33 U.S.C. § 1369(b)(2).

28

1    [Docket 104], this Court addressed Teck Cominco's argument that its revised DMR insulated it

2    from an alleged cadmium violation.  Teck Cominco attempted to distinguish the language in

3    *Sierra Club I* from the situation in this case, where Teck Cominco impeached its DMRs by

4    amending them, rather than simply attacking them in litigation.  Teck Cominco had moved for

5    summary judgment on a June 13, 2000 cadmium violation that it had "cleaned up" by revising its

6    DMR years after the fact.  This Court held,

7         Teck's arguments for distinguishing *Sierra Club* are not persuasive.  In essence, they boil
          down to the proposition that Teck does not seek to use sampling error as a defense but
8         rather to use the "correct" DMR to show there was no violation.  Such an approach still
          falls within the reach of the *Sierra Club* rationale.  First, litigating over which of two
9         reports is the "correct" one encourages additional hours of litigation.  In a related way,
          providing Adams' counsel with a second "correct" report on March 7, 2003, did not
10        reduce plaintiff's litigation risk, unless one first posits that the second report must
          necessarily be the correct one.  Third, while it may be that the "sloppy" lab work here was
11        that of CT&E, not Teck or Columbia, CT&E was the contractor chosen by Teck to
          analyze samples for reporting purposes, and so it is not unfair to require Teck to bear the
12        consequences of CT&E's presumed error.  Finally, it may be noted that there is a
          sampling error issue inherent even in the "corrected" DMR, because it recited lab results
13        from CT&E which would show a violation unless they are discredited as erroneous.
          Teck's motion for summary judgment on the June 13, 2000 cadmium claim lacks merit.
14        Application of the rationale in *Sierra Club* to the facts shows that Adams is entitled as a
          matter of law to a determination that there was a cadmium violation on June 13, 2000.
15
     Order at 10.  Teck Cominco cannot now succeed in making the same argument for its other DMR
16
     revisions.
17
          The specific facts of each DMR revision are discussed below.
18
     **VI.    THERE ARE NO DISPUTED ISSUES OF MATERIAL FACT.**
19
          Teck Cominco does not contest any of the relevant facts as set forth in Adams's
20
     "Statement of Relevant Facts," Motion at 20-25, or in its Separate Statement of Undisputed Facts
21
     ("SSUF") filed concurrently.  Teck Cominco does dispute the admissibility of some of Adams's
22
     exhibits, as discussed above in Section III, but this dispute raises only a legal question as to
23
     whether or not the exhibits are admissible, not a factual question precluding summary judgment.
24
     As all of the documents are admissible (see Section IV, above), there are no disputed material
25
     facts.
26
          While Adams disagrees strongly with many of the characterizations of the facts in Teck
27

28
     Adams Plaintiffs' Reply Memorandum in
     Support of Motion for Partial Summary Judgment        - 41 -

1    Cominco's Opposition, and offers the Declarations of Dr. Robert Moran, Ken Fucik and

2    Randolph Fischer as rebuttal to many of those claims, this disagreement does not raise issues of

3    *material* fact. The material facts here are the permit violations, and those Teck Cominco has

4    conceded in its discharge monitoring reports. For the Court's own understanding of the concepts

5    of total dissolved solids, cyanide and whole effluent toxicity, as well as the hydrogeology of

6    mining, Adams commends the declarations of Dr. Moran and Mssrs. Fucik and Fischer to the

7    Court.

8         Teck Cominco has regularly violated and continues to violate its permits, as evidenced by

9    the self-monitoring reports Teck Cominco has itself prepared and submitted to EPA. In the

10   following sections, Adams proves the 1,926 violations of the mine and port permits. As noted in

11   the Motion, these 1,926 violations are a subset of the 2,309 violations alleged in this suit,[47] which

12   are in turn a subset of the more than 4,080 violations admitted by Teck Cominco in its DMRs,

13   and documented by Adams.

14        The Mine Site violations at issue in this Motion include 1,244 violations of Teck

15   Cominco's TDS permit limits, 434 violations of its cyanide permit limits, 212 whole effluent

16   toxicity violations, three unpermitted discharges to the tundra, and five additional monitoring and

17   reporting violations, for a total of 1,898 Mine Site violations. In its Answer, Teck Cominco has

18   admitted to the following 746 violations to its mine site permit: 108 violations of the TDS daily

19   maximum limit, 603 violations of the TDS monthly average discharge limit, one WET daily and

20   31 WET monthly violations, and three unpermitted discharges to the tundra. As there is no

21   disputed issues of material fact with regards to the admitted violations, summary judgment

22   should be entered for Adams. In the previous KRPC litigation, Teck Cominco admitted to the

23   following 349 violations: an additional 329 violations of the TDS daily maximum limit, an

24

25         [47]The remaining violations are the subject of two separate cross-motions for summary
26   judgment: the 40 cadmium claims and the 356 monitoring and reporting claims (filed May 27,
     2005). This Court has decided that there were 40 violations of the cadmium permit limits, but
27   has deferred until trial the issue of whether or not the violations are ongoing or capable of
     repetition. Order of October 28, 2005 [Docket 104].

28

additional 19 violations of the TDS monthly average discharge limit, and one daily WET testing permit violation. Teck Cominco cannot reasonably dispute the 339 Mine Site permit violations that it has already admitted to this Court in the earlier KRPC litigation. Therefore, this Court should enter summary judgment for Adams on these violations as well. [Further, there are two additional Port Site violations that Adams proves here.]

In addition to the 1,095 violations that Teck Cominco has admitted to in this Court, Adams has documented 778 violations that Teck Cominco has conceded to EPA in its letters and monthly Discharge Monitoring Reports. Teck Cominco's representatives are required to certify the accuracy of such reports under penalty of law. Therefore, there is no disputed issue of material fact with regard to these violations and summary judgment should be entered for Adams. As the Ninth Circuit instructs, a Clean Water Act "self-monitoring report is to be considered . . . conclusive evidence of an exceedance of a permit limitation." *Sierra Club I*, 813 F.2d at 1492. Each of these violations are proven, below.

## VI. THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON THE 618 VIOLATIONS OF THE TOTAL DISSOLVED SOLIDS DAILY MAXIMUM PERMIT LIMIT AND THE 618 VIOLATIONS OF THE TDS MONTHLY AVERAGE PERMIT LIMIT.

Because Teck Cominco addresses its daily and monthly TDS permit violations with one set of arguments, Adams here combines its discussion of the 618 daily and 618 monthly TDS permit violations, all of which Teck Cominco admits.[48]

The mine site permit condition I(A)(1) for total dissolved solids ("TDS") in place during the time period covered by this suit (March 1999 - March 2004) specifies a daily maximum discharge of 196 milligrams per liter (mg/l). Although the permit limit is clear and was not changed between its issuance in July 1998 and August 2003, Teck Cominco never complied with this permit condition – Teck Cominco violated this permit condition each and every day it discharged during the relevant time period. Teck Cominco has taken no steps to comply with the

[48]Teck Cominco correctly points out that Adams did not allege the daily or monthly violations in May 1999 in its Complaint, and thus Adams withdraws the four daily and four monthly violations from May 1999.

1   permit condition, either.  See Fischer Reply dec. ¶¶ 35-41.  Teck Cominco itself admits that "the

2   mehtod used by Teck Cominco of adding low TDS waste stream water to the treated effluent

3   prior to discharge has not changed since the EPA first issued an end of pipe limit."  Opposition at

4   29.

5       In its Answer, Teck Cominco admits to 108 violations of the maximum daily TDS

6   discharge.  Answer ¶70.  In addition to the 108 violations admitted in this litigation, Teck

7   Cominco admitted to 329 violations in the KRPC litigation and an additional 181 violations to

8   the U.S. EPA, for a total of 618 violations of the daily maximum discharge of TDS.[49]  These

9   violations were ongoing after March 8, 2004, the date this suit was filed.  Exhibits 84, 85 to Cole

10  dec.

11

12      [49]Teck Cominco violated the daily maximum TDS permit limitation on the following
    dates: June 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26,
13  27, 28, 29, and 30;  July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22,
    23, 24, 25, 26, 27, 28, 29, 30, and 31; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16,
14  17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; September 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,
    11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30;  October 1, 2, 3,
15  4, 5, 6, 7, 8, 9, 10, 11, and 12, 1999; May 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; June 1, 2, 3,
16  4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30;
    July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27,
17  28, 29, 30, and 31; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21,
18  22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; September 1, 2 ,3 ,4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15,
    16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30; October 1, 2, 3, 4, 5, 6, and 7, 2000;
19  May 31; June 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25,
20  26, 27, 28, 29, and 30; July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21,
    22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15,
21  16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; September 1, 6, 13, 14, 15, 16,
    17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30; October 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10,
22  2001; May 26, 27, 28, 29, 30, 31; June 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18,
    19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30; July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,
23  15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; August 1, 2, 3, 4, 5, 6, 7, 8,
24  9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31;
    September 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26,
25  27, 28, 29, and 30; October 1, 2, 3, 4, 5 and 6, 2002; May 9, 10, 11, 12, 13, 14, 15, 25, 26, 27, 29,
    30 and 31; June 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24,
26  25, 26, 27, 28, 29, and 30; July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20,
27  21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and
    14, 2003.

28

1    Mine site permit Condition I(A)(1) for TDS specifies a monthly average discharge limit

2    of 170 mg/l per day. SSUF, ¶27. Teck Cominco admitted in its Answer that it violated the

3    monthly TDS limits in the following months: June 1999, August 1999, September 1999, May

4    2000, June 2000, July 2000, August 2000, September 2000, June 2001, July 2001, August 2001,

5    September 2001, October 2001, May 2002, June 2002, July 2002, August 2002, September 2002,

6    October 2002, May 2003, June 2003, July 2003, and August 2003. Answer ¶73. Further, Teck

7    Cominco conceded in its answer in the KRPC litigation that it violated the TDS monthly average

8    discharge limit in October 1999, October 2000, and May 2001. Therefore, Teck Cominco was in

9    violation every month that it discharged through August 2003.[50]

10   Violations of a monthly average limit mean that the permit was violated on each day the

11   facility discharged in that month. *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield,*

12

13   [50]Teck Cominco violated the monthly average permit limit on the following days: June 1,
     2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29,
14   and 30;  July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25,
     26, 27, 28, 29, 30, and 31; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19,
15   20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; September 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13,
     14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30;  October 1, 2, 3, 4, 5, 6, 7, 8,
16   9, 10, 11, and 12, 1999; May 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; June 1, 2, 3, 4, 5, 6, 7, 8,
     9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30; July 1, 2, 3,
17   4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and
18   31; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26,
     27, 28, 29, 30, and 31; September 1, 2 ,3 ,4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20,
19   21, 22, 23, 24, 25, 26, 27, 28, 29, and 30; October 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10, 2000; May 1, 2,
     3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and
20   30; July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26,
21   27, 28, 29, 30, and 31; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20,
     21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; September 1, 6, 13, 14, 15, 16, 17, 18, 19, 20, 21,
22   22, 23, 24, 25, 26, 27, 28, 29, and 30; October 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10, 2001; May 26, 27,
     28, 29, 30, 31; June 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23,
23   24, 25, 26, 27, 28, 29, and 30; July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19,
24   20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13,
     14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; September 1, 2, 3, 4, 5, 6,
25   7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30;
     October 1, 2, 3, 4, 5 and 6, 2002; May 9, 10, 11, 12, 13, 14, 15, 25, 26, 27, 29, 30 and 31; June 1,
26   2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29,
27   and 30; July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25,
     26, 27, 28, 29, 30, and 31; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and 14, 2003.
28

1    *Ltd.*, 791 F.2d 304, 313-15 (4th Cir. 1986) (for purposes of potential maximum civil penalty

2    under Clean Water Act, each violation of "monthly average" limits on discharge of pollutants

3    into water was equivalent to daily violation for each day of that month). Teck Cominco does not

4    dispute this. Adams has documented 618 violations of the monthly average permit limit. As

5    with the daily TDS violations, these violations were ongoing and continuing after March 8, 2004,

6    the date this suit was filed. Cole dec., Exhibits 84, 85.

7        In the face of its admitted violations, Teck Cominco spends nearly 40 pages of its

8    Opposition (pages 1-40) recounting the history of its TDS permit limitations, but never

9    specifically addresses the violations of the daily maximum permit limit of 196 mg/l or the

10    monthly average permit limit of 170 mg/l.[51] It spends considerable time and energy discussing

11    *in-stream* TDS limits, but does not address the *end-of-pipe* permit violations at issue here. Teck

12    Cominco's only arguments with respect to the end-of-pipe TDS violations are that consideration

13    of all the TDS claims should be stayed pending the issuance of a new permit (Opposition at 12-

14    19, 21-24), that the claims are judicially estopped (Opposition at 19-20), and, obliquely, that the

15    violations are not ongoing (Opposition at 28-29). Since Teck Cominco has not denied the daily

16    or monthly TDS violations, nor disputed any of the facts on these violations set forth by Adams,

17    summary judgment should be entered for Adams on each of the 618 daily violations and 618

18    monthly violations set forth in the Motion. D. Ak. L.R. 7.1(d)(1).

19        Further, none of Teck Cominco's arguments – on regulatory mootness, judicial estoppel,

20    and a lack of ongoing violations – has any merit, as discussed below.

21        **A.    "Regulatory mootness" is not applicable here, where there is not actual
              mootness.**

22

23        As discussed in Adams's Opposition to Motion to Stay Consideration of Cyanide

24    and TDS Violations (filed November 2, 2005), a stay is wholly unwarranted in this case as none

25    of the claims are actually moot, nor would they be even if Teck Cominco received the permit

26        [51]The only section on "TDS at Outfall 001" – the entire focus of the 1,244 TDS violations

27    alleged in this suit – concerns Teck Cominco's discussion of the 3900 mg/l permit limitation in
     the current permit. Opposition at 27-29.

28

1    modification it seeks.

2         Plaintiffs in any suit must maintain a stake in the controversy throughout the duration of a

3    case, so that the injury remains redressable and the case is not mooted.  Under *Gwaltney*, a Clean

4    Water Act lawsuit must be dismissed when the suit is "based solely on violations wholly

5    unconnected to any present or future wrongdoing."  *Gwaltney,* 484 U.S. at 66-67.  However, to

6    show that a suit is wholly unconnected to any present or future wrongdoing, "the defendant must

7    demonstrate that it is '*absolutely clear* that the allegedly wrongful behavior could not reasonably

8    be expected to recur.'" *Id.* at 66 (emphasis in original) (internal citation omitted).  In keeping

9    with this principle, an injury remains redressable so long as the remedy can deter future

10   violations.  *Laidlaw*, 528 U.S. at 173.  "The 'heavy burden of persuading' the court that the

11   challenged conduct cannot reasonably be expected to start up again lies with the party asserting

12   mootness."  *Id.* at 189.  "The *defendant's* burden 'is a heavy one.'" *Gwaltney*, 484 U.S. at 66

13   (emphasis added).  Thus, Teck Cominco, as the defendant, must make it absolutely clear that its

14   violations of permit conditions could not be expected to recur.  Teck Cominco has not met this

15   burden.

16        Teck Cominco fails to meet its heavy burden to prove mootness because it offers no

17   evidence of actual mootness.  Teck Cominco bases its argument for mootness on *anticipated*

18   changes to its permit, and thus it cannot show that its violations are wholly unconnected to any

19   *present* wrongdoing, as required by *Gwaltney*.  It admits that it is presently operating under the

20   1998 permit during grayling season, which is stricter than the "anticipated" permit.  Teck

21   Cominco argues that as of June 15, 2004, the 2003 permit changes regulation from 196 mg/L at

22   Outfall 001 (the 1998 permit limit) to 1500 mg/L at the end of the mixing zone in Red Dog

23   Creek.  Opposition at 21, 22.  This assertion ignores the crucial fact that Teck Cominco *still has*

24   *an end-of-pipe permit limitation* under the 2003 permit, of 3900 mg/L at Outfall 001.  The 196

25   mg/L limit was not changed to in-stream, it was raised to 3900 mg/L.  Since all of the alleged

26   TDS violations are for the *end-of-pipe limit*, the *in-stream limit* is not relevant here.  Moreover,

27   Teck Cominco has violated, and continues to violate, the end-of-pipe limitations under its current

28

1    permit for non-grayling season. Cole Reply dec. ¶112, Exhibit 306. The long list of

2    "infrastructure improvements" and "experience-based procedures" offered as argument of

3    counsel (without a single citation to evidentiary support) at Opposition 22-27 have demonstrably

4    failed to keep Teck Cominco from violating its TDS permit limits. *See, e.g.,* Exhibits 192, 193,

5    194 and 195 to E. Adams Reply dec. (June, July, August and September 2005 DMRs reporting

6    TDS levels in excess of the new 3900 mg/L TDS permit limit). Teck Cominco's assertion that

7    "these procedural and equipment upgrades in conjunction with EPA's relaxation of the TDS

8    permit limits provide substantial evidence that the allegedly wrongful behavior cannot reasonably

9    be expected to recur." Opposition at 27. To put this statement in context, Teck Cominco has

10    violated its new 2003 permit condition for TDS, 3900 mg/L, in every full month that it has

11    discharged from August 2004 through 2005. See Exhibit 84 (August 2004) and Exhibit 85

12    (September 2004) to Cole dec., and Exhibit 192 (June 2005), Exhibit 193 (July 2005), Exhibit

13    194 (August 2005) and Exhibit 195 (September 2005) to E. Adams dec.

14        Indeed, Teck Cominco appears to be flouting its new 3900 mg/L permit limit, as it is

15    consistently discharging above that level when it did not during the time period of 2000-2003, as

16    shown in the following table:

**Maximum TDS Concentrations in mg/L at Outfall 001
as reported in Teck Cominco's DMRs[52]**

|           | 1999  | 2000   | 2001 | 2002   | 2003      | 2004   | 2005   |
|-----------|-------|--------|------|--------|-----------|--------|--------|
| June      | 3260  | 3010   | 3530 | 3500   | 3350      | 3800   | 4124   |
| July      | 3270  | 3140   | 3470 | 3510   | 3720      | 3880   | 4174   |
| August    | 3270  | 3190   | 3350 | 3580   | 3690      | 3950   | 4122   |
| September | 3320  | 3150   | 3410 | 3620   | n.d.[53]  | 3920   | 4030   |
| **Average** | **3280** | **3122.5** | **3440** | **3552.5** | **3586.7** | **3887.5** | **4112.5** |

25        [52] The DMR excerpts that these figures are found in are attached as Exhibits 90-123 to the
26    Cole dec. (2000-2004 DMRs), the Cole Reply dec. (2000-2004 DMRs) and the E. Adams Reply
      dec. (2005 DMRs).

27        [53] There was no discharge from Outfall 001 in September 2003.

28

1    As the table makes clear, Teck Cominco's TDS discharges are going up so that it continues to

2    violate its permit limits even as they are dramatically increased. Teck Cominco admits it has not

3    changed its TDS discharge strategy at Outfall 001 since 1998. Opposition at 29; see also Fischer

4    Reply dec. ¶¶35-41.

5              **1.      Teck Cominco bears the burden of proving mootness.**

6              Teck Cominco asserts that it is the plaintiff that must prove that violations are likely to

7    continue when the alleged mootness is a result of regulatory action. Opposition at 15. It relies

8    for this assertion on an Eighth Circuit case, *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.,*

9    138 F.3d 351 (8th Cir. 1998). However, Ninth Circuit law is clearly to the contrary. The Ninth

10   Circuit has consistently reiterated that the defendant or the "party asserting mootness" has "a

11   heavy burden" to prove mootness. *See, e.g., Chang v. United States*, 327 F.3d 911, 918-19 (9th

12   Cir. 2003); *San Francisco Baykeeper v. Tosco Corp.*, 309 F.3d 1153, 1159 (9th Cir. 2002);

13   *Sierra Club II*, 853 F.2d at 679.

14             Moreover, even *Comfort Lake* does not help Teck Cominco. The facts here are quite

15   unlike the situation in *Comfort Lake*, which concerned a NPDES permit for the construction of a

16   Wal-Mart in Minnesota. In *Comfort Lake*, the Court held that a citizens group's Clean Water Act

17   suit was moot, reasoning that because the building was already constructed, and the permitting

18   authority had terminated the permit and taken enforcement action against the builder, "there is no

19   likelihood that NPDES/SDS Permit violations will recur at the Wal-Mart site." *Id.* at 355. Here,

20   the NPDES permit is still in force (with one provision modified), the discharges are continuing,

21   the violations are recurring, no agency has taken any enforcement action – and a mining expert

22   has testified that the violations can be reasonably expected to occur in the future. Thus, "there is

23   a realistic prospect that the violations alleged in [KRPC's] complaint will continue

24   notwithstanding" the permit modification.[54] In light of Ninth Circuit precedent, because Teck

25

26             [54]*Comfort Lake Ass'n,* 138 F.3d at 355, *quoting Atlantic States Legal Found., Inc. v.

27   Eastman Kodak Co.*, 933 F.2d 124, 127 (2d Cir. 1991). Teck Cominco also cites *Atlantic States*,
     which is entirely inapposite. There, a state agency brought suit after a citizens' group had, and

28

1 Cominco is the party asserting mootness, it must bear the burden of proving mootness, a burden
2 it has not met and cannot meet here.

3                    **2.    Teck Cominco's cases are inapposite.**

4        Teck Cominco presents a flawed reading of the law of mootness.  Teck Cominco claims
5 that a change in regulations altering a defendant's effluent standards or limitations moots the case
6 so that the defendant may avoid injunctive relief and civil penalties.  Opposition at 15.  However,
7 the cases it cites for that proposition are inapposite because 1) they are either from other circuits
8 or unpublished, 2) they are contrary to Ninth Circuit precedent, 3) they are inapplicable to the
9 facts of the case even under Teck Cominco's reading, and 4) they are inaccurately presented by
10 Teck Cominco.

11        First, Teck Cominco supports its argument on the basis of cases from other circuits in
12 spite of contrary precedent in the Ninth Circuit, and the only case it cites from within the Ninth
13 Circuit is an unpublished District Court opinion.  *See* Opposition at 14-16 (citing *Mississippi*
14 *River Revival, Inc. v. City of Minneapolis*, 319 F.3d 1013 (8th Cir. 2003); *Massachusetts Public*
15 *Interest Research Group v. ICI Americas Inc.* ("*MassPIRG*"), 777 F. Supp. 1032 (D. Mass.
16 1991); and *Communities for a Better Environment v. Tosco Refining Co., Inc.,* 2001 U.S. Dist.
17 LEXIS 1161 (N.D. Cal. 2001)).

18        Second, Ninth Circuit precedent establishes that a change in regulations which alters a
19 defendant's effluent standards or limitations is *not* sufficient to moot a case.  In *Northwest Envtl.*

20

21

22 reached an agreement with the polluting company. The Second Circuit reasoned that if "the state
   enforcement proceeding has caused the violations alleged in the citizen suit to cease without any
23 likelihood of recurrence -- we have eliminated the basis for the citizen suit -- we believe that the
   citizen action must be dismissed." *Id.* at 127. As it explained, "Atlantic States may not
24 challenge the terms of the settlement between Kodak and New York State unless there is a
   realistic prospect that the violations alleged in Atlantic States's complaint will continue
25 notwithstanding the settlement." *Id.*  The Court remanded to the District Court to determine if
   there was indeed a realistic prospect of continuing violations. *Id.* at 128. Here, it is uncontested
26 that there is no state enforcement action and there is direct evidence of violations of the higher
   permit limit. See RSSUF ¶11 (no state enforcement action); ¶¶ 109, 110 (violations of higher
27 permit limits).

28

1  *Advocates v. City of Portland*, 56 F.3d 979, 990 (9th Cir. 1995), the Court ruled that claims for

2  attorney fees were not mooted just because the claim was based on alleged violations of an

3  NPDES permit before changes were made to it.  Similarly, in *Ecological Rights Foundation*, 230

4  F.3d at 1153, where defendants claimed that a new NPDES permit adopted after litigation

5  commenced mooted plaintiffs' claims for declaratory and injunctive relief, the Court indicated

6  that civil penalties could still provide effective relief because the defendants were still operating

7  and making discharges.  The Ninth Circuit noted that monetary civil penalties continue to fulfill

8  their general deterrent purpose after the issuance of a new permit by deterring future violations.

9  *Id.*  A later Ninth Circuit case affirmed the *Ecological Rights Foundation* approach.  In *San*

10  *Francisco Baykeeper v. Tosco Corp*, the court wrote that "[p]ostcommencement compliance may

11  moot claims for injunctive relief, but district courts can still impose civil penalties for violations

12  that have already taken place" because "an imposition of civil penalties against Tosco for its

13  pollution at the facility will demonstrate to Ultramar and any future owner that violations at this

14  same facility will be costly."  309 F.3d at 1160.  Teck Cominco's attempt to distinguish

15  *Ecological Rights Foundation* because the new permit in that case was stricter should fail

16  because the rationale behind the *Ecological Rights Foundation* and *San Francisco Baykeeper*

17  applies here:  Teck Cominco will continue operating and making discharges, and civil penalties

18  will continue to fulfill their general deterrent purpose even after the issuance of a new permit by

19  deterring future violations of the new permit terms.  Just because some of the new permit limits

20  are less stringent does not mean that future violations of those limits may not occur; civil

21  penalties would continue to deter any such violations.

22      Third, even under Teck Cominco's reading, the cases that Teck Cominco cites stand for

23  the proposition that civil penalties are rendered moot by an *actual* change in defendants'

24  permits.[55]  Yet, Teck Cominco seeks to establish mootness on the basis of "an *anticipated*

25

26      [55]*Mississippi River Revival, Inc. v. City of Minneapolis*, 319 F.3d at 1015-16 (defendant

27  actually acquired a permit where it did not have a permit before); *MassPIRG*, 777 F. Supp. at
1033 (defendant operating under, and not violating, new permit for 15 months); and

28

1   change" to its permit (Opposition at 15, 18), contrary to the *Gwaltney* rule that a lawsuit is

2   dismissed for mootness only when the suit is "based solely on violations wholly unconnected to

3   any *present* or future wrongdoing." 484 U.S. at 66-67 (emphasis added).

4          Finally, Teck Cominco mischaracterizes the cases it does cite. In *Mississippi River*

5   *Revival*, cited at Opposition at 14-16, the "only violations alleged were the Cities' discharges

6   without a permit. There [wa]s no evidence that discharges without a permit w[ould] resume and

7   overwhelming evidence to the contrary." *Id.* at 1016. There, once a permit issued, the city

8   literally could not be operating without a permit. Here, even after a new permit is issued, Teck

9   Cominco could certainly violate the new permit limits. Indeed, Teck Cominco has and continues

10  to violate the new end of pipe limits that apply to its operations, and has violated the new

11  instream permit limits numerous times when they were Compliance Order limitations. See

12  Section XV, below.

13         Similarly, *MassPIRG* presented a different factual scenario which made it "absolutely

14  clear that the allegedly wrongful behavior could not reasonably be expected to recur." 777 F.

15  Supp. at 1033. In that case, the court stated as follows:

16         There have been no flow violations of the 1990 Permit for the fifteen months in
           which it has been in effect. The last recorded violation which would have
17         constituted a violation of the 1990 Permit occurred in August of 1987, almost four
           and one-half years ago. Given these circumstances, this Court determines that
18         MASSPIRG's claims for flow violations are moot under the standards articulated
           by the Supreme Court in *Gwaltney*.
19
20  777 F. Supp. at 1033. While a relaxation in permit terms *could* help make it clear that violations

21  could not reasonably be expected to recur (as was the case in *MassPIRG* where the permit terms

22  had not been violated since four and one-half years before the new permit terms were imposed),

23  the relaxation of the permit terms does not automatically prove as much, and Teck Cominco must

24  still carry its burden and prove that violations cannot reasonably be expected to recur. Here,

25  however, Teck Cominco has already violated the end-of-pipe limitations of its *new* permit and

26

27  *Communities for a Better Environment v. Tosco Refining Co., Inc.,* 2001 U.S. Dist. LEXIS at *10
    (permit amendments already adopted at time of motion for summary judgment).

28

1   thus cannot show that violations cannot reasonably be expected to recur. "If the same parameter

2   is exceeded [after the Complaint is filed] . . . then the violation will be deemed 'ongoing' and

3   liability will attach." *Sierra Club v. Union Oil Co. of Cal.*, 716 F. Supp. 429, 433 (N.D. Cal.

4   1988).

5       Finally, *Communities for a Better Environment* is not only an unpublished opinion, it also

6   did not turn on a change in permit limits. The Court there concluded, "In sum, the Court finds

7   that Tosco has met its burden to demonstrate that *the post-complaint sale of the refinery and*

8   *transfer of the permit* has rendered moot plaintiffs' citizen suit action." 2001 U.S. Dist. LEXIS

9   1161, at *27.

10      Thus, the cases that Teck Cominco cites for support are inapposite, and Ninth Circuit

11  precedent dictates that Teck Cominco must still meet its "heavy burden" of making it "absolutely

12  clear that the allegedly wrongful behavior could not reasonably be expected to recur," *Gwaltney*,

13  488 U.S. at 66, which it cannot do and has not done. *Ecological Rights Foundation*, 230 F.3d at

14  1153.

15              **3.      Teck Cominco presents no evidence that the allegedly mooting events**
                **have occurred – and cannot, because they are all speculative.**

16

17      Teck Cominco's language itself should defeat its request for a stay:

18      • "At issue here is whether an *anticipated* change to Teck Cominco's NPDES permit...

19  renders plaintiffs' claims for alleged violations moot[.]" Opposition at 15 (emphasis added).

20      • "The *anticipated* NPDES permit, which Teck Cominco *expects* to be issued before the

21  2006 discharge season begins, is *expected* to not only change the point of compliance from the

22  1998 permit..." Opposition at 18 (emphasis added).

23      These statements indicate that the event Teck Cominco is relying on to demonstrate

24  mootness – a permit modification – has not yet happened. Nor is there any evidence that it will

25  happen in the near future. Because there is no actual mootness, Teck Cominco's argument must

26  fail.

27      Further, the facts as alleged by Teck Cominco illustrate the speculative nature of its

28

1    assertions.  Teck Cominco asserts that because the state "is in the process of adopting a

2    Regulation establishing 1500 mg/L as the TDS aquatic life criterion for the Main Stem during

3    grayling spawning.... It is anticipated that EPA will approve this new site-specific criterion and

4    incorporate it in a modified NPDES permit to be issued prior to commencement of the 2006

5    discharge season at Red Dog." Opposition at 9. The "anticipation" that the three actions that

6    have to take place – adoption of the standard by the State of Alaska, approval of that standard by

7    U.S. EPA, and then modification of the permit by U.S. EPA – will take place by May 2006 is

8    highly unrealistic given the history of such regulatory and permit changes. As Teck Cominco

9    points out, the State of Alaska changed the statewide water quality criterion for TDS in *1999*.

10   Opposition at 8.  According to Teck Cominco, "The revised TDS criteria were approved by the

11   EPA *three years later*[.]"[56]  Teck Cominco's permit was not modified to reflect that criterion

12   until July 17, *2003,* another year after that.  Opposition at 8.  Indeed, for the TDS discharge

13   during grayling spawning season – at issue here – the EPA permit still has not been changed.

14   Based on this four-year chronology for just the second two actions, Teck Cominco's unsupported

15   assertions that the state will adopt the criterion, that the EPA will approve that criterion, and the

16   EPA will then modify the permit, all within the next six months, is simply not credible.  It is

17   instructive to note that Teck Cominco's earlier permit expired in 1990 and was not renewed until

18   1998, Opposition at 2, and that Teck Cominco originally "anticipated" that the same

19   modifications it now seeks from EPA were going to be in place "between one and two years"

20   after the *1998* permit was issued.  Opposition at 8; Kulas dec. ¶10.  Teck Cominco's

21   "anticipations" have consistently proven wrong, and are no basis for a finding of mootness.

22          Teck Cominco has not offered any legal or factual support for its newly proposed doctrine

23   of anticipatory mootness.  This Court should enter summary judgment for Adams on the TDS

24   violations.

25

26

27
          [56]Teck Cominco Motion for Stay, at 3 (emphasis added).
28

1

**B.     Judicial estoppel does not apply to this case.**

2     The doctrine of judicial estoppel operates to prevent a party from taking a position

3   incompatible with one the litigant has previously taken. *Rissetto v. Plumbers & Steamfitters*

4   *Local 343*, 94 F.3d 597, 601 603 (9th Cir. 1996). The interested party in the judicial estoppel

5   context is the court itself. *Id.* at 603. Thus, in *Rissetto*, the Court addressed the issue of judicial

6   estoppel because of its concern that it "might constitute 'playing fast and loose with the courts'

7   for plaintiff to claim in 1990 that she was unable to perform her job in order to obtain workers'

8   compensation benefits and to claim now that she was performing her job adequately in order to

9   win damages in this suit." *Id.* at 601.

10     As Teck Cominco observes, "the Ninth Circuit Court has adopted the majority rule that

11   the doctrine of judicial estoppel is applicable only if the court previously adopted the inconsistent

12   position." Opposition at 19, citing *Interstate Fire & Cas. Co. v. Underwriters at Lloyd's*, 139

13   F.3d 1234, 1239 (9th Cir. 1998) and *Donato v. Metropolitan Life Ins. Co.*, 230 B.R. 418, 421

14   (N.D.Cal. 1999). Here, this Court has not adopted Adams's position on the TDS permit

15   violations or the Compliance Orders; they are the subject of this Motion. Thus, under Teck

16   Cominco's own reasoning and cases, judicial estoppel is not applicable here.

17     Even were judicial estoppel available to Teck Cominco, it would not apply in this case.

18   Teck Cominco asserts that plaintiffs' efforts to enforce the terms of both the permit and the

19   Compliance Orders by Consent ("COBCs" or "Compliance Orders") are incompatible positions.

20   Opposition at 20. It cites no legal authority for this position, nor can it. The Compliance Orders

21   and the permit itself impose independent requirements on Teck Cominco, and it must comply

22   with both the Compliance Order and with its permit. As each of the Compliance Orders states,

23   "Nothing in this Modified Order shall be construed to relieve Teck Cominco of the requirements

24   of its NPDES permit or of applicable requirements of federal, state, or local law." See, e.g., May

25   17, 2002 Compliance Order, Exhibit 281 to Cole Reply dec., at 125, ¶23. The Compliance

26   Orders also state that "Violations of, or failure to comply with, the provisions of this Modified

27   Order may subject Teck Cominco to: (1) civil penalties of up to $27,500 per day of violation

28

1    pursuant to Section 309(d) of the Act, 33 U.S.C. § 1319(d), and 40 C.F.R. Part 19[.]" *Id.* at ¶22.

2    Teck Cominco's argument that it cannot be liable for both permit and Compliance Order

3    violations is contradicted by the very language of the Compliance Order; Teck Cominco is bound

4    *both* by the Compliance Orders *and* its permit.  There is no incompatibility between the two.

5         **C.    Teck Cominco's end-of-pipe TDS violations are ongoing.**

6         Teck Cominco continues to violate its end-of-pipe permit limitations for TDS, contrary to

7    Teck Cominco's representations; those violations have taken place since the March 2004 filing

8    of this suit.  Teck Cominco continues to violate both the portion of the 1998 permit still in place

9    (for discharge during Arctic Grayling spawning season), and also the new 2003 TDS permit

10   limits.  Teck Cominco argues that "plaintiffs are without standing to pursue their TDS claims

11   unless they can establish that violations of the TDS limits were ongoing as of March 8, 2004, the

12   date their Complaint was filed."  Opposition at 28.  As it did in the Motion, Adams again

13   demonstrates below that the TDS violations were ongoing as of March 8, 2004.  Further, Teck

14   Cominco has done nothing to lower TDS at Outfall 001 since 1998.  Opposition at 29; Fischer

15   Reply dec. ¶¶36-41.

16        **1.    The violations of the 1998 permit condition were ongoing when this
               suit was filed.**
17
     While the EPA changed Teck Cominco's permit limitations for TDS in the summer of
18
     2003, as a result of KRPC's appeal of that decision the 1998 permit conditions remained in place
19
     until June 15, 2004, when the EPA Appeals Board issued its decision.  Exhibits 79, 80 to Cole
20
     dec.  The Appeals Board remanded one section of the new permit limitations, leaving in place the
21
     1998 permit limits during the spring Arctic Grayling spawning season.  Exhibit 81 to Cole dec.
22
     Teck Cominco continues to violate the 1998 permit limitations for TDS today, as James Kulas,
23
     environmental superintendent of the mine, testified at his deposition on May 31, 2005:
24
               Q.  What permit requirements currently apply to you in terms of TDS during the
25             arctic grayling spawning season?

26             A.  Current permit limits for arctic grayling during the spawning period are the
               permit conditions in the 1998 permit.
27

28

1           Q.  Are you complying with those permit conditions?

2           A.  No, we are not.[57]

3  Kulas's testimony is corroborated by the May 2004 and June 2004 DMRs, which show the daily

4  maximum TDS discharge to be 2870 mg/l in May and 3800 mg/l in June, well above the permit

5  limit of 196 mg/l.  Exhibit 87 to Cole dec. (May 2004 DMR); Exhibits 282 and 294 to Cole

6  Reply dec. (June 2004 DMR).  The monthly averages are similarly way over the 170 mg/l in the

7  permit: 2747 mg/l in May (Exhibit 87) and 3410 mg/l in June (Exhibit 294).  Since the daily

8  maximum and monthly average TDS limits have been violated during grayling spawning season

9  after the filing of the suit, the TDS violations during grayling spawning season are ongoing.

10       Further, since the 1998 permit was in place until June 15, 2004 (Opposition at 9), Teck

11  Cominco violated the 196 mg/l daily maximum and 170 mg/l monthly average limits in that

12  permit during non-spawning season, as well.  Discharge in 2004 began on May 12, 2004.

13  Exhibit 87 to Cole dec. (May 2004 DMR).  Grayling spawning season began on May 25 and was

14  completed on May 31, 2004.  Cole Reply dec. ¶91; Exhibit 283 to Cole Reply dec.  Because the

15  196 mg/l daily maximum and 170 mg/l monthly average applied to the discharges in May 2004

16  before grayling spawning season and in June until June 15,[58] Teck Cominco violated those

17  parameters after the filing of the Complaint in March 2004.  "If the same parameter is exceeded

18  [after the Complaint is filed] . . . then the violation will be deemed 'ongoing' and liability will

19  attach." *Sierra Club v. Union Oil Co. of Cal.*, 716 F. Supp. 429, 433 (N.D. Cal. 1988).

20          **2.**     **Teck Cominco has also violated the new permit limitations for TDS.**

21       Despite having its TDS permit limits raised by a factor of 20, from 196 and 170 mg/l  to

22  3900 mg/l at Outfall 001 (Opposition at 9), Teck Cominco continues to violate its permit for

23  TDS.  Teck Cominco reported violations of the 3900 mg/L limit in both August and September

24

25       [57]Deposition of James Kulas ("Kulas depo."), 178:21-179:4, Exhibit 82 to Cole dec.

26       [58]Opposition at 21 ("the TDS limits under the 1998 permit, 196 mg/L (daily maximum)

27  and 170 mg/L (monthly average) remained as a default until the EAB issued its decision.  The
2003 permit modifications became effective on June 14, 2004.").

28

1   2004 and nearly every month of 2005.[59]  Exhibits 84 (August DMR excerpt) and 85 (September

2   DMR excerpt) to Cole dec.; Exhibits 192, 193, 194, 195 to E. Adams Reply dec.  Teck

3   Cominco's TDS violations are ongoing.

4         **D.**    **This Court should enter summary judgment for Adams on all TDS**

                **violations.**

5

6         Because none of Teck Cominco's arguments have any merit, summary judgment should

7   be entered for Adams on each of the 622 daily TDS violations and each of the 622 monthly

average TDS violations.

8

  **VII.**   **THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON**

9               **THE 16 VIOLATIONS OF THE CYANIDE DAILY MAXIMUM LIMIT.**

10        Adams moved for summary judgment on 16 daily cyanide violations, and demonstrated

11  that the cyanide violations were ongoing.  Of these 16 violations, Teck Cominco does not dispute

12  the 11 violations of May 25, 2000; May 29, 2000; June 13, 2000; June 24, 2000; June 14, 2001;

13  June 18, 2001; July 22, 2001; July 30, 2001; August 16, 2001; August 27, 2001; and June 10,

14  2002.  *See* Opposition at 55-57 (disputing the other five daily violations); Local Rule 7.1(d)(1).[60]

15  Because the daily cyanide violations are ongoing (as explained in Section VII.D, below) and are

16  not moot (see Section VII.E), summary judgment should be entered for Adams on each of these

17

---

18      [59]Teck Cominco complains that the 3900 mg/l permit limit "is neither a technology-based

19  nor a water-based limitation" and thus, in Teck Cominco's postulation, is somehow improper.
Opposition at 10, n.5.  However, "Teck Cominco did not appeal the 3900 mg/L limit for Outfall

20  001."  Opposition at 11.  It cannot now attack that limitation.  Because Teck Cominco did not
appeal the permit condition, the Clean Water Act precludes Teck Cominco from now attacking it

21  in this enforcement action.  Under 33 U.S.C. §1369(b)(2), an "Action of the Administrator with
respect to which review could have been obtained under [§1369(b)(1)] shall not be subject to

22  judicial review in any civil or criminal proceeding for enforcement."  If Teck Cominco believed
that the TDS permit limit was improper, as it now asserts (Opposition at 10-11), the time and

23  place to raise that was in an appeal of that permit condition when the permit was issued.  As the
Third Circuit has held, "By failing to challenge a permit in an agency proceeding, [Teck

24  Cominco] has lost 'forever the right to do so, even though that action might eventually result in

25  the imposition of severe civil or criminal penalties.'"  *Powell Duffryn,* 913 F.2d at 78, *quoting
Texas Mun. Power Agency v. EPA,* 836 F.2d at 1484-85.

26

27      [60]Teck Cominco disputes the use of several of the DMRs on which these 11 violations are
based; as explained above, all of the DMRs cited to here are admissible.

28

1   11 violations. In addition, summary judgment should be entered for Adams on four of the five

2   remaining violations, as the undisputed facts show test results over the 9.0 ug/l permit limit on

3   each of the four days, as detailed below.[61]

4   **A.    The June 2000 DMR proves the June 10, 2000 violation.**

5   Teck Cominco's entire argument regarding the June 10, 2000 violation is:

6   On May 19, 2005 Teck Cominco submitted an amended DMR Table for June 2000
    showing two cyanide permit violations for that month, however, the amended DMR
7   shows no violation of the daily maximum cyanide limit on June 10, 2000. A split sample
    taken that date demonstrated compliance[.]

8
    Opposition at 55.[62] Teck Cominco's argument fails both legally and factually. Legally, as is
9
    discussed at greater length in Section V above, Teck Cominco cannot impeach its own DMRs.
10
    The DMR "amendment" at issue here is particularly egregious: it took place on May 19, 2005,
11
    more than a year after Adams filed this suit and almost *five years* to the month after Teck
12
    Cominco filed the DMR it sought to amend. Such post-complaint "revisions" are not allowed in
13
    the Ninth Circuit. *Sierra Club I,* 813 F.2d at 1492.
14
15   Factually, the June 2000 DMR, which has not been disputed by Teck Cominco, states
    clearly:
16
    Outfall 001 samples collected on June 10, 13, 24, and 29 were analyzed by CT&E
17   analytical laboratory to contain 12 ppb (μg/L), 10 ppb, 19 ppb, and 7 ppb (parts per
    billion) total cyanide respectively.... Samples collected on June 10, 13, and 24 exceed the
18   daily maximum limit and all of the samples exceed the monthly average.

19   Exhibit 128 to Cole dec. Additionally, Teck Cominco reported to EPA on July 17, 2000 that

20   "Samples collected from Outfall 001 on June 10 and June 24 exceeded the maximum daily

21   concentration limit of 9 parts per billion (μg/L) for total cyanide." Exhibit 129 to Cole dec.;

22   Exhibit 220 to Cole Reply dec.

23   Although Teck Cominco asserts "a split sample taken that date demonstrated

24   compliance" (Opposition at 55), Teck Cominco is not allowed, under the explicit terms of its

25   _____

26   [61]Adams withdraws the allegation of the violation on May 22, 1999.

27   [62]The two cyanide violations in June 2000 it admits (Opposition at 55) are presumably
    those of June 13 and June 24.
28

1    permit, to pick and choose among split sample results for compliance or reporting. Permit

2    Condition II.D of the 1998 permit (in effect during June 2000), states,

3         If the permittee monitors any pollutant more frequently than required by this permit... *the*
         *results of this monitoring shall be included in the calculation and reporting of the data*
4         *submitted in the DMR.*

5    Exhibit 70 to Cole dec. (emphasis added); this page also included as Exhibit 289 to Cole Reply

6    dec.   Thus, all of Teck Cominco's split samples must be "included in the calculation and

7    reporting of the data" and Teck Cominco cannot, five years after the fact, amend its DMR to

8    remove the offending test.  The Court in *United States v. City of Toledo*, 867 F. Supp. 598 (N.D.

9    Ohio 1994) faced a similar situation, and ruled against the defendant who offered the "split

10   sample" defense:

11        Even where concurrently obtained samples from other testing devices showed different
         values, it is appropriate, in the Court's view, to accept the reported values as the accurate
12        value....  Where a permittee gathers inconsistent data, it should resolve any inconsistency
         as soon as possible. If it does not do so, and reports a higher value, it should not be heard
13        later to dispute the accuracy of its own work and reports.

14   *Id.* at 602.  Teck Cominco's *post hoc* DMR revisions do not rise to the level of a genuine issue of

15   material fact.  Summary judgment for Adams should be entered on the June 10, 2000 cyanide

16   daily violation.

17        **B.      The August 2001 DMR proves the August 13 and August 20, 2001 violations.**

18        Teck Cominco admits the violations on August 13 and August 20, 2001 in its Opposition:

19   "CT&E reported 17 μg/L in the August 13, 2001 sample and 21 μg/L in the August 20, 2001

20   sample[.]" Opposition at 56.  This admission echoes its own August 2001 DMR, which reports in

21   a table the results of the CAS and CT&E cyanide analyses: for August 13, CT&E reports 17

22   μg/L, with a duplicate sample testing at 13 μg/L, while for August 20, CT&E reports 21 μg/L.

23   Exhibit 134 (at 2 of 3) to Cole dec.; Exhibit 225 to Cole Reply dec.  Teck Cominco makes the

24   same admission in the Thompson Cyanide dec., at ¶20.[63]

25

26        [63]While Teck Cominco represents that "Attached as Exhibit 1 to Mr. Thompson's (CN)

27   Affidavit filed with this Opposition, is a true and correct copy of the section of the DMR for
     August 2001, as it existed prior to the submittal to EPA of the May 19, 2005 revised DMR, in

28

1      Teck Cominco excuses these exceedances with the claim that Mark Thompson had been

2  informed that it was okay to report the lower of the two numbers from split samples that were

3  taken on those dates. Opposition at 56. Mr. Thompson testified at deposition that he had been

4  told this orally by an EPA staffer sometime in 2001 and that there is no written record of this

5  advice from EPA. Thompson depo. at 123:9-11, Exhibit 272 to Cole Reply dec. This informal

6  conversation with EPA cannot trump the plain requirements of the permit, which state,

7          If the permittee monitors any pollutant more frequently than required by this permit... the
           results of this monitoring shall be included in the calculation and reporting of the data
8          submitted in the DMR.

9  Exhibit 70 to Cole dec.; this page also included as Exhibit 289 to Cole Reply dec. Teck

10  Cominco is bound by the actual cyanide test results, which it reported to EPA in the August 2001

11  DMR.

12      Teck Cominco concludes that "the court should find that a genuine issue of material fact

13  exists as to whether there was any exceedance of the 9 µg/L daily limit on either August 13 or

14  August 20, 2001." Opposition at 56. Here, there is no genuine issue of material fact: Teck

15  Cominco does not deny that CT&E reported cyanide results above Teck Cominco's permit limits

16  for August 13 and 20, 2001, and that Teck Cominco reported these results to EPA in its DMR.

17  The only dispute is the legal question as to whether or not Teck Cominco can impeach its own

18  DMRs in this litigation, and the Ninth Circuit settled that question long ago. *Sierra Club I*, 813

19  F.2d at 1492. This Court can easily resolve this legal dispute. Summary judgment should be

20  entered for Adams on the August 13 and 20, 2001 daily cyanide violations.

21      **C.      The September 2002 DMR proves the September 30, 2002 violation.**

22      Teck Cominco admits the September 30, 2002 violation in its Opposition: for a series of

23

24  ────────────────────────────────

25  which the results of the cyanide analyses required under the NPDES permit are reported to EPA."
    Opposition at 56. However, the pages Teck Cominco offers *exclude* the two pages on which it
26  actually reported the cyanide results to EPA – page two of the narrative, and the cyanide analysis
    chart. See Exhibit 134 to Cole dec., pages 1 and 2 of 3; Exhibit 225 to Cole Reply dec., pages 1
27  and 2 of 3. Teck Cominco has tried to sanitize its August 2001 DMR for this Court; the full
    DMR itself proves the violations.
28

1  20 samples collected on that date, it states, the total cyanide "analytical results reported by the

2  labs varied from 'non-detect' to 37 µg/L." Opposition at 57; Thompson Cyanide dec. ¶21. The

3  September 2002 DMR has a table of the results of the 20 split samples. For those samples tested

4  at the CAS lab, five of the ten samples tested over the cyanide daily permit limit of 9 µg/L, with

5  test results of 25, 10, 27, 10 and 37 µg/L; the *average* of the 10 tests was 12 µg/L. For those

6  tested by the CT&E lab, nine of the ten tests were over the cyanide daily permit limit, with

7  results of 28, 16, 23, 17, 24, 31, 22, 27 and 30 µg/L, and an *average* of 22 µg/L, *more than twice*

8  *the permit limit*. Exhibit 136 to Cole dec.; Exhibit 227 to Cole Reply dec. Because both labs had

9  at least one test that showed compliance, Teck Cominco reported itself in compliance for the

10  month, although 15 out of the 20 test results demonstrated non-compliance. Based on its own

11  permit (Condition II.D), Teck Cominco cannot pick and choose the results it likes best and ignore

12  the rest. Teck Cominco does not dispute the other test results, and thus there is no genuine issue

13  of material fact concerning the September 2002 violation and summary judgment should be

14  entered for Adams on this violation.

15  **D.    The daily cyanide permit violations were ongoing when this suit was filed.**

16  Teck Cominco disputes that the cyanide violations are ongoing. Opposition at 40, 46-50.

17  In its Opposition, however, Teck Cominco states plainly that a "split sample for September 19,

18  2004 was analyzed by ACZ at 17 µg/L total cyanide[.]" Opposition at 48. Further, the

19  "analytical results for September 26, 2004 include a Total cyanide analysis of 12.4 µg/L from

20  NCA, above the maximum cyanide limit of 9 µg/L." Opposition at 49, citing to the September

21  2004 DMR, Exhibit 2 to Thompson Cyanide dec.; see also Exhibit 85 to Cole dec. (DMR table

22  demonstrating violations).

23  In the face of these admissions, in its DMR and in its Opposition, Teck Cominco asserts

24  "Plaintiffs have failed to meet their burden of showing that there is competent evidence of an

25  ongoing violation of the daily maximum cyanide limit in the 1998 permit." Opposition at 49. In

26  a bold but internally contradictory assertion, Teck Cominco states, "there were samples on two

27  days of the month in which a number was reported from a lab above the 9 µg/L cyanide daily

28

1   maximum permit limit, but these results do not demonstrate any violations." Opposition at 48.

2   To make this argument Teck Cominco must both ignore the plain language of its permit, in two

3   ways, and also ignore relevant caselaw.

4           First, Permit Condition I(A)(1) limits cyanide to a daily maximum concentration of 9.0

5   parts per billion (ppb). SSUF, ¶¶28, 65. Teck Cominco does not dispute this. Second, the

6   permit requires that,

7           If the permittee monitors any pollutant more frequently than required by this permit... the
            results of this monitoring shall be included in the calculation and reporting of the data
8           submitted in the DMR.

9   Permit Condition II.D, Exhibit 71 to Cole dec., at 37 (modified permit in effect in September

10  2004); this page also included as Exhibit 289 to Cole Reply dec. Here, Teck Cominco clearly

11  reported cyanide levels in the DMR that were in excess of its permit limits. It does not dispute

12  this, either. Opposition at 48-49. This is an ongoing violation under *Gwaltney*, 484 U.S. at 57,

13  as the violations took place after the filing of this suit; *see also Sierra Club v. Union Oil Co. of*

14  *Cal.*, 716 F. Supp. 429, 433 (N.D. Cal. 1988).

15          To maintain that its September DMR should be ignored, Teck Cominco seeks to impeach

16  the results of the laboratories that undertook the analyses that indicate violations through

17  declarations of its consultants and staff. First, it tries to impeach the September 19 ACZ results

18  as an "aberration." Opposition at 48. Where two pages before Teck Cominco praised its new

19  commercial laboratory, North Creek Analytical (NCA) as "able to achieve more reliable results,"

20  Opposition at 47, it then discards NCA's September 26, 2004 results without explanation,

21  preferring ACZ's results for that test. Opposition at 49. This type of picking and choosing of

22  test results not only violates Permit Condition II.D, above, but Teck Cominco's attempts to

23  impeach its own DMRs are also not allowed in the Ninth Circuit. As that Court explicitly states,

24  "We conclude that when a permittee's reports indicate that the permittee has exceeded permit

25  limitations, the permittee may not impeach its own reports by showing sampling error." *Sierra*

26  *Club I*, 813 F.2d at 1492. Teck Cominco reported two separate violations of the cyanide daily

27  standard, measured by two separate labs, in September 2004, long after this suit was filed. Its

28

1    cyanide daily violations are ongoing. "If the same parameter is exceeded [after the Complaint is

2    filed] . . . then the violation will be deemed 'ongoing' and liability will attach." *Sierra Club v.*

3    *Union Oil Co. of Cal.*, 716 F. Supp. 429, 433 (N.D. Cal. 1988).

4              **E.    The cyanide violations are not moot.**

5              Teck Cominco reprises its regulatory mootness argument in the cyanide context, as well.

6    Opposition at 45-46. For the same reasons that its TDS violations are not moot – namely, that

7    the permit limitations *presently in place* have been violated since the filing of this suit – the

8    cyanide violations are not moot. Teck Cominco's assertions are based on the Affidavit of Luke

9    Boles, which Adams has moved to strike as Boles was not disclosed as a witness in this case by

10   Teck Cominco. CITE. However, even if Boles testimony were admitted, the testimony of a low-

11   level state staffer has no bearing on what the federal EPA may do to Teck Cominco's permit, and

12   when they may do it. All of the claimed events that Teck Cominco claims would moot the

13   cyanide claims it concedes have not happened. Teck Cominco's compliance with the WAD

14   cyanide standards is irrelevant to this suit, which is enforcing the presently-active Total Cyanide

15   permit limitations.

16   **VIII.  THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON
         THE 418 VIOLATIONS OF THE CYANIDE MONTHLY AVERAGE LIMIT.**

17

18            Adams demonstrated in its Motion that Teck Cominco had violated the monthly average

19   cyanide limit of 4.0 ppb in the 16 months of June 1999, July 1999, August 1999, September

     1999, May 2000, June 2000, July 2000, September 2000, October 2000, June 2001, July 2001,
20
     August 2001, September 2001, May 2002, June 2002, September 2002. Violations of a monthly
21
     average limit mean that the permit was violated on each day the facility discharged in that month.
22
     *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 791 F.2d at 313-15. As these
23
     violations are ongoing, this Court should enter summary judgment on all 418 monthly average
24
     violations for Adams.[64]
25

26            [64]This includes violations on the following days: June 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,

27   13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30; July 1, 2, 3, 4, 5, 6, 7, 8,
     9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; August
28

1    Teck Cominco admits nine of these violations, for May 2000. Opposition at 50. It

2    disputes the remaining 15 months of monthly average cyanide violations, totaling 408 violations,

3    for the months of June 1999, July 1999, August 1999, September 1999, June 2000, July 2000,

4    September 2000, October 2000, June 2001, July 2001, August 2001, September 2001, May 2002

5    and September 2002. In the KRPC litigation, Teck Cominco conceded the monthly average

6    violations in June 2000; it now denies those violations.[65] Teck Cominco makes only one

7    argument: that in each of these months, although its monthly average cyanide analytical results

8    were above 4 µg/L, they were below the "interim minimum level" of 9 µg/L. Opposition at 50.

9         **A.    The IML defense is contrary to the law.**

10    Teck Cominco's argument must fail for four reasons: because the permit limits cyanide

11    discharge to a monthly average of 4.0 µg/L, because Teck Cominco concedes in its Opposition

12    that its discharge has been over 4.0 µg/L in each month at issue, because the Clean Water Act

13    precludes challenging permit conditions in enforcement actions, and because the express

14    language of the permit itself requires Teck Cominco to comply with all of its provisions. The

15    Court should grant Adams's motion for summary judgment for all of the monthly cyanide

16

17    1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29,
     30, and 31; September 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23,
18    24, 25, 26, 27, 28, 29, and 30, 1999; May 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31; June 1, 2, 3,
     4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30;
19    July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27,
     28, 29, 30, and 31; September 1, 2, 3 ,4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21,
20    22, 23, 24, 25, 26, 27, 28, 29, and 30; October 1, 2, 3, 4, 5, 6, and 7, 2000; June 1, 2, 3, 4, 5, 6, 7,
     8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30; July 1, 2,
21    3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30,
22    and 31; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24,
     25, 26, 27, 28, 29, 30, and 31; September 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18,
23    19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30, 2001; May 26, 27, 28, 29, 30, and 31; June 1, 2,
24    3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and
     30; September 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25,
25    26, 27, 28, 29, and 30, 2002.

26         [65]See Exhibit 290 to Cole Reply dec., Teck Cominco's Opposition to KRPC's Motion for
27    Summary Judgment (filed September 3, 2003 in KRPC v. Teck Cominco, A02-231) (hereafter
     "Teck KRPC Opposition"), at pages 55-57 (not including challenge to June 2000 violations).

28

1   violations.

2          Teck Cominco's mine permit, found at Exhibit 70 to Cole dec., addresses monthly

3   cyanide discharges in three places. First, at I.A.1 on page 7 (000007) of Exhibit 70, the monthly

4   average that Teck Cominco must meet is 4.0 µg/L. Next, the permit requires, at I.A.5.b, that, "at

5   a minimum, analytical methods should achieve the following method detection limits... Cyanide,

6   total, 3 µg/L." Exhibit 70, page 8-9 (000008-09). Later in the permit, at I.A.5.d, it states,

7   "Effluent limits for cyanide, mercury and selenium are not quantifiable using EPA approved

8   analytical methods. EPA will use the following Interim Minimum Levels as the compliance

9   evaluation level for these parameters." Exhibit 70 at 9 (000009). There, it lists the Interim

10  Minimum Level as 9 µg/L. *Id.* The permit also has a provision, III.A, which requires that Teck

11  Cominco "comply with all conditions of this permit."

12         Teck Cominco's argument to escape liability is based on a reading of the permit which

13  would effectively read three of the permit limitations – I.A.1, I.A.5.b and III.A – out of the

14  permit. In a nutshell, Teck Cominco argues that because EPA set a separate level for EPA to

15  monitor compliance with the permit, Teck Cominco does not have to comply with the earlier

16  permit limitation found in condition I.A.1, that of 4.0 µg/L. Opposition at 51-52. It then asserts

17  that although it has reported violations of the cyanide monthly average permit limit of 4.0 µg/L in

18  all the months at issue – June 1999, July 1999, August 1999, September 1999, June 2000, July

19  2000, September 2000, October 2000, June 2001, July 2001, August 2001, September 2001, May

20  2002 and September 2002 – it should be allowed to impeach those DMRs because of what it

21  called in the KRPC litigation a "transcription error"[66] – that the 4.0 µg/L permit limit that it

22  reported in every DMR table for the months in question should actually be 9.0 µg/L, as in the

23  revised DMRs. Opposition at 54. It takes this tack despite reporting to EPA in its DMRs,

24  repeatedly over the years, statements such as "the [cyanide] average for the month is above the

25

26  _____

27         [66]See Exhibit 290 to Cole Reply dec., Teck Cominco's Opposition in the KRPC case, at
    57.

28

1  | monthly limit of 4.0 ppb." September 1999 DMR, Exhibit 140; Exhibit 229 to Cole Reply dec.[67]

2  |      Teck Cominco's argument fails on four grounds. First, under *Sierra Club*, 813 F.2d at

3  | 1492, Teck Cominco may not impeach its certified DMRs as a litigation defense. It strains

4  | credulity for Teck Cominco to assert that its engineers and managers overlooked a "transcription

5  | error" when they were reporting – under penalty of law – violations of Teck Cominco's monthly

6  | cyanide limitations over the four calendar years 1999, 2000, 2001 and 2002. This Court should

7  | reject Teck Cominco's attempts to impeach its own sworn admissions in the DMRs, particularly

8  | when that impeachment comes in amendments to the DMRs dated May 19, *2005* – in some cases

9  | almost six years after Teck Cominco filed the DMRs in question with EPA, and more than a year

10 | into this lawsuit.

11 |      Second, under the express language of the Clean Water Act, Teck Cominco is precluded

12 | from attacking one of its permit conditions in this enforcement action. The relevant section, 33

13 | U.S.C. §1369(b)(2), states that an "Action of the Administrator with respect to which review

14 | could have been obtained under [§1369(b)(1)] shall not be subject to judicial review in any civil

15 | or criminal proceeding for enforcement." Section 1369(b)(1) is the part of the U.S. Code

16 | allowing a permittee to appeal a permit granted by the EPA [check cite an rewrite for accuracy].

17 | If Teck Cominco believed that "any laboratory analytical result below 9 μg/L would not be

18 | competent evidence of the concentration, if any, of Total cyanide in the sample and should not be

19 | used to determine compliance," as it now asserts (Opposition at 53), the time and place to raise

20 | that was in an appeal of permit condition I.A.1 and permit condition I.A.5.b when the permit was

21 | issued. Teck Cominco did not appeal the cyanide permit limitations under §1369(b)(1).[68] As the

---

[67]See also June 2001 DMR ("the average of all of the monthly samples exceeded the monthly average"), Exhibit 131; July 2001 DMR ("the average of all of the monthly samples exceeded the monthly average limit"), Exhibit 133; June 2002 ("the actual monthly average exceeded the monthly average permit limit for total cyanide of 4 ppb"), Exhibit 113, Exhibit 258.

[68]Cole Reply dec. ¶98. In response to KRPC's Requests for Admission 223, Teck Cominco admitted that it had not challenged any of the conditions in its mine site permit. Cole Reply dec. Exhibit 291.

1  Third Circuit has held, "By failing to challenge a permit in an agency proceeding, [Teck

2  Cominco] has lost 'forever the right to do so, even though that action might eventually result in

3  the imposition of severe civil or criminal penalties.'" *Powell Duffryn,* 913 F.2d at 78, *quoting*

4  *Texas Mun. Power Agency v. EPA,* 836 F.2d at 1484-85.

5       Third, under the direct terms of the permit itself, the permit must be read to harmonize its

6  conditions, rather than nullify them. Permit Condition III.A is entitled "Duty to Comply." It

7  reads,

8       The Permittee *must* comply with *all* conditions of this permit. Any permit
         noncompliance constitutes a violation of the Act and is grounds for enforcement action;
9        for permit termination, revocation and reissuance, or modification; or for denial of a
         permit renewal application.[69]

10  To harmonize the permit, one would have to give all three substantive provisions – the permit

11  limit of 4.0 µg/L of I.A.1, the method detection limit of 3.0 µg/L required by I.A.%.b and the

12  Interim Minimum Level of 9 µg/L of I.A.5.d – effect. Adams's reading of the permit is that Teck

13  Cominco must comply with the 4.0 µg/L limit of I.A.1, and it must use an analytical method that

14  achieves a method detection limits of 3 µg/L under I.A.5.b, but that EPA would not enforce the

15  permit unless Teck Cominco violated the higher 9 µg/L limit of I.A.5.d. EPA described 9 µg/L

16  as the "compliance evaluation level" for these parameters." Exhibit 70 at 9 (000009). Nothing

17  in Section I.A.5.d allows Teck Cominco to ignore the plain language of sections I.A.1, I.A.5.b

18  and III.A, however: like a Compliance Order by Consent, permit condition I.A.5.d is only a tacit

19  agreement between Teck Cominco and EPA that EPA will not enforce the lower permit limit.

20  That agreement does not preclude another party, such as Adams or the State of Alaska, from

21  enforcing the lower permit level found in I.A.1; *see, e.g,* permit condition III.A. While Teck

22  Cominco asserts that *Sierra Club v. Chevron U.S.A., Inc.*[70] and *Powell Duffryn*[71] preclude Adams

23  from bringing suit where EPA cannot (Opposition at 52), those cases, which concerned the

25  [69]Exhibit 70 at 39 (emphasis added).

26  [70]834 F.2d 1517, 1522 (9th Cir. 1987).

27  [71]913 F.2d at 74.

1   choice of a statute of limitations, are not applicable here, though their general policy language

2   supports Adams. This is not a situation where EPA *cannot* enforce the permit limitation; this is a

3   situation where EPA has agreed not to enforce the permit limitation. As with the Compliance

4   Orders by Consent, it has voluntarily waived its opportunity to enforce I.A.1. Adams, however

5   (or, for that matter, the State of Alaska), is free to enforce the other permit limitations without

6   running afoul of *Powell Duffryn* or *Sierra Club v. Chevron*. As the Ninth Circuit explained in

7   *Sierra Club v. Chevron*, "A citizen plaintiff, when bringing an enforcement action, *supplements*

8   the enforcement power of the EPA." 834 F.2d at 1522 (emphasis added); *see also Powell*

9   *Duffryn*, 913 F.2d at 74, 75 (citizens act as an adjunct, and a supplement to, government

10  enforcement actions). Here, while EPA has chosen not to enforce the permit limitation (indeed,

11  EPA has not even chosen to enforce the violations of the higher 9 μg/L permit condition), Adams

12  has. To harmonize the permits conditions, Adams must have the right to enforce condition I.A.1.

13  Teck Cominco's reading of the permit, by contrast, would nullify condition I.A.1, condition

14  I.A.5.b and condition III.A.

15      Fourth, the Clean Water Act is a strict liability statute. Teck Cominco's permit is clear: it

16  must meet the 4.0 μg/L standard. Exhibit 70 to Cole dec., at Condition I.A.1. Teck Cominco's

17  Opposition is also clear in admitting that Teck Cominco did not meet that limit in June 1999,

18  July 1999, August 1999, September 1999, June 2000, July 2000, September 2000, October 2000,

19  June 2001, July 2001, August 2001, September 2001, May 2002 and September 2002.

20  Opposition at 50-51 (table).

21      Teck Cominco's long explanation of the reasons behind permit condition I.A.5.d make

22  for interesting reading, but it does not excuse Teck Cominco from complying with the clear

23  permit limitation expressed in I.A.1 and the method detection limit set forth in I.A.5.b. *See*

24  condition III.A ("permittee must comply with all conditions of this permit"). While Teck

25  Cominco asserts that to enforce permit condition I.A.1 (and presumably I.A.5.b) "would not only

26  go against the general evidentiary requirements pertaining to the use of scientific evidence but

27  EPA's exercise of its authority to set analytical standards and methods using competent science,"

28

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment    - 69 -

1    Opposition at 53-54, this assertion ignores the fact that *EPA itself* set the permit limit in I.A.1, set

2    the method detection limit requirement of 3.0 µg/L in I.A.5.b, and included the mandatory duty

3    to comply with *all* permit conditions found in III.A. Teck Cominco cannot now avoid liability

4    for a permit limit it candidly admits it routinely violated.

5            Teck Cominco's challenge to its mine site permit, and its impeachment of its own DMRs

6    over a six-year period, ignores Ninth Circuit case law in *Sierra Club*, which disallows

7    impeachment of certified DMRs; it ignores the Clean Water Act, 33 U.S.C. §1369(b)(2), which

8    precludes challenging a permit condition in an enforcement action; it ignores the express

9    language of the permit itself, in condition III.A, which requires compliance with all provisions of

10   the permit, and in condition I.A.5.b, which requires using a method detection limit of 3.0 µg/L;

11   and it ignores the fact that the Clean Water Act is a strict liability statute and Teck Cominco has

12   admitted numerous monthly cyanide violations. This Court should thus enter summary judgment

13   for Adams on the monthly cyanide violations for June 1999, July 1999, August 1999, September

14   1999, June 2000, July 2000, September 2000, October 2000, June 2001, July 2001, August 2001,

15   September 2001, May 2002 and September 2002.

16           **B.    Teck Cominco violated even the Interim Minimum Level on 91 occasions.**

17           Even under Teck Cominco's theory of the monthly average violations, it has violated its

18   permit on 91 occasions, during the months of June 2000, August 2001 and September 2002. In

19   each of these months, Teck Cominco's DMRs demonstrate that the monthly average was above

20   even the IML of 9.0 µg/L.

21           **1.    The June 2000 DMR proves the monthly violations of the IML.**

22           The June 2000 DMR, which has not been disputed by Teck Cominco, states:

23           Outfall 001 samples collected on June 10, 13, 24, and 29 were analyzed by CT&E
             analytical laboratory to contain 12 ppb (µg/L), 10 ppb, 19 ppb, and 7 ppb (parts per
24           billion) total cyanide respectively.... Samples collected on June 10, 13, and 24 exceed the
             daily maximum limit and all of the samples exceed the monthly average. CAS analysis of
25           split samples from June 10 and 13 resulted in total cyanide concentrations of 8 ppb and
             13 ppb respectively.
26
     Exhibit 128 to Cole dec. Averaging these values (12, 10, 19, 7, 8 and 13) yields a monthly
27

28

1   average of 11.5 µg/L, over the IML of 9.0 ug.l. The DMR table for June 2000 shows the average

2   monthly cyanide reported at 12 µg/L. Exhibit 128; *see also* Opposition at 50 (table listing June

3   2000 average as 12). Even if the Court adopts Teck Cominco's theory of the monthly cyanide

4   violations, there is no disputed issue of material fact here: Teck Cominco violated the monthly

5   average in June 2000 and this Court should enter the 30 violations for June 2000.

6           **2.**      **The August 2001 DMR proves the monthly violations of the IML.**

7        The August 2001 DMR contains a Table which shows the results of the cyanide analyses

8   at Outfall 001 for that month. Exhibit 134; Exhibit 225 to Cole Reply dec. The chart lists the

9   results of nine tests taken on six dates, four tests by CAS and five tests by CT&E (including one

10  "duplicate" test). The CAS results are 6, 5, 4 and 5 µg/L; the CT&E tests are 17, 13

11  ("duplicate"), 13, 21 and 20 µg/L. The average of all nine tests (104÷9) is 11.55 µg/L. Leaving

12  out the highest of the values for the duplicate test (17 µg/L on 8/13/2001), the average of the

13  eight remaining values (87÷8) is 10.875 µg/L. Either way, the monthly average of the tests

14  taken is over the 9.0 IML and thus this Court should enter summary judgment for Adams on the

15  31 violations for August 2001.

16          **3.**      **The September 2002 DMR proves the monthly violations of the IML.**

17       The September 2002 DMR has a table of the results of the 20 split samples. For those

18  samples tested at the CAS lab, five of the ten samples tested over the cyanide daily permit limit

19  of 9 µg/L, with test results of 25, 10, 27, 10 and 37 µg/L; the average of the 10 tests was 12 µg/L.

20  For those tested by the CT&E lab, nine of the ten tests were over the cyanide daily permit limit,

21  with results of 28, 16, 23, 17, 24, 31, 22, 27 and 30 µg/L, and an average of 22 µg/L, more than

22  twice the permit limit. Exhibit 136 to Cole dec.; Exhibit 227 to Cole Reply dec. The average of

23  all 20 samples is 17 µg/L, nearly double the 9.0 IML, and this Court should enter summary

24  judgment for Adams on the 30 violations for September 2002.

25          **C.**      **The daily cyanide permit violations were ongoing when this suit was filed.**

26       Teck Cominco disputes that the cyanide violations are ongoing. Opposition at 40, 46-50.

27  The September 2004 DMR reveals otherwise, however. In that DMR there is a table reporting

28

    Adams Plaintiffs' Reply Memorandum in
    Support of Motion for Partial Summary Judgment    - 71 -

1   the results of cyanide analyses conducted on five different dates by two labs, ACZ and NCA.

2   Exhibit 2 to Thompson Cyanide dec.; also Exhibit 85 to Cole dec.  The results it reports are as

3   follows:

4

| Date | Lab | Total CN ($\mu$g/L) |
|------|-----|---------------------|
| 9-10-2004 | NCA | 2.58 |
| 9-19-2004 | ACZ | 17.0 |
|           | NCA | 3.18 |
| 9-21-2004 | ACZ | <3.0 |
|           | NCA | 1.36 |
| 9-22-2004 | ACZ | <3.0 |
|           | NCA | 2.65 |
| 9-26-2004 | ACZ | 7.0 |
|           | NCA | 12.4 |

13  Exhibit 85; Exhibit 2 to Thompson Cyanide dec.  Taking the average of all of these values

14  (converting "<3" to zero to be conservative) yields a value of 5.13 $\mu$g/L, over the permit limit of

15  4.0 $\mu$g/L.  Taking just the NCA values yields an average of 4.434 $\mu$g/L, over the permit limit;

16  taking just the ACZ values, with "<3" taken as 0, yields an average of 6.0 $\mu$g/L.  Teck Cominco's

17  monthly cyanide violations are thus ongoing, because "[i]f the same parameter is exceeded [after

18  the Complaint is filed] . . . then the violation will be deemed 'ongoing' and liability will attach."

19  *Sierra Club v. Union Oil Co. of Cal.*, 716 F. Supp. 429, 433 (N.D. Cal. 1988).

20          Because Teck Cominco's own DMRs prove 418 monthly average cyanide violations, and

21  because those violations were ongoing when this suit was filed, this Court should enter summary

22  judgment for Adams on all 418 monthly average cyanide violations.

23          **D.      The monthly cyanide violations are not moot.**

24          For the reasons set forth in Section  (on regulatory mootness in the TDS context) and in

25  Section VII.E (on cyanide), Teck Cominco's cyanide violations are not moot.

26

27

28

1   **IX.  THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON
2        THE FOUR VIOLATIONS OF THE WHOLE EFFLUENT TOXICITY
         REPORTING REQUIREMENTS.**

3          Adams's Motion pointed out that the mine site permit requires that the results for WET

4   tests of effluent and ambient waters be reported in the DMR for the month in which the tests

5   were conducted. It also pointed out that Teck Cominco's own DMRs, and letters to the EPA,

6   show that Teck Cominco violated its WET reporting requirements on four occasions: August

7   1999 (Outfall 001, Station 9 and Station 12), and August 2001 (Outfall 001). Motion at 29-30

8          For the August 1999 violations, Teck Cominco does not dispute these facts – indeed, it

9   does not even address the allegations; in the one section of its Opposition titled "WET Test

10  Reporting" (at 61-62), it does not discuss the violations at all. It thus concedes the WET

11  reporting violations. *See* D. Ak. L.R. 7.1(d)(1). Further, Attachment 3 to the Affidavit of Mark

12  Thompson Regarding WET Claims attached to the Opposition ("Thompson WET dec."), the

13  August 1999 DMR, states that "there are no valid [WET] test results included in the August

14  DMR." Exhibit 292 to Cole Reply dec.

15         Teck Cominco challenges the August 2001 WET reporting violation, asserting that

16  Adams has "not provided any facts supporting this assertion." The August 2001 WET reporting

17  violation is evident in the DMR itself, Exhibit 146 to the Motion and Exhibit 234 to Cole Reply

18  dec., which demonstrates that although Teck Cominco is required to take a 24-hour composite

19  sample, it reported the results of a *grab* sample for WET at Outfall 001. As discussed in Adams'

20  M&R Cross Motion (at 13-14) a grab sample is different from a composite sample. The 24-hour

21  composite sample required by the permit is a more stringent testing method; it even requires a

22  special sampling and compositing machine.[72] Teck Cominco offers no material fact to contradict

23  the information it plainly reports in the DMR, and thus there is no disputed issue of material fact

24  as to the August 2001 violation.

25         Teck Cominco next asserts that its WET reporting violations were not ongoing when

26

27

         [72]Thompson depo. at 155-156, Exhibit 272 to Cole Reply dec.

28

1    plaintiffs filed their complaint on March 8, 2004.  Opposition at 64.  However, Teck Cominco

2    has committed this identical type of reporting violation more than once since the filing of this

3    lawsuit: Teck Cominco is required to conduct composite samples of TDS and hardness.

4    However, in the May 2004 DMR it reported results of a grab sample for TDS.[73]  In the June

5    2004, Teck Cominco again reports that it took a grab sample rather than the required composite

6    sample, this time for hardness.  Exhibit 294 to Cole Reply dec.  Thus, Teck Cominco has

7    committed identical reporting violations after the filing of this lawsuit.  None of the steps Teck

8    Cominco has taken since 1999, as it asserts in the Opposition at 64-65, have addressed this

9    failure to accurately report the testing it is undertaking.  Fucik Reply dec. ¶15.  Thus, the

10   violations are ongoing.  *See Carr v. Alta Verde, Indus.,* 931 F.2d 1055, 1065 n. 12 (5th Cir. 1991)

11   ("proof of an actual violation subsequent to the complaint is conclusive").

12          Because Teck Cominco has conceded the three 1999 WET reporting violations and not

13   offered any material facts to contradict its own admission of the fourth violation in the August

14   2001 DMR, and because Teck Cominco's reporting violations are ongoing, summary judgment

15   should be entered for Adams on each WET reporting violation: August 1999 (Outfall 001,

16   Station 9, Station 12), and August 2001 (Outfall 001).

17   **X.    THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON
18          THE NINE VIOLATIONS OF THE WHOLE EFFLUENT TOXICITY DAILY
            MAXIMUM PERMIT LIMIT.**

19          The mine permit specifies that WET may not exceed a daily maximum of 12.2 toxicity

20   units (TUc).  Thompson WET dec. ¶15.  The Motion documents that Teck Cominco violated the

21   daily maximum WET permit limit nine times: in May 1999, June 1999, July 1999 (twice),

22   August 2000, August 2001, August 2002 and September 2002 (twice).  Teck Cominco admitted

23   to the August 2001 violation in this litigation.  Answer, ¶93.  In the previous litigation, Teck

24   Cominco admitted to one of the two violations in July 1999 (the test initiated on July 13).  In

25   _____

26          [73]Teck Cominco's Monitoring and Reporting Opposition at 11, attached as Exhibit 293 to
     Cole Reply dec.  Teck Cominco's excuse is that it actually took both a grab and the required
27   composite samples.  *Id.*  However, it *reported* taking a grab sample, which is a *reporting*
     violation identical to the WET reporting violation at issue here.

28

1    addition to those admissions, Teck Cominco admitted to the EPA that it violated the WET daily

2    limit on seven other occasions, for a total of nine violations of the WET daily limit.

3            In the face of these violations, Teck Cominco makes three arguments: 1) that there is a

4    genuine issue of material fact as to whether or not the WET violations were ongoing at the time

5    of the filing of the Complaint; 2) that the claims are not supported by admissible evidence; and 3)

6    that some of the claims did not actually occur.  Opposition at 58-68.  Each of these arguments is

7    specious.

8    **A.       Teck Cominco's daily Whole Effluent Toxicity (WET) violations are ongoing.**

9            Teck Cominco reported a WET result in excess of its WET permit limit in August 2004,

10   after the March 2004 filing of this suit.  Exhibit 84 to Cole dec.; Exhibit 1 to Thompson WET

11   dec.  Teck Cominco's daily maximum WET permit limit is 12.2 TUc.  Thompson WET dec. ¶15.

12   Teck Cominco's CH2M Hill laboratory results for the WET analysis begun on August 3, 2004

13   were 13.6 TUc, more than 10 percent over its permit limit of 12.2 TUc.[74]  Exhibit 84 to Cole

14   dec.; Exhibit 1 to Thompson WET dec.  The daily WET violations are thus ongoing.  "If the

15   same parameter is exceeded [after the Complaint is filed] . . . then the violation will be deemed

16   'ongoing' and liability will attach."  *Sierra Club v. Union Oil Co. of Cal.*, 716 F. Supp. 429, 433

17   (N.D. Cal. 1988).

---

19           [74]Teck Cominco asserts that

20           Although the CH2M Hill WET results may look 10% higher than the WET limit when
21           reported as Tuc's, someone who actually understands WET testing would realize that the
             WET result reported by CH2M, even if it was correct, only represented a 1% increase in
22           toxicity over the toxicity allowed by the permit.

23   Opposition at 66, citing to Brix dec. at ¶14.  Examining Mr. Brix's actual testimony reveals that
24   the difference is much larger: Brix states that the "differences between the CH2M Hill test results
     and the daily maximum WET limit when viewed in terms of the IC25, represents less than a 3%
25   difference. (100/9.7 = 10.3 compared with 100/13.6 = 7.4)".  Brix dec. ¶14.  However, while the
     difference in Mr. Brix's calculation is indeed about three percentage points, what Adams is
26   commenting on here is that even under Brix's version, 10.3 is more than *30 percent* higher than
27   7.4.  This does not raise an issue of disputed fact, however, as even Mr. Brix concedes that the
     value is above the maximum daily permit limit.  The violations are thus ongoing.
28

1    Despite this DMR report, Teck Cominco asserts that there is a "genuine issue of material

2    fact whether the alleged WET violations were ongoing at the time of the filing of plaintiffs'

3    complaint." Opposition at 59. It attempts to create an issue of fact, stating "there have been no

4    reported WET violations using the new dilution series began." *[sic]* Opposition at 60. This

5    assertion is contradicted by its own August 2004 DMR, submitted to EPA under penalty of law,

6    which reported such a violation. Exhibit 295 to Cole Reply dec. (excerpt of Exhibit 1 to

7    Thompson WET dec. filed by Teck Cominco October 3, 2005). It is also contradicted by its own

8    Opposition (at 65): "In the narrative portion of the [August 2004] DMR, Teck Cominco notes

9    that a split of this sample was analyzed by CH2M Hill at 13.6 TUc. The daily maximum WET

10   permit limit is 12.2 TUc." *See also* Thompson WET dec. at ¶15 (same admission).

11   There is no genuine issue of material fact: Teck Cominco admits that test results showed

12   a value above its WET permit limits (Opposition at 65), and it reported that value to EPA.

13   Exhibit 295. To get around this violation, Teck Cominco again seeks to impeach its own DMR,

14   using the declarations of its consultant Kevin Brix and its employee Mark Thompson, who both

15   opine that there was not a violation even when one was reported. Such a tactic is not permitted

16   in the Ninth Circuit, however: a discharger is not allowed to escape liability by impeaching its

17   own DMRs during litigation. *Sierra Club I,* 813 F.2d at 1492. Allowing the self-monitoring

18   report to be "prima facie rather than conclusive evidence of an exceedence of a permit limitation"

19   would undermine the purposes of the Clean Water Act, creating "considerable risk [for citizen

20   groups] whenever they initiated a citizen enforcement action" and "rewarding permittees for

21   sloppy laboratory practices." *Id.* at 1492-1493. Teck Cominco's post-complaint explanations and

22   rationalizations cannot impeach its August 2004 DMR report of a violation of the daily WET

23   standard, and thus the WET violations are ongoing.[75]

24

25       [75]In this section, Teck Cominco also challenges the credentials and testimony of Dr.
     Robert Moran, stating that Dr. Moran "does not state his qualifications or analysis that supports
26   his conclusion." Opposition at 63-64. Teck Cominco offers no evidence at all that Dr. Moran's
     testimony is not correct, only the unsupported assertions of its counsel. Further, Teck Cominco
27   is simply wrong: Dr. Moran's declaration first includes 13 paragraphs on his extensive

28

1    **B.    All the claims are supported by admissible evidence.**

2         Teck Cominco's next defense is procedural: it argues that Adams relies on "Teck

3    Cominco's responses to Request for Admissions (RFAs) from the Kivalina litigation, which are

4    not admissible in this case.  Those RFAs pertain to DMRs which were superceded by amended

5    DMRs filed with EPA over a year before plaintiffs filed this case."  Opposition at 67.  This

6    defect, it alleges, pertains to seven daily maximum violations, those from May 1999, June 1999,

7    July 1999 (one violation of two), August 2000, August 2002 and September 2002 (two

8    violations).  Opposition at 67.  Teck Cominco concedes the violation for August 2001 by not

9    addressing it (as noted above, it admitted that violation in its Answer, ¶93).  Alaska District

10   Local Rule 7.1(d)(1).  It also explicitly concedes one of the July 1999 violations.  Opposition at

11   68; Thompson WET dec. ¶18.  The procedural defense thus covers the remaining seven

12   violations.

13        Here, Adams cures any defect in the offering of the original DMRs, and also

14   demonstrates that the amended DMRs continue to show WET violations.  Put simply, there are

15   no disputed material facts about the WET tests; Teck Cominco admitted to EPA that it had

16   violated its WET daily maximum permit limits.

17        **1.    The original DMRs prove the WET violations.**

18        As Exhibits 90 and 103 to Cole dec. and Exhibits 235 and 241 to Cole Reply dec., Adams

19   offers the relevant excerpts from the applicable DMRs and other correspondence from Teck

20   Cominco to EPA from May 1999, June 1999, July 1999, August 2000, and September 2002,

21   along with the language required by the discovery stipulation and Order.  Cole dec. ¶¶40, 46.

22   These exhibits demonstrate that Teck Cominco reported to EPA that it violated its daily

23

24

25   ─────────────────

26   qualifications (¶¶2-14), including a site visit to the Red Dog Mine (¶13), as well as a 13-page
     *curriculum vitae* (Exhibit 66) [Docket 72].  He then offers nine paragraphs of testimony and
27   analysis on WET testing at Teck Cominco, based on evidence presented by Teck Cominco itself.
     ¶¶ 22-31.  Teck Cominco's challenge is not only improper, but baseless.
28

1   maximum WET limits in May 1999, June 1999, July 1999, August 2000 and September 2002.[76]

2   Teck Cominco has since revised some of those DMRs, Cole dec. ¶¶40, 46, and it argues that the

3   revised results supercede the originally reported results. As Adams notes above, Teck Cominco

4   cannot impeach its own DMRs, and thus none of the revised DMR results are relevant here.

5   Teck Cominco raising the "revised DMR" defense does not create a genuine issue of material

6   fact, as it is a *legal* question as to whether or not Teck Cominco can plausibly offer such a

7   defense, and this Court has already determined that it cannot. *See* "Order from Chambers [Re:

8   Motions at Dockets 41 and 52]," filed October 28, 2005 [Docket 104]. Each original DMR

9   proves a daily maximum WET violation.

10              **2.      The revised DMRs continue to report WET violations.**

11          Further, even the *revised* DMRs continues to report WET violations, in two ways. First,

12   in the narrative section of the revised DMRs, Teck Cominco reports WET test results for Outfall

13   001 that are over the mine's permit limits. Second, in the amended DMR tables, Teck Cominco

14   reports daily WET results over the permit limit. For the sake of completeness, Adams walks this

15   Court through each of the violations documented in the *revised* DMRs:[77]

16

17          [76]*See also* Exhibits 238, 239. Teck Cominco has challenged the use of these letters as in
18   violation of the discovery stipulation and Order, but this challenge has no validity. Although it
     asserts that "these letter predate the revised DMRs, were superseded by Teck Cominco's
19   submittal of cover letters and revised DMRs showing there were no exceedances on the above-
20   listed dates," Opposition at 68, they are admissible here under the stipulation and Order. Further,
     they are admissible as admissions of a party-opponent that emphasize the validity of the nine
21   daily WET violations.

22          [77]Although Teck Cominco alleges that it amended its DMR for August 2002 (Header at
     Opposition at 67), there is no revised DMR attached to the Thompson dec. for August 2002 and
23   the Thompson WET dec. (at ¶18) refers to August 2001, not August 2002, as one of the months
24   for which the DMR was revised. Further, Teck Cominco did not challenge the August 2002
     DMR (Exhibit 153 to Adams's Summary Judgment Motion) in its Motion to Strike. As Teck
25   Cominco had already admitted the daily WET violation in August 2001, did not amend its
     August 2002 DMR for WET, and disputes the August 2002 WET violation on other grounds (see
26   below), plaintiffs assume the inclusion of August 2002 in the list in header "d." on page 67 of the
27   Opposition was in error.

28

1    **May 1999:** The revised DMR admits that "The May 1999 DMR reported a WET test

2    result for Outfall 001 that was over the permitted limit[.]" Revised May 1999 DMR, Exhibit 297

3    to Cole Reply dec. (excerpt of Exhibit B to Thompson WET dec.). Additionally, the DMR table

4    does not report *any* values for daily WET tests, a separate and independent permit violation in

5    and of itself. *Id.*

6    **July 1999:** The Revised July 1999 DMR, at page two, lists three reported results, two for

7    tests initiated on July 14, and one for a test initiated on July 27. All three of the reported results

8    – 20.8 and 19.6 TUc for the July 14 tests, and 14.9 TUc for the July 27 test – are over the

9    permit's 12.2 TUc daily maximum. Revised July 1999 DMR, Cole Reply dec. Exhibit 299

10   (excerpt of Exhibit B to Thompson WET dec.). The Revised DMR table also reports a daily

11   maximum value of 19.6 TUc, and one WET exceedance. *Id.* Thus, the revised DMR continues

12   to indicate at least two violations for July 1999 (one for the July 14 test, one for the July 27 test).

13   **August 2000:** The Revised August 2000 DMR reports, at page two, a WET result of 18.5

14   TUc, well above the permitted 12.2 TUc. Revised August 2000 DMR, Cole Reply dec. Exhibit

15   300 (excerpt of Exhibit B to Thompson WET dec.). Additionally, the table on the following

16   page lists a daily maximum of 18.4 TUc. *Id.* Thus, the revised DMR continues to report daily

17   maximum values in excess of the permit limits.

18   **September 2002:** The Revised September 2002 DMR reports, at page two, results from

19   two separate sets of WET tests, one initiated on September 4 and one on September 24. As the

20   table makes clear, the daily maximum limit of 12.2 TUc was violated in both tests, which report

21   results of 28.6 TUc for the September 4 test, and 16.9 and 13.0 TUc for the September 24 test.

22   Revised September 2002 DMR, Cole Reply dec. Exhibit 301 (excerpt of Exhibit B to Thompson

23   WET dec.). In addition, the revised DMR table attached lists the daily maximum TUc at 12.99,

24   over the permit limit. *Id.* Thus, the revised DMR continues to report daily maximum values in

25   excess of the permit limits for the WET tests performed beginning on September 4 and 24, 2002,

26   for two separate violations.

27   Even taking Teck Cominco's argument at face value, it continues to report violations in

28

1   almost every "revised" DMR.[78]  There are no genuine issues of material fact in dispute.  Summary

2   judgment for the daily WET violations in May 1999, June 1999, July 1999 (2nd violation on top

3   of one admitted violation), August 2000 and September 2002 (2 violations) should be entered for

4   Adams.  Additionally, since the revised May 1999 DMR now reports no values for daily WET,

5   this Court should enter summary judgment on that additional reporting violation for Adams.

6                        **3.    The DMR revision was not legal under EPA regulations.**

7          In addition to the fact that the Ninth Circuit has disallowed the impeachment of DMRs,

8   and that the revised DMRs continue to show violations, Teck Cominco's strategy of revising its

9   DMRs to invalidate WET tests faces yet another problem: it is not legal under EPA's regulations.

10  Teck Cominco claims that Adams must use the revised DMRs in assessing Teck Cominco's

11  violations because of high variability in the tests.  *See* Thompson (WET) Aff.; Revised DMRs

12  dated May 1999, June 1999, July 1999, August 2000, and September 2002.

13         Teck Cominco's approach directly contradicts the procedures put in place by the EPA in

14  "Guidelines Establishing Test Procedures for the Analysis of Pollutants; Whole Effluent Toxicity

15  Test Methods; Final Rule," 67 Fed. Reg. 69,952 (attached as Exhibit 190 to Fucik Reply dec.).

16  The Final Rule makes invalidation contingent on "other data evaluation steps" – "For instance,

17  tests that exceed the variability criteria are only invalidated when the test also fails to detect

18  toxicity at the permitted receiving water concentration."  *Id.* at 69,958.  Because the tests

19  detected toxicity at the permitted receiving water concentration, *see* Fucik Reply Dec. at ¶13, the

20  original tests, and therefore the original DMRs, cannot be invalidated.

21

22         [78]Remarkably, Teck Cominco reports to the Court that "No daily maximum violations are
    reported in the Revised DMR Tables[.]" Opposition at 68.  Even the quickest glance at the
23  Revised DMR Tables – Exhibit B to the Thompson WET dec. and Exhibits 297, 299, 300, 301 to
    Cole Reply dec. – show that the values reported for daily maximum WET are above the
24  permitted TUc level on the July 1999 (Exhibit 299), August 2000 (Exhibit 300) and September
    2002 (Exhibit 301) revised DMRs.  As this Court held in ruling on the earlier cadmium DMR
25  revision, in an observation relevant here,  "Finally, it may be noted that there is a sampling error
    issue inherent even in the 'corrected' DMR, because it recited lab results from CT&E which
26  would show a violation unless they are discredited as erroneous."  "Order from Chambers [Re:
    Motions at Dockets 41 and 52]," filed October 28, 2005 [Docket 104].
27

28

1    Even if toxicity had not been detected and the tests could be invalidated, they would need

2    to be repeated on a newly collected sample. The Final Rule states that "reviewed tests that fail to

3    meet the variability criteria and do not detect toxicity at the receiving water concentration are

4    invalid and must be repeated on a newly collected sample." *Id.* at 69,958. Teck Cominco did not

5    repeat the tests on newly collected samples, but rather simply adjusted the data in light of its

6    variability claims.[79] *See* Revised DMRs dated May 1999, June 1999, July 1999, August 2000,

7    and September 2002 (e.g. by excluding a test from the June 1999 test, Revised DMR, June 1999,

8    at 2). Thus, Teck Cominco's DMR impeachment strategy fails as a matter of law in two

9    independent ways. The originally reported violations of May 1999, June 1999, July 1999,

10   August 2000, and September 2002 remain.

11   **C.    Teck Cominco reported a daily WET violation in August 2002.**

12   Teck Cominco's final argument is that the "August 2002 DMR does not evidence a

13   violation of the daily maximum" WET limit. Opposition at 68. This unsupported assertion does

14   not create a genuine issue of material fact, as the actual August 2002 DMR, Exhibit 153 to the

15   Motion, demonstrates a violation: on page two of the narrative section (Bates stamped 003676),

16   under the header "Whole Effluent Toxicity," Teck Cominco reports to EPA that "A split sample

17   for *Ceriodaphnia dubia* chronic testing was sent to a second laboratory for comparative analysis.

18   The result of the split sample analysis was 17.24 TUc."[80] Teck Cominco does not dispute this

19   fact. As the overall (averaged) result of the three daily tests was 17.24 TUc, there is a clear

20   violation of the daily maximum permit limit of 12.2 TUc. Summary judgment on the August

21   2002 daily WET violation should be entered for Adams.

22   ―――――――――――――――

23   [79]Teck Cominco makes some of the DMR "adjustments" on the ground that it "cannot
     with any amount of reasonable confidence report that these tests indicate a violation of the
24   monthly average permit limit for WET." *See, e.g.,* Revised DMR, July 1999, at 2; Exhibit 299 to
     Cole Reply dec. But Teck Cominco never claims to say with confidence that the violations that
25   the original tests indicate did *not* occur.

26   [80]*See* NPDES Permit #AK-003865-2 (Mine Site), Discharge Monitoring Report for
     August, 003676, attached as Exhibit 153 to Cole dec. As noted above, Teck Cominco did not
27   move to strike Exhibit 153, so Adams does not re-introduce it here.

28

**D.    Adams has proven nine daily WET claims, plus the additional reporting violation from the revised DMR.**

Teck Cominco admits two of the daily WET violations in its Answer or in its Opposition, those of August 2001 and July 1999. Additionally, its own DMRs – both the original *and* the revised ones – prove seven more daily WET permit limit violations, and the revised May 1999 DMR demonstrates yet another reporting violation. As there is no genuine issue of material fact in dispute on these violations, and they are ongoing, summary judgment should be entered for Adams on all nine daily WET violations and the one reporting violation.

**XI.    THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON THE 199 VIOLATIONS OF THE WHOLE EFFLUENT TOXICITY MONTHLY AVERAGE PERMIT LIMIT.**

The mine site permit specifies that WET may not exceed a monthly average concentration of 9.7 TUc. Teck Cominco admitted in its Answer that it violated its monthly average in August 2001. Answer, ¶96. Teck Cominco admitted to EPA that it violated its monthly average permit limit in six other months: May 1999, June 1999, July 1999, August 2000, August 2002 and September 2002. Violations of a monthly average limit mean that the permit was violated on each day the facility discharged in that month. *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 791 F.2d at 313-315. Teck Cominco's monthly WET exceedances total 199 violations.[81]

Teck Cominco makes a unified argument on WET, addressing both daily and monthly violations together in its Opposition (at 58-68). To ensure that all of Teck Cominco's WET violations are cleanly and clearly proven, Adams here disaggregates the daily and monthly claims

[81]This includes violations on May 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31, 1999; June 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30, 1999; July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31, 1999; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31, 2000; August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31, 2001, August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31, 2002; and September 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30, 2002.

1    and proves the monthly violations, in addition to the daily violations demonstrated above. Teck

2    Cominco's three arguments applicable to the monthly violations – that there is a genuine issue of

3    material fact as to whether or not the WET violations are ongoing at the time of the filing of the

4    Complaint, that the claims are not supported by admissible evidence, and that some of the claims

5    did not actually occur – are as unpersuasive here as they were in the daily WET violation context.

6    **A.    Teck Cominco's monthly Whole Effluent Toxicity (WET) violations are ongoing.**

7    Teck Cominco reported a WET result in excess of its WET permit limit in August 2004.

8    Exhibit 84 to Cole dec.; Exhibit 1 to Thompson WET dec. Teck Cominco's monthly average

9    WET permit limit is 9.7 TUc. Teck Cominco's CH2M Hill laboratory results for the WET

10   analysis begun on August 3, 2004 were 13.6 TUc, while its ENSR laboratory reported a 9.28

11   TUc for the same test. Averaging these two tests – the only two reported by Teck Cominco for

12   August 2004 – gives a monthly average of 11.45 TUc, considerably higher than the 9.7 TUc

13   monthly average permit limit. Exhibit 84 to Cole dec.; Exhibit 1 to Thompson WET dec. The

14   monthly average WET violations are thus ongoing.[82] *See Carr v. Alta Verde, Indus.,* 931 F.2d

15   1055, 1065 n. 12 (5th Cir. 1991) ("proof of an actual violation subsequent to the complaint is

16   conclusive").

17   Teck Cominco asserts that there is a "genuine issue of material fact whether the alleged

18   WET violations were ongoing at the time of the filing of plaintiffs' complaint." Opposition at

19   59. As discussed above in Section IX.A, this argument is unavailing. There is no genuine issue

20   of material fact: Teck Cominco admits that test results showed a value above its permit limits,

21   and it reported that value to EPA; it cannot now discount one test which shows a violation and

22   rely on another test which does not.[83] To get around the offending test result, Teck Cominco

23   again seeks to impeach its own DMR. Adams incorporates here the arguments it made above at

24   Section IX.A, rather than repeat them verbatim, as they apply equally to the monthly WET

25

26   [82]See also Fucik Reply dec. ¶¶ 7, 8, 12, 15.

27   [83]Fucik Reply dec. ¶10.

28

1  violations.  The bottom line is that Teck Cominco's post-complaint explanations and

2  rationalizations cannot impeach its August 2004 DMR report of a violation of the monthly WET

3  standard.

4          **B.      All the claims are supported by admissible evidence.**

5          As with the daily WET violations, Teck Cominco's next defense is procedural: it argues

6  that Adams relies on "Teck Cominco's responses to Request for Admissions (RFAs) from the

7  Kivalina litigation, which are not admissible in this case.  Those RFAs pertain to DMRs which

8  were superceded by amended DMRs filed with EPA over a year before plaintiffs filed this case."

9  Opposition at 67.  This defect, it alleges, pertains to five months worth of monthly average

10  violations, those from May 1999, June 1999, July 1999, August 2000 and September 2002.

11  Opposition at 67.  Teck Cominco concedes the 31 violations for August 2001 by not addressing

12  them in its Opposition (as noted above, it admitted the August 2001 monthly average violation in

13  its Answer, ¶96).  Opposition at 68; Thompson WET dec. ¶19; Alaska District Local Rule

14  7.1(d)(1).  It takes issue separately with the 31 violations from August 2002 (see Section XI.C,

15  below).  The procedural challenge thus covers the 137 violations from the months listed above.

16          Here, Adams cures any defect in the offering of the original DMRs, and also

17  demonstrates that the amended DMRs continue to show monthly WET violations.  Put simply,

18  there are no disputed material facts about the WET tests; Teck Cominco admitted to EPA that it

19  had violated its WET monthly average permit limits during each of the five months in question.

20          **1.      The original DMRs prove the WET violations.**

21          As Exhibits 90 and 103 to Cole dec. and Exhibits 235 and 241 to Cole Reply dec., Adams

22  offers the relevant excerpts from the applicable DMRs and other correspondence from Teck

23  Cominco to EPA from May 1999, June 1999, July 1999, August 2000, and September 2002,

24  along with the language required by the discovery stipulation and Order.  Cole dec. ¶¶40, 46.

25  These exhibits demonstrate that Teck Cominco reported to EPA that it violated its monthly WET

26

27

28

1 limits in May 1999, June 1999, July 1999, August 2000 and September 2002.[84]  Teck Cominco

2 has since revised some of those DMRs, Cole dec. ¶¶40, 46, and it argues that the revised results

3 supercede the originally reported results.

4 **2.     The revised DMRs continue to report WET violations.**

5 Further, even the revised DMRs continue to report WET violations, in two ways.  First, in

6 the narrative section of the revised DMRs, Teck Cominco reports WET test results for Outfall

7 001 that are over the mine's permit limits.  Second, in the amended DMR tables, Teck Cominco

8 reports monthly average WET results over the permit limit.  For the sake of completeness,

9 Adams walks this Court through each of the monthly WET violations as documented in the

10 *revised* DMRs:

11 **May 1999:** The DMR narrative itself admits, "The May 1999 DMR reported a WET test

12 result for Outfall 001 that was over the permitted limit[.]"  Revised May 1999 DMR, Exhibit 297

13 to Cole Reply dec.(excerpt of Exhibit B to Thompson WET dec.).  Additionally, the DMR table

14 does not report *any* values for monthly WET tests, a permit violation in and of itself. *Id.*

15 **July 1999:** The Revised July 1999 DMR, at page two, lists three reported results, two for

16 tests initiated on July 14, and one for a test initiated on July 27.  All three of the reported results

17 – 20.8, 19.6, and 14.9 TUc – are over the permit's 9.7 TUc monthly average.  Revised July 1999

18 DMR, Exhibit 299 to Cole Reply dec. (excerpt of Exhibit B to Thompson WET dec.).  The

19 Revised DMR table reports a monthly average value of 17.3 TUc, and one WET exceedance. *Id.*

20 **August 2000:** The Revised August 2000 DMR reports, at page two, a WET result of 18.5

21 TUc for a test initiated on August 10, and results of 4.9 and 7.2 TUc for a test initiated on August

22 25.  Revised August 2000 DMR, Cole Reply dec. Exhibit 300 (excerpt of Exhibit B to Thompson

24 [84]*See also* Exhibits 238, 239.  Teck Cominco has challenged the use of these letters as in violation of the discovery stipulation and Order, but this challenge has no validity.  Although it
25 asserts that "these letter predate the revised DMRs, were superseded by Teck Cominco's submittal of cover letters and revised DMRs showing there were no exceedances on the above-
26 listed dates," Opposition at 68, they are admissible here under the stipulation and Order.  Further, they are admissible as admissions of a party-opponent that emphasize the validity of the nine
27 daily WET violations.

1    WET dec.). Averaging even the low value of the August 25 test (4.9 TUc) with the sole value

2    for the August 10 test (18.5 TUc) yields a monthly average of 11.7 TUc (4.9 + 18.5 = 23.4, 23.4

3    ÷ 2 = 11.7), well above the permit limit of 9.7 TUc. Additionally, the table on the following

4    page lists a monthly average of 11.6 TUc. *Id.* Thus, the revised DMR continues to report a

5    monthly average value in excess of the permit limits.

6          **September 2002**: The Revised September 2002 DMR reports, at page two, two sets of

7    results from two separate sets of WET tests, one initiated on September 4 and one on September

8    24. As the table makes clear, the monthly average limit of 9.7 TUc was violated in both sets of

9    results in both tests, which report 9.8 and 28.6 TUc for the September 4 test, and 16.9 and 13.0

10   TUc for the September 24 test. Revised September 2002 DMR, Cole Reply dec. Exhibit 301

11   (excerpt of Exhibit B to Thompson WET dec.). Taking the monthly average of the four values

12   reported yields a result of 17.075 TUc, nearly twice the permit limit of 9.7 TUc. In addition, the

13   DMR table attached lists the monthly average TUc at 11.40. *Id.* Thus, the revised DMR

14   continues to report monthly average values in excess of the permit limits for WET in September

15   2002.

16         Even taking Teck Cominco's "revised DMR" argument at face value, it continues to

17   report violations in each "revised" DMR. There are no genuine issues of material fact in dispute.

18   Summary judgment for the 137 monthly WET violations in May 1999, June 1999, July 1999,

19   August 2000 and September 2002 should be entered for Adams.

20         **C.    Teck Cominco reported a monthly WET violation in August 2002.**

21         Teck Cominco's final argument is that the "August 2002 DMR does not evidence a

22   violation of the... monthly average WET limits." Opposition at 68. The August 2002 DMR,

23   Exhibit 153 to the Motion, demonstrates otherwise: on page two of the narrative section (Bates

24   stamped 003676), under the header "Whole Effluent Toxicity," Teck Cominco reports to EPA

25   that "A split sample for *Ceriodaphnia dubia* chronic testing was sent to a second laboratory for

26

27

28

1   comparative analysis. The result of the split sample analysis was 17.24 TUc."[85]  Teck Cominco

2   does not dispute this fact. As Teck Cominco reported the other split sample result at 6.12 TUC

3   (Thompson WET dec. Exhibit 3), the monthly average of the two tests reported is 11.68 TUc, a

4   violation of the monthly average permit limit of 9.7 TUc.  Summary judgment on the 31 monthly

5   WET violations from August 2002 should be entered for Adams.

6           **D.      Adams has proven 199 monthly WET claims, plus the additional reporting
                       violation from the revised DMR.**

7
            Teck Cominco admits 31 of the monthly WET violations in its Answer and in its
8
    Opposition, those of August 2001.  Additionally, its own DMRs – even the revised ones –
9
    demonstrate that it violated the daily WET permit limit during an additional five months, for 137
10
    further violations.  Finally, the August 2002 DMR also demonstrates a monthly violation for that
11
    month, for an additional 31 violations.  As there is no genuine issue of material fact in dispute on
12
    these violations, and they are ongoing, summary judgment should be entered for Adams on all
13
    199 monthly WET violations and the additional reporting violation from the revised May 1999
14
    DMR.
15
    **XII.   THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON
16          THE THREE VIOLATIONS FOR UNPERMITTED DISCHARGES TO THE
            TUNDRA AT THE MINE SITE.**
17
            Adams moved for summary judgment on three permit violations for unpermitted
18
    discharges to the tundra.  Teck Cominco has admitted this unpermitted discharge. Answer ¶112;
19
    Declaration of James Swendseid (filed with Opposition, Ocotber 3, 2005), ¶¶5-6.  However, in
20
    its Opposition (at 69-73), Teck Cominco now argues that it is "excused from any liability for the
21
    overtopping of the pumping system."  It rests this attempt to escape liability on the deployment of
22
    40 C.F.R. §440.131(b) as an affirmative defense, and, alternatively, asserting that plaintiffs "have
23
    no standing to assert their claims regarding the May 2002 overtopping[.]" Opposition at 72.  Both
24
    of these arguments are simply wrong.
25

26   _____

27           [85]August 2002 DMR, attached as Exhibit 153 to Cole dec.  As noted above, Teck
     Cominco did not move to strike Exhibit 153, so Adams does not re-introduce it here.
28

First, 40 C.F.R. §440.131(b) is not available in this situation because under no circumstances is the mine permitted to discharge tailings water to the tundra.  Section 440.131(b) only allows exceedances of *permitted* discharges in upset conditions – it does not allow unpermitted discharges.  The first part of that section reads,

> If, as a result of precipitation or snowmelt, a source with an *allowable discharge* under 40 CFR Part 440 has an overflow or excess discharge of effluent which does not meet the limitations of 40 CFR Part 440, the source may qualify for an exemption from such limitations with respect to such discharge.

40 C.F.R. 440.131(b) (emphasis added).  The Mine Site Permit, at Condition I(C)(15), states categorically, "The permittee shall not discharge any water not specifically authorized in this permit." Exhibit 70 to Cole dec., at 10.  Mine site permit condition I(C)(2) reads, in its entirety, "The permittee shall ensure that precipitation falling on the Kivalina Shale pile shall be directed into the tailings impoundment." *Id.* at 9.  Section 440.131(b) is designed for those situations in which, as a result of snow melt, Teck Cominco might discharge effluent that had a higher than permitted amount of a particular substance through a permitted outfall.  Here, because the discharge was not authorized by the permit, the regulation  is inapplicable and does not excuse Teck Cominco's admitted violation.[86]

Second, the unpermitted discharges are capable of repetition.  Indeed, in a similar event at at the port site, Teck Cominco was forced to intentionally bypass its control equipment as a result of snow melt (see below).  Such events demonstrate that unpermitted discharges at the mine are capable of repetition.  As Teck Cominco has admitted the violations, and they are capable of repetition, summary judgment should be entered for Adams on the three unpermitted discharges of May 19, 22 and 23, 2002.

---

[86]Even if the storm exemption applied, Teck Cominco has not met its burden of demonstrating that the required conditions were met.  Although Teck Cominco asserts that "Plaintiffs have presented no evidence that the exemption is inapplicable," Opposition at 72, it has reversed the burden of proof here: "The storm exemption is designed to provide an affirmative defense to an enforcement action. Therefore, the *operator* has the burden of demonstrating to the appropriate authority that the above conditions have been met."  40 C.F.R. §440.131(b)(3) (emphasis added).

1    **XIII.   THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON
          ONE MONITORING AND REPORTING VIOLATION AT THE MINE SITE.**

2

3         Adams moved for summary judgment on five additional monitoring and reporting

4    violations not included in its Cross Motion for Summary Judgment as to Monitoring and

5    Reporting Claims.  These included a selenium reporting violation, a failure to record the volume

6    of mine drainage, and three missed ambient monitoring tests.  Teck Cominco asserts that there

7    were no permit violations in any of these five cases.  Opposition at 73.  Adams withdraws the

8    selenium and three missed ambient test violations.  Teck Cominco admits the one remaining

9    violation, for failing to record the volume of mine drainage, and summary judgment on that

10   violation should be entered for Adams as the monitoring and reporting violations are ongoing.

11        **A.    Teck Cominco admits failing to report the volume of mine drainage on July
                  12, 2001.**

12        As Teck Cominco admits, mine site permit condition I(C)(4) requires that "when water in

13   the Dirty Water Sump is pumped into the tailings impoundment, the pumped volume shall be

14   recorded."  Opposition at 77, quoting permit condition I(C)(4).  As Teck Cominco further admits,

15   it did not record the volume on July 12, 2001, as required.  Opposition at 77.  Instead, it "used

16   the average recorded flow from July 11 and 13, 2001 to calculate an estimated 817,515 gallons of

17   mine drainage pumped on July 12, 2001[.]" *Id.*  In its July 2001 DMR, Teck Cominco admitted

18   that it violated permit condition I(C)(4) by failing to record the volume of mine drainage pumped

19   on July 12, 2001.  Opposition at 77.  Thus, there are no disputed material facts and summary

20   judgment should be entered for Adams on the July 12, 2001 failure to record the pumped mine

21   drainage.

22        Almost two years after filing the July 2001 DMR, and six months after KRPC filed suit

23   alleging this particular violation, Teck Cominco submitted a revised DMR to EPA purporting to

24   contain the actual flow data.  That revised DMR admits the original violation and states, "at the

25   time the DMR was submitted, it was not known that the mill process control database also

26   logged the volume of water pumped on a 5-minute interval."  Exhibit 3 to Thompson M&R dec.;

27   Exhibit 307 to Cole Reply dec.  As Adams has demonstrated at length above, Teck Cominco

28

Adams Plaintiffs' Reply Memorandum in
Support of Motion for Partial Summary Judgment        - 89 -

1   cannot impeach its DMRs as a litigation tactic after being sued for the violation.  Summary

2   judgment should be entered for Adams on this monitoring and reporting violation.

3          **B.    Teck Cominco's monitoring and reporting violations are ongoing.**

4          As explained in more detail in Adams' Cross Motion for Summary Judgment on

5   Monitoring and Reporting Claims (filed May 17, 2005) ("M&R Cross Motion"), Teck Cominco

6   has committed both monitoring and reporting violations since the suit was filed.  Teck Cominco

7   asserts that "plaintiffs offer no evidence of ongoing monitoring and reporting violations,"

8   Opposition at 95, but that assertion is demonstrably wrong.

9          Teck Cominco has had monitoring violations since the March 2004·filing of this suit.

10  Teck Cominco reported in its September 2005 DMR that is took a grab sample for fecal

11  coliform, rather than the 24-hour composite sample required by the permit.  Exhibit 195 to E.

12  Adams Reply dec. (September 2005 DMR). Regardless of what parameter is being monitored, a

13  deviation from the required monitoring method is a violation of the monitoring requirement of

14  the NPDES permit.  As discussed in Adams' M&R Cross Motion (at 13-14), a grab sample is

15  different from a composite sample.  The 24-hour composite sample required by the permit is a

16  more stringent testing method; it even requires a special sampling and compositing machine.  In

17  the September 2005 DMR, Teck Cominco attempts to excuse this violation with the footnote,

18  "Sample collection was changed per EPA written instructions."  Such written instructions have

19  not been disclosed to the plaintiffs in this case, nor are they sufficient to override the express

20  requirement of the permit for a composite sample.  Because Teck Cominco has reported a

21  monitoring violation after the filing of this suit, its *monitoring* violations are ongoing.

22         Adams alleged a different monitoring violation in the Motion.  As more fully set forth in

23  Plaintiffs' Reply in Support of Cross Motion for Summary Judgment on Claims Related to

24  Monitoring and Reporting (filed June 28, 2005 [Docket 68]) ("M&R Reply"), Teck Cominco

25  reported that in June 2004, it took a grab sample rather than the required composite sample for

26  hardness.  Exhibit 86 to Cole dec.

27         Teck Cominco's response to this violation is to admit that "the sample type was

28

1   incorrectly labeled as 'grab' rather than 'composite.'" Opposition at 96. Teck Cominco admits

2   this reporting error – reporting the wrong type of sample – and calls it a "typographical error."

3   Whether or not typing "grab" rather than "composite" can be considered a "typographical error,"

4   it is a *reporting* error nonetheless. Teck Cominco offers a 1984 District Court decision from

5   New York for the proposition that a typographical error should defeat summary judgment.

6   Opposition at 96, citing *Friends of the Earth v. Facet Enterprises, Inc.*, 618 F.Supp. 532, 536

7   (W.D.N.Y. 1984). Teck Cominco's efforts here fail, as *Facet Enterprises* does not control in the

8   Ninth Circuit, which explicitly forbids impeaching ones DMR during litigation, as Teck

9   Cominco is attempting to do here. *Sierra Club I,* 813 F.2d at 1492. There are no disputed facts:

10  even under Teck Cominco's version of the facts, Teck Cominco committed a reporting violation

11  in misreporting the type of sample it took in June 2004, and thus the *reporting* violations were

12  ongoing after this suit was filed.[87]

13  **XIV.   THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON
          THREE VIOLATIONS OF THE PORT SITE PERMIT.**

14

15              Adams moved for summary judgment on five port site violations, including two

16  unpermitted discharges at the port site, a total suspended solids violation, and two failures to

17  monitor fecal coliform. As Teck Cominco correctly points out, Adams did not allege the fecal

18  coliform violations in this suit (it did in the KRPC suit), and thus it withdraws those two

19  violations. Teck Cominco admits the other three violations, however, and as they are ongoing as

20  evidenced by similar violations in May 2005, summary judgment on all three should be entered

    for Adams.

21  **A.      Teck Cominco admits the two unpermitted discharges at the Port Site.**

22              Adams moved for summary judgement for two unpermitted discharges, on May 9 and 10,

23  2002, which Teck Cominco concedes occurred.. Teck Cominco's response is to admit the

24  violations (Opposition at 81-82), but to argue that such unpermitted discharges are not capable of

25

26              [87]For the record, this is just one among many reporting violations since the filing of the

27  suit, including the reporting violation of "no permit violations" documented in the Motion and
    the other reporting violations detailed in the M&R Cross Motion.

28

1    repetition.  Teck Cominco's position is undermined by its own concession (Opposition at 84-86)

2    that it had another unpermitted discharge at the port site in the spring of 2005.  As James Kulas

3    testified on May 31, 2005:

4

5    Q.  How about so far in 2005, have there been any unpermitted discharges at the port site?

6    A.  There has been a discharge of water requiring emergency bypass at the port.

7    Kulas depo., 195:12-15, Exhibit 83 to Cole dec.; see also Exhibit 273 to Cole Reply dec. (May

8    2005 DMR reporting discharge); Exhibit 285 to Cole Reply dec. (May 2005 letter to EPA

9    reporting discharge).

10    Teck Cominco claims the unpermitted discharge is not capable of repetition because of

11    remedial actions it has taken at the ion exchange plant and pipeline.  Opposition at 84.  Teck

12    Cominco's remedial measures on the ion exchange plant and pipeline are not relevant, however,

13    as the remedial measures at the port site *over all* are demonstrably ineffective, having failed to

14    prevent new unpermitted discharges there.  Teck Cominco cites *Sierra Club v. Union Oil* in

15    support of its position, but *Sierra Club* supports Adams here:

16    On the matter of proving ongoing violations, we agree with the Fourth Circuit's recent decision on remand from *Gwaltney* that a citizen plaintiff may prove ongoing violations

17    "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing

18    likelihood of a recurrence in intermittent or sporadic violations."

19    *Sierra Club v. Union Oil*, 853 F.2d at 671, quoting *Chesapeake Bay Foundation v. Gwaltney*,

20    844 F.2d 170, 171-72 (4th Cir. 1988).  Here, there is an identical violation of the permit – an

21    unpermitted discharge at the port – after the filing of the complaint.

22    While Teck Cominco asserts that the May 2002 and May 2005 unpermitted discharges

23    are "incomparable and cannot be used as evidence of any continuing violation regarding

24    operation of the ion exchange treatment plant or its conveyances," Opposition at 85, it has missed

25    the permit violation alleged here: unpermitted discharges.  Adams did not allege unpermitted

26    discharges *at the ion exchange plant*, it alleged unpermitted discharges, period.  The port site

27    permit does not allow unpermitted discharges.  Section I.A.1, Exhibit 302 to Cole Reply dec., at

28

1  000053. Teck Cominco admits having two unpermitted discharges on May 9 and 10, 2002, and

2  admits another unpermitted discharge in May 2005, after this suit was filed in March 2004. "If

3  the same parameter is exceeded [after the Complaint is filed] . . . then the violation will be

4  deemed 'ongoing' and liability will attach." *Sierra Club v. Union Oil Co. of Cal.*, 716 F. Supp.

5  429, 433 (N.D. Cal. 1988).

6  While Teck Cominco asserts that the May 2005 unpermitted discharge is not a permit

7  violation, citing port site permit Section V.G.1, Opposition at 85, that assertion has no legal

8  foundation. First, under *Sierra Club, supra*, the same parameter was exceeded. 716 F. Supp. at

9  433. Second, that permit section does not allow the unpermitted discharge that Teck Cominco

10  caused in 2005. Under Section V.G.1, which is titled "Bypass not exceeding limitations,"

11  The Permittee may allow any bypass to occur that does not cause effluent limitations to
   be exceeded, but only if it also is for essential maintenance to assure efficient operation.

12

13  Exhibit 302 to Cole Reply dec., at 000074. Thus, the intentional bypass by Teck Cominco is

14  only allowed if it does not cause effluent limitations to be exceeded. Under the permit, the

   effluent limitations in question are found in Section I, "Effluent Limitations and Monitoring

15
   Requirements." Under Section I.A.1 states,
16

17  This permit does not authorize the discharge of any waste streams, including spills and
   other unintentional or non-routine discharges of pollutants, *that are not part of the*
   *normal operation of the facility as disclosed in the permit application*, or any pollutants

18  that are not ordinarily present in such waste streams.

19  Exhibit 302 to Cole Reply dec., at 000053. Thus, contrary to Teck Cominco's representation, the

20  intentional bypass – admittedly not part of the normal operation of the facility, Thompson M&R

21  dec. ¶26 – is a violation of the effluent limitations, and thus is not allowed under Section V.G.1.

22  As a matter of law, the May 2005 unpermitted discharge is a permit violation and thus provides

23  the ongoing violation under *Gwaltney* and *Sierra Club*.

24  (Teck Cominco also seeks to argue that its 2005 unpermitted discharges are not a permit

25  violation because "any overflow *would have been* excused under 40 C.F.R. §440.131(b)."

26  Opposition at 85 (emphasis added). The undisputed evidence in the record makes clear that Teck

27  Cominco did not avail itself of §440.131(b) and thus it cannot use it as a defense. Because Teck

28

1    Cominco admits it intentionally bypassed the treatment plant (Opposition at 85; Thompson M&R

2    dec. ¶26), the unpermitted discharge does not qualify under §440.131(b), which pertains to

3    overflows.  Teck Cominco further does not qualify as it did not take reasonable steps to

4    "maintain treatment of the wastewater" as required by §440.131(b)(2) nor has Teck Cominco

5    provided any evidence to this Court – or to Adams as a discovery disclosure under F.R.C.P. Rule

6    26 – of any notification of EPA as required under §440.131(b)(3).  As that section concludes,

7    "the operator has the burden of demonstrating to the appropriate authority that the above

8    conditions have been met."  40 C.F.R. §440.131(b)(3).)

9        Teck Cominco is liable for two unpermitted discharges at the Port Site, and summary

10    judgement should be entered for Adams accordingly.

11        **B.    Teck Cominco admits the Total Suspended Solids violation.**

12        Teck Cominco concedes that it violated its Port Site permit by discharging total

13    suspended solids in excess of the permit limitation.  Opposition at 87 ("The sample result

14    constitutes a violation of permit condition I(B)(5)").  Teck Cominco further concedes this

15    violation is ongoing or capable of repetition: "Teck Cominco has engaged in numerous attempts

16    to control the elevated TSS concentrations, most recently by installing bag filters to physically

17    remove the excess TSS.... The bags used to date have proven to be unreliable[.]" Opposition at

18    87.  Teck Cominco reports in its May 2005 Port DMR that it again exceeded its TSS permit.

19    Exhibit 286 to Cole Reply dec.; see also Exhibit 285 to Cole Reply dec. (exceedance letter to

20    EPA on TSS violation).

21        Teck Cominco attempts to evade liability for this admitted permit violation with the

22    following novel legal argument:

23        With respect to Teck Cominco's port site, TSS concentrations above the permit limit of
         30 mg/l would be observed even in the absence of the mine and associated activities,
24        because the data indicate the observed TSS concentrations are attributable to natural
         conditions.  Thus, this court cannot remedy plaintiffs' harm, and plaintiffs['] request for
25        summary judgment with respect to port site TSS violations must be denied.

26    Opposition at 89.  This assertion is specious.  Teck Cominco is required by its permit to

27    discharge less than 30 mg/l of TSS from the outfalls at the Port Site.  An injunction from this

28

1   Court requiring Teck Cominco to abide by its permit limitations with respect to TSS at the Port

2   would remedy this violation.[88]   Further, this Court can impose civil penalties for Teck Cominco's

3   past violation, giving Teck Cominco added incentive for finding a lasting solution to the

4   violations, further remedying the violation.

5        As Teck Cominco has admitted the TSS violation and admitted it is ongoing, summary

6   judgment should be entered for Adams on this violation.

7        **C.   Summary judgment should be entered for Adams on the three port violations
             as they are ongoing.**

8

9        Teck Cominco has admitted the three violations of the port site permit at issue here.  The

10  only question – of law, not fact – is whether Teck Cominco's violations of those same permit

11  parameters in May 2005 make the earlier violations ongoing.  That legal question is easy for this

12  Court to answer in the affirmative.  "If the same parameter is exceeded [after the Complaint is

13  filed] . . . then the violation will be deemed 'ongoing' and liability will attach."  *Sierra Club v.*

14  *Union Oil Co. of Cal.*, 716 F. Supp. 429, 433 (N.D. Cal. 1988).

    **XV.   THIS COURT SHOULD ENTER SUMMARY JUDGMENT FOR ADAMS ON
15         THE 45 VIOLATIONS OF THE COMPLIANCE ORDERS BY CONSENT.**

16       Teck Cominco's Modified Compliance Order for the mine site at the time of Teck

17  Cominco's violations states at paragraph 23: "Nothing in this Modified Order shall be construed

18  to relieve Teck Cominco of the requirements of its NPDES permit[.]" SSUF, ¶43; *see also* Cole

19  dec., Exhibit 76, p. 000125 (copy of Compliance Order in place at the time of the violations).

20  Similar language appears in each Compliance Order. Cole dec., Exhibits 73-75.  Thus, Teck

21  Cominco is simply wrong in its assertion that it is "*theoretically* operating under the 1998 permit

22  during grayling spawning, which has no in-stream limits but instead, limits discharge at Outfall

23  001 to 196 mg/L [but] [i]n reality, Teck Cominco has been operating under Compliance Orders

24  that establish a 500 mg/L TDS limit during grayling spawning season at the edge of the mixing

25  zone in Red Dog Creek since the filing of this lawsuit." Opposition at 18 (emphasis added).

26

27       [88]An injunction would specifically redress this violation as it is ongoing, as noted directly
    above.

28

1    There is nothing theoretical about Teck Cominco's duty to comply with its permits, as the
2    Compliance Order language makes clear.

3    As set forth in the Motion, the mine site Compliance Orders allowed Teck Cominco to
4    measure concentrations of TDS downstream from the discharge point at Stations 10 and 160,
5    points downstream of Outfall 001; until May 17, 2002, the Mine Compliance Order required
6    measuring TDS at Stations 10 and 7. Teck Cominco had to limit its discharge of TDS so that
7    concentrations of TDS remained below 1500 mg/L at Station 10; exceedences below 1600 mg/L
8    were permissible if they did not continue for more than 48 hours in any 10 day period. At Station
9    160 (and formerly at Station 7), TDS concentrations could not exceed 500 mg/L from July 25
10   through the end of the discharging season.[89]

11   Adams moved for summary judgment on 48 violations of the Compliance Order at
12   Station 7 and Station 10. Of these 48 alleged violations, Adams withdraws the six alleged in
13   June 1999, before the Compliance Order took effect. Of the remaining 42 violations, Teck
14   Cominco admits 15. Teck Cominco admits the three Compliance Order violations at Station 7 of
15   August 27, 28, 29, 2001 and the following 12 Compliance Order violations at Station 10:
16   October 5, 1999; June 22, 23, 24, 25, 26, 27, 28, 2000; July 5, 6, 8, 11, 2000. Opposition at 32.
17   Of the remaining 27 violations, Adams reserves four (those of October 1, 1999, July 7, 2000, and
18   June 3 and 6, 2002) for trial, and proves the remaining 23 below.

19   Faced with its many admitted violations of the Compliance Orders, Teck Cominco posits
20   six defenses: 1) that there are no ongoing violations (Opposition at 30-33); 2) regulatory
21   mootness (id. at 33-34); 3) judicial estoppel (id. at 34); 4) lack of redressability (id. at 34-35); 5)
22   laboratory error (id. at 35-39) ; and 6) there were no violations on certain days (id. at 39-40).
23   None of these defenses is persuasive, as Adams demonstrates below.

24

25

_____

26   [89]During the 2004 and 2005 discharge season, the Compliance Orders set a TDS limit of
     500 mg/L during grayling spawning season at the edge of the mixing zone in Red Dog Creek.
27   Opposition at 18 n. 11. This is the same limit as is found in the stayed portion of the 2003
     modified permit. Id.
28

1     **A.     The Compliance Order violations are ongoing or capable of repetition.**

2          Teck Cominco has violated its Compliance Orders after the filing of this suit in March

3     2004.  The 2004 Compliance Order required Teck Cominco to maintain an end-of-pipe TDS

4     level of 3900 mg/L.  Opposition at 33.  Teck Cominco violated that Compliance Order limit in

5     August and September 2004.  Exhibit 84 (August 2004 DMR) and Exhibit 85 (September 2004)

6     DMR to Cole dec.

7          Further, as Teck Cominco has repeatedly violated the 1500 mg/L in-stream limitation at

8     Station 10, these violations are capable of repetition.

9     **B.     The Compliance Order violations are not moot.**

10         Teck Cominco again deploys the regulatory mootness argument, this time in the

11    Compliance Order context.  Opposition at 33-34.  It is no more persuasive here than elsewhere in

12    Teck Cominco's Opposition.

13         Adams's claims are not moot as Teck Cominco has repeatedly violated the very standard

14    that is now its permit limit during non-spawning season for grayling – 1500 mg/L in-stream at

15    Station 10 – when it was the Compliance Order standard.  Thus, injunctive relief to abide by that

16    standard would redress Adams's injuries from the previous violations.  This is particularly the

17    case for the violations of June 22, 23, 24, 25, 26, 27, and 28, 2000 and July 5, 6, 8, and 11, 2000,

18    which, as Teck Cominco points out, are violations of the old 1600 mg/L Compliance Order

19    limitation.  Opposition at 34.  Here, the new permit is *stricter* than the old Compliance Order,

20    and thus violations are more likely.  *See, e.g., Ecological Rights Foundation*, 230 F.3d at 1153.

21         Finally, legally, even if the permit modification Teck Cominco "anticipates" actually is

22    issued at some time in the future, it does not mean that penalties for past violations would not be

23    effective at stopping future permit violations, and thus the Compliance Order TDS claims will

24    not be moot even then.  "Mootness with respect to the claim for injunctive relief does not moot

25    the remedy of civil penalties."  *Natural Resources Defense Council v. Southwest Marine, Inc.*, 39

26    F. Supp. 2d 1235, 1242 (S.D. Cal 1998).  The Ninth Circuit recently addressed this issue in

27    *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d at 1153, where a new permit

28

1    insulated Pacific Lumber from injunctive relief for its Clean Water Act violations:

2        There is no reason the district court could not order effective relief in this case. As is
         ordinarily the case with monetary relief, liability for civil penalties under the Clean Water
3        Act attaches at the time the violations occur, not at the time of the judgment .... Further,
         such monetary penalties continue to fulfill their purpose after the issuance of a new
4        permit: Civil penalties deter future violations of the Clean Water Act even when
         injunctive relief is inappropriate .... We must conclude that civil penalties, if appropriate
5        on the merits, would serve their deterrent purpose in this case.

6    *Ecological Rights Foundation*, 230 F.3d at 1153.  The Supreme Court faced a similar situation in

7    *Laidlaw*, where the Laidlaw facility had been shut down for some years by the time the case

8    arrived before the Court.  528 U.S. at 179-180.  Even then the Supreme Court did not find the

9    case moot, holding that "civil penalties in Clean Water Act cases do more than promote

10   immediate compliance . . . they also deter future violations." *Id.* at 184.  As one District Court

11   held,

12       Congress has statutorily given citizen suit plaintiffs the right to seek civil penalties for
         ongoing violations of the Clean Water Act based on the finding that such penalties help
13       deter these violations. First, the notice provision of the Clean Water Act already allows an
         alleged violator to come into compliance with the Act in a manner that then precludes a
14       citizen suit. To make the issue of penalties moot after an alleged violator failed to respond
         to plaintiff's notice of suit would render the notice section superfluous.
15
     *Natural Resources Defense Council v. Southwest Marine, Inc.*, 39 F. Supp. 2d at 1242.  The
16
     Third Circuit points out the policy reason behind having penalties available even in situations of
17
     post-complaint compliance:
18
         A citizen suit would lose much of its effectiveness if a defendant could avoid paying any
19       penalties by post-complaint compliance. If penalty claims could be mooted, polluters
         would be encouraged to "delay litigation as long as possible, knowing that they will
20       thereby escape liability even for post-complaint violations, so long as violations have
         ceased at the time the suit comes to trial." Moreover, whether or not damage claims are
21       mooted would depend on the vagaries of when the district court happens to set the case
         for trial.  We cannot embrace a rule that would weaken the deterrent effect of the Act by
22       diminishing incentives for citizens to sue and encourage dilatory tactics by defendants.

23   *NRDC v. Texaco Ref. & Mktg.*, 2 F.3d 493, 503-05 (3[d] Cir. 1993) *(citing Atlantic States Legal*

24   *Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1137 (11th Cir. 1990)) (internal citations

25   omitted).

26       Civil penalties for Teck Cominco's past permit violations would certainly redress some of

27

28

1    Adams's injuries by making such illegal discharges less likely in the future.[90]  Teck Cominco's

2    argument thus fails as a matter of law.

3           **C.    The Compliance Order violations are not judicially estopped.**

4           As discussed in more detail above at Section VI.B, "the Ninth Circuit Court has adopted

5    the majority rule that the doctrine of judicial estoppel is applicable only if the court previously

6    adopted the inconsistent position."  Opposition at 19, citing *Interstate Fire & Cas. Co. v.*

7    *Underwriters at Lloyd's*, 139 F.3d 1234, 1239 (9th Cir. 1998) and *Donato v. Metropolitan Life*

8    *Ins. Co.*, 230 B.R. 418, 421 (N.D.Cal. 1999).  Here, this Court has not adopted Adams's position

9    on the Compliance Order violations; they are the subject of this Motion.  Thus, under Teck

10   Cominco's own reasoning and cases, judicial estoppel is not applicable here.

11          **D.    The Compliance Order violations are easily redressed by this Court.**

12          Teck Cominco's fourth argument is that the violations of the Compliance Orders are not

13   redressable because "plaintiffs fear **any** discharge from the Red Dog Mine."  Opposition at 35

14   (emphasis original).  Adams dispatched this argument above in the Standing section, Section

15   II.C, and incorporates that argument by reference here.  Teck Cominco's position has no merit

16   whatsoever.  Injunctive relief to comply with the ongoing Compliance Orders, as well as

17   penalties for past violations, would redress plaintiffs' injuries here and deter future unlawful

18   behavior by Teck Cominco.

19          **E.    Teck Cominco may not impeach its own DMRs in the Compliance Order**
            **context either.**

20

21          Adams has addressed this argument above in Section V, and incorporates that argument

22   by reference here.  Teck Cominco's impeachment argument is no more persuasive in the

23   Compliance Order context, and should be rejected.  Although Teck Cominco spends several

24   pages (Opposition at 37-38) detailing the ways in which it finds Sierra Club "unpersuasive,"

25

26        [90]*See, e.g.*, E. Adams. KRPC dec., at ¶16:  "If Teck Cominco were fined a significant
amount for its past violations, I believe that would make them less likely to illegally discharge

27   toxic chemicals into our drinking water and hunting and fishing habitat in the future."  Exhibit
264 to Cole Reply dec.

28

1   neither it nor this Court has the power or discretion to ignore that Ninth Circuit decision squarely

2   on point here.[91]

3

4       [91]Teck Cominco also makes the wholly irrelevant argument that "plaintiffs have testified

5   in their depositions that they have not reviewed the DMRs, not relied on them, or didn't
    understand them." Opposition at 38. Besides being irrelevant – whether or not plaintiffs read the

6   DMRs has no bearing on Teck Cominco's liability for its many admitted violations of its permits
    and the Clean Water Act – the assertion is factually false. See, e.g., J. Norton 2005 depo. at

7   8:17-9:9.

8       Even the deposition sections cited do not support Teck Cominco. Joseph Swan, for

9   example, in the cited portion of his deposition, testified

10      Q. The DMRs are referred to quite a bit in the complaint. I just was going to see if you

11      yourself, do you read the DMRs?

12      A. I may read them, but I don't understand them. Like I said, I always have somebody to
        explain to me.

13

14  Deposition of Joseph Swan (May 4, 2005), 6:25-7:6, attached as Exhibit 267 to Cole Reply dec.
    Having the DMR explained to him is a perfectly logical way to understand the technical data in

15  the DMR, contrary to Teck Cominco's implication. Likewise, Enoch Adams, also cited in the
    Opposition at 38, testified at deposition,

16

17      Q. What factual research, if any, did you do regarding the allegations in the complaint
        before it was filed, to determine that these allegations were true?

18

19      A. Teck Cominco's DMRs, the NPDES permits, and the lack of reconciliation between
        the two.

20

21      Q. When did you do that review?

22      A. I believe it was soon after we were told that KRPC's lawsuit could not be entered into
        court.

23

24      Q. In your review of the -- well, the DMRs that you reviewed, did you review all of the
        DMRs current to that date?

25      A. No, our attorney did that for us.

26  Deposition of Enoch Adams (May 4, 2005), at 20:25-21, Exhibit 271 to Cole Reply dec. Again,

27  this is a perfectly acceptable method of gaining information, contrary to Teck Cominco's
    implication.

28

**F.    The DMRs and Teck Cominco's admissions in its Opposition prove the specific Compliance Order violations alleged.**

Teck Cominco challenges several specific violations alleged by Adams.  Each is proved by the applicable DMR or by Teck Cominco's admissions in its Opposition.

**1.    Teck Cominco's July 1999 DMR proves the July 27, 1999 violation at Station 7.**

Teck Cominco's July 1999 DMR demonstrates a violation at Station 7.  Exhibit 303 to Cole Reply dec. (DMR excerpt, "Red Dog Discharge Adjustment Based on Station 7"); see also Exhibit 168 to Cole dec. (report to EPA of exceedance); Exhibit 253 to Cole Reply dec. (same). In that DMR, Teck Cominco reports a value of 511 mg/L at Station 7 on July 27, 1999, above its permit limit of 500 mg/L at that Station.  Teck Cominco argues that "the alleged violation resulted from a transcription error that Teck Cominco corrected in its March 1, 2003 Amended DMR." Opposition at 39.  As set forth above, Teck Cominco is not permitted to impeach its DMRs, particularly not almost four years after the fact and after the filing of the KRPC litigation. Summary judgment should be entered for Adams on the July 27, 1999 Compliance Order violation at Station 7.

**2.    Teck Cominco's July 2001 DMR and its Opposition prove the July 25, 2001 violation at Station 7.**

In its Opposition, Teck Cominco states there was "no violation" on July 25, 2001 at Station 7, but then admits, "this is not the type of violation that is likely to recur."  Opposition at 33.  It July 2001 DMR reports an exceedance (allegedly based on an equipment incompatibility), and Teck Cominco cannot now impeach that DMR.  Exhibit 169 to Cole dec.; Exhibit 254 to Cole Reply dec.

**3.    Teck Cominco's July 1999 DMR proves the 19 violations from  July 1999 at Station 10.**

Teck Cominco's July 1999 DMR demonstrates violations of the Compliance Order at Station 10 on July 1, 2, 3, 4, 5, 6, 7, 8, 9 (seven violations), 14, 15, 17, and 18, 1999.  Exhibit 303 to Cole Reply dec. (DMR excerpt, "Red Dog Discharge Adjustsment Based on Station 10"); see also Exhibit 170 to Cole dec. (letter reporting violation to EPA), Exhibit 255 to Cole Reply

1   dec. (same); Exhibit 92 (letter reporting violation to EPA), Exhibit 198 to Cole Reply dec.

2   (same). Teck Cominco argues that "Teck Cominco amended its DMR on August 27, 2003 when

3   it recalculated its TDS results[.]" Opposition at 39. As set forth above, Teck Cominco is not

4   permitted to impeach its DMRs, particularly not after the filing of the KRPC litigation. Summary

5   judgment should be entered for Adams on the 19 violations on  July 1, 2, 3, 4, 5, 6, 7, 8, 9 (seven

6   violations), 14, 15, 17, and 18, 1999.

7               **4.      Teck Cominco admits the September 12, 1999 violation at Station 10.**

8          In the Opposition, Teck Cominco claims there was no violation on September 12, 1999

9   although admits it recorded a "TDS reading of 1658 mg/L on this date[.]" Opposition at 39.

10  Teck Cominco cannot now impeach the value it admits it reported in its DMR, which is above

11  the 1600 mg/L Compliance Order limit at Station 10.  Summary judgment should be entered for

12  Adams on the September 12, 1999 Compliance Order violation at Station 10.

13              **5.      Teck Cominco admits the June 24, 2002 violation at Station 10.**

14         Teck Cominco admits that one of the TDS values reported in the DMR "exceeds 1600

15  mg/L." Opposition at 39. The DMR reports the TDS level as 1620 mg/L at Station 10. Exhibit

16  171 to Cole dec.; Exhibit 258 to Cole Reply dec. As 1600 is the Compliance Order limit, Teck

17  Cominco admits that it reported a violation to EPA and it cannot now impeach its DMR. See

18  Exhibit   Thus summary judgment should be entered for Adams on the June 24, 2002

19  Compliance Order violation at Station 10.

20  **XVI.  TECK COMINCO'S PERMIT VIOLATIONS CONSTITUTE 1,926 DAYS OF
           VIOLATIONS FOR PURPOSES OF ASSESSING PENALTIES UNDER THE**
21  **       CLEAN WATER ACT.**

22         The Clean Water Act provides that dischargers found to be in violation of their permits as

23  a result of a citizen enforcement suit may be ordered to pay civil penalties. 33 U.S.C. §§ 1319(d);

24  1365(a). Adams asks this Court to determine the number of "days of violation" for which Teck

25  Cominco is liable for purposes of calculating penalties.  This is purely a question of law, as

26  suitable to summary adjudication as is liability in a Clean Water Act case. *See Atlantic States*

27  *Legal Foundation, supra,* 897 F.2d at 1137 (questions as to calculations of penalties under Clean

28

1  Water Act "are legal and not factual in nature").  Accordingly, Adams asks this Court to find

2  Teck Cominco subject to civil penalties of up to $27,500 for each day of violation, as

3  summarized below.

| | Originally Alleged | Withdrawn | Reserved for trial | Proven | Penalty |
|---|---|---|---|---|---|
| **Mine Site Violations** | | | | | |
| TDS daily | 622 | 4 | | 618 | |
| TDS monthly | 622 | 4 | | 618 | |
| Cyanide daily | 16 | 1 | | 15 | |
| Cyanide Monthly | 418 | | | 418 | |
| WET reporting | 4 | | | 4 | |
| WET Daily | 9 | | | 9 | |
| WET Monthly | 199 | | | 199 | |
| Unpermitted Discharges | 3 | | | 3 | |
| Monitoring and Reporting | 5 | 4 | | 1 | |
| | | | | | |
| **Port Site Violations** | | | | | |
| Unpermitted Discharges | 2 | | | 2 | |
| TSS Daily | 1 | | | 1 | |
| Monitoring and Reporting | 2 | 2 | | | |
| | | | | | |
| **COBC violations** | 48 | 6 | 4 | **38** | |
| | | | | | |
| **Total violations** | **1,951** | **21** | **4** | **1,926** | |

The maximum penalty for 1,926 violations is $52,965,000, which Adams requests this Court

levy against Teck Cominco at the penalty phase.

1  **XVIII.    CONCLUSION**

2  Consistent with Congress' intent for streamlined Clean Water Act enforcement, Adams

3  has tailored this citizen suit to be straightforward and narrowly drawn. The facts could not be

4  simpler: Teck Cominco is condemned by its own self-monitoring reports, which disclose the

5  1,926 Clean Water Act violations. This case does not involve complicated legal analysis. To

6  establish jurisdiction, the Court need do no more than look to Teck Cominco's admitted

7  post-Complaint violations. To establish liability, the Court need do no more than read and apply

8  the terms of the Permit to Teck Cominco's self-reported discharges.

9  Accordingly, Adams respectfully asks this Court to find Teck Cominco liable under the

10  Clean Water Act for those 1,926 permit violations over which there can be no genuine dispute of

11  fact, and to find Teck Cominco subject to later assessment of civil penalties for 1,926 days of

12  violations, and to hold that Adams has standing to pursue this suit.

13

14  Dated this ____ day of December 2005.

15  Respectfully submitted,

16  CENTER ON RACE, POVERTY
   & THE ENVIRONMENT

17

18

   Luke W. Cole
19  Nancy S. Wainwright

20  Attorneys for Plaintiffs

21  Avinash Kar

22

23

24

25

26

27

28

1   CERTIFICATE OF SERVICE

2   I certify that on the 5th day of December 2005, a true and correct copy of the Reply in Support of Motion for Partial
    Summary Judgment, and the Declarations of Enoch Adams, Leroy Adams, Andrew Koenig, Jerry Norton, Joseph
3   Swan, Robert Moran, Ken Fucik and Luke Cole were served via first class mail, postage prepaid, on the following
    counsel of record:

4
    Lawrence Hartig  (by Fedex)              David Case
5   Sean Halloran                            Landye Bennet Blumstein
    Hartig Rhodes                            701 West Eighth Avenue, Suite 1200
6   717 K Street                             Anchorage, AK 99501
    Anchorage, AK 99501
7
    Nancy S. Wainwright                      James E. Torgerson
8   Law Offices of Nancy S. Wainwright       Heller Ehrman
    13030 Back Road, Suite 555               510 L Street, Suite 500
9   Anchorage, AK 99515                      Anchorage, AK 99501

10

11  _____
    Luke W. Cole
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF EXHIBITS

**Declaration of Dr. Robert Moran**

**Declaration of Ken Fucik**

Exhibit 190: Federal Register Guidelines Establishing Test Procedures

**Declaration of Enoch Adams**

Exhibit 191: May 2005 Mine Site Discharge Monitoring Report ("Mine DMR")
Exhibit 192: June 2005 Mine DMR
Exhibit 193: July 2005 Mine DMR
Exhibit 194: August 2005 Mine DMR
Exhibit 195: September 2005 Mine DMR
Exhibit 196: August 2005 Discharge Monitoring Summary for Red Dog Mine

**Declaration of Randolph Fischer**

Exhibit 197: Randolph Fischer Curriculum Vitae

**Declaration of Luke Cole**

Exhibit 198: Letter from Wayne Hall to Robert Grandinetti, July 21, 1999
Exhibit 199: August 1999 Mine DMR
Exhibit 200: September 1999 Mine DMR
Exhibit 201: Letter from Wayne Hall to Robert Grandinetti, September 16, 1999
Exhibit 202: Letter from Wayne Hall to Robert Grandinetti, November 1, 1999
Exhibit 203: June 2000 Mine DMR
Exhibit 204: Letter from Mark Thompson to Randall Smith, July 17, 2000
Exhibit 205: July 2000 Mine DMR
Exhibit 206: Letter from Mark Thompson to Randall Smith, July 17, 2000
Exhibit 207: September 2000 Mine DMR
Exhibit 208: October 2000 Mine DMR
Exhibit 209: June 2001 Mine DMR
Exhibit 210: July 2001 Mine DMR
Exhibit 211: August 2001 Mine DMR
Exhibit 212: Letter from Wayne Hall to Randall Smith, August 29, 2001
Exhibit 213: September 2001 Mine DMR

Exhibit 214: June 2002 Mine DMR

Exhibit 215: Letter from John Martinisko to Pete McGee, June 3, 2002

Exhibit 216: Letter to Pete McGee, June 7, 2002

Exhibit 217: September 2002 Mine DMR

Exhibit 218: May 1999 Mine DMR

Exhibit 219: Letter from Mark Thompson to Randall Smith, June 16, 2000

Exhibit 220: Letter from Mark Thompson to Randall Smith, July 17, 2000

Exhibit 221: Letter from Wayne Hall to Randall Smith, July 3, 2000

Exhibit 222: June 2001 Mine DMR

Exhibit 223: Letter from Mark Thompson to Randall Smith, July 15, 2001

Exhibit 224: July 2001 Mine DMR

Exhibit 225: August 2001 Mine DMR

Exhibit 226: August 1999 Mine DMR

Exhibit 227: September 2002 Mine DMR

Exhibit 228: August 1999 Mine DMR

Exhibit 229: September 1999 Mine DMR

Exhibit 230: July 2000 Mine DMR

Exhibit 231: September 2000 Mine DMR

Exhibit 232: October 2000 Mine DMR

Exhibit 233: September 2001 Mine DMR

Exhibit 234: August 2001 Mine DMR

Exhibit 235: May 1999 Mine DMR

Exhibit 236: Letter from Wayne Hall to Randall Smith, June 9, 1999

Exhibit 237: Email from Wayne Hall to Robert Grandinetti, June 23, 1999

Exhibit 238: Fax from James Kulas to Robert Grandinetti, July 26, 1999

Exhibit 239: September 2002 Mine DMR

Exhibit 240: Letter from Wayne Hall to Randall Smith, August 22, 2000

Exhibit 241: September 2002 Mine DMR

Exhibit 242: Email from Mark Thompson to Robert Grandinetti, September 11, 2001

Exhibit 243: Letter from Mark Thompson to Randall Smith, May 20, 2002

Exhibit 244: Letter from Mark Thompson to Randall Smith, May 23, 2002

Exhibit 245: Letter from Mark Thompson to Randall Smith, May 24, 2002

Exhibit 246: September 2000 Mine DMR

Exhibit 247: July 2001 Mine DMR

Exhibit 248: October 2000 Mine DMR

Exhibit 249: July 2001 Mine DMR

Exhibit 250: Letter from Mark Thompson to Randall Smith, May 9, 2002

Exhibit 251: Letter from Mark Thompson to Randall Smith, May 10, 2002

Exhibit 252: Letter from Mark Thompson to Randall Smith, June 7, 2002

Exhibit 253: Email from James Kulas to Robert Grandinetti, July 28, 1999

Exhibit 254: July 2001 Mine DMR

Exhibit 255: Letter from Lawrence Hartig to Robert Grandinetti, July 1, 1999

Exhibit 256: June 2002 Mine DMR

Exhibit 257: Letter from Mark Thompson to Randall Smith, August 13, 2001

Exhibit 258: June 2002 Mine DMR

Exhibit 259: August 2001 Mine DMR

Exhibit 260: July 2001 Mine DMR

Exhibit 261: September 1999 Mine DMR

Exhibit 262: Deposition of Kevin Brix, February 22, 2005

Exhibit 263: Deposition of Jerry Norton, July 9, 2003

Exhibit 264: Deposition of Enoch Adams, July 8, 2003

Exhibit 265: Deposition of Leroy Adams, July 9, 2003

Exhibit 266: Deposition of Andrew Koenig, July 9, 2003

Exhibit 267: Deposition of Joseph Swan, May 4, 2005

Exhibit 268: Deposition of Jerry Norton, May 27, 2005

Exhibit 269: Deposition of Andrew Koenig, May 27, 2005

Exhibit 270: Deposition of Leroy Adams, May 6, 2005

Exhibit 271: Deposition of Enoch Adams, May 4, 2005

Exhibit 272: Deposition of Mark Thompson, March 3, 2005

Exhibit 273: Deposition of James Kulas, March 2, 2005

Exhibit 274: Declaration of Colleen Swan, 2005

Exhibit 275: Declaration of Jerry Norton, 2005

Exhibit 276: Declaration of Leroy Adams, 2003

Exhibit 277: Declaration of Andrew Koenig, 2003

Exhibit 278: Declaration of Jerry Norton, 2003

Exhibit 279: Declaration of Joseph Swan, 2003

Exhibit 280: Declaration of Enoch Adams, 2003

Exhibit 281: 2002 Modified COBC

Exhibit 282: June 2004 Mine DMR

Exhibit 283: Letter from Robert McLean to Jim Kulas, August 23, 2005

Exhibit 284: Letter from R.G. Scott to Micahel Gearheard, June 4, 2005

Exhibit 285: Letter from R.G. Scott to Michael Gearheard, May 23, 2005

Exhibit 286: May 2005 Port DMR

Exhibit 287: Supplemental Discovery Disclosure

Exhibit 288: 1998 Mine Site Permit

Exhibit 289: 2003 Mine Site Permit

Exhibit 290: Teck Cominco Opposition to MSJ, pages 55-57

Exhibit 291: Teck Cominco Response to Request for Admission No. 223

Exhibit 292: August 1999 Mine DMR

Exhibit 293: Teck Cominco Opposition to Plaintiffs' Cross-Motion on Monitoring

Exhibit 294: June 2004 Mine DMR

Exhibit 295: August 2004 Mine DMR

Exhibit 296: August 2002 Mine DMR

Exhibit 297: Revised May 1999 Mine DMR

Exhibit 298: Revised June 1999 Mine DMR

Exhibit 299: Revised July 1999 Mine DMR

Exhibit 300: Revised August 2000 Mine DMR

Exhibit 301: Revised September 2002 Mine DMR

Exhibit 302: Port Site Permit

Exhibit 303: July 1999 Mine DMR

Exhibit 304: United States v. Cominco Alaska, Inc., pages 1, 9, 11

Exhibit 305: Letter from R.G. Scott to Michael Gearheard, June 6, 2005

Exhibit 306: Letter from R.G. Scott to Michael Gearheard, October 12, 2004

Exhibit 307: Revised July 2001 Mine DMR

1  LUKE W. COLE, California Bar No. 145,505
   CAROLINE FARRELL, California Bar No. 202,871
2  BRENT J. NEWELL, California Bar No. 210,312
   Center on Race, Poverty, & the Environment
3  450 Geary Street, Suite 500
   San Francisco, CA, 94102
4  415/346-4179 • fax 415/346-8723

5  NANCY S. WAINWRIGHT, Alaska Bar No. 8711071
   Law Offices of Nancy S. Wainwright
6  13030 Back Road, Suite 555
   Anchorage, AK 99515-3538
7  907/345-5595• fax 907/345-3629

8  Attorneys for Plaintiff

9

10

11
                   **IN THE UNITED STATES DISTRICT COURT**
12
              **FOR THE DISTRICT OF ALASKA AT ANCHORAGE**
13

14  ENOCH ADAMS, JR., LEROY ADAMS,            Case No. A04-49 CV (JWS)
    ANDREW KOENIG, JERRY NORTON,
15  DAVID SWAN, and JOSEPH SWAN,              **NOTICE OF FACSIMILE
                                             FILING OF SIGNATURES**
16        Plaintiffs

17        v.

18  TECK COMINCO ALASKA INCORPORATED,

19        Defendant.

20

21  PLEASE TAKE NOTICE that we are filing the faxed signature pages of Dr. Robert Moran,

22  Randolph Fischer, Ken Fucik, and Enoch Adams, Jr. We will file the original signature pages

23  when received.

24
    Dated this ⟨ day of December, 2005.        Respectfully submitted,
25
                                               CENTER ON RACE, POVERTY
26                                             & THE ENVIRONMENT
27
28
    ─────────────────────────────

Notice of Facsimile Filing of Signatures

1            Luke W. Cole

2            LAW OFFICES OF NANCY S. WAINWRIGHT

3            Attorneys for Plaintiffs
             Enoch Adams, Jr., Leroy Adams, Andrew Koenig,
4            Jerry Norton, David Swan and Joseph Swan

5

6

  CERTIFICATE OF SERVICE
7

  I certify that on the 5th day of December 2005, a true and correct copy of the Notice of Facsimile Filing of Signatures
8  of Robert Moran, Ken Fucik, Randolph Fischer and Enoch Adams, Jr. were served via first class mail, postage
  prepaid, on the following counsel of record:
9

  Lawrence Hartig  (be Federal Express)  David Case
10  Sean Halloran         Landye Bennet Blumstein
  Hartig Rhodes         701 West Eighth Avenue, Suite 1200
11  717 K Street          Anchorage, AK 99501
  Anchorage, AK 99501
12

  Nancy S. Wainwright      James E. Torgerson
13  Law Offices of Nancy S. Wainwright  Heller Ehrman
  13030 Back Road, Suite 555    510 L Street, Suite 500
14  Anchorage, AK 99515      Anchorage, AK 99501

15

16  _____

  Luke W. Cole
17

18

19

20

21

22

23

24

25

26

27

28

  Notice of Facsimile Filing of Signatures    - 1 -