# UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

<table>
<tr><td>

ENOCH ADAMS, JR., LEROY ADAMS,<br>
ANDREW KOENIG, JERRY NORTON,<br>
DAVID SWAN, and JOSEPH SWAN,<br><br>

       Plaintiffs,<br><br>

    vs.<br><br>

TECK COMINCO ALASKA, INC.,<br><br>

      Defendant.<br>
_____<br><br>

NANA REGIONAL CORPORATION and<br>
NORTHWEST ARCTIC BOROUGH,<br><br>

    Interveners-Defendants.<br>
_____

</td><td>

3:04-cv-00049-JWS<br><br>

ORDER AND OPINION<br><br>

[Re:  Motion at Docket 72 and<br>
      Order for Status Report]

</td></tr>
</table>

## I. MOTION PRESENTED

At docket 72, plaintiffs Enoch Adams, Jr., Leroy Adams, Andrew Koenig, Jerry Norton, and Joseph Swan[1] move for partial summary judgment establishing defendant Teck Cominco Alaska, Inc.'s liability for 1,951 violations of its National Pollution Discharge Elimination System permits. At docket 100, defendant opposes the motion. Plaintiffs' reply is filed at docket 124. Oral argument was heard on June 15, 2006.

_____

[1]Plaintiff David Swan died on May 5, 2005.

## II. BACKGROUND

Except as otherwise noted, the facts in this section are those alleged in plaintiffs' complaint[2] which were not denied in defendant's answer.[3] Plaintiffs are residents of the village of Kivalina located near the mouth of the Wulik River in northwestern Alaska. The Wulik River is the primary source of drinking water for Kivalina residents. Plaintiffs subsistence fish in the Wulik River and its tributaries. Some of the plaintiffs also harvest fish and marine mammals from the Chuckchi Sea near the mouth of the river. Defendant Teck Cominco Alaska, Inc. ("Teck") operates the Red Dog Mine, which is located about fifty-five miles from the Chuckchi Sea on land owned by the Northwest Arctic Native Association ("NANA"). Ore removed from the open pit mine is milled to obtain zinc and lead concentrates. Throughout the year, the concentrates are trucked over the DeLong Mountain Road to storage buildings about a mile from tidewater. During the months when the Chuckchi Sea is free of ice, the concentrates are loaded aboard ships for transport to smelters outside Alaska. The tidewater storage facilities and other infrastructure at the port site are on NANA land. Teck operates the mine and the port sites under an agreement with NANA.

Cyanide is used in the milling process at the mine. Tailings and process wastewater resulting from the milling operation are impounded in a tailings pond, from which treated wastewater is discharged into the Middle Fork of Red Dog Creek through Outfall 001. Mining takes place year-round, but wastewater is discharged only during the warmer periods, generally from May until early October. The mouth of the Wulik River is downstream of Outfall 001.

Federal law prohibits discharge of pollutants from point sources except in compliance with the provisions of the Clean Water Act ("CWA").[4] The discharge of

---

[2]Doc. 10.

[3]Doc. 6.

[4]33 U.S.C. § 1311(a). Section 1 of Pub. L. 95-217 indicates that a set of federal water pollution control statutes - statutes that include those of great relevance to this litigation - may be cited as the "Clean Water Act of 1977." For simplicity and because there have been subsequent amendments, the court uses the term "Clean Water Act" to refer to this statutory

Case 3:04-cv-00049-JWS   Document 136   Filed 07/28/06   Page 2 of 32

pollutants may be authorized in accordance with National Pollution Discharge Elimination System ("NPDES") permits.[5]  In Alaska, NPDES permits are issued by the federal Environmental Protection Agency ("EPA").  The EPA issued NPDES permit number AK-03865-2 for the Red Dog mine site in 1985, reissued the permit in 1998, modified the permit in July 2003, and administratively extended it when the permit expired on August 28, 2003.  The permit authorizes Teck to discharge 2.418 billion gallons of effluent from the tailings pond via Outfall 001 each year.  Eleven discharge parameters are found in the permit which uses two limitation types–daily maximum discharge limits and monthly average discharge limits.

The EPA issued NPDES permit number AK004064-9 for the port site, effective January 29, 1999.  The permit authorizes Teck to discharge treated wastewater from a sewage treatment plant into the Chuckchi Sea via Outfall 001, and to discharge drainage from the concentrate storage buildings into the Chuckchi Sea or onto the tundra from Outfall 005.  Under the terms of both the mine and port site NPDES permits, Teck is required to file discharge monitoring reports ("DMR") with the EPA.

Between the effective date of the 1998 mine site NPDES permit and the date plaintiffs filed the underlying complaint, the EPA issued four Compliance Orders by Consent ("COBCs") extending Teck's schedule for compliance with the 170 mg/l monthly average and 196 mg/l daily maximum limits for TDS set out in the 1998 mine site NPDES permit.  The July 1999 COBC states that Teck shall achieve compliance with the mine site permit limits for TDS by the beginning of the 2001 discharge season, and that during the 1999 and 2000 discharge seasons, Teck shall limit TDS discharged in its wastewater to maintain in-stream TDS concentrations at or below 1,500 mg/l at Station 10 during the entire discharge season, and at 500 mg/L at Station 7 from July 25 through August 31.[6]

_____

scheme.

    [5]33 U.S.C. § 1342(a).

    [6]1999 COBC at 3, doc. 72, exh. 73.

The May 2000 COBC states that Teck shall achieve compliance with the permit limit for TDS by the beginning of the 2001 discharge season, and that during the 1999 and 2000 discharge seasons, Teck shall limit TDS discharged in its wastewater so as to maintain in-stream TDS concentrations at or below 1,500 mg/l at Station 10 during the entire discharge season, and at 500 mg/l at Station 7 from July 25 through August 31.[7] The May 2001 COBC requires Teck to comply with the TDS limits in the 1998 permit by the beginning of the 2002 discharge season, and states that during the 2001 discharge season, Teck shall maintain in-stream TDS concentrations at or below 1,500 mg/l at Station 10 during the entire discharge season, and at 500 mg/l at Station 7 from July 25 through September 15.[8]

The May 2002 COBC requires Teck to come into compliance with the TDS limits in its NPDES permit by August 2003, and states that during the 2002 and 2003 discharge seasons, Teck shall maintain in-stream TDS concentrations at or below 1,500 mg/l at Station 10 during the entire discharge season, and at 500 mg/l at Station 160 from July 25 through the end of the discharge season.[9] The COBCs also collectively state that Teck violated both the daily maximum and monthly average TDS effluent limits contained in the 1998 NPDES permit during the months of September 1998, May through October of 1999, May through October of 2000, and May through October of 2001, and state that Teck's violations of the TDS limits in the NPDES permit constitute violations of 33 U.S.C. § 1311(a).

Plaintiffs filed the underlying complaint on March 8, 2004. Plaintiffs' complaint alleges ten claims. Claims one through seven and ten, all of which allege violations of 33 U.S.C. § 1311(a), are pertinent to the motion presented herein. Claim one alleges violations of the total dissolved solids ("TDS") limit in the mine site NPDES permit. Claim two asserts violations of cyanide limits in the mine site permit. Claim three asserts violations of Whole Effluent Toxicity ("WET") testing requirements in the mine

---

[7]2000 COBC at 4, doc. 72, exh. 74.

[8]2001 COBC at 4-5, doc. 72, exh. 75.

[9]2002 COBC at 5, doc. 72, exh. 76.

-4-

site permit.  Claim four alleges unpermitted discharges to the tundra in violation of the mine site permit.  Claim five asserts self-monitoring and reporting violations of the mine site permit.  Claim six alleges unpermitted discharges from the port site and violations of the total suspended solids ("TSS") limit in the port site NPDES permit.  Claim seven alleges violations of the COBCs.  Claim ten alleges self-monitoring and reporting violations of the port site permit.

In their complaint, plaintiffs seek penalties for 2,309 violations of Teck's mine and port site NPDES permits and related COBCs.   Plaintiffs now move for partial summary judgment establishing Teck's liability for 1,951 of those violations.  Plaintiffs further request the court to find Teck "subject to civil penalties of up to $27,500 for each of the 1,951 days of violation."[10]

### III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted when there is no genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law.  The moving party has the burden of showing that material facts are not genuinely disputed.[11]  To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim, but need not produce evidence negating that claim.[12]  Once the moving party meets its burden, the nonmoving party must demonstrate that a genuine issue of fact exists by presenting evidence indicating that certain facts are disputed so that a fact-finder must resolve the dispute at trial.[13]  The court must view this evidence in the light most favorable to the nonmoving party, must not assess its credibility, and must draw all justifiable inferences in favor of the nonmoving party.[14]

---

[10]Motion at 36, doc. 72.

[11]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[12]*Id.* at 325.

[13]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[14]*Id.* at 255; *Soldano v. United States*, __F.3d__, 2006 WL 1897081 (9th Cir. 2006).

Case 3:04-cv-00049-JWS   Document 136   Filed 07/28/06   Page 5 of 32

## IV.  DISCUSSION

Plaintiffs move for partial summary judgment establishing defendant's liability for 1,951 violations of its mine and port site NPDES permits.  Plaintiffs allege that all of the violations are confirmed by defendant's self-monitoring reports.  Defendant opposes the motion on several grounds, including standing, subject matter jurisdiction, regulatory mootness, and failure to allege a violation.  The court addresses the issues of standing and subject matter jurisdiction before addressing the alleged permit violations.

### A.    STANDING

Defendant first argues that plaintiffs lack individual standing to proceed on the merits of their lawsuit.  "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[15]  "[T]he threshold question of citizen standing under the CWA is whether an individual can show that she has been injured in her use of a particular area because of concerns about violations of environmental laws, not whether the plaintiff can show there has been actual environmental harm."[16]  "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."[17]

Here, plaintiffs each filed a declaration detailing the injuries suffered because of defendant's alleged violations.  Plaintiff Enoch Adams declares that he no longer obtains drinking water from the Wulik River because of defendant's discharges into the Middle Fork Red Dog Creek, a tributary to the Wulik River; he is concerned about the

---

[15] *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 180-181 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).

[16] *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000).

[17] *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

-6-

risks of eating contaminated fish; he has noticed changes in the bearded seal population around Kivalina since defendant's port site opened; he is "afraid of what kind of contamination the fish, caribou, ugruk, and belugas may have as a result of drinking the contaminated water that contains the discharge from the mine"; and he "cannot enjoy this beautiful area as much knowing there are contaminants in the River from Teck Cominco's violations."[18]  The remaining plaintiffs present evidence to similar effect.[19]  Plaintiffs' sworn statements are sufficient to establish injury in fact.

"The issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court."[20]  Plaintiffs have presented evidence that defendant has discharged pollutants in violation of NPDES permits, the pollutants discharged by defendant are toxic, and the discharge flows into waters that plaintiffs use for drinking, subsistence fishing, and recreation.  Plaintiffs also allege, and defendant does not dispute, that defendant is the only "industrial polluter in the Wulik River watershed."[21]  Here, as in *Ecological Rights Foundation*, "[i]t requires no attenuated chain of conjecture" to link defendant's alleged illegal conduct to plaintiffs' diminished enjoyment of the Wulik River.[22]

Similarly, plaintiffs have satisfied the "fairly traceable" requirement by showing that defendant discharges pollutants that contribute to the kinds of injuries alleged in the geographic area around the village of Kivalina.[23]  The redressability component focuses on a plaintiff's injury and the judicial relief sought.  On summary judgment, a plaintiff

---

[18]Declaration of Enoch Adams, Jr. at 4, attached to doc. 72.

[19]*See* Declarations of Leroy Adams, Jerry Norton, Andrew Koenig, and Joseph Swan, attached to doc. 72.

[20]*Ecological Rights Foundation*, 230 F.3d at 1152.

[21]Doc. 72 at 12.

[22]*Ecological Rights Foundation*, 230 F.3d at 1152.

[23]*Natural Resources Defense v. Southwest Marine*, 236 F.3d 985, 995 (9th Cir. 2000) (citation and internal quotation marks omitted).

Case 3:04-cv-00049-JWS   Document 136   Filed 07/28/06   Page 7 of 32

must establish that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[24] In this matter, plaintiffs seek injunctive relief, civil penalties, and costs. Plaintiffs must demonstrate standing separately for each form of relief sought.[25] "A plaintiff who seeks injunctive relief satisfies the redressability requirement by alleging a continuing violation" of an applicable standard.[26] Here, plaintiffs allege and have provided evidence that defendant is continuing to violate its NPDES permits. Because plaintiffs seek an injunction to halt those continuing violations, plaintiffs satisfy the redressability requirement for injunctive relief.[27]

Similarly, civil penalties and costs redress violations in a citizen suit by deterring future violations and limiting defendant's economic incentive to delay attainment of permit limits. To the extent civil penalties encourage a defendant to discontinue current violations and deter defendant from committing future violations, civil penalties afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.[28] The civil penalties plaintiffs seek in this matter carry with them a deterrent effect that make it likely, as opposed to merely speculative, that the penalties will redress injuries "by abating current violations and preventing future ones."[29]

For the reasons stated above, plaintiffs have satisfied Article III's requirements and have standing to bring this action.

---

[24]*Laidlaw*, 528 U.S. at 181.

[25]*Id.* at 185.

[26]*Southwest Marine*, 236 F.3d at 995.

[27]*Id.*

[28]*Laidlaw*, 528 U.S. at 186.

[29]*Id.* at 187.

-8-

**B. SUBJECT MATTER JURISDICTION**

Defendant next argues that the court does not have jurisdiction over the alleged violations because plaintiffs cannot establish that the violations were ongoing as of March 8, 2004, the date plaintiffs filed their complaint. The Clean Water Act "'does not permit citizen suits for wholly past violations:' rather, the statute 'confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation.'"[30] Citizen-plaintiffs are not required to "prove their allegations of ongoing noncompliance before jurisdiction attaches under § 505."[31]

Claims one through seven and ten of plaintiffs' complaint each contain allegations that the violations at issue are "ongoing to this day or are capable of repetition," and that "without the imposition of appropriate civil penalties and the issuance of appropriate equitable relief," defendant will continue to violate its NPDES permits. Based on the court's review of the record, it appears that plaintiffs' allegations of continuous or intermittent violations are based on a good-faith belief, formed after reasonable inquiry into the facts. Because plaintiffs have made the requisite good-faith allegations, plaintiffs have satisfied the threshold requirement for jurisdiction.[32]

To prevail at trial, a citizen-plaintiff must prove ongoing violations.[33] "[A] citizen plaintiff may prove ongoing violations 'either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.'"[34] The Ninth Circuit has "confirmed that '[i]ntermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of

---

[30]*Southwest Marine,* 236 F.3d at 998 (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 64 (1987)).

[31]*Gwaltney*, 484 U.S. at 64.

[32]*Southwest Marine*, 236 F.3d at 998.

[33]*Community Association for Restoration of the Environment v. Henry Bosma Dairy*, 305 F.3d 943, 953 (9th Cir. 2002).

[34]*Sierra Club v. Union Oil Co.*, 853 F.2d 667, 671 (9th Cir. 1988) (quoting *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171-72 (4th Cir. 1988)).

repetition.'"[35]  In assessing the likelihood of repetition, the court may consider "whether remedial actions were taken to cure violations, the *ex ante* probability that such remedial measures would be effective, and any other evidence presented during the proceedings that bears on *whether the risk of defendant's continued violation had been completely eradicated* when citizen-plaintiffs filed suit."[36]  Violations can also be deemed ongoing if in comparing self-reported exceedances before a complaint was filed and afterwards, the same parameter is exceeded.[37]

Defendant alleges that plaintiffs have failed to offer evidence of ongoing TDS, cyanide, and WET limit violations, monitoring and reporting violations, and unpermitted discharge violations.  The court will consider whether plaintiffs have met their burden of establishing ongoing violations in its discussion of each category of violations.

**C.    VIOLATIONS OF THE MINE SITE NPDES PERMIT**

Defendant's mine site permit establishes discharge limits for eleven parameters and contains two types of limitations: a daily maximum discharge limit and a monthly average discharge limit.  Plaintiffs move for partial summary judgment establishing defendant's liability for violations of the TDS daily maximum and monthly average limits, cyanide daily maximum and monthly average limits, WET daily maximum and monthly average limits, and monitoring and reporting requirements.  The alleged violations are based solely on self-monitoring reports Teck has submitted to the EPA.  The court considers each category of alleged violations below.

---

[35]*Henry Bosma Dairy,* 305 F.3d at 953 (quoting *Chesapeake Bay Foundation*, 844 F.2d at 172).

[36]*Union Oil*, 853 F.2d at 667 (quotation and citation omitted) (emphasis in original).

[37]*Sierra Club v. Union Oil Co. of California*, 716 F.Supp. 429, 433 (N.D. Cal. 1989).

1.      **618 Violations of the Total Dissolved Solids Daily Maximum Limit**[38]

Teck's 1998 mine site NPDES permit sets a daily maximum limit for TDS of 196 mg/l at Outfall 001.  The 196 mg/l daily maximum limit for TDS was in effect from March 1999 through March 8, 2004, the date plaintiffs filed their complaint.  Plaintiffs allege that defendant admitted 108 violations of the daily maximum TDS limit in its answer in this litigation, and admitted "329 violations in the KRPC litigation and an additional 181 violations to the U.S. EPA, for a total of 618 violations of the daily maximum discharge of TDS."[39]

In July 2003, the EPA modified Teck's mine site NPDES permit.  The July 2003 modification of Teck's mine site permit sets in-stream limits for TDS concentrations during Arctic Grayling spawning season and for the remainder of the discharge season.  The 2003 permit also states that "[i]n addition to the above limitations the TDS concentration at Outfall 001 shall not exceed 3,900 mg/l."[40]  The 2003 permit modification of the TDS limits became effective on June 15, 2004, with the exception of the limits during grayling spawning period.[41]

Defendant first opposes plaintiffs' motion for partial summary judgment on the alleged violations of the daily maximum TDS limit on the grounds of regulatory mootness.   Defendant suggests that "an anticipated change" to its mine site NPDES permit renders plaintiffs' claim for violations of the daily maximum TDS limit moot.  Defendant specifically alleges that the anticipated "2006 permit will set TDS limits at 1500 mg/l in-stream Red Dog Creek during the entire discharge season and contain no end of pipe limit."[42]

---

[38]In their motion for summary judgment, plaintiffs alleged four violations of the TDS daily maximum in May 1999.  Defendant pointed out that plaintiffs did not allege the four May 1999 violations in their complaint; consequently, plaintiffs withdrew the four May 1999 violations.

[39]Reply at 44, doc. 124.

[40]2003 Modified Permit at 8, doc. 72, exh. 71.

[41]Opposition at 21, doc. 100.

[42]Affidavit of Mark Thompson Regarding TDS at 4, doc. 100, exh. 1.

-11-

Defendant's argument of regulatory mootness based on an anticipated change in the NPDES permit is premature. In seeking to have a claim dismissed as moot, the defendant's burden "is a heavy one."[43] "The defendant must demonstrate that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"[44] Defendant cannot meet its burden here because Teck is currently operating under the 2003 NPDES permit, which states that in addition to the in-stream limits for TDS, the daily maximum TDS concentration at Outfall 001 shall not exceed 3,900 mg/l. Moreover, even if the court assumes the renewed permit will moot plaintiffs' claims for injunctive relief related to violations of the daily maximum TDS limits, the court could still impose civil penalties for violations that have already occurred provided the violations are ongoing or capable of repetition.[45]

Defendant next argues that plaintiffs have not satisfied their burden of demonstrating that Teck's alleged violations of the daily maximum TDS limit are ongoing. Plaintiffs allege that Teck's violations of the daily maximum TDS limit in the 1998 permit were ongoing through June 14, 2004, and that Teck has also violated the 3,900 mg/l limit since plaintiffs filed this suit. In support, plaintiffs provide evidence that Teck violated the 196 mg/l daily maximum limit for TDS at Outfall 001 in May 2004 and in half of June 2004,[46] and violated the new 3,900 mg/l limit for TDS at Outfall 001 in August and September of 2004.[47]

Defendant does not deny the alleged violations of the 196 mg/l daily maximum limit for TDS, nor its violations of the 3,900 mg/l limit. Rather, defendant argues that the 3,900 mg/l limit contained in the 2003 NPDES permit was "improperly derived and not

---

[43]*Gwaltney*, 484 U.S. at 66 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

[44]*Id.* (quoting *United States v. Phosphate Export Assn. Inc.*, 393 U.S. 199, 203 (1968)).

[45]*Laidlaw*, 528 U.S. at 192-193.

[46]May 2004 DMR, doc. 72, exh. 87; June 2004 DMR, doc. 124, exhs. 282 and 294.

[47]August 2004 DMR, doc. 72, exh. 84, September 2004 DMR, doc. 72, exh. 85.

based on any requirement of the Clean Water Act."[48]  The propriety of the 3,900 mg/l limit is not before this court.  Moreover, defendant could have appealed the 3,900 mg/l limit for Outfall 001 in the 2003 modified permit, but did not.

Defendant also argues that plaintiffs do not have standing to allege the August 2004 and September 2004 violations of the 3,900 mg/l TDS limit because they did not provide notice of these alleged violations.  Defendant's argument is unavailing because plaintiffs do not seek to establish defendant's liability for the alleged TDS violations in August and September of 2004.  Rather, plaintiffs cite the August and September 2004 DMRs as evidence that "[d]espite having its TDS limits raised by a factor of 20" from 197 mg/l to 3,900 mg/l at Outfall 001, Teck continues to violate the limits for TDS at Outfall 001. [49]

Defendant has admitted the alleged violations of the daily maximum limit for TDS.  Plaintiffs have alleged sufficient facts, about which there is no genuine issue, that violations of the daily maximum TDS limit were ongoing after plaintiffs filed their complaint.  It follows that plaintiffs' motion for partial summary judgment is granted as to the 618 violations of the daily maximum limit for TDS.

### 2.	618 Violations of the Monthly Average Total Dissolved Solids Limit[50]

Mine site permit condition I(A)(1) sets a monthly average discharge limit of 170 mg/l per day for TDS.  Plaintiffs allege that defendant admitted in its answer in this litigation that Teck violated the monthly average TDS limit in June 1999, August 1999, September 1999, May through September of 2000, June through October of 2001, May through October of 2002, and May through August of 2003, and that Teck admitted in its answer in the KRPC litigation that it violated the monthly average TDS limit in October 1999, October 2000, and May 2001.  Accordingly, plaintiffs move for summary judgment

---

[48]Doc. 100 at 11.

[49]Doc. 124 at 57.

[50]In their motion, plaintiffs moved for summary judgment on 622 violations of the monthly average TDS limit.  In their reply, plaintiffs withdrew four violations which were alleged in their motion but not in their complaint.

-13-

establishing defendant's liability for violating the monthly average TDS limit during 26 months.[51]

Defendant admits that it violated the monthly average TDS limit in all of the above-referenced months except October 1999, October 2000, and May 2001. However, defendant argues that plaintiffs are not entitled to summary judgment on any violations of the monthly average TDS limit because the violations are not ongoing or capable of repetition. Defendant specifically argues that the July 2003 modified permit, which is currently in effect, does not contain a monthly average TDS limit.[52]

In support of their allegation that violations of the monthly average TDS limit "were ongoing and continuing after March 8, 2004, the date this suit was filed,"[53] plaintiffs cite the August 2004 and September 2004 DMRs, which indicate that defendant violated the 3,900 mg/l end-of-pipe limit on August 31, 2004, and September 22, 2004. However, violations of the 3,900 mg/l end-of-pipe TDS limit on one day per month do not demonstrate that violations of the 170 mg/l monthly average TDS limit are ongoing.

Moreover, plaintiffs do not dispute defendant's assertion that the 2003 mine site permit does not contain a monthly average TDS limit. To the contrary, plaintiffs appear to acknowledge that the 3,900 mg/l limit for TDS at Outfall 001 in the July 2003 modified permit replaces the196 mg/l daily maximum TDS limit at Outfall 001 in the 1998 NPDES

---

[51]Citing *Chesapeake Bay Foundation, Inc. V. Gwaltney of Smithfield, Ltd.,* 791 F.2d 304, 313-15 (4th Cir. 1986), plaintiffs allege that "[v]iolations of a monthly average limit mean that the permit was violated on each day the facility discharged in that month." Consequently, plaintiffs allege that defendant has committed 618 violations of the monthly average TDS limit. In *Gwaltney*, the Fourth Circuit held that for the purpose of fixing an appropriate civil penalty under 33 U.S.C. § 1319(d), "violations of 'average' limitations encompassing periods greater than one day are to be treated as a violation for each day of the time period involved." Plaintiffs' motion for partial summary judgment concerns liability only. If Teck is found liable for any of the alleged violations, an evidentiary hearing will likely be held to determine the appropriate amount of penalties and/or other relief. Consequently, the court reserves judgment on the issue of whether violations of the monthly average limit mean that the permit was violated on each day the facility discharged in that month.

[52]Doc. 6 at 19.

[53]Doc. 124 at 46.

-14-

permit. In their reply memorandum, plaintiffs specifically state that Teck "still has an end-of-pipe permit limitation under the 2003 permit, of 3900 mg/L at Outfall 001" and that "[t]he 196 mg/L limit was not changed to in-stream, it was raised to 3900 mg/L."[54]

Plaintiffs do not provide any evidence that the 3,900 mg/l limit for TDS in the July 2003 modified permit was intended to serve as both the daily maximum limit and the monthly average limit. Instead, the evidence shows that where there is both a daily maximum limit and a monthly average limit for a particular parameter in the 1998 and 2003 mine site permits, the monthly average limit is lower than the daily maximum limit. Morever, where the EPA has intended to impose a monthly average limit in the NPDES permits, it has used the words "monthly average" limit. Here, the plain language of the 2003 permit states in pertinent part, "In addition to the above limitations the TDS concentration at Outfall 001 shall not exceed 3,900 mg/l."[55]

Because plaintiffs have failed to demonstrate that violations of the monthly average TDS limit are ongoing or capable of repetition, plaintiffs' motion for summary judgment is denied as to the 618 alleged violations of the monthly average TDS limit.

### 3.      16 Violations of the Cyanide Daily Maximum Limit

Teck's 1998 mine site NPDES permit limits cyanide to a daily maximum concentration of 9.0 µg/l. Plaintiffs complaint alleges that defendant exceeded the daily maximum limit for cyanide on the following dates: May 22, 1999; May 25 and 29, 2000; June 10, 13, and 24, 2000; June 14 and 18, 2001; July 22 and 30, 2001; August 13, 16, 20, and 27, 2001; June 10, 2002; and, September 30, 2002. Plaintiffs assert that the daily violations listed above are confirmed by defendant's DMRs for the corresponding months. Plaintiffs withdrew the violation alleged on May 22, 1999, and now move for summary judgment establishing Teck's liability for the remaining fifteen violations.

Defendant does not dispute the alleged violations of the daily limit for cyanide on May 25 and 29, 2000, June 13 and 24, 2000, June 14 and 18, 2001, July 22 and 30,

---

[54]Doc. 124 at 47.

[55]Doc. 72, exh. 71 at 8.

2001, August 16 and 27, 2001, and June 10, 2002,[56] but argues that amended DMRs show no violations on June 10, 2000, August 13 and 20, 2001, and September 30, 2002. Defendant does not cite any controlling authority for its proposition that a defendant has a "right to amend its DMRs when laboratory error caused defendant to over-report effluent discharge when such error shows there was, in fact, no violation."[57] To the contrary, defendant acknowledges that in *Sierra Club v. Union Oil Company,* the Ninth Circuit ruled "that a permittee could not impeach its own reports by showing sampling error."[58]

Defendant next argues that plaintiffs are not entitled to summary judgment on any of the alleged violations of the daily maximum cyanide limit on the grounds of regulatory mootness. Defendant alleges that plaintiffs' claims are moot because the draft 2006 NPDES permit does not contain an effluent limit for cyanide or require Teck to use the total cyanide analytical method for monitoring cyanide. As discussed above, defendant's argument of regulatory mootness based on anticipated changes in the NPDES permit is premature. Moreover, even if the court assumes the renewed permit will moot plaintiffs' claims for injunctive relief related to violations of the daily maximum cyanide limits, the court could still impose civil penalties for any violations that have already occurred, provided the violations are ongoing or capable of repetition.[59]

Finally, defendant argues that plaintiffs cannot meet their burden of demonstrating that violations of the daily maximum cyanide limit are ongoing. Citing the September 2004 DMR, plaintiffs allege that Teck "reported two separate violations of the cyanide daily standard, measured by two separate labs, in September 2004, long after this suit was filed."[60] Plaintiffs are apparently referring to two split samples which

---

[56]Opposition at 55, doc. 100.

[57]Opposition at 36, doc. 100.

[58]Doc. 100 at 37 (citing *Sierra Club v. Union Oil Co. Of California*, 813 F.Supp. 1480, 1492 (9th Cir. 1987)).

[59]*Laidlaw*, 528 U.S. at 192-193.

[60]Doc. 124 at 63.

-16-

were reported in Table A of the September 2004 DMR. Table A, which sets forth the results of an expanded cyanide sampling program in September 2004,[61] indicates that five samples for cyanide testing were taken during September 2004, four of the five samples were split between two separate laboratories, and three of the five samples were split again with half of these samples being treated to remove sulfides. The results of a split sample for September 19, 2004, indicate that one lab found a cyanide concentration of 17.0 µg/l, whereas the other lab found 3.18 µg/l. Similarly, the results of a split sample for September 26, 2004, indicate that one lab found a cyanide concentration of 7.0 µg/l, whereas the other lab found 12.4 µg/l.

Defendant argues that contrary to plaintiffs' allegation, Teck did not report any violations of the daily cyanide limit in the September 2004 DMR. The September 2004 DMR states that "[a]ll monitored parameters were within permitted limits during September 2004."[62] Defendant further argues that the conflicting results of the split samples for September 19 and 26, 2004, do not establish ongoing violations of the daily maximum limit for cyanide, but rather raise a genuine issue of material fact as to whether the violations are ongoing. The court agrees.

Because there is a genuine issue of material fact as to whether violations of the daily maximum cyanide limit are ongoing, plaintiffs are not entitled to summary judgment as to the fifteen alleged violations of the daily maximum cyanide limit.

### 4.     418 Violations of the Cyanide Monthly Average Limit

The 1998 mine site NPDES permit sets a monthly average limit for cyanide of 4.0 µg/l. Plaintiffs' complaint alleges that Teck reported violations of the monthly average cyanide limit in June 1999, July 1999, August 1999, September 1999, May 2000, June 2000, July 2000, September 2000, October 2000, June 2001, July 2001, August 2001, September 2001, May 2002, June 2002, and September 2002. Plaintiffs also allege that violations of a monthly average limit mean that the limit was violated each day Teck

---

[61]Doc. 100, attachment 2, exh. 2 at 1-2.

[62]*Id.* at 1.

operated in that month.  Consequently, plaintiffs move for summary judgment on a total of 418 monthly average cyanide violations.

Defendant argues that the alleged violations of the monthly average cyanide limit are moot because the draft 2006 NPDES permit does not contain an effluent limit for cyanide and does not require Teck to use the total cyanide analytical method for monitoring cyanide.  As discussed previously, defendant's argument of regulatory mootness is premature.

Defendant next argues that plaintiffs have failed to establish that violations of the monthly average cyanide limit are ongoing.  The only evidence plaintiffs offer to demonstrate ongoing violations is Table A in the September 2004 DMR.  Plaintiffs allege that averaging all of the lab results that were not fixed for sulfide in Table A yields a value of 5.13 µg/l, averaging all the NCA laboratory results that were not fixed for sulfide yields an average of 4.434 µg/l, and averaging all of the ACZ laboratory results that were not fixed for sulfides yields an average of 6.0 µg/l, all of which are over the permit limit of 4.0 µg/l.

Defendant asserts that the September 2004 DMR does not provide evidence of ongoing violations of the monthly average cyanide limit because the September 2004 DMR states that "[a]ll monitored parameters were within permitted limits during September 2004."[63] Defendant also produces testimony that there have been "no reported monthly average cyanide permit violations since May 2000."[64] In addition, defendant suggests that the two highest split sample results reported in Table A are aberrations, which are grossly over the other split sample results, and that removing them from the calculation of the monthly average yields a result under 4.0 µg/l.

Moreover, defendant argues that the EPA set 9.0 µg/l as the only enforceable monthly average cyanide limit.   In September 2004, the 2003 modified NPDES permit was in effect.  The 2003 modified permit, like the 1998 NPDES permit, sets a monthly

[63]Doc. 100, exh. 2, attachment 2 at 1.

[64]Affidavit of Mark Thompson Regarding Plaintiffs' Cyanide Claims at 10, exh. 2, doc. 100.

-18-

average cyanide limit of 4.0 µg/l. However, both permits also state that effluent limits for cyanide are not quantifiable using EPA approved analytical methods and that the EPA will use the "Interim Minimum Level" of 9.00 µg/l as the "compliance evaluation level."[65] Based on the above language, defendant argues that the compliance level set by the EPA for the monthly average cyanide limit is 9.0 µg/l, not 4.0 µg/l.

Because defendant has raised genuine issues of material fact as to whether the violations of the monthly average cyanide limit are ongoing or capable of repetition, plaintiffs are not entitled to summary judgment as to the 418 alleged violations of the monthly average cyanide limit.

### 5. 4 Violations of the Whole Effluent Toxicity Reporting Requirement

The 1998 mine site NPDES permit, section I(H), requires defendant to perform toxicity tests "once per month on samples from the effluent, and on ambient water from Stations 9 and 12."[66] Section I(H)(4) further requires defendant to report the results of WET testing in the DMR "for the month in which the tests are conducted" and that a full report "be submitted by the end of the month in which the DMR is submitted."[67] Plaintiffs allege that Teck violated mine site permit section I(H)(4) by "not reporting the results of required WET testing, or by reporting the results of incomplete or inadequate WET testing" in August 1999 for Outfall 001, Station 9, and Station 12, and in August 2001 for Outfall 001.[68]

Defendant does not dispute the alleged reporting violations in August 1999, but provides evidence that no reporting violation occurred in August 2001. Defendant also argues that plaintiffs are not entitled to summary judgment on any of the alleged violations because plaintiffs have not met their burden of showing that the violations are ongoing. The court concurs. The only evidence plaintiffs offer to demonstrate ongoing WET reporting violations is the May 2004 DMR, in which Teck reported the results of a

---

[65] Doc. 72, exh. 70 at 9; exh. 71 at 6.

[66] Doc. 72, exh. 70 at 19-20.

[67] *Id.* at 21.

[68] Doc. 26 at 17.

grab sample for TDS, instead of a composite sample for TDS. Contrary to plaintiffs' assertion, a TDS reporting violation is not "identical" to a WET reporting violation.[69]

Because plaintiffs have failed to provide evidence that the alleged WET reporting violations were ongoing when they filed their complaint, plaintiffs are not entitled to summary judgment as to the four alleged WET reporting violations.

### 6. 9 Violations of the Daily Whole Effluent Toxicity Limit

Section I(H)(5) in the 1998 mine site NPDES permit sets a maximum daily limit for WET of 12.2 TUc. Plaintiffs' complaint alleges that Teck "exceeded the maximum daily limit for WET, and thus violated mine site permit condition I(H)(5), in May 1999, June 1999, July 1999, August 2000; on August 16, 18, and 20, 2001; in August 2002; and in September 2002 (2 violations)."[70] In their motion for summary judgment, plaintiffs allege that Teck admitted the August 2001 violation in this litigation, "admitted to the violation in July 1999 (on the 13th, 15th, and 17th)" in the previous litigation, and "admitted to the EPA that it violated the WET daily limit on seven other occasions, for a total of nine violations of the WET daily limit."[71]

Defendant argues that revised DMRs "rebut plaintiffs' claims of any violations of the daily maximum WET limits for May 1999, June 1999, July 13, 1999, August 2000, and September 2002."[72] Defendant further argues that plaintiffs are not entitled to summary judgment on any of the alleged violations of the daily maximum WET limit because plaintiffs have failed to demonstrate that the violations are ongoing.

Plaintiffs allege that the August 2004 DMR shows a violation of the daily maximum WET limit on August 3, 2004. However, the August 2004 DMR states that

---

[69]Doc. 124 at 74. *See Sierra Club v. Union Oil Company of California*, 716 F.Supp. 429, 433 (N.D. CA 1989) ("The court will find a violation 'ongoing' by comparing self-reported exceedances before the complaint was filed and afterwards. If the same parameter is exceeded, or a violation recurs and the cause has not been completely eradicated, then the violation will be deemed 'ongoing' and liability will attach.")

[70]Doc. 26 at 17-18.

[71]Doc. 72 at 30.

[72]Doc. 100 at 67.

WET test results for August 2004 "were within the permitted limits."[73]  Table C in the DMR sets forth the results of a split sample on August 3, 2004, which was sent to two laboratories.  The test results from one laboratory (ENSR) show a WET concentration of 9.28 TUc at Outfall 001, which is under the daily maximum WET limit of 12.2 TUc.  The results from the other laboratory (CH2M Hill) show a concentration of 13.6 TUc at Outfall 001, which is over the daily maximum WET limit.[74]

Defendant offers evidence that Kevin Brix, Principle Scientist at EcoTox, also ran a WET test on a single aliquot from the August 3, 2004, sample used by ENSR, which yielded a result of 5.6 TUc.[75]  Defendant argues that at a minimum, there is a genuine issue of material fact as to whether the CH2M Hill WET test result for August 3, 2004, demonstrates that the WET violations were ongoing at the time plaintiffs filed their complaint.[76]  The court concurs.

For the reasons set out above, plaintiffs' motion for summary judgment is denied as to the nine alleged violations of the daily maximum WET limit.

### 7.    199 Violations of the Monthly Average Whole Effluent Toxicity Limit

Section I(H)(5) of the 1998 mine site permit sets a monthly average WET limit of 9.7 TUc.  Plaintiffs' complaint alleges that Teck exceeded its monthly average WET limit in May 1999, June 1999, July 1999, August 2000, August 2001, August 2002, and September 2002, and that "[v]iolations of a monthly average limit mean that the permit was violated on each day the facility operated that month."[77]  In their motion for summary judgment, plaintiffs allege that Teck admitted in its answer that it violated its monthly average WET limit in August 2001, and "admitted to [the] EPA that it violated its monthly average permit limit in six other months: May 1999, June 1999, July 1999,

---

[73]Doc. 100, attachment 4, exh. 1.

[74]Doc. 72, exh. 84 at 1.

[75]Declaration of Kevin Brix at 5, exh. 4, doc. 100.

[76]Doc. 100 at 67.

[77]Doc. 26 at 18.

August 2000, August 2002 and September 2002."[78]  Based on the proposition that "[v]iolations of a monthly average limit mean that the permit was violated on each day the facility discharged in that month," plaintiffs allege that Teck violated its monthly average WET limit 199 times.

Defendant alleges that plaintiffs are not entitled to summary judgment because they have failed to demonstrate that violations of the WET monthly limits are ongoing. The court concurs.  The only evidence plaintiffs offer in support of their allegation that the violations are ongoing is the August 2004 DMR, which lists the results of a split sample collected on August 3, 2004.  Without citing any authority for doing so, plaintiffs arrive at a monthly average for August 2004 by averaging the results of a split sample for one day.  Moreover, as discussed above, defendants offer evidence which suggests that the lower split sample result is more plausible than the higher split sample result.

Because plaintiffs have failed to allege sufficient facts, about which there is no genuine issue, that violations of the monthly average WET limits are ongoing, plaintiffs are not entitled to summary judgement on the 199 alleged violations of the monthly average WET limit.

### 8.  3 Unpermitted Mine Site Discharges to the Tundra

Plaintiffs allege that they are entitled to summary judgment as to defendant's violation of Section I(C)(2) of the mine site NPDES permit by discharging to the tundra on May 19, 22, and 23, 2002, when the pumping system was overtopped.  Defendant argues that the unpermitted discharges on May 19, 22, and 23 are excused under 40 C.F.R. § 440.131(b) because the discharges occurred "as the result of excessive snow melt that generated more melt water than had been estimated when the pumping system was designed."[79]  Defendant argues that by implementing an overburden pumping system to handle runoff from a "100-year/24-hour precipitation event," successfully minimizing the amount of overflow experienced in May 2002, and properly notifying the EPA of the overflows, Teck "meets the requirements for the storm

---

[78]Doc. 72 at 82.

[79]Doc. 100 at 69.

-22-

exemption and is entitled to the affirmative defense to enforcement that the storm exemption was designed to provide."[80]  Defendant further alleges that it has put systems and procedures in place to prevent the reoccurrence of an unpermitted discharge from the overburden dump collection area and that no unpermitted discharges have occurred since May 2002.

Plaintiffs argue that 40 C.F.R. § 440.131(b) is not applicable here because Section 440.131(b) only allows exceedances of permitted discharges in upset conditions and no discharge of tailings water to the tundra are permissible under the mine permit. Plaintiffs also argue that the unpermitted discharges at the mine site are capable of repetition.  In support, plaintiffs point to defendant's unpermitted discharge at the port facility because of snow melt in May 2005.  Plaintiffs' argument is unavailing because the alleged violations involved two distinct facilities, permits, and permit parameters.  In addition, it appears that the actions defendant took to prevent overtopping of the pumping system at the mine site have remedied the problem.  Defendant has submitted evidence that no unpermitted discharges have occurred at the mine site since 2002, two years before plaintiffs filed their complaint.

For the reasons stated above, plaintiffs' motion for partial summary judgment is denied as to the three alleged unpermitted mine site discharges to the tundra on May 19, 22 and 23, 2002.

### 9.    5 Mine Site Monitoring and Reporting Violations

Plaintiffs initially moved for summary judgment on five mine site monitoring and reporting violations, but withdrew one selenium reporting violation and three ambient monitoring violations.  Plaintiffs now move for summary judgment on their claim that Teck "violated permit condition I(C)(4) by failing to record the volume of mine drainage pumped on July 12, 2001."[81]  Permit condition I(C)(4) requires that "[w]hen water in the Dirty Water Sump is pumped into the tailings impoundment, the pumped volume shall

---

[80]Doc. 100 at 72.

[81]Doc. 26 at 22.

be recorded.  The total volume for each month shall be recorded and reported with the DMR for that month."[82]

Defendant argues that no violation occurred because it timely reported the information required under permit condition I(C)(4) in its July 2001 DMR, namely it reported the total volume pumped for the month of July 2001.  Plaintiffs suggest that a reporting violation occurred when Teck failed to record the volume pumped on July 12, 2001.  The evidence on record shows that: 1) Teck's database contained the daily totals of water pumped for each day in July 2001, except for July 12, 2001;  2) Teck estimated the July 12, 2001, pump rate based on the average of the July 11 and 13, 2001, pump rates; 3) Teck reported the volume pumped in its July 2001 DMR using the estimated rate for July 12, 2001; 4) Teck subsequently recalculated the daily pumped volume for July 12 using five-minute readings recorded for July 12, which resulted in a monthly volume figure .03 percent lower than the monthly volume using the estimate for July 12, 2001; and 5) Teck reported this information in an amended DMR.

Based on the evidence on record, the court finds that Teck met its reporting requirements under permit condition I(C)(4) and that no violation occurred on July 12, 2001.   Plaintiffs' motion for summary judgment is denied as to the July 12, 2001, reporting claim, and the claim is dismissed.[83]

**D.    VIOLATIONS OF THE PORT SITE NPDES PERMIT**

**1.     2 Unpermitted Discharges at the Port Site**

Plaintiffs move for summary judgment on two unpermitted discharges at the port site on May 9 and 10, 2002.  Plaintiffs allege that the port facility experienced a 100-gallon leak from a pipeline on May 9, 2002,  and a resultant 1,000-gallon run-off of untreated water to the tundra on May 10, 2002.  Defendant admits the two unpermitted

---

[82]Doc. 72, exh. 70 at 12.

[83]"[I]f one party moves for summary judgment and, at the hearing, it is made to appear from all the records, files, affidavits and documents presented that there is no genuine dispute respecting a material fact essential to the proof of movant's case and that the case cannot be proved if a trial should be held, the court may sua sponte grant summary judgment to the non-moving party."  *Cool Fuel, Inc. v. Connet*, 685 F.2d 309, 310 (9th Cir. 1982).

-24-

discharges, but argues that plaintiffs are not entitled to summary judgment because plaintiffs make no showing "that a 100-gallon leak of treated water that occurred three years ago from an accidentally damaged (and later repaired and replaced) section of port site pipeline is capable of repetition."[84]  Defendant also argues that plaintiffs have not presented any evidence that unpermitted discharges to the tundra at the port site are capable of repetition.

Plaintiffs argue that an unpermitted discharge at the port site in May 2005, which exceeded permit limits, is evidence that unpermitted discharges at the port facility are capable of repetition.  The court concurs.  The discharge of water requiring emergency bypass at the port site in May 2005, which caused effluent limitations to be exceeded, is evidence that the risk of defendant's continued violation had not been "*completely eradicated* when citizen-plaintiffs filed suit."[85]

For the reasons set out above, plaintiffs' motion for summary judgment is granted as to the two unpermitted discharges at the port site on May 9 and 10, 2002.

### 2.     1 Violation of the Daily Maximum Discharge of Total Suspended Solids Permit Limit

Defendant admits that it violated port site permit condition I(B)(5), which limits daily maximum discharge of TSS, in May 2002.  Defendant further acknowledges that it has consistently observed elevated TSS concentrations in the port site effluent for approximately two weeks every spring.  Defendant states that the reasons for the elevated TSS concentrations are unknown, but that it suspects that "the annual elevated TSS occurs due to the natural introduction of constituents to port site runoff during spring breakup." [86]  As defendant admitted both the TSS violation and the fact that it is ongoing, plaintiffs' motion for summary judgment is granted as to the port site TSS violation in May 2002.

---

[84]Doc. 100 at 81.

[85]*Union Oil*, 853 F.2d at 667 (quotation and citation omitted) (emphasis in original).

[86]Doc. 100 at 87.

### 3.    2 Port Site Monitoring Violations

Plaintiffs move for summary judgment on two monitoring violations at the port site.  Plaintiffs allege that defendant failed to analyze weekly samples for coliform on two occasions in February 1999.  In their reply brief, plaintiffs concede the two monitoring violations because they were not alleged in plaintiffs' complaint.  Plaintiffs' motion for partial summary judgment is denied as to the two port site monitoring violations.

## E.    VIOLATIONS OF THE COMPLIANCE ORDERS BY CONSENT

Between the effective date of the 1998 mine site NPDES permit and the date plaintiffs filed their complaint, the EPA issued four Compliance Orders by Consent ("COBC") extending Teck's schedule for compliance with the 170 mg/l average monthly and 196 mg/l daily maximum limits for TDS set out in the 1998 mine site permit.  Plaintiffs' complaint alleges that the COBC  was "issued by the EPA on July 1, 1999, and modified most recently on May 17, 2002,"[87] and that Teck violated the "Mine Consent Order by exceeding the discharge limits at Station 7 at least 5 times, by exceeding the discharge limits at Station 10 at least 45 times, by failing to monitor as required at least 2 times, and by failing to report as required at least 12 times, for a total of 64 violations of the Mine Consent Order."[88]

Plaintiffs originally moved for summary judgment on 48 violations of the COBCs at Stations 7 and 10.  Of the 48 alleged violations, plaintiffs withdrew six alleged violations which occurred in June 1999 before the COBC took effect, and reserved four violations for trial (October 1, 1999, July 7, 2000, and June 3 and 6, 2002).   Plaintiffs now request summary judgment on the remaining 38 violations.

Defendant first argues it cannot be held liable for violations of both the NPDES permit and related COBCs.  Without citing any authority, defendant argues that "[i]f this Court determines that Teck Cominco is liable for violations of its NPDES permit, this

---

[87]Doc. 26 at 26.

[88]Doc. 26 at 27.

Court is estopped from also finding Teck Cominco liable for violations of its COBCs."[89] Defendant specifically alleges that the "doctrine of preclusion of inconsistent positions" precludes plaintiffs from alleging that "the NPDES permit remains in effect despite the subsequent COBCs" and "then taking the position that the COBCs supersede the permit and that [Teck] should be liable for the 48 alleged violations of [Teck's] COBC."[90]

Based on the plain language of the compliance orders, plaintiffs argue that the COBCs and the NPDES permit impose independent requirements and that Teck must comply with the requirements in both the COBCs and in the NPDES permit. Each COBC states that "[v]iolations of, or failure to comply with, the provisions of this Modified Order may subject [Teck] to (1) civil penalties of up to $27,500 per day of violation pursuant to Section 309(d) of the Act, 33 U.S.C. § 1319(d), and 40 C.F.R. Part 19[.]" Each compliance order also states, "Nothing in this Modified Order shall be construed to relieve [Teck] of the requirements of its NPDES permit."[91]

In addition, the plain language of 33 U.S.C. §1319(d) suggests that civil penalties are available for violations of both an NPDES permit and an order issued by the EPA. Section 1319(d) provides in pertinent part: "Any person who violates...any permit condition or limitation...and any person who violates any order issued by the Administration under subsection (a) of this section, shall be subject to a civil penalty not to exceed $25,000 per day for each violation."

Because the COBCs explicitly state that violations of the COBCs may subject Teck to civil penalties under the Clean Water Act and that the COBCs do not relieve Teck of the requirements of its NPDES permit, the court finds that defendant may be held liable for violations of both an NPDES permit and a COBC in effect at the time of the alleged violations, provided the violations are ongoing or capable of repetition.

Defendant next argues that plaintiffs do not have standing to pursue the alleged violations of the COBCs, because plaintiffs did not file their complaint until after the last

---

[89]Doc. 100 at 34.

[90]Doc. 100 at 20.

[91]*See e.g.*, 2002 COBC at 7, doc. 72, exh. 76.

-27-

recorded violations of the COBCs, "the COBCs Teck Cominco allegedly violated are no longer in effect," and plaintiffs cannot establish that any of the alleged COBC violations have "any reasonable probability of reoccurring in the future."[92]  The court will consider whether plaintiffs have met their burden of establishing ongoing violations in its discussion of each category of violations.

Plaintiffs request the court to enter summary judgment on their claims that Teck violated the COBC limits for TDS at Station 7 on the following dates: July 27, 1999, July 25, 2001, and August 27, 28, and 29, 2001.  Defendant admits the violations of the COBC limits for TDS at Station 7 (now Station 160) on August 27, 28, and 29, 2001, but argues that plaintiffs are not entitled to summary judgment on any of the alleged violations because plaintiffs have failed to demonstrate that the violations at Station 7 are ongoing or capable of repetition.  The COBCs at issue limit in-stream TDS concentrations at Station 7 to 500 mg/l from July 25 through August 31 for the 1999 discharge season and from July 25 through September 15 for the 2001 discharge season.  The 1998 NPDES permit in effect when plaintiffs filed their complaint did not contain in-stream limits for TDS.  The 2003 modified permit currently in effect limits in-stream TDS concentrations at Station 160 (formerly Station 7) to 500 mg/l from July 25th through the end of the discharge season.[93]

Having carefully reviewed the record, the court finds that plaintiffs have not provided any evidence that violations of the 500 mg/l limit for TDS at Station 7 (now Station 160) continued on or after the date their complaint was filed, nor any evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.  Plaintiffs suggest that evidence that Teck violated the 3,900 mg/l end-of-pipe TDS limit in the 2004 COBC supports their argument that COBC violations are ongoing or capable of repetition.  However, violations of the 3,900 mg/l end-of-pipe TDS limit at Outfall 001 do not demonstrate that violations of the 500 mg/l in-stream TDS limit at Station 160 (formerly Station 7) are ongoing or capable of

---

[92]Doc. 100 at 31.

[93]Doc. 72, exh. 71 at 8.

-28-

repetition. Accordingly, the court denies plaintiffs' motion for summary judgment as to the alleged COBC violations at Station 7 on July 27, 1999, July 25, 2001, and August 27, 28, and 29, 2001.

Plaintiffs' next request summary judgment on their claims that Teck violated the COBC limits for TDS at Station 10 on the following dates: July 1-9, 14-15, and 17-18, 1999; September 12, 1999; October 5, 1999; June 22-28, 2000; July 5-6, 8, and 11, 2000; May 28-29, 2002; and June 24, 2002.[94] The COBCs at issue limited in-stream TDS concentrations at Station 10 during the 1999, 2000, 2002, and 2003 discharge seasons. The COBCs all state in pertinent part that Teck shall limit the TDS discharged in its wastewater to maintain in-stream TDS concentrations at or below 1,500 mg/l at Station 10 "during the entire discharge season, except for temporary increases above 1,500 mg/l for no more than 48 hours in any 10-day period, provided that in no instance shall the TDS concentration exceed 1,600 mg/l."[95]

The 1998 mine site permit in effect at the time the complaint was filed did not contain an in-stream limit for TDS at Station 10. The 2003 permit currently in effect sets a limit at the edge of the mixing zone in Main Stem Red Dog Creek of 1,500 mg/l from the end of grayling spawning season through the end of the discharge season, and requires TDS monitoring at Station 10 once a week "as close in time as practicable to one of the sample events collected at the edge of the mixing zone in Main Stem Red Dog Creek."[96] The Main Stem Red Dog Creek mixing zone "begins at the confluence of North Fork Red Dog Creek and Middle Fork Red Dog Creek and continues downstream for 1,930 feet."[97] Station 10 is "located on the Main Stem Red Dog Creek a short distance upstream of the confluence with the Ikalukrok Creek" about two miles

---

[94]Plaintiffs also allege Teck violated the TDS limits at Station 10 on October 1, 1999, July 7, 2000, and on June 3 and 6, 2002, but reserve those violations for trial.

[95] Doc. 72, exh. 73 at 3, exh. 74 at 4, exh. 76 at 5.

[96]Doc. 72, exh. 71 at 8.

[97]Doc. 72, exh. 71 at 7.

downstream of the confluence of the North Fork Red Dog Creek and Middle Fork Red Dog Creek.[98]

While defendant admits some of the past violations at Station 10, defendant argues that plaintiffs are not entitled to summary judgment on any the alleged violations of the applicable COBCs at Station 10 because the COBCs that implemented the limits at Station 10 are no longer in effect and the 2003 permit currently in effect does not contain the same limitations. Defendant further argues that plaintiffs have not demonstrated that violations of the 1,500 mg/l TDS limit at Station 10 are ongoing. The court concurs. Plaintiffs do not offer any evidence demonstrating that violations of the 1,500 mg/l TDS limit at Station 10 are ongoing, rather plaintiffs simply allege that because Teck "has repeatedly violated the 1500 mg/l in-stream limitation at Station 10, these violations are capable of repetition."[99]

Because plaintiffs have failed to demonstrate that violations of the COBC limits for TDS at Station 10 are ongoing or have any reasonable probability of reoccurring in the future, plaintiffs are not entitled to summary judgment on their claims related to violations of the COBC limits for TDS at Station 10.

**F. PENALTIES**

Plaintiffs request the court to find that defendant is subject to civil penalties of up to $27,500 for each day of violation and further request the court to levy the above amount against defendant at the penalty phase. Because plaintiffs' motion for partial summary judgment concerns liability only, the court reserves judgment on the appropriate amount of penalties and/or other relief.

## V. CONCLUSION AND ORDER FOR STATUS REPORT

For the reasons set out above, plaintiffs' motion for partial summary judgment at docket 72 is **GRANTED IN PART** and **DENIED IN PART** as follows. Plaintiffs' motion for partial summary judgment is **GRANTED** and defendant's liability is established as to

---

[98]Doc. 72, exh. 73 at 2; exh. 71 at 48.

[99]Doc. 100 at 97.

the 618 violations of the daily maximum limit for TDS, two unpermitted discharges at the port site on May 9 and 10, 2002, and one port site TSS violation in May 2002.

Plaintiffs' motion for partial summary judgment is **DENIED** as to the 618 violations of the monthly average TDS limit, fifteen violations of the daily maximum cyanide limit, 418 violations of the monthly average cyanide limit, four WET reporting violations, nine violations of the daily maximum WET limit, 199 violations of the monthly average WET limits, three unpermitted discharges to the tundra at the mine site on May 19, 22, and 23, 2002, one mine site reporting claim on July 12, 2001, two port site monitoring violations, and 38 violations of the COBCs. The court declines to address any penalty issue at this time. In addition,

**IT IS ORDERED** that the mine site reporting claim on July 12, 2001, is **DISMISSED**.

Complete resolution of this case appears to require trial as to the remaining disputed violations and the appropriate remedy. The court is of the preliminary view that there should be separate trials of the two issues. The court also considers it possible that the first issue might be amenable to settlement–especially given the high cost of resolving so many alleged violations at trial. The court is less sanguine about the possibility of a settlement with respect to the remedy. In any event, in order to draw this case to a conclusion, the court needs further input from the parties. Therefore,

**IT IS FURTHER ORDERED** that on or before August 18, 2006, the parties shall file a joint status report which advises the court of the following:

1) What further tasks, if any, remain to be completed by the parties before the court issues a standard final pre-trial order calling for identification and marking of exhibits, objections to exhibits, final trial witness lists, trial briefs, etc.

2) The prospects for settling some or all of the remaining alleged violations and remedy issues.

3) The parties' views regarding separate trials as to (a) the remaining unresolved alleged violations and (b) the remedy or remedies.

-31-

4) The length of time the parties' estimate for each trial of the two trials if the court determines to separate the issues as suggested above, and the parties' estimate for the length of trial if a single trial is to be conducted. DATED at Anchorage, Alaska, this 28th day of July 2006.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT COURT JUDGE

Case 3:04-cv-00049-JWS   Document 136   Filed 07/28/06   Page 32 of 32