Sean Halloran
Hartig Rhodes Hoge & Lekisch, P.C.
717 K Street
Anchorage, Alaska 99501
Phone: (907) 276-1592
Fax: (907) 277-4352
Email: mail@hartig.com
Attorneys for Teck Cominco Alaska Incorporated

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ENOCH ADAMS, JR., LEROY ADAMS, ANDREW KOENIG, JERRY NORTON, DAVID SWAN, JOSEPH SWAN, ) ) ) ) | |
| Plaintiffs, ) ) | |
| vs. ) ) | |
| TECK COMINCO ALASKA INCORPORATED, NANA REGIONAL CORPORATION, and NORTHWEST ARCTIC BOROUGH ) ) ) ) ) ) | |
| Defendants. ) | A04-00049 CV (JWS) |

## TECK COMINCO'S ANSWER TO AMENDED COMPLAINT

Defendant Teck Cominco Alaska Incorporated responds to the plaintiffs' supplemental revised complaint as follows:

### I. JURISDICTION AND VENUE

1.     Teck Cominco admits that subject matter jurisdiction of citizen suits is conferred on this Court by Section 505(a)(1) of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1287 ("Act" or "Clean Water Act") as alleged in paragraph 1 of plaintiffs' complaint.

2.    Paragraph 2 of the complaint fails to identify "the port site" that it is referencing and Teck Cominco denies that it owns a port but asserts that concentrate from the Red Dog Mine is stored and shipped from a port site located in the District of Alaska. Teck Cominco admits the remaining allegations of paragraph 2 of plaintiffs' complaint.

## II. INTRODUCTION

3.    Teck Cominco admits plaintiffs are seeking an injunction, declaratory relief and civil penalties based on alleged violations of the Clean Water Act by Teck Cominco.  Teck Cominco denies the remaining allegations of paragraph 3.

4.    Teck Cominco denies the allegations of the first sentence of paragraph 4.  Teck Cominco is without sufficient knowledge or belief to form a response to the remaining allegations of paragraph 4.

5.    Teck Cominco admits that, in compliance with the self-monitoring provisions of the Act and its permits, Teck Cominco documents and reports, to the best of its ability and subject to the limitations in the required analytical testing methods and other factors beyond its reasonable control, its compliance or noncompliance with provisions of its NPDES permits.  Teck Cominco denies the remaining allegations of paragraph 5.

6.    Teck Cominco denies that the alleged violations have reduced the quality of plaintiffs' lives or changed the way they perform basic activities such as subsistence hunting and fishing.  Teck Cominco denies that all plaintiffs reside in the Native Village of Kivalina, an Inupiat village on the Chukchi Sea; that plaintiffs are "members" of the Kivalina Relocation Planning Committee

("KRPC") or that they have the authority or capacity to file or maintain any claims against Teck Cominco as the KRPC or as representatives of the KRPC. Teck Cominco denies that the plaintiffs all have homes near the mouth of the Wulik River, which is approximately 60 miles downstream of Outfall 001 on Middle Fork Red Dog Creek; denies that the community obtains drinking water from the Wulik River; and denies that the community hunts and fishes in the marine and terrestrial environment "adjacent to" the port and mine sites. Teck Cominco denies there is a reasonable or substantial basis for plaintiffs believing that drinking water quality has decreased or that the location or the quantity of fish and animals harvested for subsistence use have changed as a result of any of Teck Cominco's activities alleged by plaintiffs to constitute "illegal discharges", or that plaintiffs even believe that the changes they allege may have occurred relating to drinking water quality or subsistence hunting and fishing are attributable to any "illegal discharges" by Teck Cominco. Teck Cominco denies that the violations alleged by plaintiffs deprive plaintiffs of the opportunity to exercise their traditional lifestyle without fear of illness or exposure to dangerous contaminants. Teck Cominco does not have knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 6.

       7.      Teck Cominco admits that the U.S. Environmental Protection Agency ("EPA") and the Alaska Department of Environmental Conservation ("ADEC") issued Compliance Orders by Consent ("Compliance Orders") that gave Teck Cominco additional time to comply with new and more stringent requirements included in the NPDES permits for the mine and port issued in 1998 and 1999, which requirements had not been in prior permits for these facilities, and that the Compliance Orders also imposed requirements for monitoring and reporting, all designed to be fully

protective of the environment. The EPA in July, 2003 issued a modified NPDES permit for the mine that incorporates new State of Alaska water quality criteria for "Dissolved Inorganic Substances," including a site-specific criterion for Main Stem Red Dog Creek, and establish new compliance monitoring points ("Stations") downstream of the discharge point ("Outfall 001") from the mine site water treatment plant. These criteria are the same, or very close to, the limits for total dissolved solids ("TDS") included in the Compliance Orders. In regard to the Compliance Orders issued for the port, and which are referred to again in paragraph 56 of the complaint, the terms of the Compliance Orders have been fulfilled by Teck Cominco and the Compliance Orders for the port and mine are no longer in effect. Teck Cominco denies all other allegations of paragraph 7 of the complaint.

## III. NATURE OF THE CASE

8.    Teck Cominco admits citizens' suits, when filed and maintained in compliance with other provisions of the Act and other applicable law, are authorized under the Clean Water Act. Teck Cominco admits the remaining allegations of paragraph 8 to the extent they apply generally, but without specific regard to any of plaintiffs' claims in the complaint.

9.    Teck Cominco denies it is routinely discharging a variety of pollutants in violation of the limits established by permit number AK-003865-2 "mine site permit" and permit number AK-004064-9 "port site permit." The Red Dog Mine processing functions involving discharge from Outfall 001 (mine water treatment plant) have been terminated for the winter season and will not commence again until any earlier than May 2004. Teck Cominco denies it is routinely discharging

a variety of pollutants in violation of the limits established by the "port site permit." The port site permit authorizes discharges from a sewage treatment plant (Outfall 001) that operates year round, but which is not discharging in violation of the permit, and a metals treatment plant (Outfall 005) that is seasonal, but which is not discharging in violation of the permit. Teck Cominco denies that all of the violations alleged in the complaint, if they occurred, would be violations of an "effluent standard or limitations" as referred to in 33 U.S.C. § 1365(f).

## IV. PARTIES

10.    Teck Cominco admits that plaintiffs were each appointed to and currently serve or have served on the KRPC but deny any allegation or inference that this action was filed by them in that capacity or that the plaintiffs are "members" of the KRPC. (See January 21, 2004 and February 9, 2004 Orders filed in Case No. A02-0231 CV (JWS), United States District Court for the District of Alaska). Teck Cominco objects to plaintiffs referring to themselves as the "KRPC members" in the complaint and will use the term "plaintiffs" in this answer to properly describe the plaintiffs. Teck Cominco does not possess knowledge or information sufficient to form a belief as to the truth of the allegations regarding plaintiffs having obtained and reviewed copies of Teck Cominco's Discharge Monitoring Reports ("DMRs"). Teck Cominco admits the remaining allegations of paragraph 10.

11.    Teck Cominco admits that plaintiffs have resided or presently reside in Kivalina at or near the mouth of the Wulik River; the Wulik River is the primary source of drinking water for many of the residents of Kivalina; plaintiffs obtain fish from the Wulik River and its tributaries and

at least some of plaintiffs hunt for marine mammals and fish some distance off shore from the port

site's discharge point on the Chukchi Sea; and that plaintiffs and other residents of Kivalina depend

on the food obtained from subsistence hunting activities in the Wulik River and its tributaries and

in the Chukchi Sea for a portion of their dietary needs. Teck Cominco denies that the alleged permit

violations affect the individual plaintiffs. Teck Cominco denies that all of plaintiffs rely on the

Wulik River for their drinking water, but does not have sufficient information or knowledge to state

whether any of the plaintiffs rely on the waters of the Wulik River for their drinking water. Teck

Cominco admits that at least some of plaintiffs rely on the Wulik River as a source of fish. Teck

Cominco admits that at least some of plaintiffs fish and hunt in the Chukchi Sea, but denies that

Teck Cominco's port facility regularly discharges hazardous substances (including zinc, cadmium

and fecal coliform) particularly in any amounts that would have any reasonable potential for causing

harm to any of the plaintiffs, or to any subsistence species they consume. Teck Cominco denies that

plaintiffs have observed that the quality of their drinking water has declined, or that it has declined,

since the mine began operating, or that the discharges from the mine - particularly those at issue in

this case - have caused any strange tastes and colors that plaintiffs believe make the water offensive

to consume. Teck Cominco is without knowledge or information sufficient to form a belief as to the

truth of plaintiffs' allegation that they have "seen changes in the location and quantity of terrestrial

mammals, marine mammals and fish that constitute their basic source of food." Teck Cominco

denies that the alleged violations of permits were the cause of any such changes that may have been

observed by plaintiffs. Teck Cominco denies that the alleged violations have affected the way that

plaintiffs conduct their basic life activities or hampered their ability to ensure an adequate supply of

food for themselves and their families.  Although Teck Cominco admits that some of plaintiffs and other Kivalina residents hunt in the same region as the mine, Teck Cominco denies any allegation or inference this hunting takes place very close to the mine.  Teck Cominco denies any remaining allegations of paragraph 11.

12.     Teck Cominco admits the allegations of paragraph 12 of the complaint.

13.     Teck Cominco admits that it has a duty to comply with the terms of NPDES permits, but when EPA, as here, has exercised its statutory authority under the Act and ordered Teck Cominco to meet different terms and conditions, those terms and conditions supercede those of the permits.  Teck Cominco further denies that the Middle Fork Red Dog Creek flows directly into Ikalukrok Creek.   Teck Cominco admits that its authorized representatives sign each DMR and certify under penalty of law and based on their inquiry of responsible persons, that the report is true, accurate and complete to the best of their knowledge at the time they sign the DMR. Teck Cominco admits the remaining allegations of paragraph 13 as stated.

## V. NOTICE

14.     Teck Cominco admits that plaintiffs gave Teck Cominco notice pursuant to Section 505(b)(A) of the Act of most, but not all, of the violations alleged in the complaint more than sixty days before the filing of the complaint.  Teck Cominco does not possess knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 14.

15.     Teck Cominco admits the allegations of paragraph 15, but denies that any action is required to obtain compliance.

16.    Teck Cominco admits the allegations of paragraph 16 of plaintiffs' complaint.

## VI. GENERAL ALLEGATIONS

### A. Background on the Red Dog Mine

17.    Teck Cominco admits the allegations of paragraph 17 of plaintiffs' complaint.

18.    Teck Cominco denies the allegation that the milling process utilizes "60 to 70 grams of cyanide per ton of ore" and alleges that the milling process utilizes approximately 32 to 36 grams of cyanide per ton of ore. Teck Cominco denies any allegation that the tailings impoundment dam is not lined. Teck Cominco admits that the floor of the impoundment area is not lined, but asserts that the impoundment storage area is located on bed rock with extremely low permeability, and a ground water monitoring system is installed to detect for migration of untreated water from the impoundment. Teck Cominco admits the remaining allegations of paragraph 18.

19.    Teck Cominco admits the allegations of paragraph 19.

20.    Teck Cominco admits the allegations of paragraph 20.

21.    Teck Cominco admits the allegations of paragraph 21.

22.    Teck Cominco denies the allegations of paragraph 22 with regard to tons of "ore" mined. Teck Cominco admits the allegations regarding pounds of zinc produced is close to the actual numbers of pounds produced.

23.    Teck Cominco denies the allegations of paragraph 23.

24.    Teck Cominco admits that the mine and port are located on lands owned by NANA Regional Corporation, Inc. ("NANA") and that Teck Cominco is the borrower on the financing for

the facilities constructed on these lands.  Teck Cominco admits that it operates the mine under on

operating agreement with NANA.

## B. Statutory and Regulatory Background

25.      Teck Cominco admits that, except as in compliance with section 1311, 1312, 1316,

1317, 1828, 1342 and 1344 of Title 33 of the United States Code, the discharge of any pollutant, as

defined in 33 U.S.C. § 1362(6), is prohibited.

26.      Teck Cominco admits the allegations of paragraph 26.

27.      Teck Cominco admits the allegations of paragraph 27.

28.      Teck Cominco admits the allegations of paragraph 28.

## C. Permit History, Requirements, Consent Orders and Other Violations

### 1. The Mine Site

29.      Teck Cominco admits the allegations of paragraph 29, but denies any allegation or

inference that this is a complete statement of the history of permit number AK-003865-2, particularly

in that paragraph 29 of the complaint fails to include the fact that the permit was modified in July

of 2003 with an effective date of August 22, 2003, before it expired.  The July 2003 modified permit

includes new effluent limitations for Total Dissolved Solids ("TDS").  These TDS limits are based

on the new TDS aquatic life site specific criterion adopted by the State of Alaska and approved by

EPA in 2003 for Main Stem Red Dog Creek and on the new statewide TDS criteria adopted by the

State and approved by EPA in 2003, all of which criteria are currently in effect and have replaced the criteria upon which the TDS effluent limits in the 1998 permit were based.

30.    Teck Cominco admits  the allegations of paragraph 30.

31.    Teck Cominco admits the allegations of paragraph 31.

32.    Teck Cominco denies the allegations that the current (August 22, 2003) permit limits for TDS are a daily maximum concentration of 196 milligrams per liter (mg/L) and a monthly average concentration of 170 mg/L. Teck Cominco denies that the limits in the August 22, 2003 modified permit are stayed. Teck Cominco admits that EPA sent a letter to Teck Cominco on or about October 2, 2003 stating that "Until the appeal is resolved, all conditions of the unmodified 1998 NPDES permit referred above remains in effect, including the TDS limits and monitoring requirements for Outfall 001 contained in Part I.A." Teck Cominco denies any remaining allegations of paragraph 32.

33.    Teck Cominco admits that the permit provides for a daily maximum concentration of 9.0 parts per billion ("pbb") and a monthly average concentration of 4.0 ppb, but these limitations are subject to and are to be applied consistent with the additional provision set forth in paragraph I. D., on page 6 of the mine site permit, wherein an Interim Minimum Level ("IML") of 9 µg/L is set out to be used for compliance evaluation purposes. As stated in the permit, "Effluent limits for cyanide, mercury, and selenium are not quantifiable using EPA approved analytical methods. EPA will use the following Interim Minimum Levels as the compliance evaluation level for these parameters."

34.    Teck Cominco admits the allegations of paragraph 34.

35.    Teck Cominco admits the allegations of paragraph 35.

36.    Teck Cominco admits the allegations of paragraph 36.

37.    Teck Cominco admits the allegations of paragraph 37.

38.    Teck Cominco denies the allegations of paragraph 38.

## 2. The Port Site

39.    Teck Cominco admits the allegations of paragraph 39.

40.    Teck Cominco admits the allegations of paragraph 40.

41.    Teck Cominco admits the port site permit specifies discharge limits for three parameters for Outfall 001 and for six parameters for Outfall 005. The State of Alaska water quality criteria for marine waters, and thus the water quality based effluent limits for marine water (Chukchi Sea), are less stringent for some parameters than those for fresh water (tundra). Teck Cominco denies the discharge limits for discharges from Outfall 005 are significantly higher for discharges to the Chukchi Sea, as compared to limits for discharges to the tundra, because two of the six discharge limits are identical.

42.    Teck Cominco admits the allegations of paragraph 42.

43.    Teck Cominco admits the allegations of paragraph 43.

44.    Teck Cominco admits that the port permit does not specifically authorize the discharge of chlorine from Outfall 001, but denies that Teck Cominco was not authorized to discharge chlorine at the port site.

45.    Teck Cominco denies the allegations of paragraph 45.

### 3. Compliance Orders

46.     Teck Cominco admits that EPA has not initiated any enforcement action against Teck Cominco seeking penalties for violations of its permits alleged in this action, but denies any enforcement action would have been, or is now appropriate, in the circumstances of the alleged violations.    All limitations set by Compliance Orders were established with due regard to environmental protection, and to the extent the term "relaxed" is intended to imply otherwise, Teck Cominco denies that allegation.  The terms of the Compliance Orders were discussed among Teck Cominco, EPA, ADEC and the State of Alaska Department of Fish and Game, but the terms of the Compliance Orders were set by EPA and ADEC, whether or not Teck Cominco agreed with these terms.  Teck Cominco denies any remaining allegations of paragraph 46.

47.     Teck Cominco admits the allegations in the first sentence of paragraph 47 and in the second sentence of paragraph 47, but only  as they relate to the NPDES permit effluent limits for TDS.

48.     Teck Cominco admits the allegations in the first sentence of paragraph 48, but denies the allegations in the second sentence of paragraph 48.

49.     Teck Cominco admits the allegations of paragraph 49, except for the allegation that the May 17, 2002 was the "second" modified Compliance Order issued for TDS, in that the second such Compliance Order was issued May 23, 2001.

50.     Teck Cominco admits  the issuance of the Compliance Orders referred to above did not constitute a modification of the terms of the permits, but denies the allegations of paragraph 50 to the extent plaintiffs are alleging that the Compliance Orders did not change the duties imposed

on Teck Cominco.  Teck Cominco denies the allegations in the second sentence of paragraph 50 of the complaint, in that there is no "current modified Compliance Order" in effect at the mine or port.

51.    Teck Cominco admits the allegations of paragraph 51, subject to the facts asserted in paragraph 56 below.

52.    Teck Cominco admits the allegations of paragraph 52, including the allegations that when EPA issued the Compliance Orders it required compliance with a higher TDS limit at Stations 10 and 7 (later at Station 160), respectively located approximately 2.6 miles and 16.2 (stream) miles down stream of Outfall 001, the point of compliance under the permit prior to its modification in 2003.

53.    Teck Cominco admits that the most recent Compliance Order for TDS (issued May 17, 2002,) required TDS measurements at Station 10 on Main Stem Red Dog Creek, but denies it required TDS monitoring at Station 7.

54.    Teck Cominco denies that portion of paragraph 54 which alleges that the most recent (May 17, 2002) Compliance Order limited TDS to 500 mg/L at Station 150 through the end of the discharge season and alleges that limitation was applicable to Station 160 for the period from July 25 through the end of the discharge season.  Teck Cominco denies that portion of paragraph 54 which alleges that the first two Compliance Orders (July 1, 1999 and May 30, 2000) limited TDS to 500 mg/L at Station 150 from July 25 through August 31, and alleges that the 500 mg/L limitation was applicable to Station 7 during the July 25 through August 31 time period.  Teck Cominco admits the remaining allegations of paragraph 54.

55.    Teck Cominco admits the allegations of paragraph 55.

56.     Teck Cominco admits the allegations of paragraph 56 of plaintiffs' complaint but alleges that when the current permit was issued, Teck Cominco was planning to use, and did use, UV treatment for disinfection instead of chlorine disinfection.  The UV treatment system provided unacceptable performance because of turbidity in the water and a Compliance Order was issued by EPA authorizing use of chlorine to reduce fecal coliform to permit levels.  Teck Cominco installed a complete new treatment plant in January 2001 which addresses the turbidity problem and otherwise improved the UV treatment, and after that time the chlorine was used only to backflush filters and the concentration of chlorine discharged, if any, did not have a reasonable potential to, and did not likely exceed the applicable standard  set by the State of Alaska and approved by EPA for chlorine.  Since October of 2002, no chlorine was used for any purpose in the port treatment processes and no unpermitted discharge of chlorine occurred.

57.     Teck Cominco admits the issuance of the Compliance Orders did not constitute a modification of the terms of the permits, but denies that the Compliance Orders did not change Teck Cominco's duties under the permits.  Teck Cominco admits the remaining allegations of paragraph 57.

### 4. Summary of Teck Cominco's Violations

58.     Teck Cominco denies that portion of paragraph 58 which alleges that the DMRs are certified as accurate by Teck Cominco representatives under penalty of perjury.  Teck Cominco asserts that the certification of accuracy applies to the DMRs as qualified or explained in attachments or other information provided when the DMR is submitted.  As required by statute, Teck Cominco's

authorized representatives sign each Discharge Monitoring Report and certify under penalty of law based on their inquiry of responsible persons that the report is true, accurate and complete to the best of their knowledge at that time. When additional information or analysis becomes available and needs to be reported to avoid an incorrect interpretation of a DMR that was previously submitted, Teck Cominco has filed and EPA has accepted revised or supplemental or amended DMRs, and such supplemental or amended DMRs, supplement and amend any previously filed DMRs. Teck Cominco admits the remaining allegations of paragraph 58.

59.    Teck Cominco does not possess knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 59 regarding comparisons allegedly performed by the plaintiffs. Teck Cominco denies that there were 2,322 violations of the mine site permit from August 28, 1998 until May 31, 2003 and denies that there were 772 subsequent to that time. Teck Cominco admits that a 60-day Notice Letter was served on Teck Cominco by plaintiffs on July 3, 2003 alleging specified violations of the mine site permit, but not all of the violations alleged in the complaint. Teck Cominco denies that the violations alleged by plaintiffs in their 60-day Notice letters, and/or the violations alleged in their complaint, are ongoing or that all of them are capable of repetition.

60.    Teck Cominco does not possess knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 60 regarding the comparison allegedly performed by plaintiffs. Teck Cominco denies that there were 1,533 violations of the port site permit from May 13, 1999 until May 31, 2003. Teck Cominco admits that a 60-day Notice Letter was served on Teck Cominco by plaintiffs on July 3, 2003 alleging specified violations of the

port site permit. Teck Cominco denies that the 42 violations alleged by plaintiffs in paragraph 60 of their complaint (where such violations are alleged to have occurred at the port or mine site) are ongoing or that they are capable of repetition.

61.    Teck Cominco does not possess knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of paragraph 61. Teck Cominco admits plaintiffs served on Teck Cominco a 60-day Notice Letter on July 3, 2003, specifying alleged violations of the mine site Compliance Orders, but not all of the violations alleged in the Complaint. Teck Cominco denies there are 64 violations of the mine site Compliance Orders that are ongoing or capable of repetition. Further, Teck Cominco alleges there is no mine site Compliance Order currently in effect.

62.    Teck Cominco does not have knowledge or information sufficient to form a belief as to the truth of the allegations regarding 53 violations of the port site Compliance Order "documented" by plaintiffs.

63.    Teck Cominco denies that the plaintiffs have alleged 2,883 violations of permits and Compliance Orders.

64.    Teck Cominco admits that 40 C.F.R. §19.4 authorizes a maximum penalty for violations of an NPDES permit or Orders, but denies the remaining allegations of paragraph 64, including any allegation or inference that a maximum penalty is appropriate for any violation alleged in the complaint.

### 5. Other violations by Teck Cominco at Red Dog

65.    Teck Cominco denies the allegation of paragraph 65 that neither the U.S. EPA nor the State of Alaska has taken any action to enforce the provisions of the Clean Water Act permits at issue in this case.  Teck Cominco admits that it settled disputed claims asserted by EPA in <u>United States vs. Cominco Alaska, Inc.,</u> No. A97-267 CIV (JKS) but denies that these alleged violations were ever established or that Teck Cominco admitted to any wrongdoing.  Teck Cominco admits that on or about December 18, 2001, ADEC and Teck Cominco entered into a settlement of disputed claims relating to alleged violations of Teck Cominco's air quality permit without an admission of wrongdoing by Teck Cominco, and that with the penalty suspension and credits applied under the terms of the settlement, the penalty amount was $300,000.  Teck Cominco denies any remaining alleges of paragraph 65.

### D. The Village of Kivalina

66.    Teck Cominco admits the allegations of the first three sentences of paragraph 66. Teck Cominco admits that many residents of Kivalina practice subsistence hunting and fishing, but asserts that income from government funded employment and employment with Teck Cominco are also significant sources of income to the village and support the local economy, including public schools.

## FIRST CLAIM
## Mine Site: Violations of Total Dissolved Solids Permit Limits
## (33 U.S.C. § 1311(a))

67.     Paragraph 67 of the Complaint does not require a response from this defendant.

68.     Teck Cominco denies the allegations of paragraph 68 as they apply to the current issued (July 2003) mine site permit.

69.     Teck Cominco denies the allegations of paragraph 69 as to the July 2003 modified mine permit and admits these allegations to the extent that they allege that the TDS concentration at Outfall 001 over the time period 1998-2003 was generally 1500 percent higher than the daily maximum TDS limit (196 mg/L) in the mine site permit prior to the July 2003 permit modification. The July 2003 modification changed the TDS limit at Outfall 001 to 3900 mg/L and added a TDS limit in the permit (1500 mg/L during non-spawning periods and 500 mg/L during spawning periods) for compliance points at Stations downstream of Outfall 001. Further, Teck Cominco asserts that the former 196 mg/L daily maximum limit was based on the aquatic life water quality standard for TDS which was in the process of being amended at the time the permit was originally issued in 1998 and which was amended after the permit was issued. Finally, Teck Cominco asserts that the State of Alaska adopted and EPA approved a new site specific criterion (1500 mg/L) for Main Stem Red Dog Creek, which criterion is currently in effect.

70.     Teck Cominco denies it violated mine site permit condition I(A)(1) for daily maximum TDS on all of the days listed in paragraph 70, in that it did not even discharge on all of these dates. Teck Cominco admits that analytical results for TDS reported in DMRs submitted by Teck Cominco to EPA showed it exceeded the mine site permit condition I(A)(1) for daily maximum

TDS on May 1999: 21, 25, 27, 29; June 1999: 5, 8, 15, 24, 28; July 1999: 6, 13, 22, 27; August 1999: 3, 10, 23, 28; September 1999: 4, 11, 14, 21, 27; October 5, 1999; May 2000: 25, 27, 29, 29; June 2000; 10, 13, 24, 29; July 2000: 6, 10, 19, 22, 29; August 2000: 3, 10, 12, 24, 26, 28; September 2000: 6, 14, 18, 26; October 3, 2000; May 31, 2001; June 2001: 3, 7, 14, 18, 27; July 2001: 5, 9, 16, 23, 30; August 2001: 2, 7, 20, 27; September 2001: 6, 15, 20, 24; October 2001: 4, 8; May 28, 2002; June 2002: 4, 10, 18, 25; July 2002: 2, 9, 20, 23, 30; August 2002: 6, 13, 24, 27; September 2002: 3, 7, 8, 10, 17, 24, 26, 28; October 2002: 3, 5; May 2003: 10, 13, 27, 30; June 2003: 3, 10, 17, 24; July 2003: 1, 8, 13, 15, 17, 21, 29; August 2003: 5, 12; June 2007:10.

71.     Teck Cominco denies that the violations of mine site permit Condition I(A)(1) for daily maximum TDS are ongoing because the discharge was discontinued in August 2003 for the season and there are no continuing discharges at Outfall 001.  Teck Cominco believes that the current stay of new TDS limits in the July 2003 modified permit will be lifted and these new limits will be in effect prior to resumption of discharges in 2004 and that Teck Cominco will be able to meet the new limitations for TDS in that modified permit.

72.     Teck Cominco admits the allegations of paragraph 72 to the extent that it is alleged that the mine site permit contained a monthly average limit of 170 mg/L prior to the permit modification in July of 2003.  The July 2003 permit does not contain a monthly average limit.  Further, Teck Cominco asserts that the old 170 mg/L  limit was based on the aquatic life water quality standard for TDS which was in the process of being amended when the permit was first issued in 1998, and which was amended after the permit was issued, and that since then, a site

specific TDS aquatic life criterion of 1500 mg/L has been adopted by the State of Alaska and approved by EPA, and is currently in effect.

73.    Teck Cominco denies the allegations of the first sentence of paragraph 73. Teck Cominco admits the allegations of the second sentence of paragraph 73 except as to alleged violations in October 1999, October 2000 and May 2001, and further denies the allegations as to June 2004, June 2005, and June 2006.

74.    The first sentence of paragraph 74 does not contain any allegations of fact and is solely plaintiffs' interpretation of law. As such, no response is required in this answer. Teck Cominco denies that it exceeded the monthly average permit limit for TDS on all of the days listed in paragraph 74 in that Teck Cominco did not even discharge all of those days.

75.    Teck Cominco denies that the violations of the mine site permit for monthly average TDS are ongoing. The July 2003 modified permit does not contain a monthly average TDS limit. The mine discharge is shut down for the season. Teck Cominco believes that the current stay of new TDS limits in the modified permit issued by EPA in July of 2003 will be lifted and these new limits will become final prior to resumption of discharges in 2004, and that Teck Cominco will be able to meet the new limitations for TDS.

76.    Teck Cominco denies the allegations of paragraph 76.

77.    Teck Cominco denies the allegations of paragraph 77.

**SECOND CLAIM**
**Mine Site: Violations of Cyanide Permit Limits**
**(33 U.S.C. § 1311(a))**

78.     Paragraph 78 of the Complaint does not require a response from this defendant.

79.     Teck Cominco denies that the permit condition for cyanide specifies "a daily maximum discharge of 9 ppb" and asserts that the provisions of Section I(A)(1) of the mine site permit must be read consistent with the provisions of Section I(A)(5) regarding the setting of Interim Minimum Levels.  Teck Cominco further asserts that cyanide in the Red Dog mine discharge samples cannot be quantified by commercial laboratories using the EPA-approved total cyanide analytical method at concentrations near or below the cyanide limit of 9 ppb, which is an issue that has been the subject of many communications between EPA and Teck Cominco.  ADEC adopted in 2003 a new water quality standard requiring the use of WAD cyanide analysis for determining compliance with the state aquatic life criterion for cyanide.  EPA has approved this change.  Teck Cominco believes this change will be incorporated into the renewed mine permit and Teck Cominco will be able to demonstrate consistent compliance with the cyanide permit limits using this analytical method.

80.     Teck Cominco denies the allegations of paragraph 80.

81.     Teck Cominco denies the allegations of paragraph 81.

82.     Teck Cominco denies that mine site permit condition I(A)(1) for cyanide specifies "a maximum monthly average discharge of 4 ppb per day." Teck Cominco asserts that the monthly average effluent limit of 4 ppb must be read consistent with the provisions of Section I(A)(5) regarding the setting of Interim Minimum Levels. Teck Cominco denies that cyanide in the Red Dog

mine discharge samples can be quantified by commercial laboratories using the EPA-approved total cyanide analytical method at concentrations near or below 4 ppb ( which fact is acknowledged by EPA in paragraph I(A)(5)(d) of the permit), and which fact has been the subject of many communications between EPA and Teck Cominco.

83.    Teck Cominco denies the allegations of paragraph 83.

84.    The first sentence of paragraph 84 is not a factual assertion but solely plaintiffs' interpretation of law.  As such, no response is required in this answer.  Teck Cominco denies the remaining allegations of paragraph 84.

85.    Teck Cominco denies the allegations of paragraph 85.

86.    Teck Cominco denies the allegations of paragraph 86.

87.    Teck Cominco denies the allegations of paragraph 87.


**THIRD CLAIM**
**Mine Site: Whole Effluent Toxicity (& WET") Testing Permit Violations**
**(33 U.S.C. §1311(a))**

88.    Paragraph 88 of the Complaint does not require a response from this defendant.

89.    Teck Cominco denies that paragraph 89 is a complete, and thus accurate, summation of WET reporting requirements in the mine site permit.  All of the WET monitoring and reporting provisions of the permit are required to be read together and the allegations of paragraph 89 only refer to several portions of the WET requirement.  For example, paragraph 4a on page 18 of the permit requires submital of results of toxicity tests in the DMR and paragraphs 4(b) and (c) require that the full report be sent in by the end of the same month.

90.     Teck Cominco denies the allegations of paragraph 90.

91.     Teck Cominco denies the allegations of paragraph 91.

92.     Teck Cominco admits the allegation of paragraph 92.

93.     Teck Cominco denies there were any WET limit violations in regard to <u>Pimephales promelas</u> bioassays.   In regard to <u>Ceriodaphnia dubia</u> bioassays, Teck Cominco admits the allegations as to the August 2001 test and Teck Cominco denies the allegations as to the May 1999, June 1999, August 2002, and august 2004 tests.  Teck Cominco is without sufficient information or knowledge to form a belief as to the truth of the remaining allegations of paragraph 93.

94.     Teck Cominco denies that violations of mine site permit Condition I(H)(5) are ongoing.  Teck Cominco lacks sufficient information to form a belief as to the truth of the remaining allegations of paragraph 94.

95.     Teck Cominco admits the allegations of paragraph 95.

96.     Teck Cominco denies there were any WET limit violations in regard to <u>Pimephales promelas</u> bioassays.   In regard to <u>Ceriodaphnia dubia</u> bioassays, Teck Cominco admits the allegations as to the August 2001 test and Teck Cominco denies the allegations as to the May 1999, June 1999 and August 2002 tests.  Teck Cominco is without sufficient information or knowledge to form a belief as to the truth of the remaining allegations of paragraph 96.

97.     The first sentence of paragraph 97 is not a factual assertion but a statement of a legal conclusion by plaintiffs and, as such, requires no response from Teck Cominco in this answer.  As to the remaining allegations of paragraph 97, Teck Cominco denies there were any exceedences of WET permit limits in regard to <u>Pimephales promelas</u> bioassays, and, as to the <u>Ceriodaphnia dubia</u>

bioassays, and assuming plaintiffs' legal interpretation referred to above is correct, Teck Cominco admits the alleged August 2001 violations, denies the May 1999, June 1999 and August 2002 alleged violations, and Teck Cominco is without sufficient knowledge to form a belief as to the truth of the remaining allegations of paragraph 97.

98.    Teck Cominco denies that violations of mine site permit condition I(H)(5) for monthly average WET limits are ongoing to this day or are capable of repetition. Teck Cominco lacks sufficient information to form a belief as to any remaining allegations of paragraph 98.

99.    Teck Cominco denies the allegations of paragraph 99.

100.    Teck Cominco denies the allegations of paragraph 100.


## FOURTH CLAIM
### Mine Site: Cadmium Permit Limits Violations
### (33 U.S.C. § 1311(a))

101.    The first numbered paragraph 101 does not require a response from this defendant.

101.    Teck Cominco admits the allegations of second numbered paragraph 101.

102.    Teck Cominco denies the permit specifies a "daily maximum discharge" for cadmium. Teck Cominco denies it exceeded the daily maximum effluent limit for cadmium on June 13, 2000. Teck Cominco admits the allegation it exceeded the daily maximum effluent limit on July 30, 2001.

103.    Teck Cominco denies the allegation of paragraph 103 that violations of the mine site permit condition I(A)(1) for maximum daily cadmium discharge are ongoing to this day or are capable of repetition.

104.    Teck Cominco admits the allegation of paragraph 104.

105.    Teck Cominco denies the permit specifies a "maximum monthly average discharge" for cadmium.  Teck Cominco admits the allegations of paragraph 105 that Teck Cominco exceeded the monthly average effluent limit in July 2001, but denies these allegations as to October 2000 in that the discharge ended October 7, 2000, and the single laboratory analysis reported for that month cannot properly be used to calculate a monthly average.

106.    The first sentence of paragraph 106 is not a factual assertion but a statement of a legal conclusion by plaintiffs and as such, requires no response from Teck Cominco in this answer.  Teck Cominco denies that Teck Cominco violated permit condition I(A)(1) for monthly average cadmium discharge for July 1, 2, 3, 4, 5, 6 and 8, 2001, and admits (but only if plaintiffs' legal conclusion referenced above is correct) it exceeded the monthly average on the remaining days of July 2001, but asserts this apparent exceedence of the monthly average was the result of a single upset and cannot constitute more than a single violation.  Teck Cominco denies the remaining allegations of paragraph 106.

107.    Teck Cominco denies that violations of mine site permit Condition I(A)(1) for monthly average effluent limit for cadmium are ongoing or are capable of repetition.  Teck Cominco does not have sufficient information or knowledge to form a belief as to the remaining allegations of paragraph 107.

108.    Teck Cominco denies the allegations of paragraph 108.

109.    Teck Cominco denies the allegations of paragraph 109.

## FIFTH CLAIM
### Mine Site: Unpermitted Discharges to the Tundra
### (33 U.S.C. §1311(a))

110.    Paragraph 110 of the Complaint does not require a response from this defendant.

111.    Teck Cominco admits the allegations of paragraph 111, subject to the requirement of permit condition I(C)(2) being interpreted consistent with the remainder of the permit, including sections III(G) and (H) of the permit.

112.    Teck Cominco admits the allegations of paragraph 112 that the pumping system was overtopped on May 19, 22 and 23 of 2002, but asserts that apparent violation was the result of the rapid melting of snow generating more melt water than had been estimated when the pumping system was designed, which design was based on what was believed to be the volume of water that would be generated from a 10-year, 24-hour storm event. The exceedence is therefore excused under 40 C.F.R. §40.131(b). Teck Cominco denies the remaining allegations of paragraph 112.

113.    Teck Cominco denies the allegations of paragraph 113.

114.    Teck Cominco incorporates its response to paragraph 112 above by reference and thus denies the allegations of paragraph 114.

115.    Teck Cominco denies the allegations of paragraph 115.

## SIXTH CLAIM
### Mine Site: Self-Monitoring and Reporting Violations
### (33 U.S.C. § 1311(a))

116.    Paragraph 116 does not require a response from this defendant.

117.    Teck Cominco admits the allegation of paragraph 117.

118.    Teck Cominco denies that it failed to comply with the turbidity monitoring requirements in September 1999 in that it measured turbidity (on composite samples) on three occasions during September 1999, did not take a fourth weekly sample, but turbidity of the discharge water was being monitored every five minutes during the month and the weighted average of these was a more reliable measurement of turbidity than taking a fourth sample. Teck Cominco denies the allegations that no grab samples were taken for turbidity on June 10 or 13 of 2000. Teck Cominco denies the permit required an OPPS for June 2000 and denies that it failed to report results for silver. Teck Cominco admits that it failed to report results for total suspended solids ("TSS") for July 10, 2000 and August 3, 2000, however, Teck Cominco asserts that it measured for turbidity on 24-hour composite samples collected on July 10, 2000 and August 3, 2000 and they showed turbidity was 0.6 NTU and 0.4 NTU, which would correlate to TSS values well below the permit limits. Teck Cominco admits that a 24-hour composite sample for turbidity was not collected for turbidity, but denies this constituted a permit violation in that turbidity of the discharge was being monitored at 5-minute intervals and average turbidity was calculated using these data for July 22, 2000 and reported to EPA in the July 2000 DMR. Teck Cominco denies that no results for selenium were reported for September 2000. Teck Cominco admits the BOD and OPPS samples for September 2001 were taken from treated water that was not discharged from Outfall 001 but denies this

constituted a violation of permit requirements. At the time, potential treated water was being diverted back to the tailings impoundment while potential problems in the treatment plant were being investigated rather than discharging that treated water. Teck Cominco denies the reported result for BOD and OPPS would have changed if the samples would have been collected from Outfall 001.

119.    Teck Cominco denies the violations of mine site permit condition I(A)(1) for failure to conduct required monitoring are ongoing or capable of repetition. Teck Cominco is without sufficient knowledge or information to form a response to the remaining allegations of paragraph 119.

120.    Teck Cominco admits the allegations of paragraph 120.

121.    Teck Cominco denies that it failed to analyze samples for metals at Stations 10, 12 and 140 for June of 2000. Teck Cominco denies it violated any monitoring requirements for cyanide at Stations 10 and 20 in October 2000. Teck Cominco denies it failed to analyze two samples of weak acid dissociable ("WAD") cyanide from Station 20 in June 2001. Teck Cominco denies it failed to monitor total hardness at Station 140 and Station 12, and that it failed to monitor ammonia at Station 9 in May 2002. Teck Cominco admits the remaining allegations of paragraph 121, but denies plaintiffs have standing to assert any violations of ambient monitoring requirements.

122.    Teck Cominco denies that violations of mine site permit condition I(D)(1) are ongoing to this day or are capable of repetition.

123.    Teck Cominco admits that mine site permit condition I(D)(3) provides:

> Ambient monitoring, outlined in this section, may be discontinued
> when the permitee has ceased discharging from Outfall 001 to Middle
> Fork Red Dog Creek for a period of 30 consecutive days. Ambient

> monitoring shall recommence when the permitee re-initiates a discharge from Outfall 001.

The requirement of this Condition must be read in context with other requirements of the permit, for example, I(D)(2), which Teck Cominco admits provides:

> Ambient monitoring shall be conducted when there is flowing water (under ice or during water conditions). For example, if there is flowing water at Station 2, but not at the other Stations, the permitee shall sample at Station 2.

Teck Cominco denies the allegations of paragraph 123 to the extent they are inconsistent with these and the other actual written requirements of the mine site permit, and admits these allegations only to the extent they are consistent.

124.    Teck Cominco denies the allegations of paragraph 124 in that ice conditions at the Sulfur Creek ambient monitoring station precluded such sampling and there was no "flowing water." (See paragraph 123 above).

125.    Teck Cominco denies the allegations of paragraph 125.

126.    Teck Cominco admits that Permit Condition I(D)(8) provides:

> Streamflow shall be determined daily at Stations 2, 8, 9, 10, 12, and 140. Streamflow shall be determined using standard methods recognized by the U.S. Geological Survey: gaging Station data, discharge measurement, estimation using all available information. With the exception of the sites where streamflow estimates are made by adding or subtracting measured or gaged tributary flows, estimates should not be the sole means of determining flow at a site at all times; some discharge measurements shall be made for verification. The definition of "discharge measurement" is included in the definition section of this permit.

Teck Cominco denies the allegations of paragraph 126 to the extent they are not consistent with the actual written requirements of the mine site permit, and admits these allegations to the extent they are consistent.

127.    Teck Cominco denies the allegations of paragraph 127.

128.    Teck Cominco denies the allegations of paragraph 128.

129.    Teck Cominco admits that Permit Condition I(C)(4) provides:

> When water in the Dirty Water Sump is pumped into the tailings impoundment, the pumped volume shall be recorded.  The total volume pumped for each month shall be recorded and reported with the DMR for that month.

Teck Cominco denies the allegations of paragraph 129 to the extent they are not consistent with the actual written requirements of the mine site permit, and admits these allegations to the extent they are consistent.

130.    Teck Cominco denies the allegations of paragraph 130.

131.    Teck Cominco denies that violations of mine site permit condition I(C)(4) for failing to record volume of mine drainage pumped are capable of repetition.

132.    Teck Cominco denies the allegations of paragraph 132.

133.    Teck Cominco denies the allegations of paragraph 133.

## SEVENTH CLAIM
### Port Site: Unpermitted Discharges
### (33 U.S.C. § 1311(a))

134.    Paragraph 134 does not require a response from this defendant.

135.    Teck Cominco denies the allegation of paragraph 135.

136.    Teck Cominco admits the allegations of paragraph 136.

137.    Teck Cominco denies the alleged unpermitted discharges are capable of repetition.

138.    Teck Cominco asserts that the allegations of paragraph 138 are so vague as to preclude Teck Cominco from being able to form a response.  Teck Cominco also asserts that the allegations of paragraph 138 cannot be relied upon by plaintiffs in asserting any claims against Teck Cominco.

139.    Teck Cominco denies the allegations of paragraph 139.

## EIGHTH CLAIM
### Port Site: Total Suspended Solids Permit Limit Violations
### (33 U.S.C. § 1311(a))

140.    Paragraph 140 does not require a response from this defendant.

141.    Teck Cominco denies the allegation of paragraph 141.

142.    Teck Cominco denies the allegations of paragraph 142.

143.    Teck Cominco denies the allegations of paragraph 143.

144.    Teck Cominco denies the allegation of paragraph 144.

145.    Teck Cominco denies the allegations of paragraph 145.

## NINTH CLAIM
### Port Site: Self-Monitoring and Reporting Violations
### (33 U.S.C. § 1311(a))

146.    Paragraph 146 does not require a response from this defendant.

147.    Teck Cominco denies the allegations of paragraph 147 in that port site permit condition I(A(1) does not contain any monitoring requirements.

148.    Teck Cominco denies that it violated any monitoring requirements of Condition I(A)(1) of that port site permit in that said condition does not contain any monitoring requirements. Further, Teck Cominco asserts that as to a number of the samples described in paragraph 148 of the complaint, Teck Cominco is excused from any monitoring and reporting permit requirements because weather, which was beyond Teck Cominco's control to manage, prevented delivery of the samples to the contract laboratory within the required sample holding time. Teck Cominco denies there is a requirement in the port site permit to monitor either total hardness or copper at Outfall 001. Teck Cominco asserts that permit Condition III(A)(2) requires WET testing to "occur by the third year following the effective date with the permit," the effective date of the permit being in 1999, this made the WET testing deadline in 2002. Regardless, the required WET testing was initially performed in 2001 for both Americamysis bahia (formerly Mysidopsis bahia) and Atherinops affinis, ("A. affinis") but because of lab control survival issues with A. affinis in the contract laboratory performing the tests, (apparently due to the fact that Condition III (A)(2) was requiring the use of this salt water fish to measure the toxicity of fresh water discharge), the tests were repeated in 2002. Finally, Teck Cominco asserts that a sample was collected from Outfall 001 and analyzed for fecal

coliform on April 10, 2002 showing an analytical result of 0#/100 ml and that the results were reported in the May 2002 DMR.

149.    Teck Cominco denies that there is any ongoing failure to properly monitor discharges required by port site condition I(A)(1), or other condition of the port site permit, or that the alleged violations are capable of repetition.

150.    Teck Cominco admits the allegations of paragraph 150.

151.    Teck Cominco admits that as a result of equipment later determined to be unreliable, it did not obtain reliable data from its monitoring of flow and pH on May 21 through May 23, 2000 or for pH on June 3, 4, 5, 6, 7, 8 and 9, 2001, but asserts that the problem was resolved by the commissioning of a new monitoring system. Teck Cominco denies it failed to monitor in May 2000 for hardness in violation of port site permit condition I(B)(5) in that Teck Cominco was not required to monitor hardness while discharging to the Chukchi Sea, which it was doing at the time. Teck Cominco admits that the TSS sample shipped for analysis on June 22, 2000 was not properly preserved, and as a result the analysis could not be conducted. Teck Cominco admits that it failed to monitor TSS on July 7, July 26 and August 9, 2000 because, although required samples were taken and shipped to the independent lab, the requests for TSS analyses were inadvertently omitted by the automated lab request system. When the omission was discovered, the holding time had expired. Teck Cominco denies that it failed to conduct adequate WET tests for July, August or September 2001 (See paragraph 148 above). Teck Cominco denies any remaining allegations of paragraph 151.

152.    Teck Cominco denies that the alleged failures to monitor discharges in violation of port site permit condition I(B)(5) are ongoing or are capable of repetition.

153.    Teck Cominco denies the allegations of paragraph 153.

154.    Teck Cominco denies the allegations of paragraph 154.

**TENTH CLAIM**
**Mine Site: Violation of Consent Order**
**(33 U.S.C. § 1311(a))**

155.    Paragraph 155 of the Complaint does not require a response from this defendant.

156.    Teck Cominco admits the allegation of paragraph 156 that, as of the date the Compliance Order expired, (December 31, 2003) it was required in lieu of meeting the TDS permit limits, to comply with the TDS limits in the Compliance Order.  Teck Cominco denies any remaining allegations of paragraph 156.

157.    Teck Cominco admits the allegations of paragraph 157 that it was required under the May 17, 2002 Compliance Order to measure for compliance with TDS limits at Stations 10 and 160, points downstream of Outfall 001, and under each of the previous Compliance Orders it was required to measure TDS at both Stations 10 and 7. Teck Cominco denies it was required to limit its discharge of TDS so that concentrations of TDS remain "below" 1500 mg/L at Station 10, but admits that each of the Compliance Orders provided for the following TDS instream limit at Station 10:

> Station 10:     1,500 mg/L during the entire discharge season, except for temporary increases above 1,500 mg/L for no more than 48 hours in any 10-day period, provided that in no instance shall the TDS concentration exceed 1,600 mg/L.

Teck Cominco admits that the May 17, 2002 Compliance Order contained a 500 mg/L TDS limit at Station 160 from July 25 to the end of the discharge season, but denies that the 500 mg/L for Station 7 under the previous Compliance Orders also applied from July 25 to the end of the discharge season. The date that the 500 mg/L TDS limit at Station 7 ended was August 31 under the 1999 and 2000 Compliance Orders and September 15 under the 2001 Compliance Order.

158.    Teck Cominco denies it violated the TDS limits under the Compliance Order at Station 7 on July 27, 1999 and July 25, 2001. Teck Cominco admits the remaining allegations of paragraph 158.

159.    Teck Cominco denies that it exceeded the limits of the Compliance Order in June 1999 or that the discharges in June may be used to calculate the 10-day running average at the beginning of July 1999 in that the Compliance Order was not fully executed until July 1, 1999 and not received by Teck Cominco until July 7, 1999. Teck Cominco also denies any TDS violations at Station 10 took place in July 1999. Teck Cominco denies TDS concentration exceeded 1600 mg/L at Station 10 on September 12, 1999. Teck Cominco admits it exceeded the TDS limits at Station 10 on October 5, 1999, and denies the allegations that it exceeded the TDS limits at Station 10 on October 1, 1999. Teck Cominco admits that it exceeded the TDS limits for Station 10 on June 22-28 and July 5, 6 and 11, 2000 due to an ambiguity in the terms of the Compliance Order that was later resolved. Teck Cominco denies it exceeded the Compliance Order limits for TDS at Station 10 on July 7 or 8, 2000. Teck Cominco denies that it exceeded any TDS limit for Station 10 in the Compliance Order during 2002.

160.    Teck Cominco denies the allegations of paragraph 160.

161.    Teck Cominco admits the allegations of paragraph 161.

162.    Teck Cominco denies the allegations of paragraph 162 and asserts that on July 14, 2000 a solar flare limited the amount of data that could be transmitted, but on that date the required parameters were monitored and recorded in the Station 10 datalogger. Teck Cominco further asserts that it did monitor for and record data for required parameters at Station 10 on May 30, 2001, but discontinued discharge that day because of concerns about conditions affecting data quality.

163.    Teck Cominco denies it failed to timely report data for Station 7 for July 2001. Teck Cominco did report to EPA that data was collected but due to equipment problems, determined to be inaccurate, unreliable and misleading, and with EPA concurrence, the erroneous data was not provided to EPA. Teck Cominco denies the allegation of paragraph 163 as to May 2002 data in that the May data was reported in the June DMR.

164.    Teck Cominco denies the allegations of paragraph 164.

165.    Teck Cominco denies the allegations of paragraph 165.

166.    Teck Cominco denies the allegations of paragraph 166.


## AFFIRMATIVE DEFENSES

**FIRST AFFIRMATIVE DEFENSE:**    The allegations of plaintiffs' complaint fail to state claims against Teck Cominco upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE:**    Plaintiffs lack standing to bring each of the claims set forth in their complaint because plaintiffs have not suffered any injury-in-fact from any acts alleged in the complaint to have been committed by Teck Cominco.

**THIRD AFFIRMATIVE DEFENSE:**      Plaintiffs lack standing to bring each of the claims set forth in their complaint because there is no substantial likelihood that the conduct alleged of Teck Cominco caused or contributed to any actual or perceived injury alleged to have been suffered by plaintiffs.

**FOURTH AFFIRMATIVE DEFENSE:**    Some or all of the conduct alleged by plaintiffs was the result of an extraordinary precipitation event exceeding the 10-year, 24-hour criteria and is excused by 40 C.F.R. §440.131(b).

**FIFTH AFFIRMATIVE DEFENSE:**      Some of the conduct alleged by plaintiffs as noncompliance with an effluent based permit limitation resulted from an upset, and the noncompliance is excused under 40 C.F.R. §122.41(n).

**SIXTH AFFIRMATIVE DEFENSE:**      Alleged exceedences of the cyanide limitations reflected in analytical results reported in Teck Cominco's DMRs did not reflect actual violations of the cyanide limits by Teck Cominco and these were not intended by EPA in drafting the mine site permit to be used as evidence of actual concentrations below the "Interim Minimum Level" set in the permit. EPA had required use of a test and/or test protocol that would detect the existence of cyanide but could not produce accurate or precise quantification of it as the concentrations specified as the effluent limits in the mine site permit. Teck Cominco had no ability to change the analytical method

specified in the permit and was required to report the results known to be inaccurate. Results from analyses for cyanide of the samples by other alternative methods, which were not authorized in the permit, but are scientifically valid, show that Teck Cominco did not violate the permit limits for cyanide. Compliance with the monitoring requirement, (but not the permit limitation) was impossible.

**SEVENTH AFFIRMATIVE DEFENSE:** Alleged exceedences of whole effluent toxicity (WET) effluent limitations reflected in Teck Cominco's DMRs or failure to provide analyses at the required intervals in the DMRs did not reflect the toxicity of the effluent or any negligent failure to sample or analyze, but reflected the inability of laboratories to apply the EPA-required WET test protocol to achieve accurate or precise measurements of effluent toxicity in the range of the WET effluent limitations or achieve applicable quality control. Accurate and precise testing and meeting quality contract requirements on a consistent basis was impossible and any alleged violations are excused.

**EIGHTH AFFIRMATIVE DEFENSE:** Some of the alleged violations of limits or monitoring set forth in the complaint occurred because of errors by independent laboratories resulting in inaccurate laboratory reports of sample analysis or failure of the laboratory to analyze samples provided by Teck Cominco, all without the occurrence of any act or omission on the part of Teck Cominco for which it may properly be held accountable.

**NINTH AFFIRMATIVE DEFENSE:**    Some of plaintiffs' claims alleging monitoring violations regarding failure to provide analysis of samples at required frequencies or intervals resulted from force majeure because weather or ice conditions at Red Dog Mine and/or in the De Long Mountains area prevented sample collection or the shipment by aircraft of samples from the mine to an authorized laboratory or laboratories in time to permit analysis within the required sample holding period.

**TENTH AFFIRMATIVE DEFENSE:**    Monitoring and reporting errors during 2000 alleged as violations of Teck Cominco's NPDES permit resulted in substantial part from conversion to a new computer software program ("Envista") put in place to schedule and track sampling required to facilitate full compliance with the permit. Implementation problems were promptly corrected when discovered by modifying the software and providing additional training to operators, resulting in a very reliable automated system for later years. Monitoring and sampling errors during initial use of the new system constitute a single failure of compliance.

**ELEVENTH AFFIRMATIVE DEFENSE:**    Some of plaintiffs' claims are barred by the running of the applicable statute of limitations period or are otherwise time-barred.

**TWELFTH AFFIRMATIVE DEFENSE:** Some of plaintiffs' claims do not involve a violation by Teck Cominco of any "effluent limitation or standard" and thus plaintiffs have no standing to assert these claims.

**THIRTEENTH AFFIRMATIVE DEFENSE:**    Some or all of the plaintiffs' claims are barred by the Mootness Doctrine.

**FOURTEENTH AFFIRMATIVE DEFENSE:**    Some or all of the plaintiffs' claims were not ongoing as of the time the complaint was filed, and the plaintiffs are without standing to proceed.

**FIFTEENTH AFFIRMATIVE DEFENSE:**    The plaintiffs are without standing to assert claims for which no notice was given to Teck Cominco at least sixty (60) days before filing suit.

**SIXTEENTH AFFIRMATIVE DEFENSE:**    The plaintiffs are without standing to assert claims for reporting and monitoring violations where they are without standing to assert effluent discharge violations.

**SEVENTEENTH AFFIRMATIVE DEFENSE:**    The plaintiffs are not the real parties in interest.

**EIGHTEENTH AFFIRMATIVE DEFENSE:**    The plaintiffs cannot show that their alleged harms, if any, are fairly traceable to Teck Cominco's allegedly violative discharges.

**NINETEENTH AFFIRMATIVE DEFENSE:**    The plaintiffs cannot show that their alleged injuries, if any, are redressable by this court.

**TWENTIETH AFFIRMATIVE DEFENSE:**   The plaintiffs' injuries, if any, were caused in whole or in part by persons or entities for whom Teck Cominco is not responsible.

**TWENTY-FIRST AFFIRMATIVE DEFENSE:**  Some or all of the actions of which plaintiffs complain are privileged and, as such, do not constitute a basis for legal action against Teck Cominco.

**TWENTY-SECOND AFFIRMATIVE DEFENSE:**   Plaintiffs' claims include assertions of multiple violations of permit and Compliance Order limits for a single parameter on a single day of discharge.  Teck Cominco may not be penalized for more than one violation per parameter per day of discharge.

**TWENTY-THIRD AFFIRMATIVE DEFENSE:**  Teck Cominco reserves the right to assert such other or further defenses as may be revealed through discovery or investigation of relevant facts.

WHEREFORE, Teck Cominco Teck Cominco Alaska Incorporated asks for judgment against plaintiffs as follows:

1.   Dismissing plaintiffs' claims with prejudice.

2.   Dismissing plaintiff's complaint with prejudice.

3.   Denying plaintiffs' request for an injunction.

4.   Denying plaintiffs' request for imposition of civil penalties.

5.    Awarding Teck Cominco its costs of litigation, including reasonable attorney and expert witness fees.

6.    For such other relief as the court deems just and proper.

DATED this 21st day of November, 2007, at Anchorage, Alaska.

HARTIG RHODES HOGE & LEKISCH, P.C.
Attorneys for Teck Cominco Alaska Incorporated


By: _____
      Sean Halloran


CERTIFICATE OF SERVICE

I certify that on the 21st day of November, 2007, a
true and correct copy of the foregoing document was
served by electronic means through the ECF system,
as indicated on the Notice of Electronic Filing, on:
Luke W. Cole, James Torgerson, and David Case,
and was served by mail, first class postage prepaid, on
Nancy S. Wainwright.