JAMES E. TORGERSON (Alaska Bar No. 8509120)
HELLER EHRMAN LLP
510 L Street, Suite 500
Anchorage, AK 99501-1959
Telephone: (907) 277-1900
Facsimile: (907) 277-1920

james.torgerson@hellerehrman.com

Attorneys for Intervenor-Defendant
NANA REGIONAL CORPORATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ENOCH ADAMS, JR., LEROY ADAMS, ANDREW KOENIG, JERRY NORTON, DAVID SWAN and JOSEPH SWAN, <br><br> Plaintiffs, <br><br> v. <br><br> TECK COMINCO ALASKA INCORPORATED, <br><br> Defendant, <br><br> NANA REGIONAL CORPORATION, and NORTHWEST ARCTIC BOROUGH, <br><br> Intervenor-Defendants. | Case No.: A:04-cv-0049 (JWS) <br><br> **JOINT RESPONSE TO PLAINTIFFS' EXHIBIT OBJECTIONS AT DOCKET 215** |

## I.   INTRODUCTION

In their Objections to Teck Cominco and NANA's Final Exhibit List (Objections), Plaintiffs object to many of Teck Cominco Alaska, Incorporated's (Teck Cominco) and NANA Regional Corporation's (NANA) exhibits on multiple grounds.[1] To assist the Court in its review of Plaintiffs' objections, Teck Cominco and NANA have used the

---

[1] Doc. 215.

chart prepared by Plaintiffs as part of their Objections pleading and added a new column to the chart in which they have inserted a summary of their responses to the Plaintiffs' objections.[2] Teck Cominco and NANA believe their responses to some objections will be evident without any further explanation. But certain of their responses, especially to the Plaintiffs' relevancy objections, require a fuller response.

All of the exhibits that Plaintiffs have identified in their Objections as (A) State of Alaska documents, (B) permits or certifications that were never operative and have been withdrawn, (C) amended DMRs, (D) WET test results with regard to *Pimephales promelas*, (E) aquatic biomonitoring studies, and (F) studies of the Kivalina environment are relevant as to the appropriate remedy in this case. Many are relevant to both liability and the remedy.

## II.  ANALYSIS

The plaintiffs continue to contend that if they present DMR's to the court at trial, nothing more should be considered to determine whether liability can be established. However, this court will have to determine whether each of hundreds of alleged violations actually occurred, and doing so will entail significantly more evidence than just DMR's. There are numerous defenses asserted by Teck Cominco to the various claims, and this court has already determined that there are numerous issues of fact that must be tried. Many issues will require diverse documentary as well as testimonial evidence, including various exhibits that are objected to by the plaintiffs. As an example, evidence that tends to show whether an alleged violation is capable of repetition is evidence that must be presented in the liability phase of trial.

The remedial phase will require a broad array of evidence as well. Especially if the court is to consider injunctive relief, exhibits showing what standards have been found to be protective of the environment are necessarily relevant. Moreover, if the

---

[2] The chart is attached as Exhibit 1.

Court finds a violation of the Clean Water Act, civil penalties are mandatory.[3] But the Court has substantial discretion in setting the amount of penalties.[4] To determine the amount of penalties, the Court must consider six factors: (1) the seriousness of the violation; (2) any economic benefit resulting from the violation; (3) any history of such violations; (4) the good-faith efforts to comply with the applicable requirements; (5) the economic effect of the penalty on the violator; and (6) such other matters as justice may require.[5]

The "seriousness of the violation" statutory factor also is known as the "gravity component."[6] EPA's Interim Clean Water Act Settlement Penalty Policy divides the gravity component into four factors: (1) significance of the violation; (2) health and environmental harm; (3) number of effluent limit violations; and (4) significance of non-effluent limit violations.[7] The health and environmental harm factor is for violations that "present actual or potential harm to human health or to the environment."[8]

How all these factors are applied in determining a remedy is left to the Court's discretion. The Ninth Circuit Court of Appeals repeatedly has held that the district court has broad discretion in deciding on a remedy.[9] In *Borden Ranch Partnership*, appellate court upheld the district court's penalty even though it was "significantly lower than the statutory maximum."[10] Similarly, in *Southwest Marine*, the court upheld the district court's penalty where the district court, instead of imposing the $25,000 maximum,

---

[3] 33 U.S.C. § 1319(d); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995).
[4] *Leslie Salt*, 55 F.3d at 1397 ("District courts retain the broad discretion to set a penalty commensurate with the defendant's culpability. Indeed, in its consideration of the seriousness of a defendant's violations and 'such other matters as justice may require,' the district court could assess a civil penalty of only a nominal amount."); *Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 261 F.3d 810, 818 (9th Cir. 2001).
[5] 33 U.S.C. § 1319(d).
[6] EPA, Interim Clean Water Act Settlement Penalty Policy (March 1, 1995) at 6.
[7] *Id.*
[8] *Id.* at 8-9.
[9] *Borden Ranch Partnership*, 261 F.3d at 818; *Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985, 1001-02 (9th Cir. 2000); *Leslie Salt*, 55 F.3d at 1397.
[10] 261 F.3d at 818-19.

Heller Ehrman LLP
510 L STREET, SUITE 500
ANCHORAGE, AK 99501-1959
TELEPHONE (907) 277-1900

imposed $1,000 for each day of violation and ordered that the penalty would be reduced by the amount of the cost to the violator for improving its storm water diversion system or making other changes to its system to comply with the court's injunction.[11]

Any evidence going to any of these factors therefore is relevant, and potentially helpful to the Court in exercising its discretion, as to the appropriate remedy in this case. Many of the exhibits Plaintiffs challenge in their Objections contain such evidence.

### A. Plaintiffs' Categories of Documents

#### 1. State of Alaska documents

Plaintiffs object to ten exhibits they characterize as "State of Alaska documents." Specifically, Plaintiffs object to Exhibits 1003, 1004, 1005, 1006, 1646, 1712, 1713, 1726, 1727, and 1728. These documents are Alaska Department of Environmental (ADEC) Conservation Compliance Orders and 401 Certifications together with relevant reports, the decision document for a TDS Site-Specific Criterion (SSC), Teck Cominco's requests for TDS SSC, a memorandum regarding cadmium natural background SSC, and trip reports regarding sampling and collecting fish.

These exhibits all are relevant to liability because they were part of the regulatory regime under which Teck Cominco was operating. As such, the documents help explain what limits were in place during the relevant time period and why those limits were in place.

These documents also are relevant to one or more of the factors the Court will need to consider in determining the remedy.

Every exhibit in this category is relevant, at a minimum, to the seriousness or gravity factor the Court must consider in determining the remedy. They are relevant to this factor because they establish various baseline conditions for water quality and

---

[11] 236 F.3d at 1002.

environmental status in and around Red Dog Mine, the Wulik River drainage and/or the Village of Kivalina, and because they show that the violations about which Plaintiffs complain have caused little if any harm to health or the environment. For instance, Exhibit 1005 shows that before the Mine's development, arctic grayling were rarely seen in the Main Stem of Red Dog Creek[12] and the Main Stem did not provide suitable rearing habitat for juvenile Dolly Varden, but that the suitability of the Main Stem's habitat for rearing juvenile Dolly Varden improved after the Mine's development.[13] The other 401 Certification (Exhibit 1006) and the trip reports (Exhibits 1727 and 1728) likewise provide background information regarding baseline conditions and the Mine's effect on the environment.

All of these exhibits also are relevant to understanding the duration of the violations at Red Dog and the significance of any non-effluent limit violations, because they provide context as to the regulatory response to the Mine's operations, including any violations. For instance, Exhibit 1646, the ADEC Decision Document, shows that ADEC raised the TDS SSC based on evidence that the Arctic Grayling and invertebrates in Red Dog Creek were not being affected by the higher total dissolved solids levels.[14] Exhibit 1712, Teck Cominco's 2000 letter to ADEC, shows that the streams around Red Dog Mine had been reclassified because of the naturally occurring high concentrations of toxic metals in the creeks.[15] Similarly, Exhibit 1726, Teck Cominco's memorandum to ADEC, shows pre-mining data and the cadmium loads calculated with that data.

The exhibits, separately and collectively, also show Teck Cominco's good faith efforts to comply with applicable regulatory requirements. For example, Exhibit 1003 shows that Teck Cominco was working with the state and federal agencies to comply with the permit's requirements. The other compliance order, the 401 certifications, ADEC's decision document, and Teck Cominco's 2001 letter to ADEC, also demonstrate

---

[12] Exhibit 1005 at 10
[13] Exhibit 1646 at 31.
[14] Exhibit 1646 at 10.
[15] Exhibit 1712 at 4.

Teck Cominco's good faith efforts to meet the applicable requirements.[16]

At least one exhibit also is relevant to the statutory economic benefit factor.[17] The August 2000 letter from Teck Cominco to ADEC states that Teck Cominco engaged Gene Andrews, a water treatment technology expert, to "prepare a comprehensive analysis of available technologies which might be employed at Red Dog to lower TDS" and that the "reports found that there is no technology currently available which can practicably treat the quantity of effluent from Red Dog's water treatment plan to reduce the level of TDS in the effluent so that Cominco can consistently meet the aquatic life use criteria (500-1000 mg/l) in the Main Stem."[18]

In short, Plaintiffs understandably want to keep these exhibits out of evidence. But the reason is not that they are irrelevant. The reason is that, among other things, they show that the violations about which the Plaintiffs complain have caused no harm to health or the environment, and that Teck Cominco has made good faith efforts to comply with applicable regulatory requirements during the time in question.

### 2. Permits or certifications that were never operative and have been withdrawn

Plaintiffs also object to Exhibits 1000 and 1007, which are the 2007 EPA Permit and 2007 ADEC 401 Certification. These exhibits are relevant to one or more of the factors the Court will need to consider in determining the remedy.

Both exhibits in this category are relevant, at a minimum, to the seriousness or gravity factor the Court must consider in determining the remedy. They are relevant to this factor because, for instance, they reveal what State and Federal regulators considered to be appropriate parameters for various activities at the Mine in 2007, at least before EPA withdrew the permit. Among other things, review of the withdrawn 2007 federal

---

[16] Exhibits 1004, 1005, 1006, 1646, 1713.
[17] Exhibit 1712.
[18] Exhibit 1712 at 6.

permit will show that most of the Plaintiffs' claims would have been mooted by the 2007 permit, except that Plaintiffs were able to pressure the EPA into withdrawing the permit.

Both exhibits also are relevant to understanding the significance of any non-effluent limit violations, because they provide context as to the discharge levels regulators in 2007 considered appropriate for Red Dog Mine. And they, separately and collectively, show Teck Cominco's good faith efforts to comply with applicable regulatory requirements. Both exhibits show that Teck Cominco was working with the state and federal agencies to develop a rational permitting approach for the Mine. For example, the 2007 ADEC 401 Certification[19] shows that aquatic biomonitoring at Red Dog began in 1990 and has continued annually since then, and that the biological monitoring program has been continued each year.

These exhibits also will be relevant, to the extent the Plaintiffs seek injunctive relief, as to the appropriate terms of any such relief.

In short, it is again understandable why Plaintiffs want to keep these exhibits out of evidence. They show that the vast majority of the violations about which the Plaintiffs complain would not even have been jurisdictional, because they would have been mooted, except for Plaintiffs' success in getting the permit withdrawn. They also show Teck Cominco's good faith efforts to work with regulators and comply with applicable regulatory requirements during the time in question.

### 3. Amended DMRs

EPA regulations require Teck Cominco to amend its DMR's and other required reports whenever it becomes aware that it "submitted incorrect information" in an earlier filed report.[20] Consequently, Teck Cominco has amended most of its DMR's at one time or another to incorporate information that became available after the report was first filed

---

[19] Exhibit 1007.
[20] 40 C.F.R. § 122.41(l)(8).

(or last amended) and/or to correct inaccuracies that may have been included in earlier versions.[21] Where Teck Cominco has amended a DMR, the amendment is part and parcel of the DMR as of the date it was amended, and any exhibit purporting to be Teck Cominco's DMR must include all of the DMR including any amendments.

For purposes of filing their complaint, Ninth Circuit law allows that the Plaintiffs may rely upon a DMR as it exists at the time they file.[22] Despite the fact that the Plaintiffs have testified that they did not review the DMR's, rely upon them, or even understand them,[23] Teck Cominco and NANA recognize that their claims may be based upon DMRs existing as of the time they filed their complaint. Any amendments made prior to that time are relevant to whether liability may be established. As well, amendments occurring after the complaint was filed will still shed light on the seriousness of violations, the history of violations, Teck Cominco's good faith efforts to comply with applicable requirements, and other matters that the Court is required to consider in determining any penalties to be awarded.

### 4. WET test results with regard to *Pimephales promelas*

The Plaintiffs argue that their allegations relate only to toxicity on the "water flea" and that WET testing of other species is not relevant.[24] The questions to be tried,

---

[21] The revised DMR's addressing cyanide that are discussed by the Plaintiffs in their objections, for example, were filed with the EPA in order to comply with instructions from EPA on how the analytical results for cyanide were to be presented in DMR's. In asserting their claims of violations of the monthly average cyanide limit, the Defendants assert that the Plaintiffs rely upon a misinterpretation of the permit requirements, and this Court has determined that there is a triable issue as to the appropriate limit that Teck Cominco's effluent must meet. The DMR's are relevant to show a lack of liability, but even if liability is found, they will be relevant to any determination of an appropriate penalty.

[22] *Sierra Club v. Union Oil Co. of California*, 813 F.2d 1480, 1492 (9th Cir. 1987), *vacated for reconsideration*, 481 U.S. 931 (1988), *reinstated and amended*, 853 F.2d 667 (9th Cir. 1988) (citizen plaintiffs may rely upon DMR's without concern for "additional information unavailable to citizen groups").

[23] Joseph Swan depo. at 6-7; Enoch Adams depo at 25-26; Andrew Koenig depo at 29-31; Joseph Swan Sr. depo at 55-56.

[24] Doc. 215 at 4.

however, are not limited by species.

In its Order at Docket 127, this Court found material questions of fact as to how many aliquots are required to satisfy WET testing requirements. Those questions of fact expressly pertained to Permit Condition I(H)(4) and WET testing conducted in July 2002. Exhibit 1218 relates to the toxicity of effluents in July 2002, and further will be used to establish that Teck Cominco's effluent causes no harm to the environment. The document is necessarily relevant as to time and subject.

### 5. Aquatic biomonitoring studies

Condition I.F. of the 1998 Permit requires a "bioassessment program" from "the effective date of the permit and lasting through the expiration date."[25] Accordingly, Teck Cominco is required to monitor and record the fisheries in several of the creek tributaries at and near the Mine. As part of this process, collected fish must be analyzed for concentrations of zinc, lead, copper and other minerals in their gills and organs.[26]

In its certification of the 1998 Permit, ADEC noted difficulty in applying WET limits because "we simply do not have adequate data to calculate with any precision the natural toxicity of the Main Stem or the Lower Ikalukrok."[27] Consequently, ADEC called for further field studies of the fisheries.[28] ADEC's Certification is an integral component of EPA's Permit.[29] ADEC and EPA each require this biomonitoring program to supplement WET testing and to better assess whether Red Dog's effluent increases toxicity over natural background.

Pursuant to these requirements, aquatic biomonitoring reports have been produced

---

[25] Exhibit 1000 at 14.
[26] Permit Condition I.F.1.
[27] Exhibit 1005, App. B-1, B-2.
[28] *Id.* at B-9.
[29] CWA § 401(a), 33 U.S.C. § 1341(a); 40 C.F.R. §§ 122.4(b), 124.53; *Ackels v. U.S. E.P.A.*, 7 F.3d 862, 867 (9th Cir. 1993) (permit and certification constitute a dual federal and state permitting process).

JOINT RESPONSE TO PLAINTIFFS' EXHIBIT OBJECTIONS AT DOCKET 215
ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)
PAGE 9 OF 14

each year since 2000. These reports are Defense Exhibits 1656 through 1663. Those reports are not only relevant, they are material to all issues -- liability and penalty -- that question or consider the toxicity of the effluent. Where the Plaintiffs have alleged violations of toxicity limits, for example, it is biomonitoring that demonstrates the lack of actual toxicity and is, therefore, relevant. Accordingly, Exhibits 1656-1659, 1661, 1662, 1727, 1728, 1734-1738B, and 1740 all should be admitted over Plaintiff's objections.

### 6. Studies of the Kivalina environment

Plaintiffs object to ten exhibits: Exhibits 1645, 1647, 1714, 1715, 1716, 1717, 1718, 1719, 1720, and 1721, which they characterize as studies of the Kivalina environment. Exhibit 1645 is a public health evaluation by the Alaska Division of Public Health. Exhibits 1647, 1714, 1716 and 1719 are documents regarding drinking water. Exhibits 1715 and 1717 are documents regarding fish, which was sent to the Alaska Department of Fish and Game. Exhibits 1718, 1720, and 1721 are EPA memoranda regarding the analyses of water samples.

All of these exhibits are relevant to one or more of the factors the Court will need to consider in determining the remedy. Every exhibit in this category is relevant, at a minimum, to the seriousness or gravity factor the Court must consider in determining the remedy. They are relevant to this factor, in part, because they establish various baseline conditions for water quality and environmental status in and around the Village of Kivalina and because they show that the violations about which Plaintiffs complain have caused no harm to health or the environment. For instance, Exhibit 1645, the public health evaluation, shows that water quality data collected prior to mining activities indicated that the waters were acidic and contained levels of cadmium, lead, and zinc that exceeded State of Alaska drinking water standards and were in a range considered toxic

to aquatic life.[30] But the evaluation concluded that the concentrations of heavy metals detected in water, soil, caribou, fish, and berry samples collected from the Red Dog Mine area do not pose a public health hazard to the residents of Kivalina and Noatak.[31]

Similarly, the sanitary survey, Exhibit 1647, concluded that "[w]ater sample results do not indicate any problems with the quality of the treated water from the Kivalina water treatment plant."[32] And the analyses of the water samples and related correspondence contained in Exhibits 1714, 1716, 1718, 1719, 1720, and 1721, are relevant to whether the Mine has had any impact on health or the environment. The tests on the fish sent to the Alaska Department of Fish and Game, reported in Exhibits 1715 and 1717, also are relevant to whether there has been any impact to health or the environment.

Some of the exhibits also show Teck Cominco's good faith efforts to comply with applicable regulatory requirements and/or will be relevant to the significance of any non-effluent limit violations. For example, Exhibit 1714, Teck Cominco's 2002 letter to the Chairman of the Subsistence Committee, shows that Teck Cominco met with the Subsistence Committee about conducting a survey to address village concerns about the quality of their drinking water. Exhibit 1716, Teck Cominco's March 2003 letter to the EPA, shows that Teck Cominco was collecting samples from the Kivalina water storage tank, the Wulik River, and the Kivalina River and making good-faith efforts to comply with its permit.

In short, as with other exhibits to which the plaintiffs have objected, they understandably want to keep these exhibits out of evidence. But once again the reason is not that they are irrelevant. The reason is that they show that the violations about which the Plaintiffs complain have caused no harm to health or the environment, and that Teck Cominco has made good faith efforts to comply with applicable regulatory requirements.

---

[30] Exhibit 1645 at 5.
[31] *Id.* at 24.
[32] Exhibit 1647 at 2.

JOINT RESPONSE TO PLAINTIFFS' EXHIBIT OBJECTIONS AT DOCKET 215
ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)
PAGE 11 OF 14

### D.  Authentication

Unauthenticated evidence is not relevant.  Evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which it purports to be.[33]  However, the burden of proof to establish authenticity is not great.  The foundational requirement of authentication as a condition precedent to admissibility is satisfied by a prima facie showing that the matter in question is what its proponent claims.  Proof is sufficient if a reasonable trier could find in favor of authenticity.[34]

Documents may provide their own authentication through distinctive characteristics such as letterheads and logos.[35]  A proponent may authenticate a document with circumstantial evidence, including the circumstances surrounding its discovery.[36] Authentication can be accomplished by judicial admission, such as production of the item in response to a discovery request with introduction by the party who received the item in discovery.[37]

In this pretrial stage of litigation, evidence can be accepted conditionally. If there is any legitimate doubt about the authenticity of a document, this court can condition its ultimate admission on further proof of authenticity at trial.[38]

---

[33] Fed.R.Evid. 901(a) Advisory Committee's Note.
[34] *U.S. v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000).
[35] *U.S. v. Childs*, 5 F.3d 1328, 1336 (9th Cir. 1993).
[36] *In re McLain*, ___ F.3d ___, 2008 WL 274403, *3 (5th Cir. 2008).
[37] *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 972 (C.D. Cal. 2006).
[38] Fed.R.Evid. 104(b).

## III. SUMMARY

None of Plaintiffs' objections to Teck Cominco's and NANA's Final Exhibit List have merit. All should be denied: at trial the exhibits should be admitted into evidence.

Dated: February 5, 2008          Respectfully submitted,

                                        Attorneys for Intervenor-Defendant
                                      NANA REGIONAL CORP.
                                      By _____*/s/ James e. Torgerson*_____
                                      JAMES E. TORGERSON (BAR NO. 8509120)
                                      Heller Ehrman LLP
                                      510 L Street, Suite 500
                                      Anchorage, AK  99501
                                      Telephone:  907-277-1900
                                      james.torgerson@hellerehrman.com

Dated: February 5, 2008          Respectfully submitted,

                                      HARTIG RHODES HOGE & LEKISCH
                                      Attorneys for Defendant
                                      TECK COMINCO ALASKA INCORPORATED

                                      By _____*/s/ Sean Halloran*_____
                                      SEAN HALLORAN
                                      Hartig Rhodes Hoge & Lekisch, P.C.
                                      717 K Street
                                      Anchorage, AK  99501
                                      mail@hartig.com

*Heller Ehrman LLP*
510 L STREET, SUITE 500
ANCHORAGE, AK 99501-1959
TELEPHONE (907) 277-1900

ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing **RESPONSE TO PLAINTIFFS' EXHIBIT OBJECTIONS AT DOCKET 215** was served via the method indicated below this 5th day of February, 2008, on the following parties:

| | |
|---|---|
| Luke W. Cole<br>Center on Race, Poverty & the Environment<br>47 Kearny Street, Suite 804<br>San Francisco, CA 94108<br>luke@igc.org | Counsel for Plaintiffs<br><br>Served via: Electronic transmission |
| Nancy S. Wainwright<br>Law Offices of Nancy S. Wainwright<br>13030 Back Road, Suite 555<br>Anchorage, AK 99515-3538 | Counsel for Plaintiffs<br><br>Served via: U.S. Mail only |
| James E. Torgerson<br>Heller Ehrman, LLp<br>510 L Street, Suite 500<br>Anchorage, AK 99501<br>james.torgerson@hellerehrman.com | Counsel for Defendant NANA Regional Corp.<br>Served via: Electronic transmission |
| David S. Case<br>Landye Bennett Blumstein LLP<br>701 West 8th Avenue, Suite 1200<br>Anchorage, AK 99501<br>dcase@lbblawyers.com | Counsel for Intervenor-Defendant<br>Northwest Arctic Borough<br><br>Served via: Electronic transmission |

/S/ Sean Halloran
SEAN HALLORAN (Bar No. 9211080)
Sean Halloran
Hartig Rhodes Hoge & Lekisch, P.C.
717 K Street
Anchorage, AK 99501
sean.halloran@hartig.com

2/5/08 9:41 PM ()