# THIRD AMENDED, RESTATED
# CONTRACT FOR SERVICES
# WITH
# TECK COMINCO ALASKA INCORPORATED

This third amended, restated Agreement ("Agreement") is made to be effective as of the 17th day of October, 2003, by and between Teck Cominco Alaska Incorporated ("TCAK") and the Northwest Arctic Borough ("NAB").

WHEREAS: NAB is a home rule borough organized in accordance with the laws of the State of Alaska; and

WHEREAS: TCAK is a corporation duly organized under the laws of the State of Alaska pursuant to ALASKA STAT. § 10.06.003 et seq.; and

WHEREAS: NAB provides programs for assisting villages within the Borough boundaries and to provide public services that may directly or indirectly support TCAK's Red Dog Mine Project; and

WHEREAS: TCAK is willing to provide funding to NAB to assist with the organization and operation of the Borough Government; and

WHEREAS: NAB has previously adopted an amended ordinance governing its policy on Economic Development and Local Taxation (the "Policy"), as codified at Section 6.08.010 of the Northwest Arctic Borough Code, which provides TCAK with a clear understanding of the potential tax liability of the Red Dog Mine Project for approximately the next eleven (11) years; and

WHEREAS: TCAK and NAB have determined that it will be mutually beneficial and consistent with the public interest to enter into a cooperative agreement which will help to further a stable financial climate for the operations contemplated by the Borough and for the Red Dog Mine Project; and

WHEREAS: TCAK and NAB have previously executed such a cooperative agreement in the form of a "Contract for Services" dated effective February 23, 1987 (amended and restated twice, effective September 15, 1996 and September 29, 2000, respectively), and now wish to amend, restate and continue the same on the basis of the covenants and conditions described below, it being the intent of the parties that this "Third Amended,

Page 1   THIRD AMENDED, RESTATED CONTRACT FOR SERVICES

Restated Contract For Services" shall amend and substitute for the "Second Amended, Restated Contract For Services", described above.

NOW THEREFORE in consideration of the mutual covenants and conditions contained herein, the parties agree as follows:

1. PAYMENTS

   (a) TCAK hereby agrees to make payments to NAB in the amounts set forth in the attached Schedule "A".

   (b) In addition to the payments described in paragraph (a) above TCAK shall pay NAB an additional zinc price escalator payment of fifty-thousand dollars ($50,000) annually for each one cent (1¢) per pound the 12 month average London Metal Exchange ("LME") settlement price for zinc exceeds an adjustable 1996 base price of sixty cents (60¢) per pound. Such additional amount shall be calculated by comparing the average of the monthly averages of the LME settlement price for zinc as reported in Platt's Metals Week for the 12 consecutive calendar months ending September 30 of the year in question ["12 month price"] with a base price of $1322.77 per tonne [60¢/lb.] as adjusted and calculated in accordance with the following formula:

$$\$50{,}000 \times \left\{ \left[ \text{12 month price} - \left(1322.77 \times \frac{\text{12 month IPD}}{\text{Initial IPD}}\right)\right] \times \frac{100}{2204.62} \right\}$$

Where "12 month price" is the average of the monthly average of the London Metal Exchange settlement price for a 12 month period ending September 30.

$1322.77 is the base price per tonne [60¢/lb.].

"12 month IPD" is the Implicit Price Deflator for Gross National Product, averaged for the four quarters for the 12 month period in question.

"Initial IPD" is the Implicit Price Deflator for Gross National Product for the quarter ending September 30, 1996.

Page 2   THIRD AMENDED, RESTATED CONTRACT FOR SERVICES


Exhibit A
Page 2 of 12

For example, if the 12 month price were 65.2¢/lb. ($1,437.41 per metric tonne), the 12 month IPD were 105 and the initial IPD 101, the formula would yield the following result:

$$\$50{,}000 \times \left\{[\$1{,}437.41-(1322.77 \times \tfrac{105}{101})] \times \tfrac{100}{2204.62}\right\} = \$141{,}187.76.$$

Any zinc price escalator payments due under this section shall be made on the last business day of the December immediately following the 12 month period ending September 30. In the event that the IPD is not available for each of the 4 preceding quarters, then the IPD available for the last four quarters reported shall be used. If the IPD should cease to be reported or Platt's Metals Week cease to be published, the parties shall agree on the use of an alternate index or publication that will as nearly as possible provide the same data as the replaced index or publication.

(c) All payments shall be in U.S. funds, shall be made by bank to bank electronic funds transfer, cheque or money order, and shall be considered made when delivered to NAB's designated bank, the office of NAB or when sent by certified mail and deposited with U.S. or Canadian postal authorities on or before the applicable due date for each payment. If a due date shall fall on a weekend or holiday, then payment made on the next following business day shall be timely.

(d) Said payments shall be consideration for the services and benefits provided by NAB and in lieu of the taxes that the Assembly has decided not to impose as described in its Policy attached hereto as Exhibit "A". Payments made hereunder are inclusive of any interest, administrative cost, fees or other expenses which may be incurred by NAB in administering this Agreement.

2. PUBLIC PROGRAMS AND SERVICES

NAB shall expend the funds received under this Agreement for community purposes, facilities, or services for the good of NAB to the extent NAB is authorized by law to exercise the power necessary to accomplish the purpose or provide the facility or service. TCAK and its employees shall have equal access to all programs, services, and facilities made available by NAB to the public regardless of the source of funding for such

programs, services and facilities, for which they qualify pursuant to the terms of the program or service.

3. BOROUGH POLICY

    (a) TCAK is entering into this Agreement contingent upon continuation of the Policy enacted by NAB, as codified in Section 6.08.010 of the borough code. In the event of NAB modifying or discontinuing the Policy or taking any action in contravention of the Policy, TCAK may, at its option, terminate this Agreement by giving written notice to NAB not later than 90 days after the effective date of such action by NAB and the obligation to make payments to the NAB shall terminate retroactively to the effective date of such NAB action.

    (b) TCAK shall be entitled to a "credit" in the amount of $2,750,000 representing the amounts paid under this Agreement before the twelfth Quarter set forth in Schedule "A" to offset any taxes or other payments which might become due and owing to NAB as a result of modification or discontinuance of the Policy prior to the conclusion of the ninety-ninth quarter set forth in Schedule "A". The credit to be applied against the taxes or other payments in any one year shall be $550,000.

    (c) The Borough intends to enter into agreements with all companies that make a capital investment of $20,000,000 or more within the Borough so that these companies will make equitable contributions to the support of the Borough. In the event the Borough is unwilling or unable to enter into an agreement with a company meeting the criteria established in the Policy, then TCAK at its option may terminate this Agreement and receive a credit of $2,750,000 in accordance with subparagraph 3(b).

4. SUSPENSION OR ABANDONMENT OF PROJECT

In the event that TCAK abandons or suspends development, production or operational activities relating to the Red Dog Mine Project for a period of twelve months, then TCAK shall have the options enumerated in subparagraphs (a) through (c) of this paragraph. In the event TCAK opts to irrevocably terminate this Agreement pursuant to subparagraph (b), then neither party shall thereafter have any further obligation to the other hereunder except that TCAK, its agents and employees shall nevertheless continue to have the right

Page 4   THIRD AMENDED, RESTATED CONTRACT FOR SERVICES

Exhibit  A
Page  4  of  12

to receive those usual and normal governmental services then being provided to other similarly situated residents of the Borough.

For purposes of construing this provision, TCAK shall be considered to have abandoned or suspended development, production or operational activities relating to the Red Dog Mine Project upon ceasing commercial production from the Red Dog Mine and mill. Activities intended to preserve and protect equipment, facilities and existing developments shall not preclude a determination that TCAK has abandoned or suspended development production or operational activities relating to the Red Dog Mine Project. The twelve-month period of abandonment or suspension shall commence ten days after NAB receives written notice from TCAK by certified mail of such abandonment or suspension. During the twelve-month period all the terms, conditions and provisions set forth in this Agreement shall remain in full force and effect. Upon the expiration of the twelve-month period, TCAK shall have the following options:

    (a)    to resume development, production or operational activities and continue this Agreement in full force and effect.

    (b)    to continue the abandonment or suspension of development, production or operational activities and irrevocably terminate this Agreement; or

    (c)    to continue the abandonment or suspension of development, production or operational activities and continue this Agreement in full force and effect.

TCAK shall exercise such option pursuant to written notice to NAB within 90 days after the expiration of the twelve-month period set forth above.

5.    REOPENING OF THIS AGREEMENT

NAB or TCAK shall, upon written notice to the other, be entitled to reopen and in good faith renegotiate this Agreement upon the sooner to occur of any of the following:

    (a)    At any time after the FVD (made in accordance with AS 29.45.110 or any successor law) of assets owned by or attributable to TCAK, increases by $35,000,000 over and above the 2002 FVD excepting any increases resulting from the TCAK (formerly Cominco) VIP Mill Optimization Project expenditures prior to January 1, 2003. NAB agrees to cooperate with TCAK and to challenge any FVD valuation by the assessor of property

owned by or attributable to TCAK, which TCAK, in good faith, believes to be in error; or

(b)   At any time after the first calendar quarter in which NANA is actually paid a Net Proceeds Royalty under the "Development and Operating Agreement" between TCAK and the NANA Regional Corporation, Inc. ("NANA").

If after good faith discussions, a reopening does not result in a renegotiation of this Agreement, then either party, at its option, may elect to terminate this Agreement without penalty or further obligation other than the credit provided for in subparagraph 3 (b) hereof, except that such credit shall not apply if TCAK has made the request to reopen.

6.   ASSEMBLY APPROVAL

This Agreement shall not be effective until approved by the NAB Assembly by a resolution adopted in conformance with applicable law and in compliance with the Alaska Open Meeting Law, ALASKA STAT. §§ 44.62.310 and 44.62.312. A copy of the approving resolution shall be attached hereto as Exhibit "B".

7.   TERMINATION DATE

Unless earlier terminated pursuant to other provisions of this Agreement or terminated or extended by mutual consent of the parties, this Agreement shall automatically terminate upon the conclusion of the ninety-ninth quarter set forth in Schedule "A", namely November 23, 2011.

8.   APPLICABLE LAW AND FORUM

This Agreement, the Recitals herein set forth and the relationship of the parties hereto shall be governed by and construed in accordance with the laws of the State of Alaska. Any disputes arising under this Agreement shall be adjudicated in the Alaska Superior Court, Second Judicial District, Kotzebue, Alaska.

9.   ASSIGNMENTS

No assignment of this Agreement by either party may be made without the prior written consent of the other, except that TCAK may assign this Agreement to any parent, affiliate or subsidiary corporation without the prior written consent of NAB. In the event TCAK



Exhibit A
Page 6 of 12

exercises its right to assign this Agreement as provided above, it shall have no further obligation, responsibility, or liability hereunder.

10. ENTIRE AGREEMENT

This Agreement supersedes all contracts, arrangements, commitments and offers of every kind or nature, oral or written, at any time heretofore made by the parties relating to the subject matter hereof.

11. HEADINGS

The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

12. MODIFICATION

This Agreement may not be altered or amended, and no right hereunder may be waived, except by an instrument in writing signed by the parties hereto.

13. PUBLIC ANNOUNCEMENT

TCAK and NAB shall cooperate in the formulation of any press releases regarding the formation and execution of this Agreement and any amendments hereto and each party shall, prior to releasing any press release regarding this Agreement, provide a written copy of the language to be included in such release for review by the other.

14. REMEDIES

Any specific right or remedy set forth in this Agreement, legal, equitable, or otherwise, shall not be exclusive but shall be cumulative upon all other rights and remedies allowable by this Agreement or by law.

15. WAIVER

The failure of either party to exercise any of its rights under this Agreement for a breach hereof shall not be deemed to be a waiver of such rights nor shall the same be deemed to be a waiver of any subsequent breach.

IN WITNESS WHEREOF the parties have executed this Agreement to be effective the date and year first above written.

NORTHWEST ARCTIC BOROUGH

*[signature]*

By:  Roswell L. Schaeffer, Sr.
Its: Mayor

TECKCOMINCO ALASKA INCORPORATED

*[signature]*

By:  Robert Jacko
Its: President

| Payment Date | Quarter | 1/4 Payments | FY Totals: | Payment Date | Quarter | 1/4 Payments | FY Totals: |
|---|---|---|---|---|---|---|---|
| | 1 | $250,000.00 | $ 250,000.00 | Aug. 23, 2000 | 54 | $ 875,000.00 | FY '01 |
| | 2-5 | $250,000.00 | FY '88 | Oct. 16, 2000 | | $ 750,000.00 | |
| | | | $1,000,000.00 | Nov. 23, 2000 | 55 | $1,000,000.00 | |
| | 6-9 | $250,000.00 | FY '89 | Feb. 23, 2001 | 56 | $1,050,000.00 | |
| | | | $1,000,000.00 | May 23, 2001 | 57 | $1,050,000.00 | $4,725,000.00 |
| | 10-13 | $250,000.00 | FY '90 | Aug. 23, 2001 | 58 | $1,050,000.00 | FY '02 |
| | | | $1,000,000.00 | Nov. 23, 2001 | 59 | $1,050,000.00 | |
| | 14 | $250,000.00 | FY '91 (August) | Feb. 23, 2002 | 60 | $1,050,000.00 | |
| | 15 | $250,000.00 | | May 23, 2002 | 61 | $1,050,000.00 | $4,200,000.00 |
| | 16 | $250,000.00 | | Aug. 23, 2002 | 62 | $1,350,000.00 | FY '03 |
| | 17 | $300,000.00 | $1,050,000.00 | Nov. 23, 2002 | 63 | $1,350,000.00 | |
| | 18 | $300,000.00 | FY '92 | Feb. 23, 2003 | 64 | $1,400,000.00 | |
| | 19 | $300,000.00 | | May 23, 2003 | 65 | $1,400,000.00 | $5,500,000.00 |
| | 20 | $300,000.00 | | Aug. 23, 2003 | 66 | $1,400,000.00 | FY '04 |
| | 21 | $350,000.00 | $1,250,000.00 | | | | |
| | 22 | $350,000.00 | FY '93 | Oct. 17, 2003 | | $ 275,000.00 | |
| | 23 | $350,000.00 | | Nov. 23, 2003 | 67 | $1,400,000.00 | |
| | 24 | $350,000.00 | | Feb. 23, 2004 | 68 | $1,400,000.00 | |
| | 25 | $400,000.00 | $1,450,000.00 | May 23, 2004 | 69 | $1,928,000.00 | $6,403,000.00 |
| | 26 | $400,000.00 | FY '94 | Aug. 23, 2004 | 70 | $1,400,000.00 | FY '05 |
| | 27 | $400,000.00 | | Nov. 23, 2004 | 71 | $1,400,000.00 | |
| | 28 | $400,000.00 | | Feb. 23, 2005 | 72 | $1,450,000.00 | |
| | 29 | $450,000.00 | $1,650,000.00 | May 23, 2005 | 73 | $1,978,000.00 | $6,228,000.00 |
| | 30 | $450,000.00 | FY '95 | Aug. 23, 2005 | 74 | $1,450,000.00 | FY '06 |
| | 31 | $450,000.00 | | Nov. 23, 2005 | 75 | $1,450,000.00 | |
| | 32 | $450,000.00 | | Feb. 23, 2006 | 76 | $1,450,000.00 | |
| | 33 | $500,000.00 | $1,850,000.00 | May 23, 2006 | 77 | $1,978,000.00 | $6,328,000.00 |
| | 34 | $500,000.00 | FY '96 | Aug. 23, 2006 | 78 | $1,450,000.00 | FY '07 |
| | 35 | $500,000.00 | | Nov. 23, 2006 | 79 | $1,450,000.00 | |
| | 36 | $500,000.00 | | Feb. 23, 2007 | 80 | $1,500,000.00 | |
| | 37 | $575,000.00 | $2,075,000.00 | May 23, 2007 | 81 | $2,028,000.00 | $6,428,000.00 |
| | 38 | $575,000.00 | FY '97 | Aug. 23, 2007 | 82 | $1,500,000.00 | FY '08 |
| Sept. 16, 1996 | | $1,500,000.00 | (Bonus Payment) | Nov. 23, 2007 | 83 | $1,500,000.00 | |
| Nov. 23, 1996 | 39 | $575,000.00 | | Feb. 23, 2008 | 84 | $1,500,000.00 | |
| Feb. 23, 1997 | 40 | $575,000.00 | | May 23, 2008 | 85 | $2,028,000.00 | $6,528,000.00 |
| May 23, 1997 | 41 | $650,000.00 | $3,875,000.00 | Aug. 23, 2008 | 86 | $1,500,000.00 | FY '09 |
| Aug. 23, 1997 | 42 | $650,000.00 | FY '98 | Nov. 23, 2008 | 87 | $1,500,000.00 | |
| Nov. 23, 1997 | 43 | $650,000.00 | | Feb. 23, 2009 | 88 | $1,550,000.00 | |
| Feb. 23, 1998 | 44 | $650,000.00 | | May 23, 2009 | 89 | $2,078,000.00 | $6,628,000.00 |
| May 23, 1998 | 45 | $750,000.00 | $2,700,000.00 | Aug. 23, 2009 | 90 | $1,550,000.00 | FY '10 |
| Aug. 23, 1998 | 46 | $750,000.00 | FY '99 | Nov. 23, 2009 | 91 | $1,550,000.00 | |
| Nov. 23, 1998 | 47 | $750,000.00 | | Feb. 23, 2010 | 92 | $1,550,000.00 | |
| Feb. 23, 1999 | 48 | $875,000.00 | | May 23, 2010 | 93 | $2,078,000.00 | $6,728,000.00 |
| May 23, 1999 | 49 | $875,000.00 | $3,250,000.00 | Aug. 23, 2010 | 94 | $1,550,000.00 | FY '11 |
| Aug. 23, 1999 | 50 | $875,000.00 | FY '00 | Nov. 23, 2010 | 95 | $1,550,000.00 | |
| Nov. 23, 1999 | 51 | $875,000.00 | | Feb. 23, 2011 | 96 | $1,600,000.00 | |
| Feb. 23, 2000 | 52 | $875,000.00 | | May 23, 2011 | 97 | $2,128,000.00 | $6,828,000.00 |
| May 23, 2000 | 53 | $875,000.00 | $3,500,000.00 | Aug. 23, 2011 | 98 | $1,600,000.00 | FY '12 |
| | | | | Nov. 23, 2011 | 99 | $1,600,000.00 | $3,200,000.00 |

SCHEDULE A

Exhibit A
page 9 of 12

# NORTHWEST ARCTIC BOROUGH
# RESOLUTION 03-41

## A RESOLUTION OF THE NORTHWEST ARCTIC BOROUGH ASSEMBLY APPROVING THE THIRD AMENDED, RESTATED CONTRACT FOR SERVICES WITH TECK COMINCO ALASKA INCORPORATED AND FOR OTHER PURPOSES.

**WHEREAS**, the Northwest Arctic Borough ("NAB") and Teck Cominco Alaska Incorporated ("TCAK") are parties to a contract for services ("the Contract"), which commenced in 1987; and

**WHEREAS**, the Contract was reopened and amended in 1996 because of NAB's increased fiscal needs, particularly in the funding of education, which needs were greater than could be met under the then existing contract; and

**WHEREAS**, effective September 15, 1996, NAB and TCAK entered into a First Amended, Restated Contract for Services that replaced the original Contract for Services and a Second Amended, Restated Contract for Services on September 29, 2000 that replaced the First Amended, Restated Contract; and

**WHEREAS**, NAB wishes to partially fund the debt service for bonds to be sold in 2003 to construct a Kotzebue School addition and other projects; and

**WHEREAS**, TCAK and NAB have worked cooperatively to address NAB's educational requirements; and

**WHEREAS**, NAB has designated a special representative to act as liaison with TCAK, to facilitate the continued cooperation and exchange of information between TCAK and NAB; and

**WHEREAS**, TCAK has demonstrated that it is committed to its agreements and to assisting with the NAB's educational needs; and

**WHEREAS**, TCAK has provided a stable work environment and extensive work training to enable NAB residents to successfully progress in mining trades and supervisory positions; and

NORTHWEST ARCTIC BOROUGH
RESOLUTION 03-41
Page 1

Exhibit A
Page 10 of 12

WHEREAS, TCAK contributes significantly to the economic well being of the borough; and

WHEREAS, the NAB Assembly believes that resource and economic development are critical to the future of the borough and that stability in the long-term Contract that provides for payments to be made to NAB in lieu of taxes is essential to NAB, TCAK, and other resource developers; and

WHEREAS, TCAK has agreed to reopen the Second Amended, Restated Contract For Services to address the NAB's current financial needs and to obtain some assurance of long-term stability of payments to be made in lieu of taxes as provided in the "Third Amended Restated Contract for Services" that is referenced below; and

WHEREAS, the Assembly, after due and careful consideration, believes that it is in the best interests of the NAB to approve the "Third Amended, Restated Contract for Services with Teck Cominco Alaska Incorporated," effective October 17, 2003 as described below.

NOW THEREFORE BE IT RESOLVED, the Northwest Arctic Borough Assembly for and on behalf of NAB, and acting pursuant to its charter, hereby approves the attached "Third Amended, Restated Contract for Services with Teck Cominco Alaska Incorporated," effective October 17, 2003 in substantially the same form attached as to this Resolution; and

BE IT FURTHER RESOLVED, that the Mayor is hereby authorized to execute the Third Amended, Restated Contract for Services for and on behalf of the Northwest Arctic Borough, subject to any technical changes as may be appropriate.

PASSED AND ADOPTED THIS 23 DAY OF September, 2003.

_____
Walter G. Sampson, Assembly President

PASSED AND APPROVED THIS 23 DAY OF September, 2003.

_____
Roswell L. Schaeffer, Sr., Mayor

NORTHWEST ARCTIC BOROUGH
RESOLUTION 03-41
Page 2

Exhibit A
Page 11 of 12

SIGNED AND ATTESTED TO THIS 23 DAY OF September, 2003.

_____
Helena Hildreth, Borough Clerk

NORTHWEST ARCTIC BOROUGH
RESOLUTION 03-41
Page 3




Exhibit A
Page 12 of 12