4. Mineral development; or

5. Any use elevated for review pursuant to NABC <u>9.16.030</u>. (Ord. 93-02 § 1 (9.40.020), 1993)

### 9.12.030 Subsistence conservation (SC) district.

A. Purpose. The subsistence conservation (SC) district encompasses certain undeveloped areas of the borough that have been determined to have high importance to borough residents for subsistence resources or activities. The SC district is intended to include areas that are used regularly for subsistence harvest, to conserve the natural ecosystem for all the various plants and animals upon which borough residents depend for subsistence, and to promote access to those resources for subsistence purposes. Uses will not be allowed unless the administrator or planning commission determines by substantial evidence that such uses will not interfere or conflict with subsistence uses. Subject to this overall intent, the SC district can accommodate mineral exploration and development and minor resource extraction, but applicants for major development projects must apply for rezoning to the resource development district. Commercial recreation uses are not allowed in the subsistence conservation district, except by permit. Except where excluded as a "use" under NABC <u>9.04.070</u>, land use in the SC district is prohibited unless permitted or approved as required by this title.

B. Sub-districts. In addition to general areas zoned as the SC district, the following sub-districts are established to protect subsistence resources and uses in specific areas. The borough may identify additional sub-districts either prior to or during the consideration of permit applications. The boundaries of the sub-districts, other than the Pah River Subsistence Conservation Sub-district, are depicted on the zoning district map.

1. Sisoalik Spit Subsistence Conservation Sub-district.
2. Cape Krusenstern Subsistence Conservation Sub-district.
3. Kobuk-Selawik Lakes Subsistence Conservation Sub-district T
4. Cape Espenberg/Goodhope River Subsistence Conservation Sub-district.
5. Kobuk River Delta Subsistence Conservation Sub-district.
6. Selawik River Delta Subsistence Conservation Sub-district.
7. Salmon River Subsistence Conservation Sub-district.
8. Selawik-Hunt-Redstone Rivers Subsistence Conservation Sub-district.
9. Maniilaq River-Ambler Lowlands Subsistence Conservation Sub-district.
10. Inmachuk River Subsistence Conservation Sub-district.
11. Lower Buckland River Subsistence Conservation Sub-district.
12. North Fork-Squirrel-Omar River Subsistence Conservation Sub-district.
13. North Kivalina Coast Subsistence Conservation Sub-district.
14. Onion Portage Subsistence Conservation Sub-district.
15. Eschscholtz Bay Subsistence Conservation Sub-district
16. Elephant Point/Choris Peninsula Subsistence Conservation Sub-district.
17. Upper Kivalina River Subsistence Conservation Sub-district.
18. Pah River Subsistence Conservation Sub-district includes all of Township 16 North, Range 13 East, Kateel River Meridian, including the confluence of the Pah and Kobuk Rivers and extending south to include the area where the Pah River and its tributaries flow to and including the Pah River Flats.

C. Minor Use Permits in the SC District. The administrator may approve the following activities without public notice after reviewing the permit application:

1. Warehouse, shop use;

25



2.  Child care facilities, cultural camps, churches, health care facilities;
3.  Movement of bulk fuel for village needs;
4.  Placement of communication equipment;
5.  Miscellaneous commercial use;
6.  Public facilities;
7.  Commercial recreational uses;
8.  Ice roads and ice pads, and tundra travel for existing or approved development;
9.  Archaeological surveys;
10.  Temporary use (excluding fuel storage) of airstrips;
11.  Prospecting;
12.   Airports and airstrips;
13.  Bulk fuel storage; 14.  Minor alterations of existing uses;
15.  Major alterations to existing uses;
16.  Mineral or oil and gas exploration;
17.  Snow disposal sites;
18.  Tundra travel for new, not previously approved development; or
19. Other "uses" as defined in NABC 9.04.070 that are not included in subsections (D) or (E) of this section.

D.  Major Use Permits in the SC District. The administrator may approve the following activities after public review of the permit application:
1.  Any use or structure within a watershed which provides a community's drinking water;
2.  Landfills, placement of fill in a wetland;
3.  Temporary construction facilities;
4.  Excavation or other activities on a parcel by a professional archaeologist or other person that are likely to disturb archaeological or historic resources;
5.   Minor resource extraction;

6. Construction of new airports or expansion of existing airports involving greater than 20 acres of surface; or
7.  Any minor use permit use elevated pursuant to NABC 9.16.030.
E.  Conditional Uses in the SC District. The planning commission may approve the following activities after public review of the permit application:
1.   Residential uses including multifamily dwellings;
2.  Utility substations, power plants;
3. Major energy facilities; or
4.  Any major use permit elevated pursuant to NABC 9.16.030. (Ord. 93-02 § 1 (9.40.030), 1993)

### 9.12.035  Habitat Conservation (HC) District

A.  Purpose.  The Habitat Conservation (HC) district is a district that encompasses areas of the borough that provide habitat essential for the maintenance of subsistence species and have high importance to borough residents for subsistence resources. These areas are not appropriate for development activities. The HC district is intended to ensure that such areas are protected from development. These areas may include denning, calving, feeding, molting, brooding, migrating, fish habitat, whale resting and

26



Exhibit   C
Page 26 of 76

feeding areas and other areas that are critical to subsistence resources. Subsistence activities may be conducted in the HC district without a permit. Uses and activities will only be allowed in these areas if it is determined they will not interfere or conflict with subsistence uses or the maintenance of the habitat functions related to the productivity of the habitat. Uses with the potential for a significant adverse effect to the habitat are not allowed without a zone change including bulk fuel storage, landfills, major resource extraction, major development projects, and permanent structures not related to habitat improvement.

B. Minor Use Permits in the HC District. The administrator may approve the following activities without public notice with such conditions as the administrator determines to be appropriate to avoid interference or conflicts with subsistence uses:
1. Minor alterations of existing uses;
2. Airports or airstrips;
3. Cultural camps;
4. Bulk fuel storage; or
5. Archaeological surveys.
6. Commercial recreation uses;
7. Miscellaneous commercial use;
8. Minor or major alterations to existing uses;
9. Ice roads and ice pads, and tundra travel for existing or approved development;
10. Minor resource extraction during times when fish or wildlife populations are not present.

C. Major Use Permits in the HC District. The administrator may approve the following activities after public review of the permit application if it is determined there will be no adverse effects to the functions related to the productivity of the habitat:
1. Any use or structure within a watershed which provides a community's drinking water;
2. Any minor permit elevated pursuant to NABC 9.16.030;
3. Tundra travel for new, not previously approved development;
4. Placement of communication equipment; and
5. Mineral exploration and prospecting.

D. Conditional Uses in the HC District. The planning commission may approve the following activities after public review of the permit application if it determines there will be no adverse effects to the functions related to the productivity of the habitat:
1. Public facilities;
2. Temporary construction;
3. Excavation or other activities on a parcel by a professional archaeologist or other person that are likely to disturb archaeological or historic resources;
4. Major energy facilities;
5. Major resource extraction during times when fish or wildlife populations are not present.
6. Minor resource extraction during times when fish or wildlife populations are present; and
7. Any major permit elevated pursuant to NABC 9.16.030. (Ord. 93-02 § 1 (9.40.030), 1993)

Exhibit     C
Page 27 of 76

**9.12.040 Commercial recreational conservation (CRC) district (Repealed).**

**9.12.050 General conservation (GC) district.**

A. Purpose. The general conservation (GC) district encompasses the undeveloped areas of the borough outside the boundaries of the other districts. The general conservation district is intended to conserve the natural ecosystem for all the various plants and animals used for subsistence. Uses will only be allowed in the GC district if the administrator or planning commission determines such uses will not unreasonably interfere or conflict with access to or use of the environment or subsistence resources. Subject to this overall intent, the GC district can accommodate mineral and oil and gas exploration projects, minor resource extraction, and development projects on a limited scale. Applicants for major development projects must apply for rezoning to the resource development district. Except where excluded as "use" under NABC 9.04.070, land use in the GC district is prohibited, unless permitted or approved as required by this title.

B. Minor Use Permits in the GC District. The administrator may approve the following activities without public notice after review of the permit application:

1. Residential uses excluding multifamily dwellings;
2. Warehouse, shop use;
3. Child care facilities, cultural camps, churches, health care facilities;
4. Movement of bulk fuel for village needs;
5. Temporary construction facilities;
6. Placement of communication equipment;
7. Airstrips, construction of new airports or expansion of existing airports involving greater than 20 acres of surface;
8. Ice roads or ice pads, and tundra travel for existing, approved development;
9. Archaeological surveys;
10. Temporary use (excluding fuel storage) of airstrips;
11. Prospecting;
12. Bulk fuel storage;13. Miscellaneous commercial use;
14. Commercial recreation;
15. Minor or major alterations of existing uses;
16. Tundra travel for existing approved development;
17. Prospecting and mineral and oil and gas exploration,
18. Public facilities; or
19. Other "uses" as defined in NABC 9.04.070 that are not included in subsections (C) or (D) of this section.

C. Major Use Permits in the GC District. The administrator may approve the following activities after public review of the permit application:

1. Any use or structure within a watershed which provides a community's drinking water;
2. Landfill;
3. Placement of fill in a wetland;
4. Excavation or other activities on a parcel of land by a professional archaeologist or other person that are likely to disturb archaeological or historic resources;

5. Minor resource extraction;

28

Exhibit C
Page 28 of 76

    6. Wetlands fill less than one acre;

    7. Tundra travel for new, not previously approved development;

    8. Mineral development; or

    9. Any use elevated pursuant to NABC 9.16.030.

  D. Conditional Use Permits in the GC District. The planning commission may approve the following activities after public review of the permit application:

    1. Multifamily dwellings;

    2. Utility substations, power plants;

    3. Major energy facilities;

    4. Landfills;

    5. Wetlands fill one acre or larger; or

    6. Any use elevated pursuant to NABC 9.16.030. (Ord. 93-02 § 1 (9.40.050), 1993)

## 9.12.060 Resource development (RD) district.

  A. Purpose. The resource development (RD) district is designed and intended to address the individual and cumulative effects of major developments and to offer developers efficient and predictable permit approvals. The purpose of the RD district is to accommodate major development projects and major resource extraction including mineral development, oil and gas development, and similar activities which:

    1. Do not seriously impair the capacity of the surrounding ecosystem to support the plants and animals upon which borough residents depend for subsistence,

    2. Do not result in significant adverse effects to subsistence uses;

    3. Are planned and developed as a unit, or series of interrelated units under an approved master plan under Chapter 9.20 NABC, with provisions made for all necessary public and private facilities; and

    4. Meet the objectives of the comprehensive plan and coastal management plan as well as the conditions of approval and special policies imposed on each individual resource development district at the time of designation.

  B. To accommodate types of development and development needs that differ from one development to another, RD districts may be give distinguishing designations and may have areas within an RD district designated as subdistricts in which specific master plans, standards and policies are applicable. Commercial recreation uses are not allowed in the RD District except by a permit issued in accordance with this title.

  C. Except where excluded as "use" under NABC 9.04.070, land use in the RD district is prohibited, unless permitted or approved as required by this title.

  D. Minor Use Permits in the RD District. If not identified in an approved master plan, the administrator may approve the following activities without public notice after review of the permit application:

    1. Warehouse, shop use;

    2. Child care facilities, cultural camps, churches, health care facilities;

    3. Movement of bulk fuel for village needs;

    4. Placement of communication equipment;

    5. Temporary construction facilities;

    6. Ice roads, ice pads, or tundra travel for existing approved or new development;

    7. Snow disposal sites;

    8. Archaeological surveys;

    9. Temporary use (excluding fuel storage) of airstrips;



C
Page 29 of 76

    10.  Prospecting;
    11.  Minor resource extraction;
    12.  Miscellaneous commercial uses;
    13.  Commercial recreation uses;
    14.  Minor or major alterations of existing uses;
    15.  Bulk fuel storage;
    16.  Public facilities;
    17.  Airstrips or airports; or
    18.  Other "uses" as defined in NABC 9.04.070.

  E.  Major Use Permits in the RD District. If not identified in an approved master plan, the administrator may approve the following activities after public review of the permit application:
    1.  Residential uses including multifamily dwellings;
    2.  Schools;
    3.  Utility substations, power plants;
    4.  Excavation or other activities on a parcel by a professional archaeologist or other person that are likely to disturb archaeological or historic resources; .
    5.  Wetlands fill;
    6.  Mineral and oil and gas exploration;
    7.  Mineral development;
    8.  Construction of new airports or expansion of existing airports involving greater than 20 acres of surface; or
    9. Any use elevated pursuant to NABC 9.16.030.

  F.  Conditional Use Permits in the RD District. If not identified in an approved master plan, the planning commission may approve the following activities after public review of the permit application:
    1.  Any use or structure within a watershed, which provides a community's drinking water;
    2.  Landfill, placement of fill in wetlands;
    3.  Major development projects;
    4.  Major energy facilities;
    5.  Any use elevated pursuant to NABC 9.16.030.

  G.  Resource Development Areas. The following areas are included in the resource development district as existing development:
    1.  All borough, state, federal and private lands outside the transportation corridor committed to the development or operation of the Red Dog Mine as depicted on the borough zoning map, to include the mine ore body, processing facilities and associated infrastructure, such as the airfield, port site, construction camp, laydown areas, drinking water reservoir, and material sites and offshore lands and waters reasonably necessary for port and ore trans-shipment operations. (Ord. 93-02 § 1 (9.40.060), 1993)

## 9.12.070 Transportation corridor (TC) district.

  A.  Purpose. The transportation corridor (TC) district is established to provide a strip of land to accommodate linear transportation facilities such as roads, railroads and pipelines. The TC district will ensure that such transportation uses comply with all borough policies including those that apply specifically to transportation corridors in Chapter 9.24 NABC. The TC district provides an area for development associated with the use of a transportation corridor. Development within this corridor is intended to minimize the negative effects of the transportation corridor (such as increased access



and effects on fish and wildlife), accommodate industrial development and enhance economic opportunities for residents of the borough by means of an approved master plan, under Chapter 9.20 NABC, with provisions made for all necessary public and private facilities associated with the proposed transportation corridor. The regulations in this section apply to uses and activities within and along transportation corridors. Except where excluded as "use" under NABC 9.04.070, land use in the TC district is prohibited, unless permitted or approved as required by this title.

B. Minor Use Permits in the TC District. If not identified in an approved master plan, the administrator may approve the following activities without public notice after review of the permit application:

1. Warehouse, shop use;
2. Child care facilities, cultural camps, health care facilities, churches;
3. Movement of bulk fuel for village needs;
4. Placement of communication equipment;
5. Temporary construction facilities;
6. Ice roads, ice pads, and tundra travel for new development;
7. Snow disposal sites;
8. Archaeological surveys;
9. Temporary use (excluding fuel storage) of airstrip;
10. Prospecting;
11. Minor or major alterations of existing development;
12. Minor resource extraction;
13. Bulk fuel storage;
14. Miscellaneous commercial uses;
15. Commercial recreation uses;
16. Public facilities;
17. Airstrips and airports; or
18. Other "uses" as defined in NABC 9.04.070.

C. Major Use Permits in the TC District. If not identified in an approved master plan, the administrator may approve the  following activities after review of the application:

1. Residential uses including multifamily dwellings;
2. Schools;
3. Utility substations, power plants;
4. Excavation or other activities on a parcel of land by a professional archaeologist or other person that are likely to disturb archaeological or historic resources;
5. Wetlands fill less than one acre;;

6. Construction of new airports or expansion of existing airports involving greater than 20 acres of surface;
7. Mineral and oil and gas exploration or development; or
8. Any use elevated pursuant to NABC 9.16.030.

D. Conditional Use Permits in the TC District. If not identified in an approved master plan, the planning commission may approve the following activities after public review of the permit application:

1. The port access road to the Red Dog Mine.
2. Any use or structure within a watershed, which provides a community's drinking water;
3. Landfills, placement of fill in wetlands;

31

C
31   76

4. Major development projects;
5. Major energy facilities;
6. Wetlands fill one acre or larger; or
7. Any use or development elevated pursuant to NABC 9.16.030.

E. Transportation Corridor. The following areas are included in the transportation corridor district as existing development.

1. All state, federal and private lands committed to the development or operation of the Red Dog Mine as a part of the port and port access road as depicted on the borough zoning map; (Ord. 93-02 § 1 (9.40.070), 1993)

## 9.12.080 Nonconformities.

The purpose of this section is to identify nonconforming uses and to mitigate any negative effects which any nonconforming uses might have on uses conforming to district regulations. Nonconformities which are in full compliance with the provisions of this section are not subject to fines or remedial actions.

A. Regulation of Nonconformities. The administrator shall encourage landowners and developers to address nonconformities which are clearly inconsistent with the purposes of or uses allowed in districts in which such nonconformity are located. A nonconformity may be changed to another nonconformity with approval of the administrator as a use permit. The administrator must find the new use is more consistent with the uses allowed in the zoning district. When a nonconformity is discontinued or abandoned for 12 months or more at any time after the effective date of this title, it shall not thereafter be resumed unless approved or permitted under the procedures specified in this title and according to the standards applicable to unique circumstances in NABC 9.25.090. When a nonconformity is damaged so that the cost of repair exceeds 65 percent of the value of a structure or other improvement, as estimated by the administrator, the use must be changed to a use which is allowed in the district. After the effective date of this title, a nonconformity of land or structure, or a nonconformity of land and structure in combination shall not be extended, expanded or enlarged nor be used as grounds for adding other structures or uses prohibited elsewhere in the same district.

B. Upon application, the administrator may issue a decision defining the scope and nature of any nonconformity in accordance with the procedures for approvals under Chapter 9.16 NABC. The application shall be accompanied by such supporting documentation and evidence as the administrator may require. The administrator may elevate consideration of any such application pursuant to NABC 9.16.030, in which case the application shall be processed according to the requirements for a use permit or conditional use permit as provided in Chapter 9.16 or 9.20 NABC. Applicants for nonconformity decisions may appeal adverse determinations to the planning commission and assembly as permitted under Chapter 9.08 NABC. (Ord. 93-02 § 1 (9.40.090), 1993)

Table 9.12 Uses and Districts

| Uses | Districts | | | | | |
|------|-----|-----|-----|-----|------|------|
| | V | SC | HC | GC | RD | TC |
| Airports -- state maintained | MIN | MIN | MIN | MIN | MP/MIN | MP/MIN |
| Airstrips -- temporary use | MIN | MIN | MIN | MIN | MP/MIN | MP/MIN |
| Archaeological excavation | MAJ | MAJ | MAJ | MAJ | MP/ MAJ | MP/ MAJ |

32

C
32 of 76

| Uses | Districts | | | | | |
|------|-----|-----|-----|-----|-----|-----|
| | V | SC | HC | GC | RD | TC |
| Archaeological surveys | MIN | MIN | MIN | MIN | MP/MIN | MP/MIN |
| Bulk fuel – movement for village needs | EX | MIN | N/A | MIN | MP/MIN | MP/MIN |
| Bulk fuel – storage | MIN | MIN | MIN | MIN | MP/ MIN | MP/ MIN |
| Child care facility | MIN | MIN | N/A | MIN | MP/MIN | MP/MIN |
| Churches | MIN | MIN | N/A | MIN | MP/MIN | MP/MIN |
| Commercial – miscellaneous | MIN | MIN | MIN | MIN | MP/ MIN | MP/ MIN |
| Commercial recreation | MIN | MIN | MIN | MIN | MP/ MIN | MP/ MIN |
| Communication equipment placement | MIN | MIN | MAJ | MIN | MP/MIN | MP/MIN |
| Construction facilities – temporary | MIN | MAJ | N/A | MIN | MP/MIN | MP/MIN |
| Cultural camp | MIN | MIN | MIN | MIN | MP/MIN | MP/MIN |
| Emergency actions under NABC 9.16.040 | EX | EX | EX | EX | EX | EX |
| Existing uses – major alterations | MIN | MIN | MIN | MIN | MP/ MIN | MP/ MIN |
| Existing uses – minor alterations | MIN | MIN | MIN | MIN | MP/MIN | MP/MIN |
| General land management functions | EX | EX | EX | EX | EX | EX |
| Health care facility | MIN | MIN | N/A | MIN | MP/MIN | MP/MIN |
| Ice roads/ice pads | MIN | MIN | MIN | MIN | MP/MIN | MP/MIN |
| Landfills | CU | MAJ | N/A | MAJ | MP/CU | MP/CU |
| Major resource extraction | MP | MP | MP | MP | MP/CU | MP/CU |
| Major energy facilities | MP/CU | MP/CU | MP/CU | MP/CU | MP/CU | MP/CU |
| Master plan – approved uses | N/A | N/A | N/A | N/A | MP | MP |
| Mineral development | CU | CU | N/A | MAJ | MP/ MAJ | MP/ MAJ |
| Mineral exploration | MIN | MIN | MAJ | MIN | MP/ MAJ | MP/ MAJ |
| Minor resource extraction | MAJ | MAJ | CU | MAJ | MP/MIN | MP/MIN |
| Nonconformities (grandfather rights) | EX | EX | EX | EX | EX | EX |
| Prospecting | MIN | MIN | MAJ | MIN | MP/MIN | MP/MIN |
| Public facilities | MIN | MIN | CU | MIN | MP/ MIN | MP/ MIN |
| Recreational (no permanent construction, 10 people or less) | EX | EX | EX | EX | EX | EX |

33

| Uses | Districts | | | | | |
|---|---|---|---|---|---|---|
| | V | SC | HC | GC | RD | TC |
| Residential – multifamily | MIN | CU | N/A | CU | MP/ MAJ | MP/ MAJ |
| Residential – single family | EX | CU | N/A | MIN | MP/ MAJ | MP/ MAJ |
| Schools | MAJ | N/A | N/A | N/A | MP/ MAJ | MP/ MAJ |
| Snow disposal site | MIN | MIN | N/A | EX | MP/MIN | MP/MIN |
| Subsistence | EX | EX | EX | EX | EX | EX |
| Transfer of title, sales, leases or exchanges of land | EX | EX | EX | EX | EX | EX |
| Tundra travel–existing/approved development | MIN | MIN | MIN | MIN | EX | EX |
| Tundra travel–new development | MAJ | MAJ | MAJ | MAJ | MP/MIN | MP/MIN |
| Utility substation/power plants | CU | CU | N/A | CU | MP/MAJ | MP/MAJ |
| Warehouse or shop | MIN | MIN | N/A | MIN | MP/MIN | MP/MIN |
| Watershed–structures within | MAJ | MAJ | MAJ | MAJ | MP/CU | MP/CU |
| Wetlands fill < one acre | MIN | MAJ | N/A | MAJ | MP/MAJ | UP/MAJ |
| Wetlands fill one acre or larger | MAJ | MAJ | N/A | MAJ | MP/CU | MP/CU |
| Any use elevated under NABC 9.16.030 | MAJ/ CU | MAJ/ CU | MAJ/ CU | MAJ/ CU | MAJ/CU | MAJ/CU |
| Other uses defined in NABC 9.04.070 not identified as a MAJ or CU | MIN | MIN | MIN | MAJ | MP/MIN | MP/MIN |

Key:

EX = excluded from coverage under this title

N/A = not an applicable use in that particular zone

MIN = minor use permit

MAJ = major use permit

CU = conditional use

MP = master plan

MP/MIN = If use is not covered in a master

MP/CU = If use is not covered in a master plan, a conditional use permit is needed.

V = village district

SC = subsistence conservation district

HC= Habitat conservation district

GC = general conservation district

RD = resource development

34

| Uses | Districts | | | | | |
|---|---|---|---|---|---|---|
| | V | SC | HC | GC | RD | TC |
| plan, a minor permit is needed.  MP/MAJ = If use is not covered in a master plan, a major permit is needed. | district  TC = transportation corridor district | | | | | |

# Chapter 9.16
## ADMINISTRATIVE APPROVALS

Sections:
> 9.16.005 Permits required.
> 9.16.006 Applications and pre-application meetings.
> 9.16.010 Permit approval process.
> 9.16.020 Permit approval criteria.
> 9.16.030 Elevation.
> 9.16.040 Emergency actions.

### 9.16.005 Permits required.
Applicants for any "use" defined in NABC 9.04.070 within the borough must receive a permit from the borough prior to commencement of activities associated with the use.

### 9.16.006 Applications and pre-application meetings.
A. Pre-application meetings. Applicants for projects likely to be controversial or projects that may have significant adverse effects are encouraged to schedule a pre-application meeting with the administrator to discuss the project and its effects. The administrator may require a pre-application meeting for major development projects or for projects requiring a federal environmental impact statement.

B. Application submittal. All applications for permits must be complete, signed and accompanied by the applicable fee before the borough can accept the application.

C. Complete application. An application is complete when it contains all of the information necessary to determine if the development will comply with this title including information required in subsections (C) and (D) of this section.

D. Information Required. Subject to provisions in subsection (D) of this section, an applicant shall furnish the administrator with the following data and information:

1. A detailed description of the proposed activity, including associated facilities, and location of project activities;

2. An analysis of economic and social effects of project activities;

3. Maps, diagrams, technical data and other relevant material if the written description alone will not adequately describe the proposal;

4. A reclamation plan, if required by the administrator or commission, meeting the requirements of NAB 9.08.040(D);

5. For major or minor mineral extraction, mineral development, mineral exploration or mining, contour maps or illustrations, as required by the administrator, depicting the extent of the proposed use; and

C
35 of 76

6. Copies of applications submitted to federal or state agencies.

E. Exceptions. The administrator shall decide the form and type of information required for each type of application, and may, when a particular application warrants, authorize less or require more information than normally specified.

## 9.16.010 Use Permit approval process.

A. Determination of Completeness. Except for a major development project, the administrator shall determine if the application is complete and the submission requirements are met and shall notify the applicant of the application's acceptance within 20 business days of receipt of the application. For a major development project, the administrator shall make this determination and notification within 45 business days of receipt of the application. If the requirements are not met, the administrator shall notify the applicant that the application is incomplete and what information or modifications are needed to make it complete. If the administrator fails to act on the application within 20 business days (45 business days for a major development project), the application shall be considered complete and accepted. If additional information is necessary to find the application complete, the administrator may extend the period for processing the application upon notice to the applicant, even if the deadlines otherwise required by this section have expired.

B. Minor Use Permits. If the accepted application is for a use that qualifies as a minor use permit as described in NABC 9.12.020 – 9.12.070, the administrator may issue a permit without public review of the permit application. The administrator may place reasonable conditions on the permit to ensure the use will occur harmoniously with other activities occurring or allowed in the district and with adopted borough policies. Except for applications for a major development project or for a project subject to a coastal management consistency determination, if the administrator fails to act on an application for a use or uses that may be approved by a minor use permit within 10 business days after acceptance, the application shall be considered administratively approved and a minor use permit shall be issued on demand. Prior to the expiration of 10 business days, the administrator may elevate the review to a major use permit or conditional use permit using the procedures outlined in NABC 9.16.030 or the administrator and the applicant may mutually agree to extend the review for a time certain.

C. Draft Major Use Permits. If the accepted application is for a major use permit, the administrator shall within 15 business days of acceptance issue a draft major use permit for review and comment.

1. Public Notice. The administrator shall mail or electronically transmit the draft major use permit to the applicant, reviewing parties, commission members from an area affected by the project, village councils and to the owners of land in excess of 200 acres of land within the village area of influence affected by the permit application. The draft major use permit shall be posted in a public place in Kotzebue and all affected villages. The administrator shall publish a notice in a newspaper of general circulation in the borough or cause a public service announcement to be aired on radio or television.

2. Comment Period. Comments on the draft major use permit must be received by the borough within 20 business days following the date of public notice unless the administrator extends the comment period. The administrator may extend the comment period if requested by a citizen of the district or for other good cause.

3. Decision. Except for a major development project or a project that requires development of a federal environmental impact statement, the administrator's decision to


C
36 of 76

approve the draft major use permit, approve a revision of the draft major use permit, deny approval or elevate the decision shall be issued within 5 business days after the close of the comment period. For a major development project, the administrator shall issue the decision within 20 business days after the close of the comment period. For a project that requires a federal environmental impact statement, the administrator shall issue the decision within 20 business days after issuance of the final environmental impact statement. The decision shall be sent to all who submitted comments, the planning commission, appropriate village council(s) and the applicant. For good cause, the administrator may extend the time for issuance of the decision, not to exceed an additional five business days.

4.   Request for additional information. The administrator may request additional information from the applicant if such information is necessary to determine whether the project meets the requirements of this title. If additional information is requested, the administrator may extend the timelines in this section as necessary to prepare the request for information and to review the response to the request.

D. Appeal. The action or inaction of the administrator may be appealed pursuant to Chapter 9.08 NABC. (Ord. 93-02 § 1 (9.50.010), 1993)

## 9.16.020 Permit approval criteria.

Permit approval (or disapproval) shall include a finding by the administrator that the proposal is (or is not) consistent with the borough comprehensive plan, can (or cannot) occur harmoniously with other activities allowed in the district, and will not (or will) disrupt the character of the surrounding area. Such findings shall be in writing and shall become part of the record and the case file. The administrator shall inform the commission about all nonconformities, minor use permits and major use permits at its first regular meeting following issuance. Nonconformity and permit approval will be granted by the administrator if all the requirements set forth below are met.

A. Policies and Standards. For permit approval, the administrator must make a determination that the proposal is consistent with the applicable standards of Chapter 9.25 NABC and other promulgated policies and standards implementing this title;

B. Reviewing Parties. For nonconformities and permit approvals, consideration has been given to the comments and recommendations of reviewing parties, including specifically village councils whose village area of influence the administrator determines will be affected by the proposed use;

C. Villages. For permit approvals within the villages or their areas of influence, great weight has been given to the opinions of the village councils and residents of the villages and the proposal is in conformance with adopted village plan policies;

D. Conservation Districts. For permit approvals within the subsistence, habitat or general conservation districts, great weight has been given to the opinions of the village councils and subsistence users within the affected village areas of influence, and the proposal is in conformance with the purposes of the district. (Ord. 93-02 § 1 (9.50.030), 1993)

## 9.16.030 Elevation.

A. The administrator may elevate any nonconformity or permit decision to a major use permit for public notice or to a conditional use permit for public notice and review by the planning commission based on a written finding that the decision satisfies one or more of the following criteria:

37



1.  The proposed use or nonconformity has potential significant negative effects on or conflict with subsistence or other borough interests, resources or activities in a manner or to a degree that warrants public review or consideration by the commission;

2.  The proposed use or nonconformity would conflict with adopted borough policies in a manner or to a degree that warrants public review or consideration by the commission; or

3.  The proposed use or nonconformity raises a particular issue or set of issues that warrants public review or consideration by the commission.

B.  In addition, the administrator shall elevate any nonconformity or permit decision as a result of a request from three members of the commission. The administrator may elevate the decision at any time between the acceptance of the application and the close of the decision period in NABC 9.16.010(B) or (C). When the decision to elevate is made, the administrator shall commence the use permit procedure of this chapter or the conditional use procedure of Chapter 9.20 NABC as appropriate. (Ord. 93-02 § 1 (9.50.020), 1993)

## 9.16.040 Emergency actions.

Notwithstanding any regulation to the contrary, emergency actions may be conducted without any approval or permit, subject to the following criteria:

A.  The emergency action is necessary to avert imminent danger to a human health, safety or welfare, or imminent danger to wildlife or wildlife habitat.

B.  The developer shall make reasonable efforts to conduct emergency operations in a manner that avoids or minimizes significant harm to the environment, consistent with the need to protect property, human life, wildlife or wildlife habitat.

C.  In the event of an uncontrolled release or discharge of oil, petroleum products, or any toxic or hazardous materials, any person may undertake emergency construction and other activities reasonably necessary to control and contain the flow of oil, gas, petroleum products, or other toxic or hazardous materials consistent with an approved oil spill or other contingency plan. The Administrator shall have access, upon reasonable notice, to the developer's oil spill response and contingency plans.

D.  A developer shall inform the administrator of any action taken within the scope of this section as soon as possible but within 24 hours of the taking of the emergency action. (Ord. 93-02 § 1 (9.50.040), 1993)

E.  For an emergency action that will likely require an ongoing response for more than 7 days, the provisions of this section apply, but the applicant shall apply for appropriate permits as soon as possible. The administrator shall have access, upon reasonable notice, to the developer's oil spill response and contingency plans. The administrator may issue permits related to an emergency without public review.

## Chapter 9.20
## PLANNING COMMISSION APPROVALS

Sections:

9.20.010 Approval required.
9.20.020 Burden of proof.
9.20.030 Procedures.
9.20.040 Permit approval criteria.
9.20.050 Village protests.
9.20.060 Rezoning.

C
Page 38 of 76

9.20.070 **Master plan.**
9.20.080 **Master plan reports and updates.**

## 9.20.010 Approval required.

A. All uses requiring conditional use permits and master plans must receive planning commission approval prior to commencement.

B. Emergency Actions. Notwithstanding regulations to the contrary, emergency actions may be conducted without commission approval subject to the same criteria as under NABC 9.16.040. (Ord. 93-02 § 1 (9.60.010), 1993)

## 9.20.020 Burden of proof.

Except where otherwise provided by this title, in all applications for a conditional use permit, the burden of proof shall be on the applicant to demonstrate that the criteria set forth in this title are met. (Ord. 93-02 § 1 (9.60.020), 1993)

## 9.20.030 Procedures.

The following procedures apply to requests for a conditional use or master plan approval.

A. Preapplication meeting. Applicants shall schedule a preapplication meeting with the administrator for a rezone of a part of any land use district, for a master plan, if the project is a major project or requires a federal environmental impact statement, or if the administrator requests a preapplication meeting. The administrator may request a preapplication meeting if it is determined the project will have significant adverse effects or if a village council requests a meeting. The meeting may be held by teleconference if the administrator determines it is not necessary to meet in person.

B. Application. An application shall be submitted to the administrator in conformity with NABC 9.16.006 and accepted as complete under the requirements in NABC 9.16.010(A).

C. Review Procedures. If the application is accepted, the administrator shall:

1. Place the application on the agenda of the next meeting of the commission as a public hearing item;

2. Ensure the public notice is posted in a public place in Kotzebue and all affected villages, and publish the agenda item in a newspaper of general circulation in the borough or cause public service announcements to be aired on radio or television;

3. Mail or electronically transmit a copy of the agenda item and draft recommendation to the applicant and to reviewing parties. If the proposed development or use affects any village's area of influence, the agenda item and draft recommendations shall be sent to the village councils and to the owners of in excess of 200 acres of land within any such village's area of influence. The administrator or the commission may expand the number of those to whom the notice is sent based on the potential effect of the proposed development or use;

4. Within 15 business days of acceptance of the application as complete, issue a draft recommendation to the planning commission and reviewing parties whether the application should be approved, approved with conditions, or disapproved; If the project is a major development project or is a project that requires a federal environmental impact statement, the draft recommendation may recommend extension of the deadlines in this chapter or recommend that additional information be requested from the applicant; and

C
39 of 76

5. Deliver a copy of the agenda item and draft recommendation at least 5 business days prior to the date of the public hearing to the commission members and mayor.

D. Comment Period. Written comments on the proposal and draft recommendation must be received by the borough 10 business days before the date of the public hearing to be included in the commission meeting packet. Other written or oral comments may be submitted at the time of the public hearing.

E. Public Hearing. The commission shall conduct a public hearing to review and receive comments. By resolution, the commission may adopt rules of order to conduct public hearings. The public hearing shall be held no sooner than 15 business days and no later than 30 business days from the date the draft recommendation is distributed by the administrator. The hearing may be conducted by teleconference.

F. Extensions. The commission may extend any deadlines in this section for good cause, for requests for additional information, if the project is a major project, or if a federal environmental impact statement is required for the project.

G. Request for additional information. The commission may request additional information from the applicant.

H. Decision. Unless extended by the commission, the commission's decision will be made within 5 business days following the public hearing. (Ord. 93-02 § 1 (9.60.030), 1993)

## 9.20.040 Permit approval criteria.

Conditional use permit approval (or disapproval) shall include a written finding that includes conditions of approval, if any and that the proposal can (or cannot) occur consistent with the borough comprehensive plan, can (or cannot) occur harmoniously with other activities allowed in the district, and will not (or will) disrupt the character of the village, district or neighborhood. Such findings and conditions of approval shall become part of the record and the case file. A conditional use permit will be granted if all of the standards set forth below are met.

A. Policies and Standards. The proposal is consistent with the standards of Chapter 9.25 NABC and other promulgated policies and standards implementing this title;

B. Reviewing Parties. Consideration has been given to the comments and recommendations of reviewing parties, including specifically village councils whose village area of influence the commission or administrator determines will be affected by the proposed use;

C. Villages. For permits involving uses within the villages or their areas of influence, great weight has been given to the opinions of the village council and residents of the village and the proposal is in conformance with adopted village plan policies;

D. Conservation Districts. For permit approvals for uses within the subsistence, habitat or general conservation districts, great weight has been given to the opinions of the village councils and subsistence users within the affected village area of influence, and the proposal is in conformance with the purposes of the district. (Ord. 93-02 § 1 (9.60.040), 1993)

## 9.20.050 Village protests.

If written objections opposing a conditional use are received from at least 30 percent of the registered voters from any village within the affected village areas of influence, it shall take a two-thirds or greater favorable vote of the commission to approve the

40



application. The written objection must be received at least 2 business days prior to the hearing considering the application. (Ord. 93-02 § 1 (9.60.050), 1993)

**9.20.060 Rezoning.**

Rezonings are changes to zoning district boundaries as shown on the official zoning map. Prior to submission of an application, the applicant shall contact the administrator for the purpose of discussing the site, the proposed development, and the approval procedure.

A. Initiation. A rezoning may be initiated by the applicant, land owner, the administrator, any member of the commission, a village council member, or an assembly member.

B. Restrictions. Rezoning of an area less than one acre shall not be considered unless the rezoning involves the expansion of an existing zone. Streets or other rights-of-way shall not be included in calculating the minimum area for a rezoning. The area to be rezoned shall be a logical, integrated area.

C. Procedure. The application, acceptance and notice procedures for a rezoning shall follow the procedures set forth for conditional use in this chapter. The planning commission's recommendations shall be forwarded to the assembly.

D. Review and Decision. The commission shall hold a public hearing on the rezoning application. The commission shall approve or disapprove the application or return it to the applicant for modification or corrections, based on the requirements of this title, within 10 business days of the public hearing, unless the administrator and the applicant mutually agree to extend the period. If the commission fails to act within 10 business days or an extension of that period, the recommendation shall be considered to be for approval and the application shall be forwarded to the assembly. E. Criteria. The commission shall make a recommendation that includes written findings that each of the following criteria has been addressed:

1. The proposed rezoning must comply with the standards in Chapter 9.25 NABC and other promulgated policies and standards implementing this title;

2. If relevant, the proposed rezoning is in an area with adequate services, including roads, airstrips, parking, boardwalks, water, sewer, garbage collection, gas, electricity, drainage, police and fire protection, or the applicant has agreed to provide all the necessary improvements or services for the area;

3. The comments from reviewing parties on the proposed rezoning have been adequately addressed;

4. There is a demonstrated need for land or additional land in the zoning district being requested;

5. The resulting district or expanded district will be a logical, integrated area and will not constitute spot zoning; and

6. If otherwise required by this title, an approved master plan is available for the area to be developed.

F. Assembly. The assembly shall review and act on a rezoning by ordinance. The assembly shall consider the application and commission recommendation by introduction of the rezoning ordinance at its next regular meeting after receipt of the commission's recommendation. The assembly, in its discretion, may call a special meeting to introduce or consider the ordinance. Upon enactment of the ordinance, the administrator shall cause the official zoning map to be changed accordingly. The assembly's decision shall be final. (Ord. 93-02 § 1 (9.60.060), 1993)



### 9.20.070 Master plan.

A. An application for a rezoning to the resource development or transportation corridor districts and projects involving major resource extraction shall be accompanied by a master plan containing the following:

1. Maps, at a scale to be determined by the administrator, indicating the site requested to be rezoned, the land ownership and status within the area to be rezoned, the land ownership and status of all adjoining lands, all existing uses on the site and within two miles of the site, and all proposed uses on the site to be governed by the proposed district;

2. An estimate of the schedule for development of the proposed district;

3. An analysis of the effect of the proposed uses in the proposed district pursuant to each applicable standard in Chapter 9.25 NABC and other promulgated policies and standards implementing this title;

4. Requested policy changes (modifications in language or application of policies, additions of new policies, or suspension of existing applicable policies) for the proposed district, and an analysis of the individual and cumulative effects of the proposed uses in the proposed district pursuant to the policies if changed;

5. An assessment of the project site identifying: known and suspected archaeological, cultural and historic sites, burial sites, significant fish and wildlife habitats, subsistence resources, natural hazards, and presence of hazardous wastes;

6. An analysis of expected effects on subsistence uses and resources; and

7. Such other information as the commission, in its discretion, may prescribe.

### 9.20.080 Master plan reports and updates.

A. Annual Reports: Operators must provide an annual report to the administrator for distribution to the planning commission for each calendar year by January 31 of the following year. The annual report must provide a summary of major activities conducted to implement the master plan and any difficulties implementing the plan.

B. Notice: Operators must notify the administrator before beginning activities outside the scope of the master plan. The administrator shall notify the planning commission about the proposed activities with a recommendation of whether the commission should require an update to the master plan.

C. Updates: The applicant may submit or the commission may require periodic updates to a master plan to indicate changes in uses, new uses or uses not included in the approved plan. At any time, the operator may submit updates to the master plan or a new master plan for consideration by the commission.. Master plan updates are reviewed pursuant to the procedures of NABC 9.20.030. (Ord. 93-02 § 1 (9.60.080), 1993).

## Chapter 9.24
## BOROUGH STANDARDS (Repealed)

42

C
42 of 76

# Chapter 9.25
# Borough Standards

**Sections:**
9.25.010 Introduction.
9.25.020 Areawide standards.
9.25.030 Village district standards (VC).
9.25.040 Subsistence conservation (SC) district standards.
9.25.045 Subsistence conservation (SC) standards for sub-districts.
9.25.050 Habitat conservation (HC) district standards.
9.25.060 General conservation (GC) district standards.
9.25.070 Resource development (RD) district standards.
9.25.080 Transportation corridor (TC) district standards.9.25.090 Unique circumstances.
9.25.100 Cooperative planning.

## 9.25.010 Introduction.

The standards contained in or authorized under this chapter are applicable to the approval of all uses within the borough. Areawide standards are applied to all lands and waters within the borough boundary. Additional standards apply only to specific zoning districts. The standards in this chapter may be relaxed only under the unique circumstances described in NABC 9.25.090, and then only on lands outside the subsistence conservation district.

The enforceable policies of the Northwest Arctic Borough coastal management plan are incorporated into this title by reference. Those enforceable policies, along with the statewide standards at 11 AAC 112, are the approval criteria for activities that undergo an Alaska Coastal Management Program consistency review, but they are not intended to limit the requirements of stricter standards which may be applicable under this title area.

## 9.25.020 Areawide standards.

The areawide standards identify the general and specific courses of action to achieve region-wide comprehensive plan goals and to implement this title. The standards in this section are approval criteria for uses anywhere in the borough. All uses must comply with each of the standards set out in this section, unless the administrator or the commission finds that the standard is not applicable or the use meets the criteria of NABC 9.25.090.

    **A. State and Federal Standards.** Applicants and operators shall comply with state and federal land management and environmental protection regulations and statutes, including, but not limited to, those listed below. These regulations and statutes may be enforced by the state or federal agency or the borough as a condition to granting any permit. This standard does not require the borough to enforce state or federal standards, and failure to do so shall not impose any liability on the borough.

    1. Air and water quality. The statutes and regulations of the Alaska Department of Environmental Conservation and the Environmental Protection Agency with respect to the protection of air, land and water quality will be applied to proposed development. These statutes and regulations regulate waterborne or airborne emissions, solid waste

Exhibit C
Page 43 of 76

storage and disposal, sewage disposal, oil spill contingency plans, and other proposed or potential discharges.

2. Dredge and fill. Shoreline modifications and the discharge of dredged or fill material shall comply with existing state and federal standards.

**B. Subsistence.**

1. Priority: Protection of subsistence uses and resources shall be given the highest priority. Development shall avoid adverse effects to subsistence uses and resources whenever feasible. When adverse effects to a subsistence resource or use are likely and it is not feasible to avoid such effects, applicants shall implement measures to minimize effects. When it is not feasible to minimize adverse effects, the effects shall be mitigated. Feasibility shall be determined by the administrator with consideration of the degree of effect to subsistence resources or uses, the cost of avoiding or minimizing effect and available technology. The effects addressed in this standard may result from a single project or from a series of projects. This standard is not a basis for permitting uses which have a significant adverse effect on subsistence in the subsistence conservation district. Such uses will require rezoning.

2. Effects on Migration. Offshore and onshore uses shall not significantly interfere with subsistence use or migration of beluga whales, bowhead whales, bearded seals, caribou, or other migratory species.

3. Effects on Whaling. Uses shall not significantly interfere with subsistence activities associated with beluga or bowhead whaling, shall not cause the whales to be displaced from such water areas, and shall not jeopardize the continued use of such waters by beluga or bowhead whales. The waters intensively used by beluga whales include Escholtz Bay, Kotzebue Sound and the area around Sisoalik Spit. The waters intensively used by bowhead whales are offshore in the vicinity of the village of Kivalina, north and west to the borough boundaries.

4. Subsistence Access. Uses shall not preclude reasonable subsistence user access to a subsistence resource. "Reasonable access" is access using means generally available to subsistence users. "Precluding access" includes not only access to areas where subsistence resources are present and can be used by subsistence users, but also the means of access.

5. Subsistence Observers. Applicants for major development projects that have the potential to result in significant adverse effects on subsistence uses or resources may be required to develop a subsistence observer program. This program shall be implemented during times of high subsistence use to determine if project activities are affecting subsistence uses or resources.

6. Commercial Uses. Commercial uses and activities not related to subsistence fishing, hunting or trapping shall minimize adverse effects on these subsistence resources and uses. Residential and nontrapping commercial uses of trapping cabins are prohibited.

7. Development timing. Resource exploration and development activities shall be timed and/or located to avoid interference with subsistence activities. Where significant adverse effects cannot be avoided, mitigation shall be considered in accordance with subsection (L)(5) of this section.

8. Local or traditional knowledge may be used to grant, deny or place conditions on permits when there is an indication that subsistence uses or resources may be adversely affected by the proposed use.

**C. Cultural, Archaeological and Historic Resources.**

44

C
44 - 76

1. Applicants shall contact the administrator to determine if historic or archaeological resources are located in the project area or if a resource survey will be required. The administrator may require the applicant to contact the State Historic Preservation Officer, local tribal or Native organizations or communities near the project site to determine if resources are known to exist in the project area. When determining whether to require a resource survey, the administrator shall consider whether project activities have the potential to damage undiscovered resources and the likelihood that undiscovered resources may be encountered in the area with consideration of whether surveys have been completed in the area, the occurrence of known sites in the area and traditional knowledge about historical occupation of the area.

2. Persons shall not disturb cultural, archaeological or historic sites listed or eligible to be on the national register of historic places or sites identified by the administrator or the commission as important to the study, understanding or illustration of national, state or local history, prehistory or culture.

3. Persons shall not cause surface disturbance of newly discovered historic, prehistoric, archaeological or cultural sites prior to archaeological investigation. Uses permitted under this title shall cease upon the discovery of archaeological, prehistoric, historic or cultural resources during the course of such uses, and the applicant shall immediately contact the administrator to determine the conditions, if any, under which such uses may continue.

4. Traditional Activities. Uses shall not significantly interfere with traditional activities at cultural or historic sites identified in the coastal management plan, the Alaska Heritage Resource Survey, or by the administrator.

5. Applicants for an archaeological project shall provide adequate information to the administrator concerning the purpose of the project, the proposed site, and the timing of the operation. In addition to the borough, affected communities, landowners and other appropriate parties shall be notified before any excavation or archaeological-related work commences on lands around their respective villages.

#### D. Habitats

1. Habitat Functions. To the extent feasible and prudent, uses shall maintain the overall habitat productivity with consideration of the effects to habitat functions and the living organisms associated with the habitat. The administrator or the commission may require conditions to avoid, minimize or mitigate effects to habitat or the living organisms affected by project activities.

2. Noise and Disturbance. Vehicles, vessels and aircraft shall avoid areas where there is a concentration of a species that are sensitive to noise, movement or other project activities. Concentrations may be seasonal or year-round and may be due to behavior (e.g., migration of flocks or herds) or limited or specialized habitat (e.g., polar bear dens and seal haul-outs). The administrator or commission may require horizontal and vertical buffers as appropriate. Concern for human safety will be given special consideration when applying this standard.

3. Hydrology. To the extent feasible and prudent, uses shall not alter natural hydrological conditions in such a way as to have a significant adverse effect on migratory or nesting shorebird, seabird, or waterfowl habitat.

4. Structures in or near water bodies. To the extent feasible and prudent, structures in or over streams, lakes, rivers, wetlands, or saltwater including tideflats with the following effects are not allowed:



a. Structures that decrease fish and wildlife habitat productivity, including effects to fish and wildlife migration, spawning, and rearing, and

b. Structures that reduce opportunities for fish harvesting activities.

5. Dredging and filling. To the extent feasible and prudent, dredging or filling activities in streams, rivers, lakes, wetlands, or saltwater areas including tideflats: Shall not significantly effect fish and wildlife habitat; shall not significantly interfere with critical life history phases of fish and wildlife; shall limit disturbance to habitat to as small an area as practicable.

6. Dredge disposals. Other than sand and gravel resources, uncontained dredged materials disposed of onshore in riparian areas is not allowed.

7. Fish habitat buffers. To the extent feasible and prudent, project facilities or ground-disturbing activities within 100 feet landward of the ordinary high water mark from fish habitat are not allowed. This requirement does not apply to projects that require an over-water or water edge location, nor does it preclude necessary stream, river, or lake crossings.

8. Operations in caribou calving areas or moose overwintering areas shall not result in significant adverse effects on caribou or moose populations.

9. Management objectives. The following management objectives are established for specific habitats.

a. Offshore areas shall be managed to maintain or enhance commercial fisheries and subsistence fishing and marine mammal harvesting.

b. Estuaries shall be managed to ensure adequate water flow, natural circulation patterns, nutrients, and oxygen levels and to avoid the destruction of productive habitat and the discharge of toxic wastes and silt. Estuaries shall be managed to maintain or enhance commercial and subsistence uses including fish, waterfowl and marine mammal harvests.

c. Wetlands and tideflats shall be managed so as to assure adequate water flow, nutrients, and oxygen levels, and avoid adverse changes in natural drainage patterns, the destruction of important habitat, and the discharge of toxic substances.

d. Rocky islands and sea cliffs shall be managed so as to avoid erosion, destruction of habitat, and the discharge of toxic substances.

e. Barrier islands and lagoons shall be managed so as to maintain adequate flows of sediments, detritus and water, avoid the alteration or redirection of wave energy which would lead to the filling in of lagoons or the erosion of such islands, and discourage activities which would decrease the use of such islands by coastal species, including polar bears and nesting birds.

f. High-energy coasts shall be managed by ensuring an adequate mix and transport of sediments and nutrients and avoiding redirection of transport process and wave energy.

g. Rivers, lakes and streams shall be managed to protect natural vegetation, water quality, habitat and natural water channels and flows required to protect fish and wildlife habitat and subsistence uses.

h. Habitats in upland areas shall be managed to maintain natural drainage patterns, surface water quality, and natural groundwater recharge areas; to prevent runoff and erosion; and to minimize alteration of vegetation which may result in decreased biological productivity and loss of habitat.



### E. Commercial Recreation

Uses associated with commercial recreation uses of land and wildlife habitat (e.g., commercial hunting and fishing camps and commercial recreational boating, hiking and viewing) shall minimize adverse effects on subsistence activities and resources.

### F. Transportation and Utilities

1. Land use area designation. The borough planning commission must designate a transportation corridor district before borough permits are issued for new transportation or utility corridors or facilities incidental to major development

2. Water dependence. Transportation and utility routes and facilities shall be sited inland from beaches and shorelines unless the route or facility is water dependent or no feasible and prudent inland alternative exists to meet the public need for the route or facility.

3. Minimization of effects. Transportation and utility corridors and facilities, including ice roads, shall be sited, designed, constructed, and operated to minimize:

a. Minimize adverse effects on biological resources and alteration of shorelines, water courses, wetlands, and tidal marshes;

b. Avoid significant disturbance to important habitats and to populations of birds, fish, whale, caribou and other species during migration periods; and

c. Minimize adverse effects on subsistence use areas and local community ways of life;

d. Avoid duplication of corridors and facilities.

4. Migratory passage. Transportation and utility corridor uses shall be sited, designed and operated to:

a. Allow for the free passage and movement of fish and wildlife with due consideration for historic and recent migratory patterns; and

b. Avoid above-ground utility lines and pipelines, to the extent feasible and prudent, when above-above ground lines or pipelines would adversely affect moose or caribou populations.

5. Anadromous fish streams. To the extent feasible and prudent, access roads shall avoid crossing anadromous fish streams. Bridges and culverts shall be designed and constructed to minimize habitat disturbance and to not adversely affect free passage of fish.

6. Stream crossings. Where feasible and prudent, road and pipeline crossings of rivers or streams shall be minimized and consolidated to reduce the number of crossings in an individual drainage.

7. Facility design, construction and maintenance. Highway, airport, port and utility design, construction and maintenance shall minimize alteration of water courses, wetlands and intertidal marshes, and visual degradation.

8. Airstrips shall be sited, designed, constructed and operated in a manner that minimizes their effect on wildlife. To the extent feasible, airstrips near villages shall be sited so as to allow future growth without bifurcating the village.

9. Applicants shall include measures for unimpeded wildlife crossing in the design and construction of structures such as roads and pipelines that are located in areas used by wildlife. Pipeline, railroad, road or other transportation facility designs shall be based on the best available information and include adequate pipeline elevation, ramping or burial to minimize disruptions of migratory patterns and other major movements of wildlife. Best available information will be evaluated during project review to determine if pipeline burial, ramping, elevation or a combination thereof, will be employed.



**G. Energy Facilities: Oil and Gas, Coal, Hydroelectric, Geothermal, and Wind**

1. Land use area designation. Other than for oil and gas exploration and other temporary energy facilities and uses, major energy facilities not related to community energy supply shall be designated as a resource development district by the borough planning commission prior to or during consideration of a permit application.

2. Siting considerations. Temporary energy facilities shall be sited so as to:

a. Minimize adverse environmental and social effects while satisfying industrial requirements;

b. Minimize the site clearing, dredging and construction in productive habitats;

c. Allow the free passage and movement of fish and wildlife with due consideration for historic migratory patterns

d. Minimize the probability of spills or other forms of contamination which affect subsistence use areas and resource, commercial fishing grounds, spawning grounds, and other biologically productive or vulnerable habitats, including marine mammal rookeries and hauling out grounds and waterfowl nesting areas;

e. Use areas of least biological productivity, diversity, and vulnerability and where effluents and spills can be controlled or contained;

3. Seismic or geophysical surveys occurring on land or water will be located, designed, and conducted in a manner that avoids significant disturbances to fish and wildlife populations, habitats, and subsistence and recreational harvest of fish and wildlife. Depending on site-specific concerns, the administrator may require: Seasonal restrictions, restrictions on the use of explosives, or restrictions relating to the type of transportation used. Surveys shall be timed to avoid adverse effects on commercial and subsistence fishing and migrating smolts.

**H. Mining and Mineral Processing**

1. Land use area designation. A "mining operation" as defined in 9.04.070 NABC shall be designated as resource development districts by the borough planning commission prior to or during the consideration of a permit application.

2. Mining best management practices. Applicants for mining projects may be required to identify best management practices that will be used for mining activities.

3. Coastal gravel extraction. Sand and gravel may be extracted from coastal waters, intertidal areas, barrier islands and spits, or freshwater areas, only when there is no feasible and prudent alternative to extraction of materials from these areas which will meet the public need for the sand or gravel. Such extraction activities shall minimize sediment transport, turbidity and sedimentation; minimize shoreline erosion; minimize adverse effects to herring and anadromous fish spawning and rearing habitat, and waterfowl habitat; and minimize increases in shoreline erosion.

4. Unless there is no feasible and prudent alternative, sand and gravel shall be authorized in the following descending order of priority:

a. Reuse of gravel from abandoned development areas;

b. Existing gravel pits;

c. New upland pits;

d. Rivers, streams and lakes that do not support fish;

e. Shoreline and offshore gravel sources;

f. Floodplain gravel sources in fish-bearing streams; and

g. Small streams within tundra areas.

5. Floodplain gravel extraction. If mining in rivers and streams cannot be avoided, the following policies apply:

48


Exhibit C
Page 48 of 76

a. To the extent feasible and prudent, gravel shall be mined from the following river types in order of preference: braided, split channel, meandering, sinuous and straight. When necessary, exposed gravel bars in large, active floodplains may be considered for mining.

b. Changes to channel hydraulics shall be avoided.

c. Gravel pits shall be located to minimize the probability of channel diversion through the site.

d. The effects of gravel removal shall be minimized by maintaining buffers between active channels and the work area and by avoiding:

i. in-stream work,

ii. unnecessary clearing of riparian vegetation, and

iii. disturbance to natural banks.

e. To the extent feasible and prudent, site configurations shall avoid the use of long straight lines and shall be shaped to blend with physical features and surroundings to provide diverse riparian and aquatic habitat.

f. If the site is likely to be inundated during operation, temporary dikes shall be constructed around the site to minimize disturbance to low flow channels and avoid entrapment of fish.

g. When gravel-washing operations occur on the floodplain, settling ponds are required and shall be dikes or set back to avoid breaching by the 10-year flood cycle. The wash water shall be recycled; effluent discharge shall comply with state and federal water quality regulations.

6. Reclamation.

a. Reclamation plans shall be required for mining and gravel extraction activities. Reclamation of all upland and floodplain mined sites shall be required, unless such reclamation would cause greater adverse effects to the environment than leaving the area unreclaimed. Excavated areas may be converted to fish or waterfowl habitat if practicable. At a minimum, reclamation will include the following elements, as applicable:

i. Topsoil must be segregated from overburden, with both stored above the mean annual flood line.

ii. At the end of each operating season, all disturbed areas must be regraded to stable slopes. Within mean annual flood lines, regrading to ground contours which will not entrap fish and not significantly alter the stream hydraulics that will occur at the end of each operating season; tailings used in the construction of settling ponds and other essential facilities may be retained in place until completion of use.

iii. At the completion of mining activities or gravel extraction, all disturbed areas will be stabilized and revegetated. This reclamation shall include the following:

(1). All disturbed areas shall be graded to stable slopes that blend with the natural topography;

(2). Erosion-control measures shall be implemented as appropriate to stabilize the site; and

(3). Areas designated for revegetation shall be covered with topsoil to encourage establishment of native plant species.

(4). An exception to these requirements is provided for the portion of a gravel extraction site required to provide gravel for continuing maintenance and operation activities. Maintenance gravel sites will comply with the requirements of subsection (a)(i) and (a)(ii) of this section.

49

