7. Abutting owners. Permits for sand or gravel extraction may not be granted without the consent of abutting land owners if there is a significant possibility that the proposed activity will infringe on the property rights of the abutting owner. An applicant for an Alaska Native allotment or other state or federal public lease entitlement shall be treated as an abutting owner so long as the application for such entitlement is pending as shown in the applicable public land records.

**I. Timber**

1. Timber management practices. Best management practices shall be used for all forestry and timber harvest activities in accordance with the Forest Resource and Practice Regulations (11 AAC 95) of the Forest Practices Act (AS Chapter 41.17).

2. Access. Timber-related projects shall retain recreational and subsistence access.

3. Scenic views. Applicants shall include provisions in the project description for the protection of scenic views and vistas to the extent feasible and prudent.

**J. Air and Water Quality**

1. Cumulative effects. Applicants for major development projects shall identify the cumulative effects on air and water quality.

2. Air and water quality. Applicants shall identify and follow best management practices to minimize emissions and effluents from commercial and industrial sources.

3. Environmental protection technology. To the extent feasible and prudent, the most effective technology will be used for storage, handling, cleanup and disposal of hazardous substances, petroleum and petroleum products.

4. Siting. The borough shall work with developers of proposed commercial facilities to site facilities to ensure adequate effluent dispersion and proper siting of sewer facilities.

5. Hazardous substances. Hazardous substances shall be handled and stored to prevent release into the environment and, where appropriate, removal from the borough. Entities proposing hazardous waste treatment, storage, transportation and disposal shall consult with the borough, affected communities, Native corporations, and adjacent landowners before proposing the storage of hazardous substances.

6. Erosion and siltation. Soil erosion shall be avoided or minimized by avoiding the removal of vegetation adjacent to water bodies whenever feasible and by stabilizing and revegetating disturbed soil as soon as possible.

7. Impermeable lining and diking or other satisfactory secondary containment is required for fuel storage facilities with a capacity greater than 660 gallons.

8. All borough approvals for land or water uses which may directly affect water quality shall require that these activities be sited, designed, constructed and operated to provide a reasonable assurance that discharges shall meet state or federal water quality standards for the receiving water.

9. Applicants for industrial operations or petroleum storage and transportation facilities (onshore and offshore) shall prepare an oil spill control and clean-up plan. The plan must contain a risk analysis indicating where oil spills are likely to flow under various sets of local meteorological, oceanographic, hydrologic or soil conditions. Impacted areas must be identified and strategies fully developed to protect environmentally sensitive areas; the spill control and clean-up equipment which is available to the operator and the response time required to deploy this equipment under the various scenarios must be contained in the risk analysis. Depending on the nature of the activity, adequate spill response equipment may be required to be kept on site.

50



Duplicative borough oil spill and clean-up plans will not be required where a state or federally approved plan meets the criteria in this section.

**K. Noise and Nuisance:** Uses shall not significantly affect surrounding residential properties with excessive noise, fumes or odors, glare, smoke, light, vibration, dust, litter, or interference in any radio or television receivers off the premises or cause significant line voltage fluctuation off the premises where the use occurs.

**L. Land and Water Uses**

1. Water dependent and water related. In planning for and permitting development in or adjacent to waterbodies, the borough shall give, in the following order, priority to:

   a. Subsistence uses and activities;

   b. Commercial fishing-related facilities and uses;

   c. Noncommercial recreational uses and activities;

   d. Water-dependent facilities;

   e. Water-related facilities; and

   f. Commercial or industrial uses and activities for which there is no feasible and prudent inland alternative to meet the public need for the use or activity.

2. Multiple use. To the extent feasible and prudent, piers, cargo handling, storage, parking and other facilities shall be designed and used to prevent the need for duplicative facilities.

3. Compatible uses. To the extent feasible and prudent, activities on and uses of lands and waters within the borough shall be compatible with adjacent land and water uses.

4. Duplicative Facilities. To the extent feasible and prudent, duplicative facilities shall not be developed on shorelines if another facility is available for that use.

5. Mitigation. Applicants shall implement measures to mitigate potentially adverse effects on the following resources of local, state or federal importance: fish and wildlife populations and their habitats; subsistence resource uses and activities; cultural resources; and commercial fishing uses and activities. Mitigation shall include and be considered in the following order of preference:

   a. Avoid adverse effects to resource or other uses;

   b. When the loss cannot be avoided, minimize effects to resources and uses and minimize the need for restoration, maintenance or compensation;

   c. When the loss of resources and/or uses cannot be minimized, restore or rehabilitate the resource to its pre-disturbance condition; and

   d. When loss or damage to existing resources and associated activities is substantial and irreversible (including for example a seasonal loss in commercial fishing or subsistence harvest) and the above objectives cannot be achieved, compensation for resource and/or harvest loss may be required by the administrator. In the case of a loss of habitat production potential, the administrator may consider enhancement of other habitats as an alternative means of compensation.

6. Land disposals. Unless prohibited by law, state, federal or borough leases, permits, grants and other disposals of land or interests in lands and uses or activities arising out of such disposals are subject to borough permits issued under these policies and standards.

7. Causeways shall be avoided unless there are no reasonable alternatives. All causeways are required to be sited and designed to avoid or minimize disturbance natural migration patterns and habitat use of fish, marine mammals and molting birds, prevent changes in water circulation patterns that would have significant adverse effects



Exhibit  C

P-go  51  of  76

on fish and wildlife, and ensure adequate sediment transport. The applicant shall incorporate measures into the causeway design, including breaches, to maintain natural migration, water circulation and sediment transport patterns.

8. The administrator may require measures to rehabilitate sites potentially affected by industrial uses, mining or gravel extraction.

9. Tundra Travel. Off-road travel in tundra shall meet the following requirements.

a. Disturbance of the tundra vegetative cover is prohibited including blading, removal of the cover by other means, or other damage to vegetation.

b. Snow ramps, snow and ice bridges or cribbing shall be used to cross frozen water bodies to preclude cutting, eroding or degrading of their banks. Snow ramps and ice bridges shall be substantially free of soil and debris and of sufficient thickness to support vehicles. Snow and ice bridges must be removed or breached, and cribbing removed after final use or prior to breakup, whichever occurs first. Frozen water courses shall be crossed at shallow riffle areas, and avoid disturbance to fish overwintering areas to the extent feasible and prudent. Where such areas do not exist, the applicant shall propose an environmentally preferred location. Vehicles shall not be abandoned.

c. Project-related off-road tundra travel shall not interfere with caribou migration or calving or moose overwintering.

d. Vehicles must meet the requirements stated in the definition of tundra travel in NABC 9.04.070.

10. Watershed Protection. Applicants for proposed uses shall protect the functions of watershed areas during and after construction. The administrator may require conditions of approval to retain natural drainage patterns to the extent feasible and prudent and minimize or eliminate siltation, road and surface runoff, and pollution of the water supply, and to maintain the quality of aquifers.

**M. Natural hazards.**

1. Design and siting criteria. To the extent feasible and prudent, facilities shall not be located in a natural hazard area. Where feasible and prudent alternatives do not exist, applicants shall implement measures to design, site, construct, and operate facilities in natural hazard areas to prevent or mitigate potential hazards to minimize property damage, protect against loss of life, and prevent damage to land and water resources.

2. Erosion. Applicants shall implement measures to avoid or minimize coastal and riverine erosion from project activities. Development mining and gravel extraction shall be sited and conducted to avoid a significant increase in coastal erosion, river erosion and significant adverse effects on other coastal and riverine processes.

3. Permafrost. Uses are required to maintain the natural permafrost insulation quality of existing soils and vegetation.

4. Coastal storm surge flooding. Industrial and commercial development outside established communities and within areas subject to storm-surge flooding shall be limited to water-dependent or water-related uses unless there are no feasible or prudent alternatives.

5. Landslides and mass-wasting hazards. To the extent feasible and prudent, development shall avoid areas identified as subject to landslide and mass-wasting hazards.

6. Riverine flooding. To the extent feasible and prudent, industrial and commercial development shall not be sited within the active floodplain and high water mark of record.



7. Ice hazards. To the extent feasible and prudent, project activities shall be sited to avoid ice hazards. Where it is not feasible to site project activities to avoid ice hazards, users shall implement measures to avoid damage to facilities, human health and safety, and the environment.

8. Offshore structures shall be designed to withstand natural hazards and forces which may occur while at the site. Design criteria must be based on actual measurements or conservative estimates of geophysical forces. In addition, structures must have monitoring programs and safety systems capable of securing such structures in case unexpected geophysical hazards or forces are encountered.

**N. Economic Development Standards**

1. Applicants for a major development project shall identify measures in the project description that will increase local benefits from the development. These measures may include, but are not limited to, the following beneficial effects of uses:

a. Use of suppliers or subcontractors from within the borough for work which can be accomplished competitively by local private businesses or northwest arctic regional or village corporations;

b. Employment of borough residents;

c. Use of flexible work schedules to allow subsistence pursuits by employees;

d. Job training programs;

e. Internships;

f. Activities that are related to or encourage Inupiat arts and crafts;

g. Use of local energy sources including locally produced coal, coal bed methane gas, hydroelectric power, wind, or solar power;

h. Generation of tax revenues greater than direct or indirect local government expenditures related to the development;

2. Annual Report. Operators of major development projects shall submit an annual report to the borough by January 31 for the previous year describing how many borough residents it employed and measures to encourage local employment.

**O. Access and Easements**

1. Easements. Commercial recreation, industrial and other users shall use approved easements through or adjacent to private lands.

2. Coordination. Applicants shall develop access points and easement routes on state and federal lands in coordination with the borough, adjacent landowners and affected communities, Native corporations and tribal organizations.

**P. Fire Safety and Emergency Access**

A proposed use shall not be allowed if the administrator or the State Fire Marshal determines the use will pose a significant fire danger. A proposed use shall not be allowed if it does not allow clear and easy access for fire and emergency apparatus and police protection. Nothing in this section or title shall be interpreted to require the administrator to determine that a proposed use is or is not a fire hazard or does or does not allow emergency access. Ensuring fire safety and emergency access are responsibilities of the permittee or applicant and not the responsibility of the borough.

## 9.25.030 Village district standards (VC).

The following standards shall be used to guide the approval of development and uses in the village districts:

A. Uses will not be allowed which significantly violate guidelines on the rate or amount of growth adopted by a village as a part of its comprehensive development plan.

53

B. Uses in a village are required to be consistent with a relevant provision of an adopted village comprehensive development plan.

C. Uses are encouraged which provide or materially contribute to lower-cost fuel or power.

D. Uses are encouraged which provide local employment in the villages.

E. Uses are encouraged that improve the delivery of water, sewer, health or other community services in the villages. (Ord. __-__ § _____)

## 9.25.040 Subsistence conservation (SC) district standards.

Because subsistence use of lands and waters within the borough is the primary and highest priority use of all lands and waters, no commercial or industrial land or water uses and activities shall significantly impair the priority of the subsistence use of resources.

A. Uses involving boat, barge, air or ground traffic in the SC district shall avoid disrupting the migration of or subsistence use of whale, caribou, bird or other migratory species.

B. Commercial recreation users shall not interfere with subsistence use activities or resources. Interference with subsistence uses and resources includes the following:

    1. Activities that would diminish subsistence use by displacing existing fish and wildlife populations, including the location of temporary camps in areas that could affect migration of caribou;

    2. Activities that would interference with subsistence harvests;

    3. Activities that would disturb subsistence users including noise from repeated use of flight paths over areas used for subsistence during times of subsistence use; and

    4. Disturbance of migrating caribou during the first 24 hours after the first group of caribou travels through an area.

B. Cumulative effects. Applicants for major development projects shall consider and establish measures to avoid or minimize cumulative effects of new commercial development including effects from the project and effects of existing or reasonably foreseeable development on subsistence. The commission may require the developer to provide information on cumulative effects for projects that have a reasonable likelihood of significant adverse effects on subsistence uses or resources or other uses or resources.

C. During review of development proposals, the borough shall work with its villages to identify subsistence resource concerns and to develop permit conditions to ensure that commercial uses adequately address local concerns.

D. Management plans, master plans and development projects shall maintain traditional and customary access to subsistence resources unless alternate access is provided that is acceptable to the borough.

E. Local or traditional knowledge may be used to grant, deny or place conditions on permits when there is an indication that subsistence uses or resources may be adversely affected by the proposed use.

## 9.25.045 Subsistence conservation (SC) standards for sub-districts

A. In addition to the specific conditions required in this section for each sub-district, applicants shall include with the application a description of measures that will be implemented to protect subsistence resources and uses.

B. Sisoalik Spit Subsistence Conservation Sub-district.

    1. Subsistence uses. Uses and activities shall not significantly interfere with subsistence activities including, but not limited to, waterfowl hunting, marine mammal

54



hunting, and fishing during times of subsistence use. Commercial or industrial uses of the Sisoalik Spit uplands during times of subsistence use are prohibited. Subsistence uses generally occur between June 1st and September 30th.

2. Marine Mammals. Uses and activities shall not have a significant adverse effect on marine mammals. Offshore resource exploration extraction activities are prohibited during the months of April, May, June, September, and October.

3. Priority Uses. Subsistence uses are the highest priority for this area followed by commercial fishing.

4. Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

C. Cape Krusenstern Subsistence Conservation Sub-District.

1. Subsistence uses. Nonsubsistence uses and activities shall not interfere with subsistence activities. Subsistence use activities generally occur between March 15 and October 31.

2. Marine mammals. Uses and activities not related to subsistence shall avoid or minimize effects on marine mammals and shall not significantly interfere with the subsistence harvest of marine mammals. Mineral exploration, mining and gravel extraction activities are prohibited when marine mammals are present between March 15 and July 15 and during the months of September and October.

3. Tern nesting sites. Uses and activities not related to subsistence and/or to cultural resource studies shall avoid or minimize effects to tern nesting areas or subsistence uses of these areas.

4. Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

D. Kobuk/Selawik Lakes Subsistence Conservation Sub-District.

1. Subsistence Uses. Uses and activities not related to subsistence shall not adversely affect the following subsistence resources and activities during the time of subsistence use indicated below.

    a. Seal hunting (April - October)
    b. Herring spawning (May - June)
    c. Waterfowl hunting (April 15 - October)
    d. Fishing (year-round)
    e. Egg gathering (June 1 - July 31)
    f. Trapping
    g. Berry picking
    h. Caribou and moose (year round)

2. Fish. Uses and activities shall be designed, sited, and operated to minimize effects to larval and juvenile fish and migrating and overwintering anadromous fish.

3. Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

E. Cape Espenberg/Goodhope River Subsistence Conservation Sub-District.

1. Subsistence Uses. Nonsubsistence uses and activities shall not adversely affect the following subsistence use activities which generally occur during the time noted:

    a. Seal hunting (May 1 – July 15)
    b. Moose hunting (September – May)
    c. Waterfowl hunting (May 1 – October 31)
    d. Trapping (winter)
    e. Egg gathering (June 1 – July 31)

55



f. Fishing (year-round)

g. Berry picking (summer and fall)

2. Marine Mammals. Offshore and onshore mineral exploration, mining and gravel extraction activities shall maintain a one-mile buffer from identified spotted seal haulout areas when seals are present. Uses and activities shall avoid significant adverse effects on the subsistence harvest of spotted seals.

3. Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

F. Kobuk River Delta Subsistence Conservation Sub-District.

1. Subsistence uses. Nonsubsistence uses and activities shall not adversely affect the following activities:

a. Waterfowl hunting (May 1 – August 15)

b. Sheefish fishing (spring and summer)

c. Muskrat trapping (winter and spring)

2. Waterfowl nesting and staging. Uses and activities shall be sited and scheduled to avoid waterfowl staging (spring and fall) and nesting periods (summer).

3. Fish. Commercial uses requiring water intake or habitat alteration affecting this area shall be sited, designed and operated to avoid significant adverse effects on juvenile fish, anadromous fish migration, or overwintering fish populations.

4. Effects analysis. Applicants shall prepare an analysis of effects on subsistence, fish and wildlife habitat, and fish and wildlife populations.

5. Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

G. Selawik River Delta Subsistence Conservation Sub-District.

1. Subsistence uses. Nonsubsistence uses and activities shall not adversely effects the following subsistence use activities:

a. Waterfowl hunting (April 1 – October 31)

b. Sheefish fishing (spring)

c. Muskrat trapping (winter and spring)

d. Caribou (August 1 – October 31)

e. Moose (August 1 – September 30)

2. Waterfowl. Uses and activities shall be sited and scheduled to avoid waterfow staging and nesting periods.

3. Fish. Uses and activities shall not have a significant adverse effect on fish, including anadromous fish migration and overwintering fish populations and fish in their juvenile and larval stages. Uses and activities shall not significantly interfere with the subsistence harvest of fish.

4. Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

H. Salmon River Subsistence Conservation Sub-District.

1. Subsistence uses. Nonsubsistence uses and activities shall not adversely effect the following subsistence use activities.

a. Caribou hunting (mid-August to mid-October).

b. Salmon and whitefish fishing (August – September).

c. Furbearer trapping.

2. Caribou migration. Nonsubsistence uses or activities in this subdistrict are prohibited during caribou migration.

3. Fish spawning. Gravel extraction, placer mining, and placement of in-stream structures are prohibited within fish spawning areas.

56



4.  Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

5.  Effects analysis. Applicants for nonsubsistence uses must submit with the application an analysis of potential effects on fish, habitat, and caribou migration.

I. Selawik-Hunt-Redstone Rivers Subsistence Sub-District

1.  Subsistence uses. Nonsubsistence uses and activities shall not adversely effect subsistence caribou hunting between mid-August and mid-October.

2.  Caribou migration. Nonsubsistence uses or activities shall cease operations during the first 24 hours of caribou migration.

3.  Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

4.  Effects analysis. Applicants for nonsubsistence uses must submit with the application an analysis of potential effects on caribou migration and habitat.

J. Maniilaq River-Ambler Lowlands Subsistence Conservation Sub-District.

1.  Subsistence uses. Nonsubsistence uses and activities shall not adversely effect the following subsistence activities:

a.  Caribou hunting (mid-August – mid-October)

b.  Waterfowl hunting (spring and summer)

c.  Trapping (fall and winter).

2.  Caribou migration. Nonsubsistence uses or activities shall cease operations during the first 24 hours of caribou migration.

3.  Water quality. Mining activities shall avoid or minimize effects to water quality including increased sediment load in waterbodies.

4.  Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

5.  Effects analysis. Applicants for nonsubsistence uses must submit with the application an analysis of potential effects on fish, habitat, and caribou migration.

K. Inmachuk River Subsistence Conservation Sub-District.

1.  Subsistence uses. Nonsubsistence uses and activities shall not adversely affect the following subsistence activities:

a.  Fishing (year-round),

b.  Moose, caribou, and musk-ox hunting (August - March),

c.  Beluga whale hunting (June and July),

d.  Trapping (winter),

e.  Waterfowl hunting (April-September),

f.  Egg gathering (May-July), and

g.  Berry picking and herb gathering (summer and fall).

2.  Waterfowl. Uses and activities shall avoid effects to waterfowl staging (spring and fall) and nesting areas (summer).

3.  Fish spawning. Gravel extraction, placer mining, and placement of in-stream structures are prohibited within fish spawning areas.

4.  Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

5.  Effects Analysis. Applicants for nonsubsistence uses must submit with the application an analysis of potential effects on subsistence and to fish, habitat, and caribou migration.

L. Lower Buckland River Subsistence Conservation Sub-District.

1.  Subsistence uses. Nonsubsistence uses and activities shall not adversely affect the following subsistence activities:

57



a. Waterfowl hunting (April 15 - June 15 and August 15 - Sept. 15),
b. Seal hunting (April 15 - October 31),
c. Moose hunting (September - March),
d. Fishing (year-round), and
e. Berry picking and herb gathering (summer and fall).

2. Salmon spawning. Uses and activities are prohibited in salmon spawning areas. Prior to gravel extraction, placer mining and placement of instream structures, the applicant shall survey waterbodies for salmon spawning areas.

3. Waterfowl. Uses and activities shall not have a significant adverse effect on waterfowl, waterfowl staging areas, waterfowl nesting areas, or significantly interfere with the subsistence harvest of waterfowl.

4. Marine mammals. Uses and activities shall not have a significant adverse effect on marine mammals or significantly interfere with the subsistence harvest of marine mammals.

5. Moose. Uses and activities shall not have a significant adverse effect on moose populations or moose habitat.

6. Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

7. Effects Analysis. Applicants for nonsubsistence uses must submit with the application an analysis of potential effects on subsistence and to fish, habitat, and caribou migration.

M. North Fork-Squirrel-Omar River Subsistence Conservation Sub-District.

1. Subsistence uses. Nonsubsistence uses and activities shall not adversely affect the following subsistence activities:
a. Caribou hunting (mid-August - mid-October)
b. Fishing (year-round)
c. Waterfowl hunting (September - October)
d. Trapping (winter)
e. Egg gathering (May-July)

2. Fish spawning. Gravel extraction, placer mining and placement of instream structures are prohibited in fish spawning areas.

3. Caribou migration. Nonsubsistence uses shall cease operations during the first 24 hours of caribou migration.

4. Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

5. Effects Analysis. Applicants for nonsubsistence uses must submit with the application an analysis of potential effects on subsistence and to fish, habitat, and caribou migration.

N. North Kivalina Coast Subsistence Conservation Sub-District.

1. Subsistence uses. Nonsubsistence uses and activities shall not adversely affect the following subsistence activities:
a. Marine mammal hunting (March 15 - July 15)
b. Waterfowl hunting (April 1 - May 31 and September 1 - 30)
c. Egg gathering (May-July)

2. Marine mammals. Uses and activities shall not have a significant adverse effect on marine mammals. Between March 15 - July 15 and September 1 – October 31.

3. Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.

58



4. Effects Analysis. Applicants for nonsubsistence uses must submit with the application an analysis of potential effects on subsistence and to fish, habitat, and caribou migration.

O. Onion Portage Subsistence Conservation Sub-District.

1. Prohibited uses. Oil and gas and mining exploration and development, minor and major resource extraction, and development of facilities are prohibited in this sub-district.

2. Caribou migration. Nonsubsistence uses and activities, including river floating, shall cease operations during the first 24 hours of caribou migration.

3. Fish. Nonsubsistence uses and activities shall not interfere with subsistence fishing and fish migration during June through October.

P. Eschscholtz Bay Subsistence Conservation Sub-District.

1. . Prohibited uses. Oil and gas and mining exploration and development, and minor and major resource extraction are prohibited in this sub-district.

2. Priority Uses: The following uses are priority uses in the area and activities shall avoid significant adverse effects to these uses and resources:

  a. Subsistence activities
  b. Cultural resource management
  c. Fish and wildlife management

Q. Elephant Point/Choris Peninsula Subsistence Conservation Sub-District

1. Prohibited uses. Oil and gas and mining exploration and development, minor and major resource extraction, and development of facilities are prohibited in this sub-district.

2. Beluga whales. Nonsubsistence uses and activities shall not adversely affectt marine mammals or related subsistence activities during beluga whale hunting in June and July.

3. Priority Uses: The following uses are priority uses in the area and activities shall avoid significant adverse effects to these uses and resources:

  a. Subsistence activities
  b. Cultural resource management
  c. Fish and wildlife management

R. Upper Kivalina River Subsistence Conservation Sub-District.

1. Prohibited uses. The following uses and activities are prohibited: Minor and major resource extraction, gravel extraction, placer mining, instream structures, pipelines, water withdrawal, and water discharges (during fall, winter and spring).

2. Priority Uses: The following uses are priority uses in the area and activities shall avoid significant adverse effects to these uses and resources:

  a. Fish spawning
  b. Fish overwintering
  c. Fish and wildlife management

3. Water quality. Water discharges shall be treated to maintain water quality.

4. Water flow. Activities requiring water withdrawal during summer months shall maintain water flows necessary to support fish and wildlife habitat.

S. Pah River Subsistence Conservation Sub-District

1. Subsistence uses. Use and activities not related to subsistence or cultural resource management are prohibited within the Pah River Cultural Resource Protection Area. Nonsubsistence uses and activities shall not adversely affect the following subsistence activities:

  a. Caribou hunting (mid-August – mid-October)

59

C
59 of 76

b. Waterfowl hunting (spring and summer)
c. Trapping (fall and winter).
2. Caribou migration. Nonsubsistence uses or activities shall cease operations during the first 24 hours of caribou migration.
3. Water quality. Mining activities shall avoid or minimize effects to water quality including increased sediment load in waterbodies.
4. Alternative sites. To the extent feasible and prudent, activities and facilities shall be located outside of this sub-district.
5. Effects Analysis. Applicants for nonsubsistence uses must submit with the application an analysis of potential effects on subsistence and to fish, habitat, and caribou migration.

## 9.25.050 Habitat conservation (HC) standards.
The intent of the HC district is to restrict uses and activities to protect habitat with exceptional productivity or habitat that is critical for the survival of a population of a species.
A. Uses and activities in the HC district shall not adversely affect the habitat functions that support the living resources in the HC.
B. Project activities shall not reduce the productivity of fish habitat. Productivity is directly related to the ability of the habitat to support spawning, migration, rearing, and over-wintering.
C. Project activities shall not alter natural hydrological conditions.
D. Permanent structures are not allowed in the HC district.
E. Temporary structures may be allowed if there are no adverse effects to habitat or to associated fish and wildlife populations.
F. Project activities shall not have an adverse effect on migrating caribou.
G. The following standards apply to the specific Habitat Conservation districts:
1. Kobuk River Sheefish-Chum Salmon-Whitefish Spawning Area.
a. Prohibited Uses. Gravel extraction and placer mining activities are prohibited within the active floodplain.
b. Priority Uses: The following uses are priority uses in the area and activities shall avoid significant adverse effects to these uses and resources:
i. Subsistence activities
ii. Fish spawning
iii. Fish migration
iv. Fish and wildlife management
c. Water quality. Water discharges shall be treated to maintain water quality within this sub-district.
d. Spawning habitat. Commercial and industrial uses shall maintain natural water flows. Uses and activities shall not have a significant adverse effect on sheefish spawning habitat or significantly interfere with the subsistence harvest of sheefish. Permits may be granted or denied using information from ADF&G Technical Paper No. 175, "Subsistence and Sport Fishing of Sheefish on the Upper Kobuk River, Alaska," regarding local subsistence practices that may be adversely affected by the proposed use.
e. Buffer zone. Outside villages, non-water-dependent commercial and industrial uses within 100 feet of the river's ordinary high water mark are prohibited. Within 500 feet of ordinary high water mark, these activities must minimize on-site erosion to avoid increased sediment discharge into the river.

60



2. Selawik River Sheefish-Whitefish Spawning Area .
  a. Prohibited Uses. Gravel extraction and placer mining activities are prohibited within the active floodplain.
  b. Priority Uses: The following uses are priority uses in the area and activities shall avoid significant adverse effects to these uses and resources:
        i. Subsistence activities
        ii. Fish spawning
        iii. Fish migration
        iv. Fish and wildlife management
  c. Water quality. Water discharges shall be treated to maintain water quality within this sub-district.
  d. Buffer zone. Outside villages, non-water-dependent commercial and industrial uses within 100 feet of the river's ordinary high water mark are prohibited. Within 500 feet of ordinary high water mark, these activities must minimize on-site erosion to avoid increased sediment discharge into the river.

3. Wulik River Arctic Char Overwintering Area.
  a. Prohibited uses. The following uses and activities are prohibited: Minor and major resource extraction, gravel extraction, placer mining, instream structures, pipelines, water withdrawal, and water discharges (during fall, winter and spring).
  b. Priority Uses: The following uses are priority uses in the area and activities shall avoid significant adverse effects to these uses and resources:
        i. Subsistence activities,
        ii. Fish spawning
        iii. Fish overwintering
        iv. Fish migration
        v. Fish and wildlife management
  c. Water flow. Activities requiring water withdrawal during summer months shall maintain water flows necessary to support fish and wildlife habitat.
  d. Water quality. Water discharges shall be treated to maintain water quality.

4. Noatak River Chum Salmon Spawning Area.
  a. Prohibited uses. Except from existing gravel pits, gravel extraction, mining and placer mining activities are prohibited within the active flood plain.
  b. Priority Uses: The following uses are priority uses in the area and activities shall avoid significant adverse effects to these uses and resources:
        i. Subsistence activities,
        ii. Fish spawning
        iii. Fish overwintering
        iv. Fish migration
        v. Fish and wildlife management
  c. Water quality. Water discharges shall be treated to maintain water quality.
  d. Buffer zone. Outside villages, non-water-dependent commercial and industrial uses within 100 feet of the river's ordinary high water mark are prohibited. Within 500 feet of ordinary high water mark, these activities must minimize on-site erosion to avoid increased sediment discharge into the river.
  e. Caribou migration. Commercial or industrial uses are prohibited in this sub-district during migration of the western arctic caribou herd are prohibited. Permits may be granted, denied or conditioned using information from ADF&G Technical Paper No. 162, "The Noatak River: Fall Caribou Hunting and Airplane Use," regarding local subsistence practices that may be adversely affected by the proposed use. Uses and

61

activities shall not have a significant adverse effect on caribou or significantly interfere with the subsistence harvest of caribou.

### 9.25.060 General conservation (GC) district standards.

A. Uses involving boat, barge, air and ground traffic in the GC district shall avoid or minimize adverse effects on fish and wildlife resources.

B. Uses shall avoid or minimize interference with subsistence use activities or resources.

C. Cumulative Effects. Applicants for major development projects shall consider and establish measures to avoid or minimize cumulative effects of new commercial development including effects from the project and effects of existing or reasonably foreseeable development on subsistence. The commission may require the developer to provide information on cumulative effects for projects that have a reasonable likelihood of significant adverse effects on subsistence uses or resources or other uses or resources.

D. During review of development proposals, the borough shall work with its villages to identify potential effects on uses and natural resources and to develop permit conditions to address local concerns about such effects.

E. Local or traditional knowledge may be used to grant, deny or place conditions on permits when other uses or resources may be adversely affected by the proposed use.

### 9.25.070 Resource development (RD) district standards.

A. Uses and activities in RD districts must either be approved under one of the permits approved under provisions in NABC 9.10, NABC 9.20 or approved under a master plan approved under provisions in NABC 9.20.070 or NABC 9.20.080. Uses and activities shall meet the requirements in the areawide standards and requirements in the master plan, if applicable.

B. Oil and gas development activities.

    1. Siting considerations. The siting and approval of major energy facilities shall be based on the following standards:

        a. Facilities shall be sited so as to minimize adverse environmental and social effects while satisfying industrial requirements;

        b. Facilities shall be sited so as to be compatible with existing adjacent uses and projected community needs;

        c. To the extent feasible and prudent, facilities shall be consolidated and sited near existing infrastructure, including roads, docks and airstrips;

        d. To the extent feasible and prudent, existing energy facilities, including pipelines and transmission lines shall be used.

        e. Applicants shall cooperate with private landowners, local governments, developers, and state and federal agencies in the development of facilities;

        f. Facilities shall be sited in areas with sufficient acreage to allow for reasonable expansion of facilities;

        g. Harbors and shipping routes shall be sited in areas with the least exposure to reefs, shoals, drift ice and other obstructions;

        h. Best available vessel traffic control and collision avoidance systems shall be used;

        i. Sites shall be selected where development will require minimal site clearing, dredging and construction in productive habitats;



j. Facilities shall be sited to minimize the probability, along shipping routes, of spills or other forms of contamination which affect subsistence use areas, commercial fishing grounds, spawning grounds, and other biologically productive or vulnerable habitats, including marine mammal rookeries and hauling out grounds and waterfowl nesting areas;

k. Facilities shall be sited to allow the free passage and movement of fish and wildlife with due consideration for historic migratory patterns;

l. Facilities shall be sited in areas of least biological productivity, diversity, and vulnerability and where effluents and spills can be controlled or contained;

m. Facilities shall be sited where winds and air currents maximize dispersal of airborne emissions which cannot be captured before escape into the atmosphere;

n. Sites shall be selected in areas which are designated for industrial purposes and where industrial traffic is minimized through population centers; and

o. Sites shall be selected where vessel movements will not result in overcrowded harbors or interfere with fishing operations and equipment.

2. Applicants for oil and gas development projects shall include measures in the application or master plan regarding restoration and rehabilitation of the project area at the end of the useful life of the facilities. These measures shall address how the project site will be restored, describe when these measures will be implemented, and document expected costs and resources available to implement the measures. The commission may require additional measures to ensure the project area will be restored or rehabilitated

## 9.25.080 Transportation corridor (TC) district standards.

A. Uses and activities in TC districts must either be rezoned under provisions in NABC 9.10, NABC 9.20 or approved under a master plan approved under provisions in NABC 9.20.070 or NABC 9.20.080. In addition to the requirements in this standard, uses and activities shall meet the requirements in the areawide standards and requirements in the master plan, if applicable.

B. Any expansions or reactivation of airstrips must be done on the basis of plans and permits reviewed and approved by the borough and affected villages. Airstrip land use shall minimize commercial and recreational use at the airstrip. Land use at airstrips outside of village districts shall be directly related to the primary industrial uses in the area.

C. To the extent feasible and prudent, transportation corridors shall not be located adjacent to waterbodies. Stream banks and lake shores of fish-bearing waters and drinking water supplies shall be protected by providing an adequate buffer strip of undisturbed vegetation to mitigate adverse effects. This standard does not prohibit bridge abutments on or adjacent to stream banks where necessary.

D. Activities in sensitive habitats may be prohibited or restricted including wolf den areas, mineral licks, and caribou calving areas during the calving season.

E. Existing commercial or recreational uses which have been validly established on specific parcels or sites prior to the effective date of this title are allowed to continue as nonconformities. New commercial or recreational uses are not allowed within the transportation corridor, except by approval or permit.

F. Red Dog transportation corridor sub-district.

63

1. Uses in this transportation corridor shall be directly related to access between the mine and the port, future resource-extraction-related development, or with approval of the mine owner, village access to port, airport or other facilities associated with the Red Dog access road.

2. Subsistence. This standard does not preclude the operator from allowing access for subsistence uses. Uses and activities in this transportation corridor shall be sited, scheduled and operated to minimize adverse effects on caribou migration, anadromous and resident fish populations according to existing arrangements with Cominco Alaska, Inc. and the NANA Regional Corporation and the requirements of state and federal law.

## 9.25.090 Unique circumstances.

A. This section does not apply to uses and activities in areas within subsistence conservation or habitat districts. In order for this section to apply to an area in a subsistence conservation or habitat districts, the area must be rezoned to another district.

B. All uses must comply with each of the standards specified in this chapter unless the standard is not applicable to the proposed use or the administrator finds the proposed use meets all of the following criteria:

1. There is a significant public need for the proposed use;

2. The costs of complying with the standard outweigh the public benefits of complying with the standard;

3. The applicant has rigorously explored and objectively evaluated all feasible and prudent alternatives to the proposed use and cannot comply with the standard;

4. The applicant has documented the reasons noncompliance with the standard;

5. For major projects or projects where affected landowners, tribes or villages have raised concerns, consultation with those entities has been has been completed; and

6. The other requirements in this subsection have been met.

C. If the requirements in subsection (B) of this section have been met, uses of the categories or types described in subsection (D) of this section may be allowed only if the applicant has taken all feasible and prudent steps to avoid the following adverse effects associated with the proposed use:

1. Development that will likely result in significantly decreased productivity of subsistence resources or their ecosystems;

2. Development that restricts subsistence user access to a subsistence resource;

3. Uses from April 15th to July 10th that will likely displace beluga or bowhead whales. These uses may include, but are not limited to, extensive barge or boat traffic, low altitude or frequent plane and helicopter traffic, and other activities resulting in excessive noise or other forms of disturbance;

4. Offshore and onshore uses within the areas of beluga, bowhead whale, or bearded seal, caribou or other species' migration which significantly interfere with subsistence activities or jeopardize the continued availability of migrating animals for subsistence purposes during the migration seasons;

5. Uses on or near a shoreline that has the potential of adversely affecting water quality (e.g., landfills, hazardous materials storage areas, dumps, etc.). "Near," as used in the phrase "near the shoreline," is defined as that area within a 1,500-foot setback from the high-water mark along the coast, lake shore or river;

64



6.  Public highway development including village roads and streets, and highways indicated in the borough or a capital improvement program, which adversely affect subsistence habitat or which significantly interfere with subsistence activities or jeopardize the continued availability of migrating animals for subsistence purposes during the migration seasons;

7.  Transportation development, including pipelines, which significantly obstructs wildlife migration;

8.  Duplicative transportation corridors from resource extraction, mineral development and other development sites;

9.  Mining of beaches, barrier islands or offshore shoals. Even in those circumstances where no feasible and prudent alternatives exist, substantial alteration of shoreline dynamics is prohibited;

10.  Placement of structures in floodplains subject to a 50-year recurrence level and in geologic hazard areas.

C.  Specific Uses. The following are required of applicable uses except where the use has met the criteria described above in this section for unique circumstances and the applicant has taken all feasible and prudent steps to maximize conformance with each standard and avoid the adverse effects listed in subsection (B) of this section.

1.  Mining and gravel extraction shall be evaluated with respect to type of extraction operation, location, possible mitigation measures and season so as to lessen, to the maximum extent practicable, environmental degradation of coastal lands and waters (e.g., siltation of anadromous rivers and streams.

2.  Mining development is required to be sited, designed, constructed and maintained in a manner that prevents significant adverse effects on fish and wildlife and their habitat, including water circulation and drainage patterns and coastal processes.

3.  Major and minor resource extraction support facilities, including administration offices, operations, residence and other uses not absolutely required in the field, must be located in a designated service base which is sited, designed, constructed and maintained to be as compact as possible and to share facilities to the maximum extent possible.

4.  Gravel extraction activities within floodplains shall maintain buffers between active channels and the work area, avoid in-stream work, permanent channel shifts and ponding of water, clearing of riparian vegetation, and disturbance to natural banks.

5.  New subdivisions or other significant development within an existing subdivision must provide appropriate water and sewer service to prevent damage to fish and wildlife and their habitat.

6.  Transportation facilities and utilities must be consolidated to the maximum extent possible.

7.  Mining and grave extraction are required to be sited, designed, constructed and maintained in a manner that does not substantially interfere with the use of a site that is important for significant cultural uses or essential for transportation to subsistence use areas. (Ord. 93-02 § 1 (9.70.070), 1993)

### 9.25.100. Cooperative planning

Inupiat people have traditionally used a process called "Sivunniuq" to ensure cooperative decision making occurs. Literally translated as "people meeting together to make a plan," this concept is especially important for projects with the potential to significantly affect uses and resources important to borough residents. Applied to development projects,

65

this process will help identify potential conflicts early in the process, develop alternatives to resolve differences and avoid project delays.

A. For projects with a potential to have significant effects on local residents, including the resources and uses on which they depend, the borough shall work closely with state and federal agencies to ensure local residents have the opportunity to be involved early in the planning process for project development. Specifically, the borough shall work with state and federal agencies and applicants early in the project planning process to:

1. Ensure compliance with provisions in Title 9 and enforceable policies of the coastal management plan,
2. Ensure early consideration of issues and concerns of borough residents and landowners, and
3. Schedule one or more pre-application meetings to discuss the project description, review maps of the proposed development area, discuss the location and size of proposed facilities, and discuss the proposed construction schedule, effects to resources and uses, and mitigation measures that would address potential project effects.

## Chapter 9.28
## SUPPLEMENTAL SUBSISTENCE STANDARDS (repealed)

## Chapter 9.30

## MISCELLANEOUS PROVISIONS

Sections:

### Article I. Commercial Transporters

9.30.010 Statement of purpose.
9.30.020 Commercial transporter permit required.
9.30.030 Contents of application for permit.
9.30.040 Issuance of permits.
9.30.050 Permit approval criteria.
9.30.060 Application amendments.
9.30.070 Term of permit.
9.30.080 Annual report.
9.30.090 Suspension and revocation of permit.
9.30.100 Violation – Penalty.
9.30.110 Enforcement.

### Article II. Disposal of Refuse, Human Waste and Chemicals

9.30.200 Statement of purpose.
9.30.210 Disposal of refuse.
9.30.220 Disposal of human waste.
9.30.230 Violation – Penalty.
9.30.240 Enforcement.

Exhibit   C
Page  66 of  76

### Article I. Commercial Transporters

**9.30.010 Statement of purpose.**
The purposes of this article include prevention of land use conflicts and adverse environmental effects caused by the rapidly increasing drop-off of visitors on lands in the borough by commercial air transporters and to promote visitor safety and enforcement of visitor compliance with sanitation and other land use laws of the Northwest Arctic Borough. It is the intent of this article to regulate the activities of transporters and visitors where not inconsistent with law or the borough charter. (Ord. 06-01 § 1, 2006; Ord. 03-05 § 1, 2003)

**9.30.020 Commercial transporter permit required.**
It shall be unlawful for a commercial transporter to transport any person to or from the field without first receiving a permit under this article. (Ord. 03-05 § 1, 2003)

**9.30.030 Contents of application for permit.**
A. Commercial transporters shall submit written applications for commercial transporter permits to the administrator on a form prescribed and furnished by the administrator. Applications shall contain the following information:
1. The full and true name of the applicant and all other names and aliases used by the applicant;
2. The birthdate of the applicant;
3. The mailing, residential and business addresses of the applicant;
4. The residential and business telephone numbers of the applicant;
5. The full and true name of any employee of the applicant who will be landing aircraft and all other names and aliases used by the employee;
6. The birthdate of the employee;
7. If the applicant has been convicted of a felony or misdemeanor in this state or any other jurisdiction within the past five years, the date of the conviction, the offense, and the location of the court;
8. If the employee of the applicant has been convicted of a felony or misdemeanor in this state or any other jurisdiction within the past five years, the date of the conviction, the offense, and the location of the court;
9. The date of the application;
10. If known in advance, the drop-off and pick-up locations for each transport;
11. A statement that the applicant filed the required annual reports for any prior permits;
12. If the applicant has received any state or federal permit or license in connection with the proposed activity, the name of the agency issuing the license or permit, the type of license or permit, and any ANILCA 810 analysis, environmental assessment or other agency study done in connection with issuing the license or permit, and the date it was issued;
13. A plan for the disposal of human waste and garbage for each person transported;
14. A statement that the transporter and all people transported will attend and complete any educational or other requirement placed on them by federal or state agencies or the borough;
15. A map demonstrating that no people transported will be dropped off adjacent or proximate to private or other lands where trespass or hunting or fishing is prohibited

67

EXHIBIT C
67 OF 76

or restricted, and a showing that there are sufficient open lands reasonably accessible to those transported given their drop-off and pick-up locations and their planned activities;

16. A plan that will ensure that all salvageable parts of fish and wildlife taken by those transported are properly cared for and preserved in the field and are either transported in a well-preserved and edible condition out of the field and borough or distributed in such condition to residents within the borough;

17. Any other issue that the administrator determines should be included in the application due to environmental, health, welfare, safety or other concerns pertaining to the application.

B. With the application, the applicant shall also furnish:

1. A fee as set by the commission;

2. The legible signature of the applicant or person authorized to sign on behalf of the applicant;

3. An affirmation or oath as may be required by the administrator that the information and statements made in connection with the application are true, correct and complete;

4. An undertaking to collect and remit to the borough a land use fee of $100.00 per visitor transported under the permit. (Ord. 06-04 § 2, 2006; Ord. 06-01 § 2, 2006; Ord. 03-05 § 1, 2003)

## 9.30.040 Issuance of permits.

A. Applications for a permit must be submitted at least 30 business days before the first transport in a calendar year.

B. The administrator shall review the application and may consult with appropriate borough, state or federal officials to determine whether the information contained in the application is true and complete. The administrator may request an applicant to submit additional information if the administrator determines that the application is incomplete.

C. The administrator's decision to approve the transporter permit, to request additional information, or to deny the permit shall be issued within 10 business days from the receipt of the complete application. The reasons for denial shall be set forth in writing.

D. The administrator may approve a permit subject to special conditions.

E. An applicant may revise or amend an application to address concerns expressed by the administrator.

F. The administrator may require the transporter to attend an orientation as a condition of the permit.

G. If the administrator fails to issue a decision within 20 business days from the submission of a complete application or revised application, the permit shall issue upon the applicant's request.

H. An applicant may appeal the decision of the administrator pursuant to Chapter 9.08 NABC. (Ord. 06-04 § 3, 2006; Ord. 03-05 § 1, 2003)

## 9.30.050 Permit approval criteria.

A. The administrator may deny an application if:

1. Any of the information is inaccurate or any of the plans, statements or other requirements of the application are insufficient to ensure that the borough's health, safety, welfare or other concerns have been addressed;

68

EXHIBIT   C
PAGE 68 of 76

2.  The applicant has failed to file the required annual report in connection with a permit issued for a prior year;

3.  The applicant fails to meet any applicable federal, state or borough criteria, standard or requirement for permit approval; or

4.  The administrator finds that the number of people transported in an area negatively affects the quality of the recreational activity or experience of others.

B.  In addition to the administrator's general authority to approve a permit subject to special conditions, the administrator may also condition the approval of a commercial transporter permit upon the land use by the commercial transporter being conducted in another district, or occurring only within specific time periods, or by placing limitations on the drop-off locations or number of people that can be transported into the district during any restricted period, or any combination of the above or any other condition consistent with law determined to be necessary by the administrator. (Ord. 06-04 § 4, 2006; Ord. 03-05 § 1, 2003)

### 9.30.060 Application amendments.

A.  If any of the information submitted to the borough changes, the applicant shall report these changes on a form prescribed and furnished by the administrator within 10 calendar days of the change.

B.  If the applicant paid a fee as set by the commission under NABC 9.30.030 and the amended information increases the total number of transports to more than 10, the applicant shall pay an additional fee as set by the commission. (Ord. 03-05 § 1, 2003)

### 9.30.070 Term of permit.

The permit shall be valid for the calendar year in which it is issued. (Ord. 03-05 § 1, 2003)

### 9.30.080 Annual report.

The permittee shall provide a signed, annual activity report on a form prescribed and furnished by the administrator. The report form shall contain an affirmation that the information is true, accurate and complete. The original report shall be filed by January 15th of the next calendar year. The report shall contain the following information for each trip:

A.  Client's name and address;

B.  Date the client was transported into the field;

C.  Specific location to which the client was transported;

D.  The date the client was transported out of the field;

E.  The specific location from which the client was transported out of the field; and

F.  A land use fee of $100.00 per visitor transported shall accompany the report. (Ord. 06-01 § 3, 2006; Ord. 03-05 § 1, 2003)

### 9.30.090 Suspension and revocation of permit.

A.  A permit issued under this article may be suspended or revoked by the administrator:

1.  For providing false or incomplete information on the application;

2.  For failing to timely report changes in information to the clerk;

3.  For providing false or incomplete information on an annual report;

4.  If the applicant is convicted of a state, or federal fish and game violation, felony or misdemeanor offense;

69



5.  If the permittee violates any of the special conditions of the permit.
B.  The administrator will notify a permittee in writing of the administration's intent to suspend or revoke a permit. The notice will include the grounds for the intended suspension or revocation, and statement of the opportunity to be heard. The permittee shall have 10 calendar days to submit objections in writing, within 10 business days of the receipt of written objections, the administration shall issue a decision.
C.  A permittee may appeal the administrator's decision pursuant to Chapter 9.08 NABC. (Ord. 03-05 § 1, 2003)

### 9.30.100 Violation – Penalty.
A.  Any person who provides transportation services without the permit required under this article or in violation of a permit condition under NABC 9.30.040 or 9.30.050 shall, upon determination of liability, be subject to a civil fine of not less than $500.00 nor more than $1,000 for each trip and shall be prohibited from obtaining a permit under this article for a period not less than three years. The minimum fine may not be suspended.
B.  Any person who fails to collect or remit the required land use fee for each visitor shall be personally subject to a civil fine equal to each unpaid fee plus an additional civil fine of up to $100.00 per unpaid fee. (Ord. 06-04 § 5, 2006; Ord. 06-01 § 4, 2006; Ord. 03-05 § 1, 2003)

### 9.30.110 Enforcement.
The provisions of this article shall be enforced as civil fines by the administrator as provided in Chapter 9.08 NABC. (Ord. 03-05 § 1, 2003)

#### Article II. Disposal of Refuse, Human Waste and Chemicals

### 9.30.200 Statement of purpose.
The purpose of this article is to protect the environment by having those who engage in activities within the borough's boundaries properly dispose of refuse, human body waste and chemicals. (Ord. 04-02 § 1, 2004)

### 9.30.210 Disposal of refuse.
A.  A person in a developed area of the borough shall dispose of refuse in refuse receptacles.
B.  A person in an undeveloped area of the Borough shall dispose of refuse by:
1.  Burning the refuse:
a.  If a fire can be safely maintained; and
b.  Removing all unburned material from the ashes and taking to a refuse receptacle.
2.  Taking the refuse to a refuse receptacle. (Ord. 04-02 § 1, 2004)

### 9.30.220 Disposal of human waste.
A.  A person in a developed area shall dispose of human body waste at designated locations or in fixtures provided for that purpose.
B.  A person in an undeveloped area shall not dispose of human body waste within 200 feet of a water source or high water mark of a body of water.
C.  A person in an undeveloped area shall deposit solid human body waste in holes dug six to eight inches deep, and shall cover the hole. (Ord. 04-02 § 1, 2004)

70



**9.30.230 Violation – Penalty.**
Any person who violates NABC <u>9.20.210</u> through <u>9.20.220</u> shall, upon conviction, be subject to a civil fine of not less than $50.00 and not more than $300.00. The minimum fine may not be suspended. (Amended during 2006 reformat; Ord. 04-02 § 1, 2004)

**9.30.240 Enforcement.**
The provisions of this article shall be enforced as civil fines by the administrator as provided in Chapter <u>9.08</u> NABC. (Amended during 2006 reformat; Ord. 04-02 § 1, 2004)

**9.30.250 Definitions.**
As used in NABC <u>9.30.210</u> through <u>9.30.220</u>:
    A. "Developed area" means a city, village or other area where receptacles for refuse and fixtures for disposing of human waste are reasonably accessible.
    B. "Undeveloped area" means an area where receptacles for refuse and fixtures for disposing of human waste are not reasonably accessible. (Amended during 2006 reformat; Ord. 04-02 § 1, 2004)

**Chapter 9.32**
**FLOOD DAMAGE PREVENTION**

Sections:
      <u>9.32.010</u> Statement of purpose and intent.
      <u>9.32.020</u> Geographic scope and applicability.
      <u>9.32.030</u> Land use permit standards within flood areas.
      <u>9.32.040</u> Platting standards within flood areas.
      <u>9.32.050</u> Variances from flood damage prevention standards.
      <u>9.32.060</u> Erosion setback.
      <u>9.32.070</u> Implementation.
      <u>9.32.080</u> Definitions.
      <u>9.32.090</u> Disclaimer of liability.

**9.32.010 Statement of purpose and intent.**
    A. The borough recognizes that areas within its boundaries are periodically subject to flooding that may result in the loss of life and property, health and safety hazards, disruption of commerce and governmental services, and extraordinary public expenditures for flood protection and relief, all of which adversely affect the health, safety and general welfare of borough residents. This chapter adopts the necessary regulations of the Federal Emergency Management Agency (FEMA) to enable the borough as well as its communities and residents to participate in the National Flood Insurance Program (NFIP) and to promote the public health, safety and general welfare by minimizing flood damage and loss and promoting access to disaster relief.
    B. To accomplish these purposes, it is the intent of this chapter to:
        1. Encourage protection of land uses vulnerable to floods, including public facilities and utilities that serve such uses, against flood damage at the time of initial construction or substantial improvement.
        2. Modify, restrict or prohibit land uses that are dangerous to health, safety or property in times of flood or that might cause an excessive increase in flood heights or velocity.



3. Ensure that subdivision and development of land within the borough are consistent with the need to minimize flood hazards and damage.

4. Ensure that potential buyers are notified that property is in an area of special flood hazard.

5. Make federally subsidized flood insurance available to owners of property in the borough.

6. Ensure that those persons who occupy areas of special flood hazards assume responsibility for occupying such flood hazard areas. (Ord. 05-03 § 1, 2005)

## 9.32.020 Geographic scope and applicability.

This chapter shall apply to all designated special flood hazard areas within the jurisdiction of the Northwest Arctic Borough, excluding the city of Kotzebue. Until such time as a "Flood Insurance Study" and "Flood Insurance Rate Maps" are published by FEMA and approved by the assembly, the borough shall reasonably utilize the high water marks of record on the existing community profile maps or other available flood data to identify flood hazard areas. (Ord. 05-03 § 1, 2005)

## 9.32.030 Land use permit standards within flood areas.

Within a designated flood hazard area as identified in NABC 9.32.020, no land use permit shall be approved unless the following applicable conditions are satisfied. Where flood elevation data is not available, applications for land use permits will be reviewed to assure proposed land uses will be reasonably safe from flooding. The test for reasonableness will depend on local knowledge and judgment, including use of historical data, local high water marks, photographs of past flooding, traditional knowledge and other available information.

A. General Standards. If a proposed land use is located in a flood area, all new construction and substantial improvements shall meet the following general standards, as applicable:

1. Anchoring. All new construction and substantial improvements shall be designed, modified, constructed and adequately anchored to prevent flotation, collapse or lateral movement of the structure; all manufactured homes must likewise be anchored to prevent flotation, collapse or lateral movement.

2. Construction Materials and Methods. All new construction and substantial improvements shall be constructed with materials and utilize equipment resistant to flood damage and use methods and practices that minimize flood damage, including waterproofing, watertight construction, use of substantially impermeable materials and other construction techniques.

3. Mechanical and Electrical Utilities. Electrical, heating, ventilation, plumbing, and other service facilities shall be designed, constructed and/or otherwise elevated or located to prevent water from entering or accumulating within the components during flooding.

4. Water and Sewer Utilities. All new and replacement water supply and sewage systems shall be designed and constructed to minimize or eliminate infiltration of flood waters into the system and discharge from the systems into flood waters. Sewage lift station electrical panels shall be elevated above flood areas.

5. Public Utilities. All new or replacement public utilities such as gas, electric and telephone systems shall be designed or constructed to eliminate disruptions due to flooding and associated hazards.

72



6. Residential Construction. New construction and substantial improvement of any residential structure shall have the lowest floor elevated to or above base flood elevation if established, or the high water marks of record, to avoid flood damage. Fully enclosed areas below the lowest floor in residential elevated structures that are subject to flooding to be designed to allow for the entry and exit of floodwaters or are otherwise prohibited.

7. Manufactured Homes and Structures. Manufactured homes shall not be placed in a flood area if possible and if placed within a flood area shall be installed using methods and practices that minimize flood damage. For the purposes of this requirement, manufactured homes must be elevated and anchored to resist flotation, collapse, or lateral movement.

8. Nonresidential Construction. New construction and substantial improvement of any commercial, industrial or other nonresidential structure, including associated utility and sanitary facilities, shall have the lowest floor elevated to or above either the level of the flood elevation or the high water marks of record shall be:

a. Floodproofed so that below the base level the structure is watertight with walls substantially impermeable to the passage of water.

b. Certified by a registered professional engineer or architect that the design and methods of construction are in accordance with accepted standards of practice for meeting provisions of this section and such certifications shall be provided to the planning department in conjunction with require permit documentation.

c. Fully enclosed areas below the lowest floor in nonresidential elevated structures that are subject to flooding shall to be designed to allow for the entry and exit of floodwaters or are otherwise prohibited.

B. Pursuant to subsection (A) of this section, the planning director or planning commission may, consistent with NABC Title 9, require additional flood damage control measures such as, but not limited to, the following:

1. Installation of watertight doors, bulkheads, shutters, or similar methods of watertight closure;

2. Reinforcement of walls to resist water pressures;

3. Use of paints, membranes, or mortars to reduce seepage of water through walls, foundation, structural supports;

4. Installation of pumps or comparable facilities for subsurface drainage systems to relieve external foundation wall and basement flood pressures and water levels inside the structure;

5. Location and installation of all electrical equipment, circuits, appliances and heating systems so that they are protected from inundation by floodwaters;

6. Location of storage facilities for chemicals, explosives, buoyant materials, flammable liquids or other toxic materials that could be hazardous to public health, safety and welfare, or design of such facilities to prevent flotation of storage containers that could result in the escape of toxic materials into flood waters;

7. Use of materials such as sheathing, siding, sub-flooring and underlining that are not subject to water damage due to prolonged submersion;

8. Use of closed cell insulation to prevent waterlogging and consequent loss of insulation capacity;

9. Installation of backwater valves in sewer lines in accessible locations immediately adjacent to the exterior foundation wall; and

EXHIBIT C

73 of 76

10. Other standards and methods that may be required to site, design, construct and maintain uses to minimize the loss of life or property due to flooding. (Ord. 05-03 § 1, 2005)

## 9.32.040 Platting standards within flood areas.

A. The planning director may deny approval of a plat that proposes to subdivide land within a flood area unless the following requirements have been met:

1. Require that all new subdivision proposals and other proposed development of more than five acres or involving more than 10 lots include within such proposals base flood elevation data.

2. Utilize any base flood elevation data from federal, state, local or other sources, as criteria for reviewing the new construction, substantial improvements or other development in flood areas.

3. Ensure that the subdivision and associated development are consistent with the need to minimize flood damages.

4. Ensure that all public utilities and facilities such as sewer, gas, electrical and water systems shall be located, elevated or constructed to minimize or eliminate flood damage.

5. Ensure adequate drainage shall be provided to reduce the exposure of structures, utilities and facilities to flood hazards.

6. Ensure evidence has been submitted that all necessary permits required by federal, state and borough law have been applied for and granted.

7. The preliminary and final plat shall include the ground elevation and the flood elevation, if available, at convenient reference points and flood hazard areas shall be labeled on preliminary and final plats.

8. Require disclosure that a lot is in a flood hazard area in any contract to purchase, rent or lease the lot.

B. In determining if the requirements of this section are fulfilled, the planning director shall, consistent with the purpose and the intent of this chapter, consider the following factors:

I. The danger of life and property due to the increased flood elevation or velocities caused by subdivision fill, roads, structures and intended uses.

2. The danger that structures may be swept onto other lands or downstream to the injury of others.

3. The adequacy of proposed water supply and sanitation systems and the ability of these systems to prevent disease, contamination and unsanitary conditions under flood conditions.

4. The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner.

5. The requirements of the subdivision for a waterfront location and the availability of alternative locations not subject to flooding for the proposed subdivision and land uses.

6. The compatibility of the proposed uses with existing development and development anticipated in the foreseeable future and the relationship of the proposed subdivision to the floodplain management program for the area.

7. The safety of access to the property for emergency vehicles in times of flood.

8. The expected heights, velocity, duration, rate of rise and sediment transport of the floodwaters expected at the site.

74

EXHIBIT C
PAGE 74 of 76

9. The costs of providing governmental services during and after flood conditions, including maintenance and repair of public utilities and facilities such as sewer, gas, electrical and water systems and streets and bridges. (Ord. 05-03 § 1, 2005)

**9.32.050 Variances from flood damage prevention standards.**
Variances from the requirements of this chapter may be granted by the planning director or planning commission as permitted by law and in accordance with the following conditions:

A. A determination that the granting of a variance will not result in increased flood elevations, additional threats to public safety, extraordinary public expense, create nuisances, or conflict with existing federal, state and local flood prevention laws or ordinances.

B. A determination that the variance, while affording relief, will authorize the minimum possible departure from the provisions of this chapter. (Ord. 05-03 § 1, 2005)

**9.32.060 Erosion setback.**
The planning director or planning commission may, consistent with NABC Title 9, impose a setback requirement on new development to create a safety buffer for erosion, or may require new development to be designed to be easily relocatable. The planning director may develop setback guidelines for communities when erosion data becomes available. (Ord. 05-03 § 1, 2005)

**9.32.070 Implementation.**
A. Use permits issued pursuant to this chapter shall conform to all applicable federal, state and local laws, ordinances or regulations as are from time to time established or amended; however, unless preempted, the provisions of this chapter shall control in the event of any conflict with such ordinances or regulations.

B. The planning department shall be responsible for maintaining for public use and inspection appropriate records and information relevant to implementation of this chapter. Such records and information may include but not be limited to the following:

1. The elevation to which structures are floodproofed or made flood resistant.

2. Flood data maps, as available, and any reports or studies on flood hazards in borough communities, such as written by the U.S. Army Corps of Engineers, United States Geological Survey or private firms.

C. The planning department shall file with the Federal Insurance Administration an annual report on forms provided by the Federal Insurance Administration. This annual report shall be verified and signed by the mayor. A copy of the annual report shall be retained by the borough and one copy shall be sent to the relevant state coordinating agency.

D. In case any structure is constructed or substantially improved in violation of this chapter, the borough, in addition to other remedies, shall institute any proper actions or proceedings necessary to correct or abate such violations as also permitted under Title 9.

E. Nothing in this chapter shall be construed as applying to any structures existing prior to the effective date of this chapter, unless they are substantially improved after the effective date. (Ord. 05-03 § 1, 2005)

**9.32.090 Disclaimer of liability.**

75

The grant of a use permit or approval of a plat in the flood hazard area shall not constitute a representation, guarantee or warranty of any kind by the borough or any official or employee thereof of the practicability or safety of the proposed use, and shall create no liability upon the borough, its officials or employees. (Ord. 05-03 § 1, 2005)

**Footnotes**

[1]Editor's note. NABC Title 9, zoning, is part of the Northwest Arctic Borough comprehensive plan, which is on file in the office of the borough clerk. For statutory provisions describing the borough's zoning responsibilities, see AS 29.10.200(34) and 29.35.180(b). For charter provisions regarding the authorization and authority of the planning commission, see Charter Sections 7.01 – 7.03 and NABC Title 8.

Exhibit C
Page 76 of 76