LUKE W. COLE, California Bar No. 145,505
CAROLINE FARRELL, California Bar No. 202,871
BRENT J. NEWELL, California Bar No. 210,312
Center on Race, Poverty, & the Environment
47 Kearny Street, Suite 804
San Francisco, CA, 94108
415/346-4179 • fax 415/346-8723

NANCY S. WAINWRIGHT, Alaska Bar No. 8711071
Law Offices of Nancy S. Wainwright
13030 Back Road, Suite 555
Anchorage, AK 99515-3538
907/345-5595 • fax 907/345-3629

Attorneys for Plaintiffs Enoch Adams, Jr., Leroy Adams, Andrew Koenig, Jerry Norton and Joseph Swan

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA AT ANCHORAGE**

| | |
|---|---|
| ENOCH ADAMS, JR., LEROY ADAMS, ANDREW KOENIG, JERRY NORTON DAVID SWAN and JOSEPH SWAN,<br><br>Plaintiffs,<br><br>v.<br><br>TECK COMINCO ALASKA INCORPORATED<br><br>Defendant.<br><br>NANA REGIONAL CORPORATION and NORTHWEST ARCTIC BOROUGH,<br><br>Intervenors-Defendants. | Case No. A04-49 (JWS)<br><br>**PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF FOUR LEGAL ISSUES** |

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   TECK COMINCO IS LIABLE FOR ALL VIOLATIONS OF THE
      MONTHLY TDS PERMIT LIMITATION IF THE VIOLATIONS OF
      THAT LIMITATION ARE PROVEN TO BE ONGOING OR CAPABLE OF
      REPETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  TECK COMINCO CANNOT AVOID LIABILITY FOR THE VIOLATIONS OF
      PERMIT CONDITION I.A.1 FOR CYANIDE BY RELYING ON PERMIT
      CONDITION I.A.5.d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Teck Cominco's cyanide permit conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Teck Cominco did not appeal permit condition I.A.1 for monthly
            average cyanide, so it must comply with it  . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      C.    Teck Cominco may not impeach its DMRs during this enforcement action . . . . . 6

      D.    Teck Cominco's reading of the permit would eliminate three conditions
            of the permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      E.    The Clean Water Act is a strict liability statute . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.   THE "SPLIT SAMPLE" DEFENSE IS CONTRARY TO THE STRICT
      LIABILITY REGIME OF THE CLEAN WATER ACT . . . . . . . . . . . . . . . . . . . . . . . . 9

V.    A VIOLATION OF A MONTHLY AVERAGE PERMIT LIMITATION IS
      CONSIDERED A VIOLATION ON EACH DAY OF THE MONTH THE
      FACILITY DISCHARGED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES          i

# TABLE OF AUTHORITIES

**Federal Cases**

*Adams v. Teck Cominco Alaska, Inc.*, 396 F.Supp.2d 1095 (D.Alaska 2005) . . . . . . . . . . . . . . . 11

*Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 261 F.3d 810 (9th Cir. 2001) . . . 12

*Chesapeake Bay Foundation v. Gwaltney*, 844 F.2d 170 (4th Cir. 1988),
    *on remand from* 484 U.S. 49 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12

*Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000) . . . . . . . . . . . 3

*Hawaii's Thousand Friends v. City and County of Honolulu*, 821 F. Supp. 1368
    (D. Haw. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing,
    Inc.*, 2 F.3d 493 (3rd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Public Interest Research Group v. Powell Duffryn Terminals Inc.*, 913 F.2d 64
    (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*San Francisco Baykeeper v. Tosco Corp.*, 309 F.3d 1153 (9th Cir. 2002) . . . . . . . . . . . . . . . 2-3

*Save Our Bays and Beaches v. City and County of Honolulu*, 904 F. Supp. 1098
    (D. Haw. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Sierra Club v. City and County of Honolulu*, 2007 U.S. Dist. LEXIS 80452 (D. Haw. 2007) . . 12

*Sierra Club v. Union Oil Co. of Cal.*, 716 F. Supp. 429 (N.D. Cal. 1988) . . . . . . . . . . . . . . . . . 4

*Sierra Club v. Union Oil Co. Of Calif.*, 853 F.2d 667 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . 3

*Sierra Club v. Union Oil of Calif.*, 813 F.2d 1480 (9th Cir. 1986), *vacated
    and remanded,* 485 U.S. 931 (1988), *reinstated and amended,*
    853 F.2d 667 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 11

*Texas Mun. Power Agency v. EPA,* 836 F.2d 1482 (5th Cir. 1988*)* . . . . . . . . . . . . . . . . . . . . . . 6

*Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60 (1975) . . . . . . . . . . . . . . . . . . . 6

*U.S. v. Gulf States Steel, Inc.* 54 F. Supp. 2d 1233 (N.D.Ala. 1999) . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Trident Seafoods Corp.*, 60 F.3d 556 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . 12

**Federal Statutes**

33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

33 U.S.C. §1369(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

33 U.S.C. §1369(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6, 8

## I.   INTRODUCTION

The Court has set the Adams plaintiffs' Clean Water Act suit for trial beginning on May 19, 2008. The Court has granted Adams leave to file this summary judgment motion addressing four discrete legal questions, the resolution of which will clarify issues for trial:

1. Does the fact that there are post-complaint (and still ongoing) violations of the still-applicable 1998 permit monthly total dissolved solids (TDS) limitations during Arctic Grayling spawning season mean that all historical monthly TDS violations (even those outside Grayling spawning season, although there is no longer a monthly TDS permit limitation outside Grayling spawning season) are "ongoing or capable of repetition"?

2. Can Teck Cominco challenge a permit condition during an enforcement action and thus avoid liability for violating the monthly cyanide permit limitation of 4 µg/ml found in Section I.A.1 of the permit because Section I.A.5.d lists 9 µg/ml as the "Compliance Evaluation Level"?

3. Given that the Clean Water Act is a strict liability statute, is Teck Cominco able to avoid liability for a laboratory test result of its effluent taken under accepted and reliable procedures showing a value for cyanide or whole effluent toxicity over its permit limit, by offering a laboratory result from a second lab showing a value for that permit parameter under the permit limit?

4. Is violation of a monthly average permit limitation a violation on each day of that month the facility discharges?

The Court should grant the motion for Adams on each of these four questions. First, Teck Cominco remains liable for all previous violations of the monthly TDS permit limit, even those outside grayling spawning season, if Adams proves the monthly TDS permit limit has been violated since the filing of this suit (section II). Second, Adams may enforce the 4.0 µg/L monthly cyanide permit limitation; the "Compliance Evaluation Level" elsewhere in the permit is not relevant in this suit (Section III).

Third, under the strict liability imposed by the Clean Water Act, if Teck Cominco reports a laboratory result exceeding its permit – even if it also reports a lab result from a second lab

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES          1

showing compliance – Teck Cominco has violated its permit (Section IV). And fourth, a violation of a monthly average permit limitation is a violation on each day of that month that Teck Cominco discharged (Section V). Adams respectfully requests that summary judgment be entered for Adams on each of these discrete legal questions.

## II. TECK COMINCO IS LIABLE FOR ALL VIOLATIONS OF THE MONTHLY TDS PERMIT LIMITATION IF THE VIOLATIONS OF THAT LIMITATION ARE PROVEN TO BE ONGOING OR CAPABLE OF REPETITION.

The answer to the first question is straightforward: Teck Cominco is liable for all violations of its monthly TDS permit limitation if Adams can prove the violations are ongoing or capable of repetition.

The factual question of whether or not Teck Cominco has violated the monthly average TDS permit limitation of 170 mg/L found in Permit Condition I.A.1 since the filing of this suit will be answered by Adams' proof at trial. The Environmental Protection Agency (EPA) imposed that Permit Condition, I.A.1 for TDS as a monthly average, on Teck Cominco in 1998. EPA later modified Teck Cominco's permit limitations for TDS in the summer of 2003. As a result of an administrative appeal of that decision, the 1998 permit condition remained in place until June 15, 2004, when the EPA Appeals Board issued its decision.[1] The Appeals Board remanded one section of the new permit limitations, leaving in place the 1998 permit limit for monthly TDS during the spring Arctic Grayling spawning season.[2]

Liability under the Clean Water Act is tied to the date of the violation. *See San Francisco*

---

[1] EPA informed Teck Cominco in October 2003,

> Until the appeal has been resolved, all conditions of the unmodified 1998 NPDES permit referenced above remain in effect, including the TDS limits and monitoring requirements for Outfall 001 contained in Part I.A[.]

Trial Exhibit 4, lodged with the Court on January 22, 2008; also attached as Exhibit 1 to Declaration of Luke Cole in Support of Plaintiffs' Motion for Summary Adjudication of Four Legal Issues ("Cole dec.").

[2] The EAB decision also left in place the *daily* TDS permit limitation from the 1998 permit during grayling spawning season, but that is not at issue here as the Court has already found the daily TDS violations to be ongoing. Docket 136 at 13.

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES        2

1  *Baykeeper v. Tosco Corp.*, 309 F.3d 1153, 1160 (9th Cir. 2002) ("Liability for civil penalties
2  attaches at the time of the violation"); *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d
3  1141, 1144 (9th Cir. 2000) ("As is ordinarily the case with monetary relief, liability for civil
4  penalties under the Clean Water Act attaches at the time the violations occur, not at the time of
5  judgment"). Teck Cominco's liability for its monthly TDS violations (to be proven at trial) has
6  thus already accrued. The threshold question is whether or not those violations are ongoing or
7  capable of repetition. The Ninth Circuit has explained that at trial a citizen suit plaintiff may
8  establish that the violations are ongoing in either of two ways:

> (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.

11  *Sierra Club v. Union Oil Co. Of Calif.*, 853 F.2d 667, 671 (9th Cir. 1988) (*Sierra Club III*),
12  quoting *Chesapeake Bay Foundation v. Gwaltney*, 844 F.2d 170, 71-72 (4th Cir. 1988), *on*
13  *remand from* 484 U.S. 49 (1987) ("*Gwaltney II*"). The Ninth Circuit also has explained that
14  intermittent or sporadic violations are to be considered ongoing unless there is "*no real*
15  *likelihood of repetition.*" *Sierra Club III*, *quoting Gwaltney II* (emphasis by 9th Circuit).
16  Even post-complaint compliance through a loosened permit, such as here, does not
17  insulate Teck Cominco from liability for its historical violations when that same permit
18  parameter is capable of being violated and is actually violated after the complaint is filed. "A
19  citizen suit would lose much of its effectiveness if a defendant could avoid paying penalties by
20  post-complaint compliance," observed the Third Circuit in *Natural Resources Defense Council,*
21  *Inc. v. Texaco Refining and Marketing, Inc.*, 2 F.3d 493, 504 (3rd Cir. 1993). "It makes no
22  difference that [Teck Cominco's] post-complaint compliance was a result of a new, more lenient
23  NPDES permit instead of [Teck Cominco] affirmatively taking steps to reduce its toxic
24  discharge. While a polluter awaits changes in permit conditions, it is strictly bound by the terms
25  of the effective permit." *Id.* (citing and quoting *Train v. Natural Resources Defense Council,*
26  *Inc.*, 421 U.S. 60, 92 (1975) (litigation seeking variance to national air standards "is carried out
27  on the polluter's time, not the public's, for during its pendency the original regulations remain in
28  effect, and the polluter's failure to comply may subject him to a variety of enforcement

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES          3

1  procedures.").

2      The relevant legal inquiry for the Court is thus, can the violation of Permit Condition
3  I.A.1 for monthly average TDS that occurred in the past recur?  Because that permit condition is
4  still in place, with the same numeric requirement previously violated (170 mg/L), the answer is
5  yes.  The factual question of whether or not Teck Cominco has violated this permit condition
6  since this suit was filed in March 2004 is reserved for trial, but if Adams proves Teck Cominco
7  has so violated its permits after the filing of the suit, Teck Cominco is liable for all previous
8  violations of that same permit parameter.  "If the same parameter is exceeded [after the
9  Complaint is filed] . . . then the violation will be deemed 'ongoing' and liability will attach."
10 *Sierra Club v. Union Oil Co. of Cal.*, 716 F. Supp. 429, 433 (N.D. Cal. 1988) (*Sierra Club II*).

11 **III.  TECK COMINCO CANNOT AVOID LIABILITY FOR THE VIOLATIONS OF PERMIT CONDITION I.A.1 FOR CYANIDE BY RELYING ON PERMIT**
12 **CONDITION I.A.5.d.**

13     Teck Cominco's primary defense to the allegations that it has violated the monthly
14 average permit limitation for cyanide of 4.0 µg/L (Condition I.A.1) is to asert that Condition
15 I.A.5.d of the permit – which sets an "interim minimum level" for cyanide of 9 µg/L – overrides
16 I.A.1.[3]  This assertion fails for four legal reasons:  Teck Cominco's defense is a direct challenge
17 to permit condition I.A.1 in this enforcement action, a challenge which is expressly barred by the
18 Clean Water Act.  It is also an impeachment of Teck Cominco's own DMRs, which for years
19 have reported results as "in violation" of the 4.0 µg/ml permit condition.  Further, accepting Teck
20 Cominco's reading of its permit would impermissibly read out of the permit three other permit
21 provisions.  Finally, the Clean Water Act is a strict liability statute, and Teck Cominco has
22 reported cyanide levels in excess of its monthly average permit limitations.

23     **A.  Teck Cominco's cyanide permit conditions.**

24     Teck Cominco's mine permit addresses monthly cyanide discharges in three places.[4]

---

[3] *See, e.g.,* Docket 100 at 50-54 (Teck Cominco's Opposition to Summary Judgment making this argument).

[4] The Mine Permit is found in its entirety at Trial Exhibit 3000, lodged with the Court on January 22, 2008.  Relevant excerpts including the permit conditions at issue in this section are

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES            4

First, Condition I.A.1 (*see* table on page 4 of the permit) specifies the monthly average cyanide limit that Teck Cominco must meet: 4.0 µg/L. Next (on pages 5-6), Condition I.A.5.b requires that, "at a minimum, analytical methods should achieve the following method detection limits... Cyanide, total, 3 µg/L." Later in the permit (page 6), Condition I.A.5.d states, "Effluent limits for cyanide, mercury and selenium are not quantifiable using EPA approved analytical methods. EPA will use the following Interim Minimum Levels as the compliance evaluation level for these parameters." There, it lists the Interim Minimum Level for cyanide as 9 µg/L. The permit also has a provision, III.A, which requires that Teck Cominco "comply with all conditions of this permit." Exhibit 2 at 39.

**B.    Teck Cominco did not appeal permit condition I.A.1 for monthly average cyanide, so it must comply with it.**

Under the express language of the Clean Water Act, Teck Cominco is precluded from attacking one of its permit conditions in this enforcement action. The relevant section, 33 U.S.C. §1369(b)(2), states that an "Action of the Administrator with respect to which review could have been obtained under [§1369(b)(1)] shall not be subject to judicial review in any civil or criminal proceeding for enforcement." (Section 1369(b)(1) is the part of the U.S. Code allowing a permittee to appeal a permit granted by the EPA.) If Teck Cominco believed that "any laboratory analytical result below 9 µg/L would not be competent evidence of the concentration, if any, of Total cyanide in the sample and should not be used to determine compliance," as it has asserted in this case [Docket 100 at 53], the time and place to have raised that was in an appeal of the permit when it was issued in 1998. Teck Cominco did not appeal the cyanide permit limitations under §1369(b)(1).[5]

Because review under 1369(b)(1) was available to Teck Cominco, 1369(b)(2) bars it from now challenging the monthly average cyanide limitation in Condition I.A.1 in this enforcement action. As the Third Circuit has held, "By failing to challenge a permit in an agency proceeding,

---

attached as Exhibit 2 to Cole dec.

[5]Exhibit 3 to Cole dec. (Teck Cominco's response to Request for Admission No. 223 admitting that it did not challenge any of the conditions in its 1998 mine site permit).

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES           5

1  [Teck Cominco] has lost 'forever the right to do so, even though that action might eventually
2  result in the imposition of severe civil or criminal penalties.'" *Public Interest Research Group v.*
3  *Powell Duffryn Terminals Inc.*, 913 F.2d 64, 78-79 (3d Cir. 1990), *quoting Texas Mun. Power*
4  *Agency v. EPA,* 836 F.2d 1482, 1484-85 (5th Cir. 1988). "[I]f the alleged violator chose to forgo
5  review available under 1369(b)(1)," under the plain language of 1369(b)(2), that violator is
6  prohibited from litigating the terms of its NPDES permit in an enforcement action. *U.S. v. Gulf*
7  *States Steel, Inc.* 54 F. Supp. 2d 1233, 1242 (N.D.Ala. 1999).

8      **C.**     **Teck Cominco may not impeach its DMRs during this enforcement action.**

9      Teck Cominco's attack on its permit limit is also an attempt to impeach its own DMRs, in
10 two ways: first, Teck Cominco is asserting that the plain language it used in the DMRs (e.g., "the
11 average of all of the monthly samples exceeded the monthly average limit"[6]) does not actually
12 mean that the permit limit was exceeded. Second, Teck Cominco amended its DMRs years after
13 originally filing them with EPA, to sanitize them by changing the compliance limit in the DMR
14 table for monthly cyanide from 4.0 µg/L to 9.0 µg/L. Neither of these impeachment tactics are
15 legal under the Clean Water Act and Ninth Circuit caselaw.

16     Under *Sierra Club v. Union Oil of Calif.*, 813 F.2d 1480, 1492 (9th Cir. 1986), *vacated*
17 *and remanded,* 485 U.S. 931 (1988), *reinstated and amended,* 853 F.2d 667 (1988) (*"Sierra*
18 *Club I"*), Teck Cominco may not impeach its certified DMRs as a litigation defense. It strains
19 credulity for Teck Cominco to assert that its engineers and managers overlooked a "transcription
20 error"[7] when they were reporting violations of Teck Cominco's monthly cyanide limitations over
21 the four calendar years 1999, 2000, 2001 and 2002. Discharge Monitoring Reports constitute
22 admissions of noncompliance that bind the defendant in an enforcement proceeding because the
23 reports are submitted under penalty of perjury. *Save Our Bays and Beaches v. City and County*
24 *of Honolulu*, 904 F. Supp. 1098, 1138 (D. Haw. 1994) ("these self-monitoring reports, known as

---

[6] See Exhibit 6 to Cole dec.

[7] Teck Cominco called its reporting 4.0 µg/L as the compliance standard in its DMRs a "transcription error" in the KRPC suit. See Exhibit 4 Cole dec., Teck Cominco's Opposition in the KRPC case, at 57.

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES      6

'Discharge Monitoring Reports' or 'DMRs,' are public documents and are submitted under penalty of perjury.").

This Court should reject Teck Cominco's attempts to impeach its own sworn admissions in the DMRs, particularly when that impeachment comes in amendments to the DMRs dated May 19, 2005 – in some cases almost six years after Teck Cominco filed the DMRs in question with EPA, and more than a year into this lawsuit. Teck Cominco takes this tack despite reporting to EPA in its DMRs, repeatedly over the years, statements such as "the [cyanide] average for the month is above the monthly limit of 4.0 ppb." September 1999 DMR, Exhibit 5 to Cole dec.[8]

### D. Teck Cominco's reading of the permit would eliminate three conditions of the permit.

Teck Cominco's legal argument to escape liability is based on a reading of the permit which would effectively render three of the permit conditions – I.A.1, I.A.5.b and III.A – completely void. In a nutshell, Teck Cominco argues that because EPA set a separate level of 9.0 μg/L in Condition I.A.5.d for EPA to monitor compliance with the permit, Teck Cominco does not have to comply with the earlier permit limitation of 4.0 μg/L found in condition I.A.1.

Under the direct terms of the permit itself, the permit must be read to harmonize its conditions, rather than nullify them: Permit Condition III.A, entitled "Duty to Comply," reads,

> The Permittee *must* comply with *all* conditions of this permit. Any permit noncompliance constitutes a violation of the Act and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application.[9]

To harmonize the permit, one would have to give effect to all three substantive conditions – the permit limit of 4.0 μg/L of I.A.1, the method detection limit of 3.0 μg/L required by I.A.5.b and the Interim Minimum Level of 9 μg/L of I.A.5.d. Teck Cominco's reading makes three different permit conditions meaningless, an unacceptable interpretation if the permit can be harmonized. To give effect to the entire permit, the Court should interpret the permit so that Teck Cominco

---

[8] See also July 2001 DMR ("the average of all of the monthly samples exceeded the monthly average limit"), Exhibit 6 to Cole dec.; June 2002 DMR ("the actual monthly average exceeded the monthly average permit limit for total cyanide of 4 ppb"), Exhibit 7 to Cole dec.

[9] Exhibit 2 to Cole dec. at 39 (emphasis added).

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES        7

1   must comply with the 4.0 µg/L limit of I.A.1, and it must use an analytical method that achieves
2   a method detection limit of 3 µg/L under I.A.5.b, but that *EPA* would not enforce the permit
3   unless Teck Cominco violated the higher 9 µg/L limit of I.A.5.d.

4   EPA described 9 µg/L as the "compliance evaluation level" for these parameters. Exhibit
5   2 to Cole dec. at 6. Importantly, nothing in Section I.A.5.d allows Teck Cominco to ignore the
6   plain language of sections I.A.1, I.A.5.b and III.A: like a Compliance Order by Consent, permit
7   condition I.A.5.d is only a tacit agreement between Teck Cominco and EPA that EPA will not
8   enforce the lower permit limit. That agreement does not preclude another party, such as Adams
9   or the State of Alaska, from enforcing the lower permit level found in I.A.1; *see, e.g*, permit
10  condition III.A.

11  **E.   The Clean Water Act is a strict liability statute.**

12  Finally, Teck Cominco is bound by the cyanide permit limitation in Condtion I.A.1 and
13  its admissions in its DMRs because the Clean Water Act imposes strict liability. 33 U.S.C. §
14  1311(a)*; Hawaii's Thousand Friends v. City and County of Honolulu*, 821 F. Supp. 1368, 1392
15  (D. Haw. 1993). *EPA itself* set the permit limit at 4.0 µg/L in Condition I.A.1, set the method
16  detection limit requirement of 3.0 µg/L in Condition I.A.5.b, and included Condition III.A
17  creating the mandatory duty to comply with *all* permit conditions. Exhibit 2 to Cole dec. EPA
18  set these permit limits in 1998, a decade ago, and they remain in place today. Had EPA felt the
19  4.0 µg/ml standard was incorrect, it has had 10 years to change it. EPA modified the permit in
20  2003, but chose not to address the cyanide permit limitation at that time. Cole dec. ¶10. Teck
21  Cominco has routinely reported violating the cyanide monthly permit limitation,[10] as Adams will
22  demonstrate at trial, and under the strict liability of the Clean Water Act Teck Cominco must be
23  held liable for that non-compliance.

24  Teck Cominco's challenge to its mine site permit, and its impeachment of its own DMRs
25  over a six-year period, ignores the Clean Water Act, 33 U.S.C. §1369(b)(2), which precludes
26  challenging a permit condition in an enforcement action; ignores Ninth Circuit case law

---

[10]*See, e.g.*, Exhibits 5, 6 and 7 to Cole dec.

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES          8

prohibiting impeachment of certified DMRs; ignores the express language of the *entire* permit; and ignores the Clean Water Act's strict liability scheme. This Court should thus grant summary judgment for Adams and hold that the 4 µg/L found in permit Condition I.A.1 is enforceable.

### IV. THE "SPLIT SAMPLE" DEFENSE IS CONTRARY TO THE STRICT LIABILITY REGIME OF THE CLEAN WATER ACT.

Although the Clean Water Act is a strict liability statute, Teck Cominco has attempted to evade liability in this suit for some of its reported permit violations by asserting what is known as the "split sample" or "laboratory error" defense: Teck Cominco has conceded that there are laboratory test results of its effluent taken under accepted and reliable procedures which show values for cyanide and whole effluent toxicity over its permit limits, but it points to separate laboratory test results, by a second laboratory, showing values below the permit limit, to assert compliance.[11] This approach is contrary to the Clean Water Act and Ninth Circuit caselaw.

Teck Cominco began to routinely send its cyanide field samples to two different laboratories in the summer of 2002, when the Kivalina Relocation Planning Committee first sent a notice letter pointing out Teck Cominco's violations of its cyanide permit limits. When the samples from one laboratory would come back with a result over the permit limit and from another with a result under the permit limit, Teck Cominco would report both results in the narrative (or "cover letter") portion of the DMR, but not label these results as a "violation" in the DMR by choosing the lab results with the lower test result to assert that it was in compliance with the permit.

To assert this "split sample" defense, Teck Cominco must impeach the results of the laboratories that undertook the analyses that indicate violations, laboratory results which it reported in its monthly DMRs.[12] At the summary judgment stage, Teck Cominco attempted that

---

[11]Teck Cominco has raised the split sample defense in its filings in this case, including in its Opposition to Motion for Summary Judgment at 48-49 [Docket 100].

[12]Teck Cominco reports all of the laboratory results in its DMRs. See Deposition of Mark Thompson, March 3, 2005, at 35:3-22, attached as Exhibit 8 to Cole dec.:

Q. ...Now, if you do a split sample and another lab comes back with a value that is

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES           9

1    impeachment through declarations of its consultants and staff.  *See, e.g.*, Docket 100 at 48.
2    Adams requests summary judgment on the legal question of whether, given that the Clean Water
3    Act is a strict liability statute, Teck Cominco is able to avoid liability for a laboratory test result
4    of its effluent taken under accepted and reliable procedures showing a value for cyanide or whole
5    effluent toxicity over its permit limit, by offering a laboratory result from a second lab showing a
6    value for that permit parameter under the permit limit.  Through this summary judgment motion,
7    Adams seeks a decision that will preclude Teck Cominco from attempting to impeach its DMRs
8    at trial.
9         Teck Cominco's attempts to impeach its own DMRs are not allowed in the Ninth Circuit.
10   In the controlling case on point, *Sierra Club I*, 813 F.2d at 1492, the Ninth Circuit disapproved
11   the use of sampling errors as a defense to a claim based on a reported violation of an NPDES
12   permit.  The *Sierra Club I* Court explained why sampling errors cannot be used to defend against
13   claims that an NPDES permit has been violated:

---

       above your permit parameter, what do you do with that value?

A.     It's in the DMR.

Q.     So it's reported in the DMR?

A.     It's reported right here.  All values are reported here.  We don't withhold any
       values.

Q.     When you're saying "here," what are you referring to?

A.     The DMR.

Q.     The narrative portion?  The letter portion?

A.     Sometimes it's in what -- the portion of the DMR we call the cover letter.
       Sometimes it's in tables as attachments.  Generally is here, but it can vary.  All
       data is reported.  We don't hold back any data.  We report it all.

Q.     Okay.  So the cover letter, the forms and the attachments are all part of the DMR?

A.     Yes.

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES         10

> Were we to accept Union Oil's argument regarding the use of sampling errors to excuse reported permit exceedances, we would be sanctioning countless additional hours of NPDES litigation and creating new, complicated factual questions for district courts to resolve. As indicated by the legislative history, Congress hoped to limit such situations. In addition, if each self monitoring report is to be considered only prima facie rather than conclusive evidence of an exceedance of a permit limitation, citizen groups like the Sierra Club would be taking a considerable risk whenever they initiated a citizen enforcement action . . . . While a permitee's publicly filed reports might clearly indicate that illegal pollution was taking place, the permittee might have additional information unavailable to citizen groups indicating that sampling error rendered the reports meaningless. Finally and most importantly, allowing permittees to excuse their reported exceedances by showing sampling error would create the perverse result of rewarding permittees for sloppy laboratory practices. Such an approach would surely undermine the efficacy of the self-monitoring program.

*Id.* As the Ninth Circuit held, "We conclude that when a permittee's reports indicate that the permittee has exceeded permit limitations, the permittee may not impeach its own reports by showing sampling error." *Sierra Club I*, 813 F.2d at 1492. Teck Cominco has tried to skirt *Sierra Club I*, arguing that in picking and choosing among favorable samples, it is not sampling error but instead using the "correct" sample to show there was no violation. (Interestingly, the "correct" sample is always the lowest of the two numbers.) This court rejected Teck Cominco's similar argument in an earlier published opinion, *Adams v. Teck Cominco Alaska, Inc.*, 396 F.Supp.2d 1095, 1102 (D.Alaska 2005):

> Teck's arguments for distinguishing *Sierra Club* are not persuasive. In essence, they boil down to the proposition that Teck does not seek to use sampling error as a defense but rather to use the "correct" DMR to show there was no violation. Such an approach still falls within the reach of the *Sierra Club* rationale. First, litigating over which of two reports is the "correct" one encourages additional hours of litigation. In a related way, providing Adams' counsel with a second "correct" report on March 7, 2003, did not reduce plaintiff's litigation risk, unless one first posits that the second report must necessarily be the correct one. Third, while it may be that the "sloppy" lab work here was that of CT&E, not Teck or Columbia, CT&E was the contractor chosen by Teck to analyze samples for reporting purposes, and so it is not unfair to require Teck to bear the consequences of CT&E's presumed error. Finally, it may be noted that there is a sampling error issue inherent even in the "corrected" DMR, because it recited lab results from CT&E which would show a violation unless they are discredited as erroneous.

*Id.* at 1102. The Court also noted that plaintiffs would bear the risk of incurring "needless costs by initiating litigation which would not succeed if a defendant could then put on proof of sampling error remains." *Id.* The Court should apply this law of the case to Teck Cominco's new application of the split sample defense, and enter summary judgment for Adams precluding the "split sample" defense at trial.

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES           11

1  **V.  A VIOLATION OF A MONTHLY AVERAGE PERMIT LIMITATION IS CONSIDERED A VIOLATION ON EACH DAY OF THE MONTH THE FACILITY DISCHARGED.**

Violations of a monthly average limit mean that the permit was violated on each day the facility discharged in that month. *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 791 F.2d 304, 313-15 (4th Cir. 1986), *vacated and remanded on other grounds,* 484 U.S. 49 (1987). In that case, defendant Gwaltney argued that a monthly average limitation should be treated as a single day of violation, but the Fourth Circuit disagreed. *Id.* at 313. As the Ninth Circuit noted in *United States v. Trident Seafoods Corp.*, 60 F.3d 556 (9th Cir. 1995),

> The Court reasoned that the Clean Water Act 'speaks in terms of penalties per *day* of violation, rather than penalties per *violation*.' *Chesapeake Bay*, 791 F.2d at 314. 'This language strongly suggests that where a violation is defined in terms of a time period longer than a day, the maximum penalty assessable for that violation should be defined in terms of the number of days in that time period.'

*Id.* at 558. This legal point is directly relevant to Adams' claims that Teck Cominco violated its monthly average permit limitations for TDS, cyanide and whole effluent toxicity (WET).

A District Court in the Ninth Circuit recently expressly embraced the *Gwaltney* reasoning cited above, in *Sierra Club v. City and County of Honolulu*, 2007 U.S. Dist. LEXIS 80452 (D. Haw. 2007). There, in a Clean Water Act enforcement suit like this one, the Court extended the logic of *Gwaltney* to find that, in addition to a violation of a monthly average limit counting as a violation of every day of the month (*id.* at *17), "a violation of an annual limit counts as a violation of each day of the year." *Id*. at *20. In reaching this decision, the District Court was also persuaded by the Ninth Circuit's opinion in *Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 261 F.3d 810 (9th Cir. 2001). In *Borden Ranch*, the Court rejected an argument by the defendant that he should not be assessed a separate penalty for each separate violation on a single day, finding that such a rule would create serious incentive problems. *Id*. at 817-18. Persuaded by *Gwaltney* and *Borden*, the Court in *City and County of Honolulu* found that "the focus should continue to be imposing liability for each day for the time period that the defendant is in violation of a Permit standard." *Id*. at *19-*20. Thus, for purposes of assessing liability, violations of a monthly average limit count as a violation on each *day* the facility discharged in that *month*. The Court should enter summary judgment on this legal question for Adams.

## VI. CONCLUSION

Adams respectfully requests that the Court to grant summary judgment on each of the questions to Adams, as set forth in the attached Proposed Order [Docket 241-2].

Respectfully submitted this 8th day of February, 2008.

          /S/ Luke Cole
          Luke Cole
          Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of February 2008, a true and correct copy of the foregoing Motion for Summary Judgment on Four Legal Issues and Proposed Order was served, via electronic mail, on the below identified parties of record:

Sean Halloran
Hartig Rhodes
717 K Street
Anchorage, AK 99501

Nancy S. Wainwright
Law Offices of Nancy S. Wainwright
13030 Back Road, Suite 555
Anchorage, Alaska 99515-3538

James E. Torgerson
Heller Ehrman White & McAuliffe LLP
510 L Street, Suite 500
Anchorage, Alaska 99501-1959

David S. Case
Landye Bennett Blumstein LLP
701 W. 8th Ave., Suite 1200
Anchorage, AK 99501

    /S/ Luke Cole

Luke Cole

ADAMS PLAINTIFFS' MOTION FOR SUMMARY
ADJUDICATION OF FOUR LEGAL ISSUES     13