Sean Halloran
Hartig Rhodes Hoge & Lekisch, P.C.
717 K Street
Anchorage, Alaska 99501
Phone: (907) 276-1592
Fax: (907) 277-4352
Firm email: mail@hartig.law.pro
Attorneys for Teck Cominco Alaska Incorporated

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ENOCH ADAMS, JR., LEROY ADAMS, ANDREW KOENIG, JERRY NORTON, DAVID SWAN, JOSEPH SWAN, Plaintiffs, | ) ) ) ) ) |
| vs. | ) ) |
| TECK COMINCO ALASKA INCORPORATED, Defendant | ) ) ) ) |
| NANA REGIONAL CORPORATION, and NORTHWEST ARCTIC BOROUGH, Intervening Defendants. | ) ) ) ) |

Case No.: A04-00049 CV (JWS)

### TECK COMINCO'S AND NANA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF FOUR LEGAL ISSUES

Teck Cominco and NANA oppose the plaintiffs' Motion at Docket 241 for

Summary Adjudication of Four Legal Issues. For the reasons stated below, the

plaintiffs' motion must be denied.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

## Summary Judgment Standards

A principal purpose of a summary judgment motion is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate when there is no genuine issue as to any material fact and when the moving party is entitled to judgment on a given claim as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment must be denied if there are genuine issues as to any material fact or if the moving party is not otherwise entitled to judgment as a matter of law. The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Id.; Celotex* at 322.

A fact is material if it may affect the outcome of a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the party opposing the motion for summary judgment. Id. When the moving party fails to meet its burden of demonstrating the absence of triable issues, summary judgment must be denied regardless of whether the opposing party has offered affidavits or even filed an opposition. *Marks v. Chicoine*, 2007 U.S. Dist. LEXIS 65671 (D. Cal. 2007) citing *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). Only after the moving party makes a properly supported motion must the responding party present specific facts showing that contradiction of the moving party's presentation of evidence is possible. *Parra v. Cigna Group Ins.*, 258 F. Supp. 2d 1058, 1063 (D. Cal. 2003) citing *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978).

The court may not weigh the evidence or make credibility determinations in considering a motion for summary judgment; rather, the Court is required to draw all inferences in a light most favorable to the non-moving party. *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). "If reasonable minds could differ as to the import of the evidence," judgment should not be entered in favor of the moving party. *Anderson*, 477 U.S. at 250-51. Judgment for the moving party may only be

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id.

## Argument

**A.    Monthly TDS Claims.**

**1.    This Court May Not Rule On A Portion Of A Claim.**

In their motion, the plaintiffs inform the court that the factual questions attendant to whether Teck Cominco has violated a monthly average TDS permit limit "will be answered by Adams' proof at trial". Docket 241 at 2 (p. 5 of 16). They then ask the court to rule that IF they prove at trial that such claims are capable of repetition, then Teck Cominco will be liable. Id. at 2, 4 (pp. 5 and 7 of 16). Where the instant motion essentially seeks judgment as to only a portion of each of their claims, it is an impermissible motion and the court should decline to hear it, for the Civil Rules do not permit "the singling out of limited issues on which the Court's advice may be obtained." Mendenhall v. Barber-Greene Co., 531 F.Supp. 947, 948 (N.D. Ill. 1981). Accordingly, a motion "that partitions a single claim for relief into constituent parts and then seeks partial summary judgment on some but not all of the constituent parts is not permitted."[1]    In this regard,

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[1]    Rubin v. Islamic Republic of Iran, 408 F.Supp.2d 549, 552 (N.D. Ill. 2005). See also Wright, Miller & Cane, *Federal Practice & Procedure: Civil* § 2737 at 316-318 (3d ed. 1998) & 2007 Pocket Part at 28 (Rules do "not authorize the entry of a judgment on part of a claim"); Testa v. Janssen, 492 F. Supp. 198, 204 (W.D.Pa. 1980) ("The Federal Rules of Civil Procedure do not authorize partial summary judgment for a portion of a single claim."); Commonwealth Ins. Co. of New York v. O. Henry Tent & Awning Co., 266 F.2d 200, 201 (7th Cir. 1959); Biggins v. Oltmer Iron Works, 154 F.2d 214, 216 (7th Cir. 1946); Primavera Familienstiftung v. Askin, 130 F. Supp. 2d 450, 539 (S.D.N.Y. 2001); Antenor v. D&S Farms, 39 F. Supp. 2d 1372, 1375 n. 4 (S. Fla. 1999); New Jersey Automobile Insurance Plan v. Sciarra, 103 F. Supp. 2d 388, 396 (D.N.J. 1998); Capitol Records, Inc. v. Progress Record Distributing, Inc.,

although "Rule 56(d) authorizes the court to make an order establishing the uncontroverted facts; it does not permit the court to enter judgment on part of a single claim . . . the court lacks such authority even where a party stipulates to his or her liability on part of a claim." <u>Kirsch v. LOT Polish Airlines</u>, 979 F. Supp. 164, 166-167 (E.D.N.Y. 1997), <u>aff'd</u>. 133 F.3d 169 (2d. Cir. 1997). Where the plaintiffs are asking the court to rule on only one portion of a claim, the court should decline to do so, and summarily deny the instant motion accordingly.

## 2.    The Plaintiffs Concede That There Are Issues Of Material Fact.

To succeed in obtaining summary judgment, the plaintiffs must first show that there are no genuine issues of material fact attendant to their claims. Fed.R.Civ.P. 56(c). Rather than meeting their burden in this regard, the plaintiffs' repeatedly concede that numerous genuine issues of material fact remain for trial.[2] Not only would determining the rule of law applicable to Teck Cominco without first proving the facts of the case run counter to the standard of review applicable to summary judgment motions, but such a determination would ignore a legal system carved by due process rights and judicial restraint.

The Complaint in this case dates to March 8, 2004. Docket 1  Permit modifications became effective by no later than June 15, 2004. Docket 136 at 11; Docket 196 at Unconstested Fact #28  Conceivably, if the effective date of the 3900 standard was not earlier than June 15, 2004, the plaintiffs could attempt to prove the existence of a post-complaint violation of the monthly TDS limit during the intervening three months. However, they have not done so.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

106 F.R.D. 25, 28 (N.D.Ill. 1985); <u>Schnering v. Aetna Life Ins. Co. of Illinois</u>, 1985 WL 2534, at *1 (N.D.Ill. 1985).

[2]    "The factual question of whether or not Teck Cominco has violated the monthly average TDS permit limitation of 170 mg/L found in Permit Condition I.A.1 since the filing of this suit will be answered by Adams' proof at trial." [Docket 241 at 2 (p. 5 of 16) and at 4 (p. 7 of 16) ("factual question" is "reserved for trial").]

Opposition To Plaintiffs' Motion For Summary Adjudication Of 4 Issues
*Adams et. al. v. Teck Cominco Alaska*, A04-00049 CV (JWS)                                    Page 4 of 25

Although the plaintiffs disingenuously assert as "fact" that there are post-complaint violations of the average monthly TDS limit,[3] the plaintiffs subsequently admit they merely presume they can show such violations at trial.[4] Judicial restraint directs that facts must first be established so that only the issues of law necessary to be decided are considered. This Court should once again find that, "[b]ecause there is a genuine issue of material fact as to whether violations of [a] ... limit are ongoing, plaintiffs are not entitled to summary judgment" and deny the instant motion accordingly. Docket 136 at 19.

### 3.  Evidence That One Limit Has Been Violated Does Not Make It More Likely That A Distinctly Different Standard Will Be Violated.

Because the Clean Water Act does not authorize citizen suits to redress wholly past violations, the plaintiffs correctly note they must now prove violations continued after their filing of the complaint, or that future violations are likely. Docket 241 at 6, citing *Sierra Club III* In that context, the plaintiffs look to provision I.A.1. of the 1998 permit as it applied to monthly average concentrations of total dissolved solids (TDS). That particular provision restricted TDS to 170 milligrams per liter of effluent, as measured at the outfall.[5]

The plaintiffs seek a ruling to the effect that if they prove the limit was violated after their filing of the complaint during Grayling spawning season for any reason, then all historic violations of that limit -- including violations that

---

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

[3]    Docket 241 at 4: "Does the fact that there are post-complaint (and still ongoing) violations of the still applicable 1998 permit monthly total dissolved solids (TDS) limitations during Arctic Grayling spawning season ..."

[4]    Docket 241 at 7: "The factual question of whether or not Teck Cominco has violated the monthly average TDS permit limitation of 170 mg/L found in Permit Condition I.A.1 since the filing of this suit will be answered by Adams' proof at trial."

[5]    Plaintiffs assert they provided the court with a copy of "Trial Exhibit 3000," the 1998 Permit. In fact, what they actually provided to the court was a small portion of Trial Exhibit 3001, the 2003 Permit Modification. This is clear from the face of Docket 242-3, page 1, which unequivocally shows the 2003 effective date. (Docket 242-3 was Exhibit 2 to plaintiff's *Motion for Summary Adjudication of Four Legal Issues*). Teck Cominco asks the court to view Trial Exhibit 3000 (the 1998 Permit), and Trial Exhibit 3001 where appropriate, and not rely upon the plaintiffs' misrepresented motion exhibits.

occurred outside of spawning season or as a result of different reasons -- must be deemed ongoing or capable of repetition. Docket 241 at 4. There are at least three flaws in plaintiffs' reasoning.

First, the plaintiffs ask the court to presume that the average monthly limit from the 1998 permit still applies to discharges occurring during Grayling spawning season. However, this court previously recognized that the plaintiffs have conceded that the 1998 permit's monthly average and daily maximum TDS limits of 170 and 196 mg/l were replaced in the 2003 permit modification by a single end of pipe limit providing that "TDS concentration at Outfall 001 shall not exceed 3900 mg/l". Docket 136 at 15; see also Docket 196 at fact 28 (only in-stream limits for spawning season not effective.   Even if it is proven that Teck Cominco currently exceeds the limit that was previously incorporated within its permit, where the permit no longer requires compliance with the standard at issue, violations of that prior permit standard are no longer possible.

Second, the plaintiffs seek summary judgment without addressing the reasons for why an alleged violation may have occurred. If a particular set of circumstances resulted in a violation, and that set of circumstances is corrected and will not recur, there is no possibility of an ongoing violation, even if for some completely different reason the same parameter is later violated as the result of completely different circumstances. In short, this case is about facts. Where the plaintiffs ask the court to ignore the facts until trial, they have not met their burden of demonstrating that all material issues of fact have been resolved. No post-complaint violation of the monthly average TDS limit has yet been proven, and summary judgment must be denied.

Third, even if the monthly average limit of the unmodified 1998 permit continued to apply during spawning season, and even if that limit was violated during a post-complaint spawning season, there still would be no likelihood of ongoing or future violations outside of spawning season. The limit no longer regulates TDS concentrations outside of spawning season.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

a.    **The Average Monthly TDS Limit Has No Continuing Viability.**

The 1998 permit included a table showing maximum allowable daily and monthly numeric concentrations for each pollutant. Trial Exhibit 3000 at Condition I.A.1, Table. These were "effluent limits" with a point of compliance at Outfall 001. Id. at I.A., narrative. Samples analyzed for compliance were to represent the effluent without dilution from or contact with any outside sources. Id. at Table Endnote #1  In short, these were "end of pipe" limitations. The monthly average TDS limit of 170 milligrams per liter was found only in that table.

As modified in 2003, the table in the permit no longer included numeric concentrations for TDS. Where daily and monthly TDS limits had previously appeared, the permit said: "See Part I.A.8." Trial Exhibit 3001 at I.A.1, Table. In the referenced section, daily and monthly end of pipe concentrations are not recreated. Rather, there are various in-stream limits for TDS, all measured in ambient waters at the edge of mixing zones, and "in addition to the above limitations the TDS concentration at Outfall 001 shall not exceed 3900 mg/L". Id. at I.A.8.a-d; I.A.8.f.

No later than June 15, 2004, all of the 2003 Modification became effective as the controlling permit except the ambient, in-stream limit applicable during Arctic Grayling spawning season. Docket 136 at 11; Docket 196 at Fact #28. That specific limit was found in Condition I.A.8.c. of the 2003 permit. In *In re Teck Cominco Alaska Incorporated, Red Dog Mine*, 11 E.A.D. 457, 482 (June 15, 2004) EPA's Environmental Appeals Board refused to recognize Condition I.A.8.c on the basis that that provision had not been shown to be supported by substantial evidence. *Id.* at 494  Nothing in the Board's analysis impugned Condition I.A.8.f., the 3,900 end of pipe limit. Nothing in the Board's decision expressly reinvigorated the end-of-pipe limits that 3,900 replaced.

Nor does the modified permit suggest that denial of the in-stream limit necessarily reinvigorated 1998 end-of-pipe limits for spawning season. On the contrary, given that the 3,900 mg/L end-of-pipe limit was upheld and became

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

effective, it logically would replace the decidedly obsolescent 1998 end-of-pipe limits.

For all these reasons, Teck Cominco respectfully submits that the monthly average TDS limit from 1998 no longer has any viability. It is impossible for the plaintiffs to prove any violations of that standard after June 15, 2004 even if Teck Cominco admitted that its discharge was in excess of that standard. Thus, the plaintiffs' logic -- which commences with the proposition that they must prove a post-complaint violation of the monthly TDS standard at trial -- is substantially flawed. Where the monthly average TDS limit no longer applies in any season, the plaintiffs are missing a fundamental predicate to their proposition

This court previously ruled that "Because plaintiffs failed to demonstrate that violations of the monthly average TDS limit are capable of repetition, plaintiffs' motion for summary judgment is denied". Docket 136 at 15  There is no reason to reconsider that ruling, and the court should once again deny summary judgment.

**b.    Eliminating A Permit Condition Eliminates The Possibility Of Violating It.**

The plaintiffs acknowledge that the monthly limit no longer regulates effluent from Red Dog Mine outside grayling spawning season. Docket 241 at 5. Indeed they must, for it has already been established that the 2003 mine permit does not contain a monthly average TDS limit. Docket 136 at 14-15  Nonetheless, the plaintiffs seek a ruling that if there were effluent levels during post-complaint Grayling spawning seasons that would have violated the former limit if it was still in effect, then it necessarily follows that all historic TDS violations outside of the spawning season are ongoing or capable of repetition. Docket 241 at 4. This simply cannot be.

Here, the 1998 and 2003 TDS permit conditions applicable to discharges occurring outside of Grayling spawning season are fundamentally distinct. The 1998 limit measured concentrations of TDS contained in effluent within the Outfall 001 pipe. Samples were required to be free from dilution and/or contact

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

with any outside sources.  Trial Exhibit 3000 at I.A.1, Table, Endnote #1  In contrast, the applicable limit in the 2003 modification measures conductivity in ambient water at the downstream edge of an in-creek mixing zone, miles away from the outfall.  Trial Exhibit 3001 at I.A.8.a, e., g., j.  These samples are necessarily diluted and mixed with natural concentrations of dissolved solids.  The differing permit conditions employ fundamentally different media and utilize different units of measure.  They are not directly comparable.  Indeed, they are so different that one truly has no relevance to the other.

The current limit relies upon a calculated correlation accounting for the creek-flow and effluent flow.  End-of-pipe TDS concentrations are merely one variable in the formula.  To be conservative, that formula assumes end-of-pipe concentrations of TDS are always 3,900 mg/L.  Id. at I.A.8.j, Effluent (1)  Thus, if either of the 1998 limits had any continued viability, compliance with the 2003 modified permit would suggest simultaneous and continuous violations, since 196 mg/L daily maximum is considerably less than 3,900 mg/L continuous concentration and a full month at 3,900 will assuredly average out to more than 170 mg/L.

Because there is no longer any average monthly limit to be violated, it logically follows that prior violations of that limit will not, and cannot, recur.  One simply cannot violate requirements that no longer exist.  Any evidence that the plaintiffs may eventually present to show that the 1998 monthly average limit has been exceeded post-complaint during the few days in which grayling spawn in any given year does not, on any level, make it more likely that a now discarded provision of the permit could still be violated.  As a matter of law, the plaintiffs' first issue must be resolved against them.

## B.    Daily Cyanide Limit

This court previously ruled that "[b]ecause defendant has raised genuine issues of material fact as to whether the violations of the monthly average cyanide limit are ongoing or capable of repetition, plaintiffs are not entitled to summary

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

judgment." Docket 136 at 19  The plaintiffs essentially seek reconsideration of that ruling.  In doing so, the plaintiffs again ignore their burden of proof.  Instead of showing that no genuine issues of material fact exist, they attempt to argue that their interpretation of the material facts outweighs Teck Cominco's interpretation. The court, however, may not weigh the evidence or determine credibility when considering a motion for summary judgment; rather, the court is required to draw all inferences in a light most favorable to the non-moving party.  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

## 1.    The Enforceable Standard Incorporated In The Permit Is 9.0 µg/l, Not 4.

In Teck Cominco's permits, the EPA expressly provided that an "Interim Minimum Level" of 9.0 µg/l is to be the "compliance evaluation level", and thus the ONLY enforceable monthly average cyanide limit under Teck Cominco's 1998 and 2003 modified NPDES permits, despite the fact that the maximum discharge limit is 4.0 µg/l.  Trial Exhibit 3000, § I.A.5.d ("not quantifiable"); <u>see</u> § I.A.1 (discharge limit).  This standard of enforcement was specified because cyanide simply is not quantifiable using EPA approved analytical methods at any amount less than 9 µg/l.  As explained in the Affidavit of Mr. Botz, on file with this court[6]:

> The Method Detection Limit (MDL) is used by EPA to indicate the lowest level at which a constituent can be reliably detected in a sample.  However, the error of analytical measurements made near the Method Detection Limit is too high to allow assignment of an accurate numerical value to the measured concentration. Therefore, analytical measurements made near the Method Detection Limit are often designated as "detected but not quantifiable".  At a concentration above the Method Detection Limit, the Minimum Level (or Interim Minimum Level) is used to indicate the lowest concentration at which a constituent can be quantified in a sample such that a value can be assigned to the analytical measurement.  The relationship

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[6]    The Original Botz Declaration is on file in <u>KRPC v. Teck Cominco</u>, A02-231 CV (JWS).  A true and correct copy is attached for the convenience of the court.

between the Method Detection Limit and Minimum
Level is illustrated in Figure 2:



**Figure 2**
**Relationship Between the Method Detection Limit and Minimum Level**

The recognition by EPA that cyanide cannot be accurately quantified at any concentration lower than 9.0 µg/l precludes the enforcement of any cyanide limit less than 9 µg/l until such time as EPA is able to develop and approve a methodology by which cyanide can be quantified when it is present at a concentration less than 9 µg/l. As the permit properly recognizes, despite the fact that Teck Cominco is not permitted to discharge in excess of 4 µg/l, science and technology simply do not currently offer any means by which compliance with such a standard can be measured. Stated simply, if Teck Cominco obtains a test result of 7 µg/l or 5 µg/l or any other number less than 9.0, there is no possibility of knowing how much (if any) cyanide is present in its effluent, for all numbers less than 9.0 establish only that cyanide, if present in any amount, is not quantifiable.

This court previously recognized that "there are genuine issues of material fact as to whether the violations of the monthly average cyanide limit are ongoing or capable of repetition" and that the "plaintiffs are not entitled to summary judgment as to the 418 alleged violations of the monthly average cyanide limit" as a result. Docket 136 at 19  Nothing new has been presented by the plaintiffs that would justify the alteration of that ruling. Summary judgment must once again be denied to the plaintiffs.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

2.    **The Plaintiffs Concede That 9.0 µg/l Is The Enforceable Standard.**

The plaintiffs concede that the 9.0 µg/l permit limit binds the EPA in such a way that EPA can "not enforce" any lower limit. Docket 241 at 8. As a matter of law, this concession establishes that the plaintiffs may not enforce any lower limit either. "Citizen plaintiffs effectively stand in the shoes of the EPA." *Sierra Club v. Chevron*, 834 F.2d 1517, 1522 (9th Cir. 1987). Allowing citizens to participate in this capacity "promotes the important federal policy of uniformly and adequately enforcing the Clean Water Act." *Id.* at 1521. The Clean Water Act would be frustrated if citizens could "bring suits where the government would be barred or vice versa." *P. I.R.G. of New Jersey v. Powell Duffryn Terminals.*, 913 F.2d 64, 74 (3rd Cir. 1990). As a fundamental matter of law, the plaintiffs may not enforce any permit parameter stricter than that which EPA may enforce. This court must therefore recognize that the monthly average cyanide limit of 9.0 µg/l is the enforceable limit, and not 4 µg/l as asserted by the plaintiffs. Any analysis reporting a number less than 9 is entirely without any meaning, and must be treated as such.

3.    **Teck Cominco Was Not Required To Appeal From the 4 µg/l Parameter.**

According to the plaintiffs, "if Teck Cominco believed that any laboratory analytical result below 9 µg/l would not be competent evidence of the concentration, if any, of Total cyanide in the sample and should not be used to determine compliance, . . . the time and place to have asserted that was in an appeal of the permit when it was issued in 1998." Docket 241 at 5. This argument is frivolous.

The 1998 NPDES permit for the mine expressly recognized at § I.A.5.d that levels less than 9.0 are "not quantifiable". Trial Exhibit 3000 at § I.A.5.d. Accordingly, the permit expressly provides that the "Interim Minimum Level" of 9.0 µg/l is the "compliance evaluation level". <u>Id</u>. Where the permit expressly recognized that any laboratory analytical result below 9 µg/l is not competent

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

evidence of the concentration, if any, of Total cyanide that may be present in any given sample, and where the permit expressly provided that compliance would be measured using only the 9 µg/l standard, there was nothing in this regard from which Teck Cominco could or should properly have appealed.

EPA Region 10's official 1995 Guidance document specifying how permits should address water quality based effluent limits when the calculated limits turn out to be below the available detection and/or quantification limits, demonstrates that EPA acted properly in incorporating the 4 µg/l limit into the permit and also acted properly when it simultaneously incorporated the 9 µg/l standard into the permit for use as a compliance evaluation level.  Trial Exhibit 1639 at 2, 3  At the national level, moreover, the EPA issued Guidance directly to EPA's Region 10 permit writers and compliance staff in 2005 in which it confirmed that permits "should state that any sample analyzed in accordance with a method having the appropriate MDL and ML and found to be below the ML will be considered in compliance with the permit limits unless other monitoring information indicates a violation."  Trial Exhibit 1642 at 1.  To the extent that Total cyanide measures were incorporated into Teck Cominco's permit for the mine, the undisputed fact is that the differing levels of 4 and 9 µg/l were each properly incorporated, and there is no factual or legal basis underlying the plaintiffs' varied arguments suggesting the contrary.

**C.    A Split Sample Defense Is Available: Different Results On Split Samples Create Questions Of Fact For Trial.**

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

Cyanide limits in the 1998 Permit are for "Total cyanide" and Teck Cominco is instructed to analyze for Total cyanide.  Trial Exhibit 3000 at I.A.1 and I.A.6  To help mitigate inherent variability of the Total cyanide test method, Teck Cominco has, since May 2003, taken each water sample it collected for cyanide analysis and "split" it into subsamples.  The split samples have been sent to two or three different laboratories.  Each lab was required to perform the Total analysis; a

Weak Acid Dissociable (WAD) analysis; and "sulfide fixed," total analysis on its part of the sample. Docket 100, Exh. 2, Thompson *Affidavit Re: Cyanide* at ¶ 15. Not unexpectedly, the analytical results received from different laboratories rarely matched precisely. *Id.* at ¶ 16

Mark. Thompson, then Senior Environmental Coordinator at Red Dog Mine, discussed with the water division compliance officer of EPA Region X, how Teck Cominco should report the analytical results from split samples. His understanding was that Teck Cominco could report compliance with the permit limit if Teck Cominco had a compliant analytical result that had been run using the Total cyanide analysis as specified in the permit. In each case, this is what Teck Cominco did. *Id.*

Each month's Discharge Monitoring Report (DMR) is comprised of at least three basic parts: a cover letter narrative, a table furnished by EPA which Teck Cominco uses to insert analytical results, and attachments where Teck Cominco supplies supplemental information. *Id..* at ¶ 9 All of the analytical results from all of the split samples were reported on some portion of the DMR. *Thompson depo.* at 35, Docket 241 at 9, n.12

The plaintiffs invoke only those select laboratory results that serve the plaintiffs' interest. Mistakenly thinking that *Sierra Club III*[7] prevents a trier from weighing the conflicting evidence, the plaintiffs assert that Teck Cominco cannot use a "split sample" defense to "impeach" those results which suggested violations (as compared to those results that did not). Docket 241 at 9-11 The plaintiffs are confused.

First, this Court has already ruled that conflicting results of split samples do not establish ongoing violations, but rather raise a genuine issue of material fact as to whether there were violations. Docket 136 at 17 That proposition is correct. Second, nothing in *Sierra Club I* dictates that only one split can be

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[7]   *Sierra Club v. Union Oil of California*, 813 F.2d 1480, 1491 (9th Cir. 1986) (*Sierra Club I*), *vacated and remanded*, 485 U.S. 931 (1988), *reinstated and amended,* 853 F.2d 667 (1988)(*Sierra Club III*).

believed and only one split can be relied upon. Where, as here, multiple analyses were reported and the permittee reasonably concluded that permit limits had not been exceeded, *Sierra Club I* does not bar the permittee from proving the correctness of his conclusion.

In *Sierra Club I*, the trial court had made no explicit finding as to why thirteen alleged exceedances were not exceedances so the appellate court had to "surmise" that the alleged violations had been excused on the basis of sampling error. That judicial supposition flowed from defendant Union Oil's argument that violations reported as such in DMRs, and which on their face were supported only by the incriminating results, were actually invalid due to some sampling error not disclosed in the DMR. *Sierra Club I*, at 1491 The Ninth Circuit Court refused to allow after-the-fact impeachment of publicly filed reports that clearly indicated illegal pollution was taking place. *Id.* at 1492

Here, the publicly filed reports were, at most, ambiguous. Both laboratory results were provided and, consistent with instructions from EPA, Teck Cominco would not label as a "violation" such inconclusive sampling results. Docket 241 at 9  Strict liability relieves the plaintiff of the obligation to show *mens rea*, not the *actus reus*. *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 174 (3d Cir. 2004). Strict liability does not divest defendants of their conflicting evidence. The Clean Water Act is violated *if* a permittee discharges pollutants in violation of its permit, but whether he has done so is still a question of fact to be tried and nothing in *Sierra Club I* divests a reporting entity of split sample "defenses" when his DMR is pregnant with the exculpatory data. *Id.* at 174-75

Concerns underlying *Sierra Club I* are not present when both split sample results are reported. The *Sierra Club* court was troubled by the possibility that unequivocal reports would be rendered meaningless with "additional information unavailable to citizen groups." *Sierra Club I*, at 1492. Here, the "additional information" was presented as part of Teck Cominco's DMRs.

The troubling facts of *Sierra Club I* are not present here and that tribunal's disallowance of the alleged "Sampling Errors" does not bar fully disclosed "Split

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

Sample Distinctions." In response to the plaintiffs' third question -- whether the split sample defense is contrary to the Clean Water Act's strict liability regime -- the answer must be that 'Teck Cominco is able to avoid liability for a laboratory result showing concentrations over a permit limit if another (or multiple other) analytical value(s) in the same DMR more persuasively show that effluent concentrations were under the permit limit.'

### D.   DMR Revisions, Intended To Comply With Federal Regulation, Are Entitled To As Much Weight As The Initial Document.

Under two sections of their brief, the plaintiffs ask this Court to "reject Teck Cominco's attempts to impeach its own sworn admissions in the DMRs." By "impeachment," the plaintiffs assert that Teck Cominco should not be permitted to address seemingly contradictory information sometimes incorporated within its DMRs or treat an amendment to a DMR as a valid alteration of or addition to what was said in an initial document -- except, of course, when it is advantageous for the plaintiffs to instead rely upon the amendment. See Plaintiffs' Trial Exhibits While nobody seriously contends that plain words lack plain meanings, Teck Cominco does insist that it -- and not the plaintiffs alone -- is entitled to explain the information within its DMRs and that its formal revisions to DMRs are entitled to the same weight as documents that are incorporated into them at earlier times.

The matter of revising previously filed DMRs to correct error or provide after-acquired information is clearly distinguishable from the foregoing discussion of split samples. Here the topic is not a single DMR replete with divergent information. Rather, in this section Teck Cominco addresses those DMRs that, for one reason or another, were later required to be revised in a supplemental filing in such a way that later supplied information questions or alters earlier reported conclusions. This discussion goes both to the second and third of the four issues addressed in the plaintiffs' motion.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

In analyzing whether DMRs may permissibly be amended, it is necessary to start with recognition of the requirement that DMRs must include the results of all sampling, no matter whether the sampling event was mandated by the permit or voluntarily undertaken. This requirement is found in 40 C.F.R. §122.41(l)(4):

> If the permittee monitors any pollutant more frequently
> than required by the permit using test procedures
> approved under 40 CFR part 136 ... or as specified in the
> permit ...the results of this monitoring shall be included
> in the calculation and reporting of the data submitted in
> the DMR ...

Thus, it does not further the analysis to say, as this Court previously has done, that Teck Cominco could "avoid problems" by having samples analyzed by someone other than "the official outside lab." Docket 104, 396 F.Supp.2d 1095, 1102. All samples must find their way into the DMRs; otherwise there is a reporting violation.

Given this broad mandate to divulge everything, no matter how immediate and clear flaws may be when viewed by specialists engaged in day-to-day management of effluent control, it is not surprising that federal regulation also demands the updating and correcting of DMRs. In 40 C.F.R. §122.41(l)(8), a condition applicable to all permits and other requied reports, the law mandates that:

> Where the permittee becomes aware that it failed to
> submit any relevant facts ...or submitted incorrect
> information in ... any report to the Director, it shall
> promptly submit such facts or information.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

Obviously one can "become aware" long after the initial report through a wide array of mechanisms. However long the time, and wherever the correction originates, permittees are duty bound to supplement and correct their DMRs. Thus, the paradigm developed for NPDES permits is to report everything, then make corrections as additional information is ascertained.

Without in any manner minimizing the notion that this federal program is "designed to ensure utmost accuracy in the reports submitted by permittees," the

program is also designed to offer some redemption from material mistake.[8] With due respect to the 9th Circuit Court's ruling in *Sierra Club I*, it would not be consistent with the regulatory program to treat initial DMR documents, in every context, as "conclusive evidence" for whatever they purport to show, while ignoring the later filed supplements and corrections or relegating them to the dust bin of non-evidence.[9] Legitimate updates are every bit as much a part of a DMR as are the initial submissions.

The plaintiffs complain that giving credence to revisions undermines the Clean Water Act's strict liability regime. But, as the Third Circuit court noted in *Allegheny Ludlum*, while the Act "unambiguously imposes strict liability for unlawful discharges, it is by no means obvious that a similar strict liability regime has been imposed on faulty reporting." *U.S. v. Allegheny Ludlum Corp.* 366 F.3d 164, 175 (3rd Cir. 2004). Indeed, as noted by that Circuit's Court while looking at the regulations quoted above, the existence of a mechanism to correct erroneous DMRs suggests that strict liability has not been imposed on faulty reporting. *Id.* at 175.

If self-monitoring reports are to be conclusive evidence, as the plaintiffs' argue, permittees must be able to ensure the accuracy of such reports. While giving consideration to revisions and amendments may occasionally complicate factual questions for district courts to resolve (and there is no reason to believe that they do so here), courts do not shy from such tasks or ignore complete truths merely because plaintiffs prefer to pick and choose which evidence they wish to rely upon. As for plaintiffs argument that Teck Cominco's amendments should not be trusted because they occurred later in time, that goes to the weight, not the admissibility, of the amendment.

For all these reasons, legitimate revisions and supplements to DMRs are entitled to as much weight as the documents that initially were incorporated within them.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[8]    The quote is from the oft-cited *Sierra Club 1*. 813 F.2d at 1491.
[9]    The "conclusive evidence" language is found at 813 F.2d 1492.

**E.    To Be Just, Sanctions For Violating An 'Average' Limit Should Not Result in Double Counting Or Over Counting Violations.**

Relying on the Fourth Circuit's decision in *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, the plaintiffs assert that a violation of a monthly average permit limitation is considered a violation on each day of the month the facility discharged. Doc. 241 at 12   This Court previously reserved judgment on the question how violations of 'average' limitations encompassing periods greater than one day ought be treated for penalty purposes. Docket 136 at 14, n51. This Court anticipated the need for an evidentiary hearing to ascertain a just, but not duplicative, penalty amount. <u>Id.</u> Teck Cominco and NANA endorse that approach and respectfully suggest that this Court apply the balancing espoused in *United States v. Allegheny Ludlum Corporation*.[10]

The Ninth Circuit Court of Appeals has not addressed the question of how to value average permit limitations. Other circuit courts are split on the question. The Eleventh Circuit adopted the Fourth Circuit's calculation of the penalty for a violation of a monthly average. *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1139-40 (11th Cir. 1990). But the circuit court that addressed the question most recently, the Third Circuit in *Allegheny Ludlum Corporation*, declared the Fourth Circuit's reasoning "incomplete." *Allegheny Ludlum* at 188.

**1.    The Ninth Circuit Has Not Addressed This Question.**

Although the Plaintiffs imply otherwise, the Ninth Circuit Court never has addressed whether violation of a monthly average limit should be considered a violation for each day of the month.[11] Twice, in cases decided before the Third Circuit's 2004 decision in *Allegheny,* the Ninth Circuit referenced *Gwaltney.* In

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[10]    *United States v. Allegheny Ludlum Corporation*, 366 F.3d 164 (3d Cir. 2004)

[11]    The parties appear to agree that the statutory language does not address the question. 33 U.S.C. § 1319(d) provides that a violator "shall be subject to a civil penalty not to exceed $25,000 per day for each violation. ... For purposes of this subsection, a single operational upset which leads to simultaneous violations of more than one pollutant parameter shall be treated as a single violation."

*Gwaltney*, 791 F.2d at 314, the Fourth Circuit held that a violation of a monthly average is a violation of each day of the month. The Ninth Circuit did not adopt or apply *Gwaltney* in either of the two cases in which it was mentioned.

In *United States v. Trident Seafoods Corp.*, 60 F.3d 556, 558 (9th Cir. 1995), the Ninth Circuit addressed the question of whether a failure to comply with a notice requirement was a one-time violation or a continuing violation. The plaintiffs quote a portion of the Ninth Circuit Court's decision in *Trident Seafoods Corp.* where the court quotes *Gwaltney*. Doc. 241 at 12. The plaintiffs imply, although they do not state, that the court adopted the quoted language. What the plaintiffs do not disclose, however, is that the court then goes on to distinguish the facts in *Trident Seafoods Corp.*, including that there were no specific time periods defined by the statute or regulation relevant in that case. *Trident Seafoods*, 60 F.3d at 558. The court held that the failure to comply with a notice requirement was a one-time violation. *Id.* at 558-59. *Trident Seafoods Corp* explicitly did not apply *Gwaltney*.

In its 2001 decision *Borden Ranch Partnership v. U.S. Army Corps of Engineers*, the Ninth Circuit held that each pass of a ripper through a protected wetland was a separate violation. *Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 261 F.3d 810, 817-18 (9th Cir. 2001). The court mentioned *Gwaltney*, but noted that it did not resolve the problem at issue in the *Borden Ranch* case. *Id.* at 817-18.

The Ninth Circuit has never discussed or referenced the Third Circuit's decision in *Allegheny*.

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

2.     **The Third Circuit Rejected The Formulaic *Gwaltney* Approach.**

Because there is no Ninth Circuit precedent on this issue, it is appropriate to consider decisions from other circuits. As mentioned, the three circuits that have addressed the question are split. The most persuasive approach for setting a statutory maximum penalty on a monthly average violation is that taken by the Third Circuit in Allegheny Ludlum Corp., 366 F.3d at 187-189.

In *Allegheny*, the Third Circuit found the Fourth Circuit's reasoning of *Gwaltney* "incomplete" given the absence of guidance from Congress or the EPA on the relative severity of violating a monthly average as opposed to a daily limit. *Id.* at 188. The court pointed to the problematic results of using the *Gwaltney* calculation:

> A discharger who exceeds the monthly average maximum by a great amount will probably also have committed a number of daily violations, and the penalties for those violations will mete out at least part of the total punishment that the permittee's conduct for the month merits. The penalty for violating the average monthly maximum seems well suited to punish a pattern of discharges that, with a few exceptions, do not violate the daily maximums but are nevertheless, in the aggregate, excessive. However, we find problematic the proposition that the maximum penalty for such a course of conduct should be thirty times the maximum penalty for the worst daily violation imaginable.

*Id.*

Instead of following *Gwaltney*, the court developed a modified *Gwaltney* approach. In doing so, the Third Circuit focused on policy considerations including the purpose of permit limits and penalties, and notions of fairness:

> We adopt *Gwaltney* insofar as it establishes an absolute upper bound on the penalty that can be assessed for a monthly average violation. However, permit limits can be exceeded in many different ways, both by very large, isolated discharges and by moderate continuous discharges. Furthermore, daily and monthly average limits are designed to avoid distinct environmental

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

> harms.  As a result, in some cases a violator's wrongful
> conduct will merit punishment for both daily and
> monthly violations, while in others, the conduct will
> have been sufficiently punished by penalties for daily
> violations alone.

*Id.* at 169

The *Allegheny* court's solution was to provide more discretion to district courts when determining how many violation days should be assessed as penalty when a monthly average limit is exceeded.  *Id.*  The court held that this determination should be "based on whether violations are already sufficiently sanctioned as violations of a daily maximum limit."  *Id.*  The court explained that district judges should "take into account the degree to which the polluter's conduct had already been punished by penalties for daily violations."[12]

Plaintiffs rely on the recent decision *Sierra Club v. City and County of Honolulu,* as an example of another district court in the Ninth Circuit adopting *Gwaltney.*  Doc. 241 at 12  But the court in *City and County of Honolulu* actually approached this issue like the Third Circuit in *Allegheny.*  It accepted the general premise of *Gwaltney,* that a monthly violation could mean the permit had been violated every day of the month, but rejected a formulaic application of that premise.  2007 WL 3166771 at *7-8, *11.  In fact, the *City and County of Honolulu* court denied the plaintiffs' motion for summary judgment, rejecting the plaintiffs' argument that a violation of a yearly average meant the permit had been violated every day of the year.  *Id.* at *8, *11.  The court left open the question, for instance, of whether it should subtract days when the defendant was in compliance with the permit from the number of days of violation.  *Id.*  The court's rationale reflected policy considerations of fairness and proportionality:

> Indeed, during the penalty assessment phase of this
> case, it would be appropriate for this Court to consider
> days or continuous periods where [the violator] was in

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[12]    *Id.* at 189.  The court also held that no violation should be found for any days on which a defendant was not operating.  *Id.* at 169 (citing *Natural Resources Defense Council, Inc. v. Texaco Refining & Marketing Inc.*, 2 F.3d 493 (3d Cir. 1993)).

> compliance with its annual limits, the degree to which it
> is being punished for violations of different time periods
> of the Permit, and [the violator's] good faith in
> attempting to comply.

*Id.* at *7.

### 3.   There Are Limitations To The *Gwaltney* Calculation.

Even where the "unmodified" *Gwaltney* approach is applied, there are limits to the *Gwaltney* calculation. While the Eleventh Circuit adopted the *Gwaltney* approach, it specified that if the discharge of a single pollutant causes both daily and monthly violations, it would be improper to fine the violator twice.[13] The court provided an illustration:

> Thus, if a polluter is guilty of violating the daily average
> discharge limitation of pollutant A, and also violates the
> daily maximum limitation of only pollutant A, then the
> maximum fine for discharge of pollutant A would be
> $10,000 (or $25,000) times the number of days in the
> month.[14]

### 4.   This Court Should Follow The *Allegheny* Approach.

This Court should follow the Third Circuit's approach in *Allegheny* and the district court's decision in *Sierra Club v. City and County of Honolulu.* Where

---

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

[13]     *Tyson Foods, Inc.*, 897 F.2d at 1140. *See also Hawaii's Thousand Friends v. City and County of Honolulu*, 821 F. Supp. 1368, 1393-94 (D. Haw. 1993) (applying *Tyson* reasoning about duplicative penalties); *but see City and County of Honolulu*, 2007 WL 3166771 at *8-9 (distinguishing facts from *Tyson* and concluding that the court "would not be imposing duplicative fines for the same illegal act by finding an annual average violation to count as 365 violations and also counting a violation of the daily limit").

[14]     897 F.2d at 1140. At least in the penalty phase, as contrasted with the liability phase, EPA has adopted the *Tyson* approach. The EPA's example of how to calculate statutory maximum penalty shows that if there are violations of a daily maximum limit for pollutant A in the same month there are violations of monthly average limits for pollutant A, EPA does not calculate additional penalties for the violations of the daily maximum limit. EPA, Interim Clean Water Act Settlement Penalty Policy (March 1, 1995) at Attachment 1 to Interim CWA Settlement Penalty Policy.

---

Opposition To Plaintiffs' Motion For Summary Adjudication Of 4 Issues
*Adams et. al. v. Teck Cominco Alaska*, A04-00049 CV (JWS)                    Page 23 of 25

there is no controlling authority and the circuits are split, the choice of rule "must ultimately come down to policy considerations."[15]

In *Allegheny*, the court highlighted shortcomings of the formulaic *Gwaltney* approach, which can lead to disproportionate, duplicative, and unfair penalties. For similar reasons, the court in *City and County of Honolulu* refused to hold, on summary judgment, that violation of an average limit set in an annual permit necessarily meant the permit had been violated every day of the year. Likewise, this Court should deny Plaintiffs' request for a summary holding that if "any violations of monthly average permit limitations are proven at trial, each such violation shall count as a violation for each day of that month in which the facility discharged." Docket 241-2 at 2. As was done in *Allegheny* and *City and County of Honolulu*, this Court should consider periods of compliance and whether violations are already sufficiently sanctioned before determining how many -- if any -- violation days should be assessed for exceeding a monthly average permit limitation.

Teck Cominco and NANA ask the Court to so hold.

DATED at Anchorage, Alaska, this 15th day of February, 2008.

HARTIG RHODES HOGE & LEKISCH, P.C.
Attorneys for Teck Cominco Alaska, Incorporated


By: ____/s/_____
Sean Halloran

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

---

[15]    *MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 734 (9th Cir. 2005). Of course, the Ninth Circuit repeatedly has held that the district court has broad discretion in deciding a remedy. *Borden Ranch Partnership*, 261 F.3d at 818; *Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985, 1002 (9th Cir. 2000); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995). In *Borden Ranch Partnership*, the Ninth Circuit upheld the district court's penalty even though it was "significantly lower than the statutory maximum." 261 F.3d at 818-19. Similarly, in *Southwest Marine*, the court upheld the district court's penalty where the district court, instead of imposing the $25,000 maximum, imposed $1,000 for each day of violation and ordered that the penalty would be reduced by the amount of the cost to the violator for improving its storm water diversion system or making other changes to its system to comply with the court's injunction. 236 F.3d at 1002.

HELLER EHRMAN LLP
Attorneys for NANA Regional Corp.


By: ____/s/_____
James Torgerson

CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of February, 2008,
a true and correct copy of the foregoing was served,
via electronic service, on the  below identified parties of
record:

Luke W. Cole
Center on Race, Poverty, & the Environment
47 Kearny Street, Suite 804
San Francisco, California 94108

Nancy S. Wainwright (via U.S. Mail only)
Law Offices of Nancy S. Wainwright
13030 Back Road, Suite 555
Anchorage, Alaska 99515-3538

James E. Torgerson
Heller Ehrman White & McAuliffe LLP
510 L Street, Suite 500
Anchorage, Alaska 99501-1959

David S. Case
Landye Bennett Blumstein LLP
701 W. 8th Ave., Suite 1200
Anchorage, AK 99501

_____
Hartig Rhodes Hoge & Lekisch PC

HARTIG RHODES
HOGE &
LEKISCH, P.C.
ATTORNEYS AT LAW
717 K STREET
ANCHORAGE,
ALASKA
99501-3397
TELEPHONE:
(907) 276-1592
FAX:
(907) 277-4352

Opposition To Plaintiffs' Motion For Summary Adjudication Of 4 Issues
*Adams et. al. v. Teck Cominco Alaska*, A04-00049 CV (JWS)