David S. Case, P.C.
Landye Bennett Blumstein LLP
701 West Eighth Avenue, Suite 1200
Anchorage, Alaska 99501
Telephone (907) 276-5152
Facsimile (907) 276-8433
E-mail: dcase@lbblawyers.com
Alaska Bar No. 7505010

Attorneys for Northwest Arctic Borough

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| ENOCH ADAMS, JR., LEROY ADAMS, ANDREW KOENIG, JERRY NORTON, DAVID SWAN and JOSEPH SWAN, )<br><br>Plaintiff, )<br><br>v. )<br><br>TECK COMINCO ALASKA INCORPORATED, )<br><br>Defendant. ) | Case No. A04-0049 CV (JWS)<br><br><br><br><br><br><br><br><br><br>**DEFENDANT-INTERVENOR NORTHWEST ARCTIC BOROUGH'S TRIAL MEMORANDUM** |
| NANA REGIONAL CORPORATION and NORTHWEST ARCTIC BOROUGH, )<br><br>Intervenor-Defendants.) |  |

## I.    INTRODUCTION

This is a citizen suit under the Clean Water Act (CWA), 33 U.S.C. § 1251, *et seq.*, brought by citizens of the Native Village and City of Kivalina. The plaintiffs complain of

numerous violations of the CWA, primarily continuing exceedances of the effluent limitations contained within the National Pollution Discharge Elimination System (NPDES) Permit issued to defendant Teck Cominco (TCAK) in conjunction with its mining operations at the Red Dog Mine, from which large quantities of zinc and lead ore are mined and then transported to a port site on the coast of the Chukchi Sea near Kivalina. The Court has previously issued an Order holding defendant Teck Cominco liable for many of the unpermitted discharges. Additional CWA violations alleged by the plaintiffs are factually disputed and therefore must be resolved at trial. For that reason, the trial of the case has been bifurcated into a liability phase and a penalty phase.

The Northwest Arctic Borough (NAB) has been allowed to intervene as a party defendant in the penalty phase only. The NAB therefore assumes that penalties will be assessed against defendant TCAK because of the already adjudicated violations of the CWA regardless of the Court's disposition of the still-outstanding factual disputes regarding the additional violations.

A.   **NAB's Governmental Status, Function, Role, and Responsibilities**

NAB is incorporated under a homerule charter adopted June 2, 1986.    Its boundaries encompass an area of

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

approximately 39,150 square miles. Approximately 7,100 residents live in eleven communities scattered throughout the Borough: Ambler, Buckland, Deering, Kiana, Kivalina, Kobuk, Kotzebue, Noatak, Noorvik, Selawik, and Shungnak. The largest city is Kotzebue with a population of approximately 3,100 people. Kotzebue is NAB's headquarters.

Kivalina is a community located along the coast of the Chukchi Sea in the northwest quadrant of the Borough (northwest of Kotzebue) and has a population of approximately 390 people. Noatak and Kivalina are the two villages located nearest the Red Dog mine and are equidistant from it – 50+ miles away – but only Kivalina is incorporated.

NAB has adopted a comprehensive land use regulation ordinance known as "Title 9" of the Northwest Arctic Borough code. The Borough code extends to all activities within "all private, state, Borough, and municipally owned lands and waters within the Borough's boundaries ... unless preempted by federal law." NABC § 9.04.030 (*see* Ex. "A" to this brief for copies of relevant Borough Code provisions). The Code obligates NAB:

> … to promote and protect the public health, safety ... and general welfare, as well as the historic, economic, social, and cultural interests of the Borough's residents; to ensure that the future growth and development of the Borough is in accord with the values of its residents; to identify and secure for present and future residents the beneficial effects of development;

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

and to ensure that future development ... is served by a proper range of public services and facilities.

NABC § 9.04.020 (1993).

**B.    The Red Dog Mine and Its Relationship to NAB**

TCAK and NAB have entered into a contract – the "Second Amended, Restated Contract for Services with Cominco Alaska Incorporated." This contract or agreement is for "payments in lieu of taxes," and commonly referred to as the "PILOT Agreement." The mining operation and the associated Delong Mountain Transportation System (DMTS) are the primary revenue sources for NAB, which does not levy any taxes within its borders. Under the terms of the PILOT Agreement, as amended, NAB is currently entitled to payments of approximately $6.5 million per year, increasing at regular rates through the year 2011 to $6.8 million per year.

In reliance on the annual revenue paid under the PILOT Agreement, NAB has issued in excess of $65 million in bonds to fund the capital construction of schools and school-related improvements for the NAB School District. The bonds were issued through the Alaska Municipal Bond Bank, a bank incorporated by the State of Alaska. All NAB's bonds have maturities within 20 years and secure the loan agreement with the Alaska Municipal Bond Bank. All NAB bonds are secured by payment derived from the production of ore at the Red Dog

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

Mine.  Consequently, continued operation of the mine and the PILOT Agreement are essential to the Borough's economic well-being.

In addition to this substantial economic interest, however, NAB is very concerned that the mine operates in an environmentally responsible fashion.  Title 9 of NAB's code regulates development within the "Resource Development and Transportation Districts" that comprise the Red Dog mine and the related DMTS, whereby the ore from the mine is transported to a port site on the coast of the Chukchi Sea.  Pursuant to this legal duty, NAB has written letters to the Alaska Department of Environmental Conservation (ADEC) publicly expressing its concerns about potentially adverse environmental consequences caused by mine operations.

C.    **The Borough's Party Status**

NAB successfully moved to intervene in this litigation and asserted two significant protectable interests: (1) a governmental interest in protecting the environment, subsistence resources, and promoting economically sustained development for the citizens of the Borough; and (2) a contractual interest – the Pilot Agreement – in the continuing operation of the mine.  Consequently, the Borough's interest in this litigation is substantial and includes a significant economic interest, as well as contract rights and property

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

rights, as well as a substantial interest in environmental and water quality protection and legally-imposed obligations to promote and protect the health, safety, and general welfare of the Borough and its residents to ensure that the mine, whose operations are at issue in this action, "operates in a sound, environmentally safe manner and that its operations do not threaten the safety and health of the Borough citizens, its water, or its natural resources" – not just the village of Kivalina.

To that end, the Borough also has created a Resource Development (RD) District that is specifically designed to balance development, such as the Red Dog Mine, with protection of the surrounding ecosystem.  Among the purposes of the RD District which includes the Red Dog Mine, is to make sure that the activities of the mine "do not seriously impair the capacity of the surrounding ecosystem to support the plants and animals upon which Borough residents depend for its subsistence."  NABC § 9.12.060(A)(1).

NAB has the power to issue permits regulating water quality and mining.  *See, e.g.,* NABC § 9.12.060(E)(1) (describing the aforementioned RD District; § 9.12.060(C)(9) (requiring a Use Permit for "mineral development" and "resource extraction" in the RD District); and § 9.12.060(D)(1) (requiring a Conditional Use Permit for any

"use or structure within a watershed which provides a community's drinking water" in the RD District). Any capital improvement projects related to improvement of water quality within the Borough would necessarily require Borough review and approval. The Borough was quite hopeful this litigation could be resolved by settlement to allow most of the penalty monies assessed to be instead used for Supplemental Environmental Projects (SEPs), which would directly benefit the plaintiffs and Kivalina. That has not occurred to date. This brief then will be devoted to setting forth the Borough's position regarding penalty assessment.

## II.  CIVIL PENALTIES UNDER THE CLEAN WATER ACT

### A.  <u>Statutory Framework</u>

Where there has been a violation of the CWA, the imposition of civil penalties is "mandatory." *Leslie Salt v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995); *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990). *See* 33 U.S.C. § 1319(d) ("Any person who violates [sections 301, 402, or 404] * * * shall be subject to a civil penalty").

The CWA mandates the imposition of civil penalties to ensure that the violator is punished, the economic gains resulting from the violation are recouped, and other potential violators are deterred. *Tull v. United States*, 481 U.S. 412,

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

422-23 (1987) (citing 123 CONG. REC. 39,191 (1977)) ("Congress wanted the District Court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties.")

The question for the Court to determine is not only the amount of penalty that will force the defendant to become concerned about its own compliance with the Clean Water Act (specific deterrence), but also, the amount of penalty that will prevent others from acting similarly (general deterrence). *See Friends of the Earth, Inc. v. Laidlaw Envtl Servs. (TOC), Inc.*, 120 S. Ct. 693, 706 (2000) (civil penalties in CWA cases serve to "deter future violations").

A court should award a penalty that exceeds what defendant and similarly situated persons might consider, and therefore absorb, as the "cost of doing business." *See United States v. ITT Continental Baking*, 420 U.S. 223, 231 (1975). A penalty should therefore be "large enough to hurt; it should deter anyone in the future from showing a similar lack of concern with compliance." *United States v. Envtl. Waste Control, Inc.*, 710 F. Supp. 1172, 1244 (N.D. Ind. 1989), *aff'd*, 917 F.2d 327 (7th Cir. 1990).

In determining the civil penalty, "the point of departure for the District Court should be the maximum fines for such violations permitted by the Clean Water Act." *Atlantic States*

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

*Legal Found.*, 897 F.2d at 1137. The maximum statutory penalty is $27,500 per day per violation for the period when the violations occurred. 62 Fed. Reg. 13,514-515 (Mar. 20, 1997); 40 C.F.R. § 19.4, Table 1 (1999).

Some courts employ the "top-down" approach to determining penalties, others employ a "bottom-up" approach. Under the "top-down" system, the Court first ascertains the maximum civil penalty, and then "determine[s] if the penalty should be reduced from the maximum by reference to the statutory factors." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 573 (5th Cir. 1996) (citing *Atlantic States Legal Found.*, 897 F.2d 1128, 1142 (11th Cir. 1990)); *see also United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 528 & n. 7 (citing cases applying the "top-down" approach); *United States v. Mun. Auth. of Union Township*, 150 F.3d 259, 265 (3d Cir. 1998); *Hawaii's Thousand Friends v. City and County of Honolulu*, 821 F. Supp. 1368, 1395 (D. Ha. 1993); *Center for Biological Diversity v. Marina Point Dev. Assocs.*, 434 F. Supp. 2d 789, 799 (C.D. Cal.). The statutory maximum penalty amount should only be reduced after clear indications as to the weight given to each of the statutory factors and the factual findings that support the Court's conclusions. *Atlantic States Legal Found.*, 897 F.2d at 1142; *United States v. Gulf Park, Inc.*, 14 F. Supp. 2d 854, 858-68 (S.D. Miss.

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

1991). Defendant bears the burden of establishing the facts that entitles it to such mitigation. *See Roll Coater*, 21 Envtl. L. Rep. 21073, 21075 (S.D. Ind. 1991) (consideration of seriousness of violation at the penalty phase of the litigation places the issue of environmental harm on the defense); *NRDC v. Texaco*, 800 F. Supp. 1, 26 (D. Del. 1992) (defendant did not demonstrate that a large penalty would have an adverse impact on the company), *aff'd in part, rev'd in part on other grounds*, 2 F.3d 493 (3d Cir. 1993).

Under the "bottom-up" approach to determining penalties, the Court begins with the violator's estimated economic benefit and then adjusts the penalty amount based on the other section 309(d) factors, as well as the goals of retribution and deterrence. *See Smithfield*, 191 F.3d at 528-29. When determining civil penalties, "it is hoped that the potential economic gain which would tempt a regulated entity to violate the Clean Water Act, when converted into a potential economic loss of the same magnitude, will inspire fidelity to the law." *United States v. Mun. Auth. of Union Township*, 929 F. Supp. 800, 808 (M.D. Pa. 1996), aff'd 150 F.3d 259 (3d Cir. 1998). If the Court concludes that the economic benefit has been significant in relation to the other penalty factors, the Court may determine that a penalty that is substantially greater than the amount of the economic benefit serves the

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

goals of retribution and deterrence. *Id.; Union Township*, 150 F.3d at 265.

### B. **Penalty Factors**

Trial courts have broad discretion in setting the civil penalty in a Clean Water Act case. *Borden Ranch P'ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810, 818 (9th Cir. 2001), *aff'd*, 537 U.S. 99 (2002). However, the statute sets out six factors that must be considered by a court in determining the appropriate civil penalty amount: "[1] the seriousness of the violation or violations, [2] the economic benefit (if any) resulting from the violation, [3] any history of such violations, [4] any good-faith efforts to comply with the applicable requirements, [5] the economic impact of the penalty on the violator, and [6] such other matters as justice may require." 33 U.S.C. § 1319(d).

To the extent that a violator seeks to reduce the maximum penalty by relying on the statutory penalty factors, the violator bears the burden of showing that he is entitled to such a reduction. *See Gulf Park Water*, 14 F. Supp. 2d at 868 (burden on defendant to show economic impact of penalty); *Roll Coater*, 21 Envtl. L. Rep. at 21075 (consideration of seriousness of violation at penalty phase places the issue of environmental harm on defense).

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

### 1.   Seriousness of the Violations

In considering the seriousness factor, courts have looked to the number and duration of the violations, their importance to the CWA regulatory scheme, and the actual or potential harm to the environment.  *Gulf Park Water*, 14 F. Supp. 2d at 859; *United States v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 343 (E.D. Va. 1997); *Union Township*, 929 F. Supp. at 807; *Hawaii's Thousand Friends*, 821 F. Supp. at 1383.

### a.   Number and Duration

The Court has the discretion to calculate a civil penalty based on the number of individual acts that gave rise to unlawful discharges of pollutants to waters of the United States.  *See, e.g., Borden Ranch P'ship v. United States Army Corps of Eng'rs*, 261 F.3d at 816-18.

### b.   Importance to the Regulatory Scheme

The statutory "cornerstone" of the regulatory scheme for enforcement of the CWA and the controlling of unlawful discharges is the assessment of penalties.

### 2.   Economic Benefit to the Violator

In determining the civil penalty, the Court must also consider the "economic benefit (if any) resulting from the violation." 33 U.S.C. § 1319(d). "The objective of the economic benefit calculation is to place violators in the same financial position as they would have been if they had

L~ANDYE~ B~ENNETT~ B~LUMSTEIN~ LLP
701 W~EST~ E~IGHTH~ A~VENUE~, S~UITE~ 1200
A~NCHORAGE~, A~LASKA~ 99501
T~ELEPHONE~ (907) 276-5152, F~AX~ (907) 276-8433

complied on time." EPA Interim Clean Water Act Settlement Penalty Policy, § IV.A at 4. Although economic benefit is one factor to be considered by the Court in setting a CWA penalty, other factors may decrease the penalty below the calculated economic benefit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 956 F. Supp. 588, 610 (D.S.C. 1997), *vacated as moot* because the only relief sought on appeal was penalties, 149 F.3d 303 (4th Cir. 1998), *rev'd and remanded on mootness issue*, 528 U.S. 167 (2000).

This provision is intended to "prevent a violator from profiting from its wrongdoing." *Union Township*, 150 F.3d at 263. Violators should not be allowed to gain an unfair competitive advantage over those who comply with the law. *Id.* at 263-64; *Smithfield Foods*, 191 F.3d at 529. The goal is "'to remove or neutralize the economic incentive to violate environmental regulations.'" *Id.* (*quoting Powell Duffryn*, 913 F.2d at 80). Unless a violator is penalized in an amount greater than the economic gain resulting from its noncompliance with the statute, the penalty serves little deterrent value. *Roll Coater*, 21 Envtl. L. Rep. at 21075. Consequently, the economic benefit analysis must "encompass every benefit . . . received from violation of the law." *Gulf Park Water Co.*, 14 F. Supp. 2d at 864.

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

The corollary to the above maxims is that a violator should also be able to receive credit for expenditures made to improve water quality and for accompanying lost earnings, if any. For example, the earnings lost by a company that violates the CWA should be credited when calculating economic benefit. In *Laidlaw*, the defendant lost earnings in the amount of $831,136 due to shutting down an incinerator to comply with permit limits. *Id.* 605-06. The Court recognized that defendants would have received 20 days of additional revenues (minus time for routine maintenance) if it had not shut down; the Court therefore granted defendant a credit in the economic benefit calculation. *Id.* Similarly, when the price received by a defendant for the sale of assets was reduced due to a court's decision, that reduction in price was credited from the penalty amount. *United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1032, 1038-39 (N.D. Cal. 2004).

Credits should also be granted for payments for remedial actions taken by the defendant, including prospective payments. *Natural Resources Def. Council v. Southwest Marine*, 236 F.3d 985, 1001-02 (9th Cir. 2000). In *Southwest Marine*, defendant was found liable under the CWA. *Id.* at 990, 1001. The District Court entered an injunction and imposed a penalty of $799,000 "reduced by the amount of the cost of any actions that Defendant takes to improve its storm water diversion

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

system and any changes that Defendant makes to its facilities to comply with the court's injunction." *Id.* at 1002. In other words, "the amount of the penalty actually [was] $799,000 minus the cost of such [future] physical alterations." *Id.* Credits should also be granted in calculating economic benefit for payments to other plaintiffs for the same underlying actions. *See* EPA Interim Clean Water Act Settlement Penalty Policy, § IV.D.4, p. 15 (credit may be appropriate for "payment by the defendant of civil penalties for the same violations in a case brought by another plaintiff"). Thus, for example, where the defendant in *Laidlaw* had paid a $100,000 fine to the South Carolina Department of Health and Environmental Control, the Court granted a credit equal to the present value of the payment. *Laidlaw*, 956 F. Supp. at 606.

The courts have recognized that it is often difficult or impossible to measure economic benefit precisely. *Union Township*, 150 F.3d at 264-65. For this reason, "an elaborate evidentiary showing" regarding economic benefit is not necessary, and a "reasonable approximation" will suffice. *Gulf Park Water*, 14 F. Supp. 3d at 863. *See also Union Township*, 150 F.3d at 264-65; *Smithfield Foods*, 972 F. Supp. at 348 (same).

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

Because violators must disgorge the economic benefit they enjoyed from their violations, evidence regarding economic benefit provides the starting point for a penalty calculation. TCAK'S total economic benefit is the subject of great dispute, but it obviously should be a significant factor in the assessment of penalties.

### 3.    History of Violations

NAB has participated only minimally in the pretrial discovery process, particularly as it relates to the liability phase of the trial, and therefore will defer to the other parties' arguments regarding this issue and the relative seriousness of those violations.  TCAK has operated the Red Dog Mine under the terms of an NPDES Wastewater Discharge Permit since 1985.  The original Permit apparently was based primarily on technology-based standards and did not even contain a discharge limit for total dissolved solids (TDS). EPA then began changing the contents of NPDES Permits from technology-based standards to water quality-based standards, and eventually included an effluent limit for TDS based on the State of Alaska's TDS water quality criteria.  That limit has been violated on numerous occasions.

There is no question but that TCAK has also violated many of the other effluent limits contained in its NPDES Permit on numerous occasions and has done so over a long period of time.

These violations were required to be and were reported in the Discharge Monitoring Reports (DMRs) that were required to be maintained by TCAK and submitted to the EPA.

The Court has been and will be provided with considerable argument regarding the history of these past violations and their significance.

### 4.   Good Faith Efforts to Comply

TCAK will introduce substantial evidence regarding its good faith efforts to comply with its NPDES Permit and the CWA.   These efforts are both considerable in number and ongoing in nature and the Borough believes, accordingly, that the civil penalty in this case should be adjusted downward based upon those good faith efforts to comply.

### 5.   Economic Impact of Penalty on Violator

Because the primary purpose of a civil penalty is to deter the violator from committing future violations, *Tull v. United States*, 481 U.S. 412, 422-23 (1987), the Court is required to consider the economic impact of the penalty on the violator.   *Smithfield Foods*, 972 F. Supp. at 352-53. 33 U.S.C. § 1319(d).

To serve a deterrent function, the amount of a civil penalty must be "high enough so that the discharger cannot 'write it off' as an acceptable environmental trade-off for doing business." *Gulf Park Water*, 14 F. Supp. at 869 (*quoting*

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

*Hawaii's Thousand*, 821 F. Supp. at 1394). Otherwise, a rational, profit-maximizing person will choose to pay the penalty rather than to incur compliance costs. *See PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1166 (D. N.J. 1989), *rev'd in part on other grounds*, 913 F.2d 64 (3d Cir. 1990).

To deter future violations by TCAK and to reaffirm that similarly situated persons must comply with the CWA, the Court should impose a penalty that is relative to TCAK'S financial resources.

### 6. Other Matters As Justice May Require

The Clean Water Act includes as a sixth penalty factor a broad evidentiary category: "…Such other matters as justice may require." 33 U.S.C. § 1319(d). One such factor is fairness and proportionality, as illustrated by the government's own CWA Settlement Penalty Policy, which states that CWA penalties should be "consistent across the country" to provide "fair and equitable treatment to the regulated community wherever they may operate." EPA Interim Clean Water Act Settlement Penalty Policy, § II at 3.

The EPA maintains and publishes a list of the CWA penalties that it has imposed, and the Court may wish to consult this list in determining an appropriate penalty to impose upon TCAK.

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

NAB has been and is concerned about the environmental and potential human health implications of TCAK's CWA violations. The Mayor of the Borough will testify concerning the Borough's legal authority and responsibility to its citizens regarding TCAK's pollutant discharges.

The Court will also hear considerable testimony from TCAK and perhaps NANA as well about the substantial efforts undertaken by TCAK to reduce pollutant discharges and ensure that the effluent limits established for the Red Dog Mine more accurately reflect site-specific water quality criteria and concerns.

NAB has attempted to work with TCAK and the citizens and officials of the Native Village and City of Kivalina to address their understandable concerns regarding the uncertain and perhaps long-term consequences of pollutant discharges from the Red Dog Mine. At the same time, NAB has encouraged TCAK to continue in its good faith efforts to find cost-effective ways of reducing pollutant discharges from the Mine and to comply with applicable environmental regulations and restrictions.

Revenues from Mine operations are critical to the economic well-being of NAB and NANA, and, by extension, to the Borough citizens and NANA shareholders, including the plaintiffs and other members and citizens of the Native

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

Village and City of Kivalina.  This economic dependence is an established fact, but it cannot, should not, and will not excuse TCAK's violations of the CWA.  The CWA exists to improve the nation's water quality and to limit, if not eliminate, the adverse environmental and human health consequences of water pollution.  Where as here, the pollutants in question include toxic chemicals and the citizens whose water supply, way of life, and quality of life is most directly affected by those pollutant discharges have understandable and legitimate concerns.

NAB has an obligation to protect the Borough's environment, its subsistence resources, way of life, and to promote sustainable economic development for the overall benefit of all Borough citizens, including that of the plaintiffs.  In furtherance of that obligation, the Borough has adopted a Comprehensive Land Use Regulation Ordinance – Title 9 of the Borough's Code.  The general purpose of Title 9 is to balance the benefits and costs of development within the Borough, and that development necessarily, and in particular, includes the Red Dog Mine and the negative effects associated with that development, as well as its economic benefits.

## III. CONCLUSION

In a real sense, the statutory penalty factors to be considered by the Court are all quire consonant with the

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

purposes of Title 9 of NAB's Code.  The Borough submits that the penalties to be imposed upon TCAK should be substantial enough to reflect the seriousness and history of those violations, as well as any economic benefit the Court concludes resulted from the violations, but should also reflect TCAK's good faith efforts to comply with those requirements and assess penalties that are designed to ensure that the future operation of the Mine will promote compliance with the terms of the CWA and TCAK's NPDES Permits.  This overall penalty assessment should also be one that recognizes the values and subsistence way of life of the great majority of the Borough's Native residents and serves to promote and protect the public health, general welfare, and the historic, economic, social, and cultural interests of the Borough's residents, and, in particular, the plaintiffs and the other citizens of the Native Village and City of Kivalina.

DATED this _____ day of March, 2008.

LANDYE BENNETT BLUMSTEIN LLP
Attorneys for Northwest Arctic
Borough


s/David S. Case
_____
David S. Case
Landye Bennett Blumstein LLP
701 West Eighth Avenue, Suite 1200
Anchorage, Alaska 99501
Telephone (907) 276-5152
Facsimile (907) 276-8433
E-mail: dcase@lbblawyers.com
Alaska Bar No. 7505010

Landye Bennett Blumstein LLP
701 West Eighth Avenue, Suite 1200
Anchorage, Alaska 99501
Telephone (907) 276-5152, Fax (907) 276-8433

LANDYE BENNETT BLUMSTEIN LLP
701 WEST EIGHTH AVENUE, SUITE 1200
ANCHORAGE, ALASKA 99501
TELEPHONE (907) 276-5152, FAX (907) 276-8433

## Certificate of Service

I hereby certify that on March ____, 2008, a copy of the foregoing DEFENDANT-INTERVENOR NORTHWEST ARCTIC BOROUGH'S TRIAL MEMORANDUM was served electronically on:

Sean Halloran
Hartig Rhodes Hoge & Lekisch
717 K Street
Anchorage, AK  99501
sean.halloran@hartig.com

Luke W. Cole
Center on Race, Poverty & the Environment
450 Geary Street, Suite 500
San Francisco, CA  94102
luke@igc.org

James E. Torgerson
Heller Ehrman White & McAuliffe LLP
510 L Street, Suite 500
Anchorage, AK  99501
jim.torgerson@hellerhrman.com

and on the following by regular U.S. Mail:

Nancy S. Wainwright
Law Offices of Nancy S. Wainwright
13030 Back Road, Suite 555
Anchorage, AK  99515-3538


s/David S. Case
David S. Case


\\lbbanc-dc\lbb\CLIENTS\01040 NAB\123 Adams v. Teck Cominco\Pleading File\Trial Brief 03 07 08.doc