JAMES E. TORGERSON (Alaska Bar No. 8509120)
YVONNE LAMOUREUX (Alaska Bar No. 0512124)
HELLER EHRMAN LLP
510 L Street, Suite 500
Anchorage, AK 99501-1959
Telephone: (907) 277-1900
Facsimile: (907) 277-1920
Jim.torgerson@hellerehrman.com
Yvonne.lamoureux@hellerehrman.com

Attorneys for Intervenor-Defendant
NANA REGIONAL CORPORATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ENOCH ADAMS, JR., LEROY ADAMS, ANDREW KOENIG, JERRY NORTON, DAVID SWAN and JOSEPH SWAN,<br><br>    Plaintiffs,<br><br>v.<br><br>TECK COMINCO ALASKA INCORPORATED,<br><br>    Defendant,<br><br>NANA REGIONAL CORPORATION, and NORTHWEST ARCTIC BOROUGH,<br><br>    Intervenor-Defendants. | Case No.: A:04-cv-0049 (JWS)<br><br>**NANA REGIONAL CORPORATION'S TRIAL BRIEF** |

## I. NANA HAS A DEEP INTEREST IN THE OUTCOME OF THIS LITIGATION.

NANA Regional Corporation (NANA) sought to join this litigation because of its interest in the issues raised and the remedies sought by the Plaintiffs. Red Dog Mine is on NANA lands. The Plaintiffs are NANA shareholders. Any penalty assessed against Teck Cominco Alaska Incorporated (Teck Cominco) potentially affects how much money NANA receives from Teck Cominco from its operation of the Red Dog Mine. Accordingly, NANA's preeminent concern is advancing its shareholders' interests. Here, its shareholders' interests include both protecting the environment and trying to

prevent the imposition of an unwarranted penalty on Teck Cominco.

Because the Court already has found that Teck Cominco committed a number of violations of the Clean Water Act (CWA), NANA understands there will be a remedy phase of this trial. NANA is concerned about, and intends to participate in, the liability phase of the trial as well as the remedy phase of the trial. In this brief, however, NANA discusses only remedy issues, leaving the liability issues for Teck Cominco to address.

## II. CITIZEN SUITS ARE NOT MEANT TO SUPPLANT GOVERNMENTAL ACTION.

The United States Supreme Court stated in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*,[1] that a "citizen suit is meant to supplement rather than to supplant governmental action." The Court noted that the relevant legislative history supported its conclusion. It quoted from a Senate Report that stated:

> "[t]he Committee intends the great volume of enforcement actions [to] be brought by the State," and that citizen suits are proper only "if the Federal, State, and local agencies fail to exercise their enforcement responsibility."[2]

Likewise, as the Eighth Circuit Court observed in *United States EPA v. City of Green Forest*[3], the citizens' suit provision "was not intended to enable citizens to commandeer the federal enforcement machinery."

NANA submits that the evidence at trial will show that this citizen suit is effectively supplanting, not supplementing, governmental action. Both the federal and state governments have been and remain well aware of the relevant characteristics of the effluent at Red Dog Mine. They have closely monitored the effects on the receiving water of the Mine's discharge and worked with Teck Cominco to devise appropriate effluent limits. But they have chosen not to bring an enforcement action against Teck Cominco.

Instead of pursuing an enforcement action, they have worked closely with Teck Cominco to develop compliance orders by consent (COBCs). The COBCs allowed Total

---

[1] *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*, 484 U.S. 49, 60 (1987).
[2] *Id*. (internal cites deleted).
[3] *United States EPA v. City of Green Forest,* 921 F.2d 1394, 1402 (8th Cir. 1990).

**NANA REGIONAL CORPORATION'S TRIAL BRIEF**
**ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)**
PAGE 2 OF 15

Dissolved Solid (TDS) levels of 500 ppm during the grayling spawning season and 1500 ppm during the non-spawning seasons in lieu of the permit limits, which the Plaintiffs are suing to enforce, of 197 ppm TDS at any time.

The government also worked with Teck Cominco to develop new permits with new limits that more accurately reflect the site-specific circumstances at Red Dog Mine. The final National Pollutant Discharge Elimination System (NPDES) permit issued on April 12, 2007 (the "2007 Permit" or "2007 final NPDES permit"), for instance, increased the limit on the discharge of TDS to 1500 ppm throughout the discharge season as measured at the edge of a mixing zone. That permit would be in effect today but for the appeals taken from it by Plaintiffs and others.

The vast majority of exceedances about which Plaintiffs complain are not violations of the revised limits the government has required Teck Cominco to comply with in lieu of those set forth in the 1998 permit. In seeking penalties against Teck Cominco under these circumstances, therefore, the Plaintiffs are not supplementing the government's efforts to fill a regulatory void. They instead are supplanting the government, attempting to commandeer the federal enforcement machinery to pursue penalties the government has chosen not to seek.

## III. AT MOST NOMINAL PENALTIES SHOULD BE IMPOSED FOR DISCHARGES THAT DO NOT EXCEED THE UPDATED LIMITS PERMITTED BY THE GOVERNMENT.

The government has exercised its regulatory authority here, given the relevant facts and circumstances, by issuing COBCs and the 2007 final NPDES permit with higher discharge limits than in the 1998 permit. Teck Cominco generally has met those higher limits. Plaintiffs' case is built, then, on violations the government has not only decided not to prosecute but which it has decided should not be considered violations because the relevant discharge did not exceed the higher limits set by the government in, for instance, the 2007 final NPDES permit. Accordingly, so that the Plaintiffs are not allowed to commandeer the federal enforcement machinery, the Court should impose at most nominal penalties for any violations that do not exceed the updated limits set by the government.

There is not much case law addressing this situation. It appears plaintiffs have not

often filed citizen suits based on violations of limits in permits that the EPA has not been able to change because of the plaintiffs' appeals.

NANA believes the Court will hear the following evidence at trial that will further support the proposition that the Court should impose at most a nominal penalty for violations that do not exceed the modified limits set by the government after it issued the 1998 NPDES permit:

- The 1998 NPDES permit contained impossible, unwarranted and, in some instances, scientifically unsupported limits and requirements.

- Teck Cominco agreed to proceed under the permit based on its understanding that EPA would grant it COBCs with more appropriate limits until a new permit was put in place.

- Teck Cominco, EPA and the State of Alaska Department of Environmental Conservation (DEC) have worked closely together over the last ten years regarding the proper permit limits for water discharged at Red Dog Mine.

- EPA has issued a new permit. The application of the new permit has been stayed by appeals filed by the Plaintiffs.

The regulators, therefore, have identified new limits they believe appropriate for water discharged at Red Dog Mine. The vast majority of the exceedances about which Plaintiffs complain do not violate the limits contained in the COBCs and the 2007 final NPDES permit.

For instance, the great majority of the total violations alleged by the Plaintiffs involve alleged violations of the total dissolved solids (TDS) standards set in the 1998 NPDES permit.[4] All but three of the 621 violations the Plaintiffs established through summary judgment involved such violations.[5] The 1998 NPDES permit contained TDS limits based on an old state-wide standard. Teck Cominco could not meet the TDS limits in the 1998 permit. EPA knew the TDS limits in the 1998 permit were not achievable and also knew and supported development of site-specific TDS standards for Red Dog

---

[4] At Red Dog Mine, TDS is a non-toxic by-product of treating waste water to remove lead, cadmium, and zinc.
[5] Docket 136, July 28, 2006 Order.

NANA REGIONAL CORPORATION'S TRIAL BRIEF
ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)
PAGE 4 OF 15

Mine.  EPA addressed this problem on an interim basis, while awaiting the site-specific TDS standards, by issuing a series of COBCs that allowed higher TDS discharge levels.  Site-specific TDS standards have now been adopted by the State and approved by EPA and are the basis for the TDS limits in the new permit.  By and large, Teck Cominco met the applicable COBC limits, as well as the 2007 permit limits.

Congress had reservations about potential abuses of citizen suits at the time it authorized them.  It expressly noted its concern "with protecting local government, industry, and individuals from harassing law suits while still keeping the courts open to responsible parties concerned with environmental protection."[6]  For a citizen suit can be a vehicle for abuse and harassment, especially where a plaintiff sues over technical violations that state and federal authorities have fully considered and addressed.  In *Gwaltney*, the Court gave an example of such a situation, which happens to have facts in common with this case where the EPA deliberately exercised its enforcement discretion in deciding to issue compliance orders rather than take enforcement action against Teck Cominco.

> Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obligated to take.  If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably.[7]

In this case, Plaintiffs have skillfully exploited various procedural niceties in the rules to pursue Teck Cominco.  First, Plaintiffs sued Teck Cominco over claims of which the EPA was well aware and had no interest in pursuing.  Instead, EPA had addressed them through compliance orders.  Second, Plaintiffs appealed EPA and State permitting decisions to try to preserve hundreds of violations that would otherwise have been

---

[6] Environmental Policy Division, Congressional Research Service, Library of Congress, A Legislative History of the Water Pollution Control Act Amendments of 1972, note 13, at 217, 221. (Comm. Print 1973).
[7] *Gwaltney*, 484 U.S. at 60-61.

NANA REGIONAL CORPORATION'S TRIAL BRIEF
ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)
PAGE 5 OF 15

mooted by EPA's amendments to the effluent limits in the Red Dog NPDES permits.[8]

NANA respects the Plaintiffs' right to challenge new permit limits set by EPA. But the Plaintiffs should not be rewarded with success in their effort to have Teck Cominco penalized for violating permit limits that EPA decided Teck Cominco did not need to comply with, as reflected in the COBCs and the 2007 final NPDES permit EPA issued. NANA asks that the Court impose at most minimal penalties for violations based on discharges that do not exceed the limits set in the contemporaneous COBCs or the 2007 final NPDES permit.

## IV. ANY PENALTY SHOULD BE VERY MODEST.

### A. The Court has broad discretion in determining a penalty.

If the Court finds a violation of the Clean Water Act, it has substantial discretion in setting the amount of any penalty.[9] In a recent decision, for example, the District Court of Alaska exercised its discretion to conclude that no penalty should be imposed.[10] There is one limitation on their discretion that courts generally have embraced. They have refused to impose duplicate fines for the same act.[11]

---

[8] NPDES Appeal No. 03-09 Seeking Review of Region 10's decision to issue a final permit modification on July 17, 2003, and Center on Race, Poverty & the Environment, March 12, 2007, Request for Adjudicatory Appeal under 18 AAC § 15.200 for Teck Cominco Alaska, Inc.'s Red Dog Mine's State § 401 Certification, NPDES AK-003865-2 and Request for Stay under 18 AAC § 15.210. NANA acknowledges its shareholders' right to challenge Teck Cominco's Red Dog permits, but notes that in this context – in light of the evidence supporting the EPA's revised permit levels – the primary effect of the plaintiffs' appeal is to potentially preserve in this litigation hundreds of "violations" that otherwise would be moot.

[9] 33 U.S.C. § 1319(d); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995) ("District courts retain the broad discretion to set a penalty commensurate with the defendant's culpability. Indeed, in its consideration of the seriousness of a defendant's violations and 'such other matters as justice may require,' the district court could assess a civil penalty of only a nominal amount."); *Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 261 F.3d 810, 818 (9th Cir. 2001); *Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985, 1001-02 (9th Cir. 2000).

[10] *Resurrection Bay Conservation Alliance v. City of Seward*, Case No. 3:06-cv-0224-RRB, Docket 66 at 17-18.

[11] *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1140 (11th Cir. 1990) ("if a polluter is guilty of violating the daily average discharge limitation of pollutant A, and also violates the daily maximum limitation of only pollutant A, then the maximum fine for discharge of pollutant A would be $10,000 (or $25,000) times the number of days in the month"). *See also United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 189 (3d Cir. 2004) ("in exercising its discretion, a district court should take

*(Footnote Continued)*

### B.   The Court should use a "bottom up" approach.

The law contains no presumption as to the amount of a penalty nor does it dictate how the court should calculate a penalty.[12]  There are, however, two generally recognized methods for calculating penalties: (1) the top-down method[13]; and (2) bottom-up method.[14]  Under the top-down method, the court begins with the statutory maximum allowable penalty.  Under the bottom-up method, the court begins with the company's estimated economic benefit from noncompliance.  The starting figure is then adjusted in light of the court's assessment of the six statutory factors.  The Ninth Circuit has not yet adopted one approach or the other.

Logically, the Court should impose penalties only to the extent the evidence supports doing so.  The bottom-up approach, therefore, is superior.  It is better structured to ensure that any penalty will be supported by relevant evidence because it does not assume a penalty amount in the absence of justifying evidence.  It is the approach the Court should follow here.

Ultimately, however, the Court can exercise its discretion to impose a penalty in the amount it deems warranted irrespective of where it starts.  In fact, in some cases,

---

into account the degree to which the polluter's conduct had already been punished by penalties for daily violations and to use the maximum penalty for a daily violation as a basis for comparison.").

[12] 33 U.S.C. § 1319(d).  *See also Leslie Salt Co.,* 55 F.3d at 1397; *Sierra Club v. City and County of Honolulu*, 2007 WL 3166771, *7 (D. Haw. Oct. 30, 2007) ("Although the penalty statute sets a maximum amount of penalty that can be assessed, it does not provide a required minimum amount, and sets forth factors for this Court to consider in making the penalty determination.").

[13] *Hawaii's Thousand Friends v. City and County of Honolulu*, 821 F. Supp. 1368, 1395-97 (D. Haw. 1993)(applying top-down approach to impose $718,000 penalty as opposed to the $249.35 million statutory maximum and separately requiring city to allocate an additional $1 million to study the potential impacts of discharge); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77, 87-88 (2d Cir. 2006) (recognizing the district court could use either the top-down or bottom-up method where the district court opted to use the top-down method).

[14] *Allegheny Ludlum Corp.*, 366 F.3d at 178 n.6 (noting that the CWA does not prescribe a specific method for determining appropriate civil penalties for violations, the Third Circuit upheld the district court's decision to follow the bottom-up method and impose a penalty that was twice the amount of the economic benefit); *United States v. Mun. Auth. of Union Township*, 150 F.3d 259, 265 (3d Cir. 1998) (recognizing that district court was free to use its discretion in choosing the appropriate method and upholding district court's decision to apply bottom-up method and impose penalty that was twice the amount of the economic benefit).

**NANA REGIONAL CORPORATION'S TRIAL BRIEF**
**ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)**
PAGE 7 OF 15

courts do not specify which method was used to calculate the penalty.[15]

### C.    The Court is to consider six statutory factors.

To determine the penalty, the Court must consider six factors: (1) the seriousness of the violation; (2) any economic benefit resulting from the violation; (3) any history of such violations; (4) good-faith efforts to comply with the relevant requirements; (5) the economic effect of the penalty on the violator; and (6) such other matters as justice may require.[16]

#### 1.    The seriousness of the violations.

Courts have looked at several factors in considering the seriousness of violations. These include the number and duration of the violations,[17] their importance, and the actual or potential harm they caused.

##### a.    The violations caused no actual harm.

In addressing the seriousness of the violations at trial, NANA expects the evidence to show that they caused no actual harm. For instance, Red Dog Creek is toxic to fish in its natural condition. Before the Mine, no fish lived in the Middle Fork, Arctic Grayling would only briefly migrate through the mainstem to reach the North Fork, and there were numerous fish mortalities documented in the mainstem. Since the Mine began operations, the biological conditions in Red Dog Creek have greatly improved over the natural pre-mine conditions. Further, NANA expects the evidence also will show that Kivalina's drinking water is and has been safe, and that the Mine's effluents are not responsible for any of the observations Plaintiffs have made regarding various fish populations. The Court should take this evidence into account in considering the

---

[15] *Southwest Marine, Inc.*, 236 F.3d at 1002 (upholding the district court's penalty where the district court, instead of imposing the $25,000 maximum, imposed $1,000 for each day of violation and ordered that the penalty would be reduced by the amount of the cost to the violator for improving its storm water diversion system or making other changes to its system to comply with the court's injunction).
[16] 33 U.S.C. § 1319(d).
[17] *See Borden Ranch Partnership*, 261 F.3d at 816-18; *Hawaii's Thousand Friends*, 821 F. Supp. at 1393-94 (counting violations starting on the day the consent order was no longer in effect instead of counting from the day the NPDES permit became effective).

seriousness of the violations.[18]

### b. Very few violations exceeded the limits set in the COBCs and final NPDES permit issued in 2007.

Plaintiffs have brought before the Court thousands of alleged violations. As referenced earlier with respect to TDS violations, however, the evidence at trial will show that very few violations involved discharges that exceeded the limits set in the COBCs and the final NPDES permit that was stayed by Plaintiffs' and others' appeals.

This point is not limited to just the alleged TDS violations. Most of the non-TDS violations alleged by the Plaintiffs involve alleged violations of the cyanide limits. The cyanide limits were based on the State's water quality standards for "free cyanide", but because there was no approved test method for free cyanide, the State required use of a test method that measured "total cyanide" to evaluate compliance. Using that methodology, the Mine's effluent occasionally produced false positives that suggested violations of the cyanide limits, although other, more accurate tests established that in fact no violations occurred. These false positives technically are violations, but they caused no environmental harm.

In June 2003, the State adopted revisions to its water quality standards and specified that use of the weak acid dissociable (WAD) cyanide test was the relevant test to evaluate compliance with limits based on free cyanide. EPA approved the revisions in February 2004. Teck Cominco has routinely tested with the appropriate "WAD cyanide" test as well as testing with the required "total cyanide" test. While the Mine's effluent

---

[18] *Hawaii's Thousand Friends,* 821 F. Supp. at 1383-87 (court states that "it will consider the lack of measurable material harm to be a significant mitigating factor in assessing penalties"); *Atlantic States Legal Found. Inc. v. Universal Tool & Stamping Co., Inc.*, 786 F.Supp. 743, 747-49 (N.D.Ind.1992) (court held that, even though the defendant had violated its CWA permit more than 1,900 times during the relevant period, the lack of material environmental harm was a significant mitigating factor); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 244 F.Supp.2d 41, 49-50 (N.D.N.Y. 2003) (court held that it must "weigh the fact that the turbidity and suspended solids which Defendants discharged … were not toxic and, at least in part, were the result of the natural conditions of the water …. Moreover, … there was evidence that without the discharge of the water through the Shandaken Tunnel, there would have been less habitat for trout because of low water levels. Based upon this evidence, the Court considers this element to be a mitigating factor.").

occasionally showed exceedances of the cyanide limits when measured using the old and inappropriate "total cyanide" test method, the more accurate and relevant WAD cyanide test method shows compliance with the cyanide limits set in its permit. Such exceedances are violations only because of Plaintiffs' success in thwarting the regulatory process. They are not "serious" and any penalty should be reduced accordingly.

### 2. The economic benefit to Teck Cominco.

The Court also must consider the "economic benefit (if any) resulting from the violation."[19] Although the court must consider this factor in setting a penalty, other factors may decrease the penalty below the calculated economic benefit.[20] For the reasons set forth in other sections of this brief, NANA submits that in this case a penalty less than the calculated economic benefit is proper.

### 3. The history of violations.

The *Hawaii's Thousand Friends* court found that because the state government had permitted the city's wastewater treatment plant to discharge effluent as long as it met the limitations set in an interim consent order, the "history of the violations" factor was not applicable to the determination of the penalty.[21] This Court should conclude the same as to all violations that do not exceed the limits set by the EPA in its COBCs and the 2007 final NPDES permit.

### 4. Teck Cominco's good-faith efforts to comply.

Teck Cominco worked consistently with the state and federal governments to try to achieve compliance with its NPDES permit. After 1998, EPA and the DEC developed a site-specific water quality standard for Red Dog Creek. That standard could not be immediately used, however, because NPDES permit program rules forbade EPA to base NPDES permit limits on the new water quality standard until it was adopted by the State

---

[19] 33 U.S.C. § 1319(d). *See Mun. Auth. of Union Township*, 150 F.3d at 263 ("the goal of the economic benefit analysis is to prevent a violator from profiting from its wrongdoing").

[20] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 956 F. Supp 588, 610 (D.S.C. 1997), *vacated as moot because the only relief sought on appeal was penalties*, 149 F.3d 303 (4th Cir. 1998), *reversed and remanded on mootness issue*, 528 U.S. 167 (2000).

[21] 821 F.Supp. at 1388-89.

**NANA REGIONAL CORPORATION'S TRIAL BRIEF**
**ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)**
PAGE 10 OF 15

and approved by EPA.[22]

Consequently, Teck Cominco operated under the terms of a succession of COBCs. But they did not change the limits set out in the 1998 permit. Accordingly, Plaintiffs sued Teck Cominco for non-compliance with the permit limits irrespective of the fact that, for the most part, Teck Cominco had complied with the limits set in the compliance orders. Again, faced with an analogous situation, the *Hawaii's Thousand Friends* court held that the city's good faith reliance on the standards in the consent order were a "significant mitigating factor in assessing a penalty."[23]

### 5. The economic effect of the penalty on Teck Cominco.

The Court also is required to consider the economic impact of the penalty on Teck Cominco.[24] This factor should be given very little weight. Teck Cominco worked consistently to comply with the government's regulatory requirements. The record reflects that no penalty is required in order to motivate Teck Cominco towards compliance.

### 6. Other Matters as Justice Requires.

The last penalty factor under the Clean Water Act is broad: "…Such other matters as justice may require."[25] While the Plaintiffs' procedural ploys have preserved their claims, justice requires they be understood for what they are. In short, the 'violations' over which Plaintiffs have sued do not reflect real environmental harm. All of them were known to EPA. None of them were deemed appropriate by EPA for enforcement action.

Rather, EPA's response to the situation over the last several years has been to work steadily to try to update the relevant limits. In 2007 the EPA issued a new NPDES permit for Red Dog Mine that adopted all the changes EPA had tried to implement earlier. It created requirements that, based on Teck Cominco's operating history at Red

---

[22] 40 CFR 131.21.
[23] 821 F. Supp. at 1396. *See also Laidlaw*, 956 F. Supp. at 610 (reducing penalty below the calculated economic benefit in part because of evidence of the difficulty of environmental compliance and the company's good faith efforts to work with the agency to achieve compliance.).
[24] 33 U.S.C. § 1319(d).
[25] *Id*.

**NANA REGIONAL CORPORATION'S TRIAL BRIEF**
**ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)**
PAGE 11 OF 15

Dog, Teck Cominco would rarely if ever violate. Not surprisingly, Plaintiffs appealed the State's 401 certification of the 2007 permit to prevent the updates from taking effect.[26]

The Third Circuit Court of Appeals has recognized that in some cases it may be proper to consider a government agency's inaction when setting civil penalties:

> In a case where a defendant has failed in a good faith attempt to comply with its permit because of technical or economic problems and the EPA has affirmatively recognized and excused noncompliance, justice may require that a court adjust the penalty amount.[27]

Moreover, the Court should consider the economic impact any penalty imposed on Teck Cominco would have on NANA's shareholders and the shareholders of other native corporations across the State.[28] NANA expects the evidence at trial will show that the Mine has provided the economic foundation for the Northwest Arctic Borough, providing jobs and a local revenue stream that enables residents in the region to become more self-reliant. Total payments to the NANA region, including payments to the Northwest Arctic Borough, shareholder salaries, NANA royalties and NANA contracts at the Mine has been about a half billion dollars since start-up in 1989. Because of the Mine, the borough is able to issue bonds to build new schools. Since the beginning of production, the Mine has hired over 1,100 NANA shareholders and has paid out over $223 million in salaries to shareholders. Other Native village and regional corporations also will suffer

---

[26] Center on Race, Poverty & the Environment, March 12, 2007, Request for Adjudicatory Appeal under 18 AAC § 15.200 for Teck Cominco Alaska, Inc.'s Red Dog Mine's State § 401 Certification, NPDES AK-003865-2 and Request for Stay under 18 AAC § 15.210. If it had taken effect, it would have mooted many of the Plaintiffs' alleged violations because under the new limits the violations would not have been repeated in the future. The United States Supreme Court stated in *Gwaltney* that the mootness doctrine "protects defendants from the maintenance of suit under the Clean Water Act based solely on violations wholly unconnected to any present or future wrongdoing." 484 U.S. at 66-67.

[27] *Pub. Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 81 (3d Cir. 1990). *See also Laidlaw*, 956 F. Supp. at 610 (reducing penalty below the calculated economic benefit because of (1) evidence of the difficulty of environmental compliance; (2) lack of proven damage to the environment; and (3) the company's good faith efforts to work with the agency to achieve compliance.)

[28] *Atlantic States Legal Found., Inc.*, 897 F.2d at 1141 ("the court is to take each listed factor into account as well as any additional factors the court feels have bearing on the question of penalties").

**NANA REGIONAL CORPORATION'S TRIAL BRIEF**
**ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)**
PAGE 12 OF 15

the economic impact of any penalty imposed on Teck Cominco. Under the terms of the Native Claims Settlement Act, 62 percent of NANA's royalty is distributed to the other Native village and regional corporations.

## V.   NO INJUNCTIVE RELIEF IS WARRANTED.

Under the Clean Water Act, district courts may enforce standards, limitations, and orders that have been violated.[29] The Ninth Circuit has followed the United States Supreme Court's four-part test to determine when injunctive relief may be appropriate, namely when a party demonstrates:

1. that it has suffered an irreparable injury;
2. that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;
3. that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and
4. that the public interest would not be disserved by a permanent injunction.[30]

The Ninth Circuit, however, has explained that "injunctive relief is not automatic, and there is no rule requiring automatic issuance of a blanket injunction when a violation is found."[31]

District courts have "'broad latitude in fashioning equitable relief when necessary

---

[29] 33 U.S.C. § 1365(a). *See also Southwest Marine, Inc.*, 236 F.3d at 1000 (indicating that while the district court's enforcement authority is not limited to simply ordering the violator to comply with the applicable requirements, courts may not impose more stringent limitations than those imposed by the EPA); *Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.*, 2 F.3d 493, 507 (3d Cir. 1993) (remanding for district court to narrow the scope of the injunction to order compliance only with the parameters that were being continuously or intermittently violated and which have not been rendered moot by virtue of the relaxed standards in the superseding permit).

[30] *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

[31] *Id.* The Ninth Circuit quoted the Supreme Court's holding in *Weinberger v. Romero-Barcelo*: "The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.* (quoting *Weinberger*, 456 U.S. 305, 313 (1982)).

to remedy an established wrong.'"[32]  But district courts must '"balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"[33]

Plaintiffs may ask the Court to enjoin Teck Cominco to comply with the limits set forth in the 1998 permit.  But those limits are not achievable.  Neither EPA nor the DEC support application of those limits.  EPA has and will continue to take steps to impose the appropriate limits, which would already be in effect but for the appeal of the 2007 permit.

Moreover, an injunction ordering Teck Cominco to comply with the limits in the 1998 permit would not result in compliance with the limits in the 1998 permit. Regardless of whether the Mine is operating or not, the surface runoff, which will occur in perpetuity, will discharge effluents that grossly exceed the limits in the 1998 permit. Further, preclusion of any further discharge would run the risk of overtopping the dam on the tailings pond.

If any injunctive relief is warranted, the Court could order Teck Cominco (1) to achieve compliance with the limits in the revised permit that EPA will issue upon completion of the EIS on which it currently is working and (2) to submit a report to the Court within three months of issuance of that permit regarding how Teck Cominco intends to comply with those limits.

---

[32] *Southwest Marine, Inc.*, 236 F.3d at 999-1000 (quoting *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994)).
[33] *Northern Cheyenne Tribe*, 503 F.3d at 843-44 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

**NANA REGIONAL CORPORATION'S TRIAL BRIEF**
**ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)**
PAGE 14 OF 15

Dated: March 12, 2008     Respectfully submitted,

Attorneys for Intervenor-Defendant
NANA REGIONAL CORP.

By      */s/ James E. Torgerson*
JAMES E. TORGERSON (BAR NO. 8509120)
YVONNE LAMOUREUX (BAR NO. 0512124)
Heller Ehrman LLP
510 L Street, Suite 500
Anchorage, AK  99501
Telephone:  907-277-1900
Jim.torgerson@hellerehrman.com
Yvonne.lamoureux@hellerehrman.com

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of NANA REGIONAL CORPORATION'S TRIAL BRIEF was served via the method indicated below this 12th day of March, 2008, on the following parties:

| | |
|---|---|
| Luke W. Cole<br>Center on Race, Poverty & the Environment<br>47 Kearny Street, Suite 804<br>San Francisco, CA  94108<br>luke@igc.org | Counsel for Plaintiffs<br><br>Served via:  Electronic transmission |
| Nancy S. Wainwright<br>Law Offices of Nancy S. Wainwright<br>13030 Back Road, Suite 555<br>Anchorage, AK  99515-3538 | Counsel for Plaintiffs<br><br>Served via:  U.S. Mail only |
| Sean Halloran<br>Hartig Rhodes Hoge & Lekisch, P.C.<br>717 K Street<br>Anchorage, AK  99501<br>sean.halloran@hartig.com | Counsel for Defendant Teck Cominco<br>Served via:  Electronic transmission |
| David S. Case<br>Landye Bennett Blumstein LLP<br>701 West 8th Avenue, Suite 1200<br>Anchorage, AK  99501<br>dcase@lbblawyers.com | Counsel for Intervenor-Defendant<br>Northwest Arctic Borough<br><br>Served via:  Electronic transmission |

      */S/ James E. Torgerson*
JAMES E. TORGERSON (BAR NO. 8509120)
YVONNE LAMOUREUX (BAR NO. 0512124)
HELLER EHRMAN LLP
510 L Street, Suite 500, Anchorage, AK  99501
Telephone:  907-277-1900
Jim.torgerson@hellerehrman.com
Yvonne.lamoureux@hellerehrman.com

SE 2244806 v6
3/12/08 5:59 PM (38576.0002)

**NANA REGIONAL CORPORATION'S TRIAL BRIEF**
**ENOCH ADAMS V. TECK COMINCO ALASKA INCORPORATED, CASE NO.: A:04-CV-0049 (JWS)**
PAGE 15 OF 15