LUKE W. COLE, California Bar No. 145,505
CAROLINE FARRELL, California Bar No. 202,871
BRENT J. NEWELL, California Bar No. 210,312
Center on Race, Poverty & the Environment
47 Kearny St, Suite 804
San Francisco, CA 94108
415/346-4179 • fax 415/346-8723

NANCY S. WAINWRIGHT, Alaska Bar No. 8711071
Law Offices of Nancy S. Wainwright
13030 Back Road, Suite 555
Anchorage, AK 99515-3358
907/345-5595 • fax 907/345-3629

Attorneys for Plaintiffs Enoch Adams, Jr., Leroy Adams, Andrew Koenig, Jerry Norton, David Swan and Joseph Swan

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA AT ANCHORAGE**

| | |
|---|---|
| ENOCH ADAMS, JR., LEROY ADAMS, ANDREW KOENIG, JERRY NORTON DAVID SWAN and JOSEPH SWAN,<br><br>       Plaintiffs,<br><br>       v.<br><br>TECK COMINCO ALASKA INCORPORATED<br><br>       Defendant.<br>_____<br>NANA REGIONAL CORPORATION and NORTHWEST ARCTIC BOROUGH,<br><br>       Intervenors-Defendants.<br>_____ | Case No. A04-49 (JWS)<br><br><br><br>**PLAINTIFFS' TRIAL BRIEF**<br><br>[D.Ak. L.R. 39.2] |

**PLAINTIFFS' TRIAL BRIEF**

I.  **INTRODUCTION**

As this Court well knows, this is a Clean Water Act enforcement action by residents of the Native Village of Kivalina against the world's largest zinc and lead mine, the Red Dog mine operated by Teck Cominco Alaska Incorporated. This dispute first began in 2002 in *Kivalina Relocation Planning Commission v. Teck Cominco Alaska, Incorporated*, A02-231-CV (JWS) (the "*KRPC* case"), has continued across four years in its present incarnation, and is now ready for trial. Teck Cominco's admitted violations are well documented, and it is time for it to face both liability and significant penalties for its years of illegal behavior.

This trial brief follows the dictates of this Court's Order at Docket 177 and also Local Rule 39.2, in giving a short statement of Adams's position supported with authority, designating pleadings and identifying the remaining claims. It addresses the issues expected at both the liability and penalty phases of trial.

II.  **SUMMARY OF BRIEF**

This citizens' suit enforcement case relies on Teck Cominco's admissions to the United States Environmental Protection Agency ("EPA") to demonstrate that Teck Cominco violated its Clean Water Act permit more than 2400 times. Adams's Supplemental Revised Complaint [Docket 183] includes 10 claims covering a variety of violations, as summarized in Table I.[1] Adams has proven 621 violations [Docket 136], the Court has dismissed 54 violations [Docket 127], and Adams has previously withdrawn several violations [Docket 127]. Through this brief Adams withdraws the remaining monitoring and reporting violations alleged in its third, sixth and ninth claims, as well as the remaining violations in its fourth, fifth and tenth claims (396 withdrawn violations total), which should streamline trial. For proof at trial there remain 992 total dissolved solids ("TDS") violations in the first claim, 622 cyanide violations in the second claim, and 208 whole effluent toxicity ("WET") violations in the third claim, totaling 1822 violations.

---

[1] Per D.Ak.L.R. 39.2(b)(1)[A], the plaintiffs in this case – Enoch Adams, Jr., Leroy Adams, Andrew Koenig, Jerry Norton and Joseph Swan, Sr., collectively "Adams" – are all subsistence hunters and fishers and long-time residents of the Native Village of Kivalina (plaintiff David Swan passed away on May 5, 2005). The defendant is Teck Cominco Alaska Incorporated, the operator of the Red Dog Mine upstream of Kivalina. The NANA Regional Corporation intervened as a defendant, and the Northwest Arctic Borough intervened as a defendant in the penalty phase.

**PLAINTIFFS' TRIAL BRIEF**                1

| Claim/Violation | Proven | Dismissed | Withdrawn | For Trial |
|---|---|---|---|---|
| **TABLE I: Summary of Adams's Claims** | | | | |
| **FIRST CLAIM** | | | | |
| TDS Daily | 618 | | | 301 |
| TDS Monthly | | | | 691 |
| **SECOND CLAIM** | | | | |
| Cyanide Daily | | | 1 | 34 |
| Cyanide Monthly | | | | 588 |
| **THIRD CLAIM** | | | | |
| WET Reporting | | | 7 | |
| WET Daily | | | | 11 |
| WET Monthly | | | | 199 |
| **FOURTH CLAIM** | | | | |
| Cadmium Daily | | | 2 | |
| Cadmium Monthly | | | 38 | |
| **FIFTH CLAIM** | | | | |
| Unpermitted Discharge | | | 3 | |
| **SIXTH CLAIM** | | | | |
| Mine Monitoring & Reporting | | 20 | 276 | |
| **SEVENTH CLAIM** | | | | |
| Unpermitted Discharges - Port | 2 | | | |
| **EIGHTH CLAIM** | | | | |
| Port TSS | 1 | | | |
| **NINTH CLAIM** | | | | |
| Port Monitoring & Reporting | | 20 | 19 | |
| **TENTH CLAIM** | | | | |
| COBC | | 14 | 50 | |
| **Total** | 621 | 54 | 396 | 1822 |

**PLAINTIFFS' TRIAL BRIEF**  2

Under the Clean Water Act, there are two stages to this litigation: the liability phase and the penalty phase. At the liability stage, Adams's theory of the case is simple: Teck Cominco has a permit from EPA requiring its discharge of mine effluent to meet certain numerical limitations; over the past 10 years it has routinely filed reports with EPA documenting its failure to meet those numerical limitations. Teck Cominco has admitted and documented the 1822 violations remaining for trial in filings with the EPA, and a great number of them in its Answers here and in the *KRPC* case. At trial these violations will be proven through a variety of documentary evidence: Teck Cominco's Discharge Monitoring Reports (DMRs), laboratory reports, court filings, and other correspondence. The three central legal/factual questions to be resolved at this stage are 1) what are the permit limitations applicable to each parameter? 2) Has Teck Cominco violated those permit limitations? And 3) is that violation ongoing or capable of repetition?

Teck Cominco's anticipated defenses to liability include 1) the split sample defense rejected by this Court on two previous occasions (Dockets 104 and 276); 2) factually challenging certain violations; 3) challenging its permit limitation for monthly cyanide; and 4) asserting that the violations are not ongoing or capable of repetition.

At the penalty stage, Adams will demonstrate the six Clean Water Act penalty factors require a significant fine, near the maximum of $70,370,000 for the 2,456 violations that Adams will ultimately prove. It will demonstrate the violations were serious and continuous across 10 years, that Teck Cominco had significant economic benefit by not complying, that these violations are part of a long history of violations by the mine, that Teck Cominco did not in good faith attempt to remedy the violations or mitigate its impact on spawning fish, that a significant penalty is necessary for deterrence given Teck Cominco's gigantic profits, and that justice requires that Teck Cominco's flouting of the law be halted. 33 U.S.C. § 1319(d). Beyond a significant fine, however, there is also a need for injunctive relief to remedy Teck Cominco's violations.

Teck Cominco's anticipated defenses at the penalty phase include 1) it assertion that it had little economic benefit from its violations; 2) that the violations were not serious and did not harm wildlife; 3) that it acted in good faith; and 4) that regulatory agencies signed off on its violations of its permit.

III.  **DESIGNATION OF PLEADINGS (D.Ak. L.R. 39.2(b)(2))**

The pleadings Adams expects to rely on include the Complaint (Docket 1), Answer (Docket 6), Supplemental Revised Complaint (Docket 183) and Answer to Supplemental Revised Complaint (Docket 184). In addition, Adams expects to rely on the Complaint (Docket 1) and Teck Cominco's Answer (Docket 7) in the *KRPC* case.

Relevant pre-trial rulings include this Court's rulings on various summary judgment motions at Dockets 127, 136 and 276. Further relevant pre-trial rulings include those at Dockets 302, 303. The stipulated Uncontested Facts are found at Docket 196. In addition, Adams will rely on admissions made by Teck Cominco in its summary judgment pleadings.

IV.  **REMAINING CLAIMS (D.Ak. L.R. 39.2(b)(3))**

As set forth in Table I above, the violations remaining for proof at trial include 992 violations of Teck Cominco's TDS permit limits (first claim), 622 violations of its cyanide permit limits (second claim), and 208 violations of its WET permit limits (third claim). A total of 1822 violations in these three claims are the claims Adams will prove at trial.[2] As noted above in Section II, Adams is withdrawing a subset of its original claims. The threshold the Court set for proving ongoing violations in the monitoring and reporting context – violations of the same parameter at the same location – has not been met and thus Adams is withdrawing the 276 monitoring and reporting violations in its sixth claim, the 19 in its ninth claim and the seven in its third claim. In addition, as there was no Compliance Order by Consent ("COBC") for the 2007 discharge season, and the 2004, 2005 and 2006 COBCs had shifting requirements, Adams is unable to show the documented violations of the 1999-2003 COBCs are ongoing and is thus withdrawing those 50 violations in its tenth claim. Further, Adams is withdrawing the cadmium claims in its fourth claim and the unpermitted discharge claims in its fifth claim as they are not, to Adams knowledge, ongoing. The withdrawal of these claims will streamline the trial and focus it on the three major sets of violations,

---

[2] In totaling the number of violations here, and in Tables I and II, Adams follows this Court's adoption of the holding of *Chesapeake Bay Foundation v. Gwaltney of Smithfield*, 791 F.2d 304, 313-15 (4th Cir. 1986), *vacated and remanded on other grounds*, 484 U.S. 49 (1987) that violations of a monthly average permit limitation mean a violation on each day of that month the facility discharged. Docket 276 at 5.

**PLAINTIFFS' TRIAL BRIEF**    4

of TDS, cyanide and WET permit limits.

Below, Adams sets forth its case at the liability and penalties phases of this case.

## LIABILITY PHASE

**V. PLAINTIFFS WILL PROVE THE REMAINING TDS, CYANIDE AND WHOLE EFFLUENT TOXICITY VIOLATIONS DURING THE LIABILITY PHASE.**

The three remaining claims cover violations of Teck Cominco's TDS, cyanide and whole effuent toxicity permit limitations. The evidence of liability, all provided by Teck Cominco, is overwhelming. The few issues as to liability – permit limits, violations and whether or not they are ongoing – should be relatively easy to resolve given the evidence.

**A.    The evidence of liability is overwhelming.**

The evidence of liability for each category of claims is similar: first, Teck Cominco has admitted a great number of the violations in its Answers and other filings in this case and the *KRPC* case. Second, Teck Cominco has admitted the remaining violations in its DMRs, backed up by the laboratory reports underlying those DMRs. Third, Teck Cominco has further admitted certain violations in notices of permit violations submitted to the EPA. Fourth, Teck Cominco has admitted certain violations in its Compliance Orders by Consent with the EPA. Finally, Teck Cominco's staff have admitted certain violations in their deposition testimony. The documentary evidence of these violations will be presented through expert witnesses, the plaintiffs themselves (elected officials and former elected officials in Kivalina), and Teck Cominco employees.

**B.    The issues at trial on liability are easy to resolve.**

There are three basic issues to be decided during the liability phase: what are the permit limits, did Teck Cominco violate them, and are those violations ongoing or capable of repetition?

**1.    What are the permit limits?**

For two of the three parameters at issue – TDS and cyanide – there may be legal skirmishes as to what permit limits apply. On TDS, there should not be a dispute because of the Court's recent summary judgment ruling (Docket 276 at 3), but one may still arise given Teck Cominco's position in summary judgment briefing. It is Adams's position that the permit limits in the 1998 mine permit for both monthly average TDS (170 mg/L) and daily maximum TDS (196 mg/L) apply through June 15, 2004, when the EPA Appeals Board issued its decision on an appeal of Teck Cominco's

**PLAINTIFFS' TRIAL BRIEF**                5

1  2003 permit modification. After June 15, 2004, the permit limits for both monthly and daily TDS
2  from the 1998 permit apply only during Arctic grayling season, a period in late May and/or early
3  June each year; at other times the limitation in the 2003 permit modification (3900 mg/L daily
4  maximum, no monthly average limit) applies. The potential dispute may arise because Teck
5  Cominco has recently made an argument, for the first time, that the monthly TDS permit limitation
6  does not apply at any time. Docket 257 at 6-9. As Adams explained in plaintiffs' summary
7  judgment reply, this argument contradicts its own deposition testimony and representations to and by
8  the EPA in its COBCs. Docket 270 at 7-9. This Court appears to have rejected Teck Cominco's
9  argument in ruling for Adams on the monthly TDS summary judgment question, Docket 276 at 3,
10 but Teck Cominco may still argue that there is no longer a monthly TDS permit limit. Adams
11 incorporates its earlier argument, Docket 270 at 7-9, if this is the case.
12        The other legal issue – what is the monthly cyanide permit limit Teck Cominco must meet?
13 – was also raised in Adams's recent summary judgment motion, but not decided by the Court.
14 Adams set forth plaintiffs' position in its opening and reply briefs (Dockets 241 at 4-12, 270 at 9-
15 13), and incorporates those arguments here. At trial, Adams's experts will explain that (contrary to
16 the Court's implication in Docket 276 at 3) there currently exist methodologies that can detect
17 cyanide below 9 µg/L, that those methodologies are required by the permit and that they are
18 currently employed by Teck Cominco in its total cyanide testing. It is based on those methodologies
19 that Teck Cominco has been, for years, reporting values in excess of the permit limit (4 µg/L) but
20 below the interim minimum limit (9 µg/L) found in a different permit condition. The confusion
21 arises in parsing the permit because although the methodologies exist, the methodologies are
22 required by the permit, and Teck Cominco is using them, they are not yet officially "*EPA-
23 approved.*" This does not mean that EPA does not know of them or approve of their use by Teck
24 Cominco; indeed, it *required* their use in setting the permit condition at 4 µg/L and requiring Teck
25 Cominco to achieve a method detection limit of 3 µg/L (Permit Condition I.A.5.b, Trial Exhibit
26 3000 at 5-6). The factual elucidation of existing and in-use methodologies will inform the Court's
27 understanding of the legal requirements of the permit regarding monthly cyanide limits. All of the
28 permit's conditions must be read together, including the 4 µg/L limit, and the requirement (at

**PLAINTIFFS' TRIAL BRIEF**            6

Condition I.A.5.b) that Teck Cominco achieve a method detection limit of 3 µg/L. Trial Exhibit 3000, at 5-6. Teck Cominco has complied with the requirement to achieve a method detection limit of 3 µg/L, and the total cyanide tests under that methodology reveal repeated violations of it permit limit of 4 µg/L.

The WET permit limits should not be in dispute.

### 2. Did Teck Cominco violate those permit limits?

Teck Cominco has admitted a substantial proportion of the violations remaining for trial, and the remaining violations will be proven using the evidence summarized in Section V.A, above.

### 3. Are the violations ongoing or capable of repetition?

The central question at the liability phase is going to be, are the permit violations of TDS, cyanide and WET ongoing or capable of repetition? This was the reason that the Court declined to enter summary judgment on many of Adams's claims, despite Teck Cominco's admissions of violations. Docket 136. Adams will demonstrate at trial that each of the six types of violations – daily and monthly TDS, daily and monthly cyanide, and daily and monthly WET – have occurred since this suit was filed in March 2004. This meets the test in the Ninth Circuit: "If the same parameter is exceeded [after the Complaint is filed] . . . then the violation will be deemed 'ongoing' and liability will attach." *Sierra Club v. Union Oil Co. of Cal.*, 716 F. Supp. 429, 433 (N.D. Cal. 1988).

## C. Known evidentiary issues (D.Ak. L.R. 39.2(b)(7))

Adams expects that most of the evidentiary issues – raised in the motions in limine – will be resolved by the time of trial. Adams expects Teck Cominco to challenge Adams's experts in various ways. Because Teck Cominco did not file any motions challenging Adams's witness list or those listed on it by the objection date set by the Court, it should be estopped from objecting to those experts at a later date. (Adams anticipates that the evidentiary issues at the liability phase, if any, will be similar to those at the penalty phase, and so does not independently address them in discussing the penalty phase, below.)

# PENALTY PHASE

## VI. TECK COMINCO'S ONGOING, SERIOUS VIOLATIONS OF THE CLEAN WATER ACT REQUIRE A SIGNIFICANT PENALTY TO CAPTURE THE ECONOMIC BENEFIT IT HAS ACQUIRED AND DETER FUTURE ILLEGAL BEHAVIOR.

At the penalty phase, Adams will demonstrate the six Clean Water Act penalty factors require a significant fine, near the maximum of $70,370,000 for the 2,456 violations that Adams will ultimately prove. For each of the violations in the claims summarized above, the penalty assessment is similar in approach, as outlined below. The penalty assessment is governed by 33 U.S.C. §1319(d), which requires a mandatory penalty once liability is found: any person who violates the Act "*shall be subject to a civil penalty* not to exceed $25,000 per day for each violation." 33 U.S.C. § 1319(d) (emphasis added); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1396 (9th Cir. 1995) (civil penalties under Clean Water Act are mandatory, not discretionary). EPA has increased the maximum penalty amount: the penalty is $27,500 per day for each violation occurring after January 30, 1997 and through March 15, 2004, and $32,500 per day for each violation after March 15, 2004. 40 C.F.R. § 19.4. The maximum penalties for the violations Adams will prove at trial are summarized in Table II below, and Adams will request that the maximum penalty be imposed.

The Supreme Court has clarified that economic gain and restoration of the status quo are not the only bases on which penalties should be awarded under the Clean Water Act. *Tull v. United States*, 481 U.S. 412, 422 (1987) (explaining that civil penalties imposed are not to be "calculated solely on the basis of equitable determinations, such as the profits gained from violations of the [Clean Water Act]"). Instead, Clean Water Act penalties are "intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo[.]" *Id*.; *see also Atlantic States Legal Found. Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1141 (11th Cir. 1990) (*"Tyson Foods"*) ("penalties are designed to punish violators for their non-compliance and to serve the goal of retribution"); *United States v. Environmental Waste Control, Inc.*, 710 F. Supp. 1172, 1244 (N.D. Ind. 1989) ("A civil penalty must provide a meaningful deterrence without being overly punitive; it should be large enough to hurt; it should deter anyone in the future from showing a similar lack of concern with compliance."). Because Teck Cominco has flouted its

**PLAINTIFFS' TRIAL BRIEF**            8

1  permit limits for a decade, accruing thousands of permit violations, a severe penalty is warranted not
2  only for punishment, but to deter it and similarly situated mines from committing Clean Water Act
3  violations in the future.

| TABLE II: Maximum Penalties for Teck Cominco's Violations | | | | |
|---|---|---|---|---|
| Parameter | Number of Violations pre March 15, 2004 | Number of Violations post March 15, 2004 | Penalty per Violation ($) | Total Penalty ($) |
| TDS daily | 618* |  | 27,500 | 16,995,000 |
|  |  | 301 | 32,500 | 9,782,500 |
| TDS monthly | 618 |  | 27,500 | 16,995,000 |
|  |  | 73 | 32,500 | 2,372,500 |
| Cyanide daily | 24 |  | 27,500 | 660,000 |
|  |  | 10 | 32,500 | 325,000 |
| Cyanide monthly | 418 |  | 27,500 | 11,495,000 |
|  |  | 181 | 32,500 | 5,882,500 |
| WET daily | 10 |  | 27,500 | 275,000 |
|  |  | 1 | 32,500 | 32,500 |
| WET monthly | 199 |  | 27,500 | 5,472,500 |
| Unpermitted Discharge to Tundra | 2* |  | 27,500 | 55,000 |
| Port TSS | 1* |  | 27,500 | 27,500 |
| Total | 1,890 | 566 |  | $70,370,000 |

*Violations already established at summary judgment, Docket 136.

Courts follow a two-step process in calculating penalties under section 1319 of the Clean Water Act. *See Tyson Foods, Inc.*, 897 F.2d at 1142. First, the court calculates the maximum penalty that could be assessed against the violator. *Id*. Second, the court determines if the

**PLAINTIFFS' TRIAL BRIEF**        9

1  maximum penalty should be reduced based upon an analysis of six factors in section 1319(d). *Id*.[3]
2  Those factors are "the seriousness of the violation or violations, the economic benefit (if any)
3  resulting from the violation, any history of such violations, any good-faith efforts to comply with the
4  applicable requirements, the economic impact of the penalty on the violator, and such other matters
5  as justice may require." 33 U.S.C. § 1319(d). If the court chooses not to impose the maximum
6  penalty, "it must reduce the fine in accordance with the factors spelled out in section 1319(d);
7  clearly indicating the weight it gives to each of the factors and the factual findings that support its
8  conclusion." *Tyson Foods, Inc.*, 897 F.2d at 1142.

   **A.  Teck Cominco's violations here are serious.**

   In evaluating the seriousness of the violations, it is appropriate to consider the number,
duration and degree of the violations, as well as the actual or potential harm to human health and the
environment. *Hawaii's Thousand Friends*, 821 F. Supp. at 1383. The Court may justifiably
impose a significant penalty if it finds there is a risk or potential risk of environmental harm from the
violations, even absent proof of actual deleterious effect. *United States v. Smithfield Foods*, 972 F.
Supp. 338, 344 (E.D. Va. 1997); *United States v. The Municipal Authority of Union Township*,
929 F. Supp. 800, 807 (M.D. Pa. 1996), *aff'd* 150 F.3d 259, 264 (3rd Cir. 1998) ("*Municipal
Township II*") ("because actual harm to the environment is by nature difficult and sometimes
impossible to demonstrate, it need not be proven to establish that substantial penalties are
appropriate in a Clean Water Act case").

---

[3]This is commonly known as the "top-down" approach. Some courts apply the "bottom-up" approach, in which the economic benefit of noncompliance with the Act is calculated in the first step, and then adjusted either up or down based on the statutory factors in section 1319(d). *See, e.g.,United States v. The Municipal Authority of Union Township*, 150 F.3d 259, 265-66 (3rd Cir. 1998) ("*Municipal Township II*"). There appears to be some judicial preference for the "top-down" penalty calculation method, however, and that approach has been applied in this circuit. *See Hawaii's Thousand Friends v. City and County of Honolulu*, 821 F. Supp. 1368, 1395 (D. Haw. 1993); *see, e.g. Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 574-76 (5th Cir.), *cert. denied*, 519 U.S. 811 (1996); *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 79 (3rd Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991); *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990).

**PLAINTIFFS' TRIAL BRIEF**                    10

One indicator of the seriousness of particular violations is the degree to which the discharge violations exceeded effluent limitations or water quality standards. *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1161, 1163, 1166 (D. N.J. 1989), *aff'd in part, rev'd in part*, 913 F.2d 64, 79 (3rd Cir. 1990), *cert. denied*, 498 U.S. 1109 (1991) ("*Powell Duffryn*"). Here, the evidence at trial will show that Teck Cominco's TDS daily maximum and monthly average discharge routinely and for many years exceeded its permit limit *by a factor of 20,* meeting the threshold of serious violation.

Along with the magnitude of water quality violations, the risk of impacts to aquatic ecosystems and public health also attest to the seriousness of defendants' discharges. The evidence at trial will show that although the EPA set permit levels to be protective of Arctic grayling spawning, Teck Cominco did not change its discharge in any way during grayling spawning season but continued "business as usual" with high TDS discharges.

Teck Cominco's discharge violations clearly meet the criteria to be considered "serious" for the purposes of assessing civil penalties, and thus does not justify any reduction from the statutory maximum penalty.

**B.    Teck Cominco achieved significant economic benefit by not complying with its permit.**

The "economic benefit" factor has been described as the "after-tax present value of avoided or delayed expenditures," *Municipal Township II*, 150 F.3d at 264 (*quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 890 F. Supp. 470, 481 (D.S.C. 1995)), and the "amount of money a company has gained over its competitors by failing to comply with the law." *Smithfield Foods*, 972 F. Supp. at 348. As the Court explained in *Smithfield Foods*, "[w]hen a company delays or avoids certain costs of capital and operations and maintenance necessary for compliance, the company is able to use those funds for other income-producing activities, such as investing that money in their own company." *Id*. at 349.

As summarized by another District Court:

An integral part of an economic benefit calculation is a "present value analysis" of compliance costs based on dates, rates and amounts. Present value is a common economic term that refers to a stream of future cash flows expressed as a single current dollar amount. The purpose of the analysis is to compare the present dollar value of [a party's] delayed compliance costs with the present dollar value of the [party's] costs had it completed and

PLAINTIFFS' TRIAL BRIEF                         11

begun operating necessary pollution control equipment in a timely manner. *Hawaii's Thousand Friends*, 821 F. Supp. at 1387. A violator's economic benefit under the Clean Water Act is often difficult to accurately determine. A reasonable approximation of economic benefit, however, is sufficient to meet the plaintiff's burden for this factor. *Powell Duffryn*, 913 F.2d at 80.

At trial, plaintiffs' expert economist Dr. Michael Kavanaugh will demonstrate that Teck Cominco achieved a significant economic benefit – more than $25,000,000 – by not investing in the technology necessary to bring its discharges into line with its permit limitations. However, for the purposes of assessing Clean Water Act penalties using the "top-down" method of calculation, the exact amount of economic benefit is not important. As long as defendants gained *some* economic benefit under this factor – as will be demonstrated at trial – reduction of the statutory maximum penalty amount is not appropriate.

### C. Teck Cominco has a Long History of Violations

In determining the "history of such violations," courts consider the duration of a defendant's current violations, whether the defendant has committed similar violations in the past, and the duration and nature of all of the violations, including whether the violations are perpetual or sporadic. *Gulf Park Water*, 14 F. Supp. 2d 854, 864 (S.D. Miss. 1998) (*citing Smithfield Foods*, 972 F. Supp. at 349). In doing so, the court may weigh *all* of a defendant's violations in the record, not just those for which liability has been determined. *Municipal Township II*, 929 F. Supp. at 807.

In this case, the violations that will be proven at trial span an eight-year period from 1999 to 2007, a significant duration; the violations actually began earlier, as alleged in the *KRPC* suit, but the earlier violations could not be pursued in this suit because of the five-year statute of limitations. In addition to the violations alleged in this suit and the *KRPC* suit, and violations documented in Adams's and KRPC's notice letters but not part of either lawsuit because they were not ongoing, Adams will offer evidence of other, similar violations by Teck Cominco as memorialized in the Consent Decree in *United States v. Cominco Alaska, Inc.*, No. A97-267-CIV (JKS) and other settlements involving Teck Cominco, the EPA and the state Department of Environmental

Conservation. The sheer magnitude of the violations here – almost 2500 – plus the thousands of other violations documented but not alleged in this suit, in addition to the violations shown in enforcement actions by federal and state agencies, demonstrate that no reduction of the maximum penalty is warranted for the history of Teck Cominco's violations.

**D. Teck Cominco has never made a good faith effort to comply with its TDS permit limit.**

Adams will demonstrate through documentary evidence and expert testimony that Teck Cominco did not ever make a good faith effort to comply with its TDS permit limits, instead pursuing solely a regulatory strategy that to date has not produced compliance, a decade after its permit first included TDS limits. The lack of good faith on Teck Cominco's part does not justify any reduction in the maximum penalty.

**E. Teck Cominco's massive profits demonstrate that it can absorb a significant penalty.**

Penalties are not limited to the economic benefit derived from noncompliance, otherwise a penalty would make the violator no worse off than complying in a timely manner. *Tull*, 481 U.S. at 422-23 (economic gain and restoration of the status quo are not the only bases on which penalties should be awarded under the Clean Water Act; penalties are designed to punish violators for their noncompliance and to serve the goals of retribution and deterrence). One of the primary purposes of civil penalties is to deter the violator and others from committing future violations. *Id*.

Under section 1319 of the Act, the court is required to consider the economic impact of the penalty on the violator. In doing so, the court may consider appropriate economic indicators of a company's financial status. *Smithfield Foods*, 972 F. Supp. at 353. To deter future violations by Teck Cominco Alaska and other similarly situated mines in Alaska, the Court should impose a penalty that is significant relative to the company's financial resources. The size of Teck Cominco's business and its annual revenues warrant the imposition of the maximum penalty. At trial, Adams's expert Dr. Michael Kavanaugh will demonstrate that Teck Cominco has the ability to pay a significant penalty.

**F. Justice requires the imposition of the maximum penalty to deter Teck Cominco and others from violating the Clean Water Act.**

Not only do all of the Clean Water Act section 1319 factors weigh in favor of imposing the

PLAINTIFFS' TRIAL BRIEF                13

maximum penalty, but they also indicate that Teck Cominco is in serious need of deterrence. It has significantly violated its permit with impunity for almost ten years, setting an example of non-compliance that cannot help but encourage other industries in Alaska to similarly ignore their permit limitations.

The legislative history of the Clean Water Act reveals that Congress wanted District Courts to consider the need for retribution and deterrence, in addition to restitution, when they imposed civil penalties. *Tull*, 481 U.S. at 421; 123 Cong. Rec. 39191 (1977) (remarks of Sen. Muskie citing Environmental Protection Agency memorandum outlining enforcement policy). To achieve the goal of deterrence, "the amount of the civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business." *Powell Duffryn*, 720 F. Supp. at 1166. Additionally, the probability that a penalty will be imposed must be high enough so that polluters will not choose to risk punishment for non-compliance. *Id*. Over the last 10 years, and despite repeated Compliance Orders by Consent with EPA in which Teck Cominco promised to achieve compliance within a year, only to seek yet another COBC, Teck Cominco has trivialized and ignored the Clean Water Act. Imposing the maximum penalty allowed under the Clean Water Act will make it perfectly clear to defendants and other similar operations that Clean Water Act requirements must be followed and that public waterways cannot be sacrificed for private gain.

### G. Injunctive relief is appropriate to bring Teck Cominco into compliance.

At trial, plaintiffs will present several proposed forms of injunctive relief that would force Teck Cominco to comply with its permit limitations. These include the possibility of building additional treatment facilities at the mine, and/or building a pipeline from the mine to the Chukchi Sea so that mine effluent is not discharged into the Red Dog Creek in amounts violating Teck Cominco's permits. The individual plaintiffs, who lives downstream of Teck Cominco, have strongly urged the company to voluntarily agree to a pipeline to the ocean, to no avail. Injunctive relief ordering compliance with its permit limitations through such a pipeline is appropriate here where all other methods of trying to force Teck Cominco into compliance – numerous COBCs by state and federal agencies, as well as numerous enforcement suits by those agencies and private parties over more than a decade – have failed. It is time for Teck Cominco to follow the law, and

PLAINTIFFS' TRIAL BRIEF                 14

this Court has the power to make that happen.

## VII.   CONCLUSION

After six years of preliminaries, Adams is looking forward to proving the remaining 1822 claims at trial.  Respectfully submitted this 12th day of March, 2008.

　　　　　　　　　　　　　　　　　_____/S/ Luke Cole_____
　　　　　　　　　　　　　　　　　Luke Cole
　　　　　　　　　　　　　　　　　Attorney for Plaintiffs

CERTIFICATE OF SERVICE
I hereby certify that on the 12th day of March 2008, a true and correct copy of the foregoing Plaintiffs' Trial Brief was served, via electronic mail, on the below identified parties of record:

Sean Halloran
Hartig Rhodes
717 K Street
Anchorage, AK 99501

Nancy S. Wainwright
Law Offices of Nancy S. Wainwright
13030 Back Road, Suite 555
Anchorage, Alaska 99515-3538

James E. Torgerson
Heller Ehrman White & McAuliffe LLP
510 L Street, Suite 500
Anchorage, Alaska 99501-1959

David S. Case
Landye Bennett Blumstein LLP
701 W. 8th Ave., Suite 1200
Anchorage, AK 99501

Thane Tienson
Landye Bennet Blumstein
1300 Southwest Fifth Ave, Suite 3500
Portland, OR 97201

_____/S/ Luke Cole_____

Luke Cole

**PLAINTIFFS' TRIAL BRIEF**　　　　　　　　15