Page 23

1    has to be produced for the court prior to any

2    trial testimony and would be available, I

3    believe, if we ever -- I don't know when trial

4    is.  So I can't say for sure that I will be

5    there.  But that's my intent, if it happens.

6         Q.   Do you have any plans at this point to

7    revise your report?

8         A.   No.  Nothing is planned, no.

9         Q.   So at this point you are not working on

10   any revisions or amendments to your report?

11   When I say "your report," I'm talking about your

12   expert report filed in this case.

13        A.   Correct.  Nothing is underway.

14        Q.   And nothing planned?

15        A.   And nothing is planned.

16        Q.   Would you please summarize for me, and

17   then we will go into some more detail, what you

18   did to obtain the facts that you used in

19   preparing your expert report.

20        A.   Sure.  A key question I always try and

21   ask at the outset is what would the plaintiffs

22   have had the defendants do.  I ask it a couple

Page 24

1    of different ways.

2            If you were the defendant, what would

3    you have done to control your discharges, what

4    do you think the defendants should have done to

5    correct the discharges, what would you have them

6    do.

7            So I ask that question a lot of

8    different ways and try and ask that they think

9    about that, "they" being any engineer that might

10    be retained on the case.  Or if the attorney has

11    already had some discovery material, you look

12    through the discovery material and see if there

13    is any kind of document or admission that sheds

14    some light on what the defendant should have

15    done.  What would you have them do.

16            That was one of the first things I did,

17    is I put that question out there.

18    Q.    To who?

19    A.    I asked that it be asked of the

20    engineering experts.  The engineering experts,

21    it turned out, were out of the country in the

22    first part of December.  So I had to bide my

Michael Kavanaugh          Adams, et al. v. Teck Cominco Alaksa, et al.          2/23/2005

```
 1   time a little bit on that.

 2          So I went and began to collect

 3   financial information from discovery of the Teck

 4   Cominco Alaska, Incorporated annual reports that

 5   were sent to me.

 6          I went and downloaded annual reports of

 7   Cominco prior to -- say '98, '99, prior to their

 8   merger.

 9   Q.   That's Cominco Alaska we are talking

10   about?

11   A.   Cominco Alaska.

12   Q.   Thank you.

13   A.   Then I also looked at Teck annual

14   reports when they owned significant portions of

15   Cominco Alaska.  I think that was also from '98,

16   '99 period.

17          I began to assemble in general terms a

18   financial profile of the parents and the mine

19   operation.  I looked at a map to find out where

20   this place was.

21          There is also some financial

22   information, general economic information that I
```

Michael Kavanaugh                 Adams, et al. v. Teck Cominco Alaksa, et al.                 2/23/2005

Page 26

1    might need.  So I went and updated that

2    material.  That basically is tax rates, price

3    indices, interest rates.  And I began to get all

4    that material together.

5              The engineers returned from their

6    travels.  And about the 20th or so of December

7    we held a conference call between myself and

8    Luke Cole, Bob Moran, Randy Fischer, Ken Fucik,

9    and we talked for about an hour and a half.

10             The outcome of that conversation was

11   that no one could be very specific about what

12   they would have the defendant do, that there was

13   a consensus that what the defendant should have

14   done -- I basically put the question to them

15   about three quarters of the way into the

16   conversation, I said, "all right, I'm the vice

17   president of environmental affairs for Teck

18   Cominco, the parent, and I've got this mine in

19   Alaska and I've got to go to the board and get

20   an appropriation.  What the heck should I tell

21   them?  You are my consultants.  What should I

22   tell my board?"

Michael Kavanaugh                Adams, et al. v. Teck Cominco Alaksa, et al.                    2/23/2005

Page 167

1    opportunities.

2        Q.    I have that.  Let's look at the

3    for-profit corporations.

4        A.    All for profits are the same unless

5    they are bankrupt.

6        Q.    So that's the only distinction you

7    would make in calculating the economic benefit

8    any of these cost-forward models that we are

9    talking about have.  Using the equity cost of

10   capital and WACC, that's the only distinction

11   you would make when you look at return on

12   investment?

13       A.    Yes.

14       Q.    If you turn to page 8 of your report,

15   please.

16       A.    With you.

17       Q.    In the first paragraph, you say, "I use

18   Teck Cominco's borrowing from 1999 to 2003, a

19   capital structure of 25 percent debt and 75

20   percent equity and an equity return."

21             I believe your answer was you got this

22   from the financial statements of Teck Cominco

Page 168

1    Limited.

2        A.    Correct.

3        Q.    How did you actually calculate this 25

4    percent debt, 75 percent equity off the Teck

5    Cominco Limited financial statements?

6        A.    I looked at the long-term debt as a

7    share of debt plus equity.

8        Q.    That's it?

9        A.    That's it.

10       Q.    I would like to move down to the bottom

11   of page 8 here now and talk about ability to

12   pay.  We have referenced today and you reference

13   here in your expert report EPA's ABEL model.

14   Can you explain to me what the ABEL model is.

15       A.    The ABEL model is a way of calculating

16   available cash flows from a company's financial

17   statements.

18       Q.    Did you follow the ABEL model here?

19       A.    More or less.  I made some

20   simplifications to it.

21       Q.    I was going to ask you, I notice at the

22   bottom, the last sentence of this page says what

Michael Kavanaugh          Adams, et al. v. Teck Cominco Alaksa, et al.          2/23/2005

1    you did here, you say, is consistent with EPA's

2    ABEL model.  I didn't know whether you exactly

3    followed it or you took some deviations.

4        A.    I don't think there has ever been a

5    model EPA has used that I have exactly followed.

6        Q.    Can you tell me what your deviations

7    were from EPA's ABEL model and the ability to

8    pay calculation you did?

9        A.    Deviations.  EPA's model constructs a

10   database of available cash flows and then

11   projects that forward into the future and then

12   discounts that back to present time.

13         I do not project it forward nor

14   discount it back to present time.  I simply take

15   available cash flows from a historical period.

16   In this case I think it was five years, '99 to

17   2003.  That forms the database over which I make

18   my judgments.

19       Q.    Here you say that you are looking at

20   the financial performance of Teck Cominco

21   Alaska.  Were you working off Teck Cominco

22   Alaska's financial statements or using Teck

Michael Kavanaugh                Adams, et al. v. Teck Cominco Alaksa, et al.                2/23/2005

1    Cominco Limited's financial statements?

2        A.    Teck Cominco Alaska.

3        Q.    Why were you using Teck Cominco Alaska

4    instead of the limited?

5        A.    I wanted to see if Teck Cominco Alaska

6    could survive.

7        Q.    You didn't assume they would get their

8    money from the parent corporation?

9        A.    Right, I did not.  I wanted to see if

10   Teck Cominco Alaska, Incorporated could survive.

11       Q.    I believe you mentioned that you had

12   reviewed Mr. Fuhrman's rebuttal report in this

13   case.

14       A.    I saw that about a week ago.

15       Q.    Did you recall reading in it his

16   criticisms of your ability-to-pay analysis?

17       A.    You know, I didn't spend any time with

18   that.

19       Q.    I believe we already have that marked

20   as Exhibit 3.

21             MR. COLE:  There is no exhibit marked

22   that is Fuhrman.

```
 1              MR. HARTIG:  Let's get it, then.

 2              MR. COLE:  Let's take a short break for

 3    the witness.

 4              (Recess.)

 5              (Kavanaugh Exhibit 5 identified.)

 6              MR. HARTIG:  Go to page 14 near the

 7    bottom of the page.  That's the ability-to-pay

 8    analysis section.

 9              (Witness examined the document.)

10              BY MR. HARTIG:

11         Q.   We took a short break here, and during

12    that break, Dr. Kavanaugh, I gave you the

13    opportunity to review Mr. Fuhrman's rebuttal

14    report which has been marked as Exhibit 5.

15         A.   Yes.  I skimmed through Section III.

16         Q.   Had you reviewed this report before?

17         A.   No, I hadn't.  I was aware of it, just

18    didn't pay much attention to that or Section IV.

19         Q.   Have you reviewed Section III now of

20    this report?

21         A.   Well, I have looked through it.

22    References are made to a number of calculations.
```

Michael Kavanaugh          Adams, et al. v. Teck Cominco Alaksa, et al.          2/23/2005

Page 172

```
 1    I haven't had the time to sit down and look at

 2    those.  So I'm not in a very good position to

 3    comment on any of the analysis that he did.

 4        Q.   I would like you to ask you some

 5    specific questions.  If you are not prepared

 6    today to answer those questions, just tell me.

 7    Otherwise, I would appreciate your best answer.

 8        A.   Okay.

 9        Q.   Do you agree with Mr. Fuhrman's

10    criticism that your analysis of Teck Cominco's

11    ability to pay gave equal weight to each year's

12    financial results?

13        A.   Yes.

14        Q.   You agree that you should have?

15        A.   I did.  I gave equal weight to each

16    year's financial results.

17        Q.   Is that consistent with the ABEL model?

18        A.   ABEL doesn't do it that way.

19        Q.   Why did you choose not to do it that

20    way?

21        A.   Because there is no good reason not to

22    give equal weight to every year that you have
```

1    data on.

2         Q.    Why do you say that?

3         A.    I want a reason for reducing the

4    importance of an observation before I reduce it.

5    The ABEL User Manual reduces it so that it can

6    make a forecast into the future.  I'm not making

7    a forecast into the future.

8              I looked at each individual year and

9    said each individual year's experience, and we

10   can go to my expert report --

11        Q.    We are looking at Exhibit 1?

12        A.    We are back to Exhibit 1.  We can go to

13   the table at the bottom of page 9.  The table

14   has years 1999 to 2003.  The bottom line is it

15   reports it in constant 2003 dollars.  I gave

16   equal weight to each of those years, and I

17   wanted to give equal weight to each of those

18   years.

19        Q.    Let me ask you another question while

20   we are on this table.

21             This table, I take it, these are from

22   the financial statements?

Page 174

```
 1        A.    Yes, the annual reports of Teck Cominco

 2    Alaska, Incorporated.

 3        Q.    Do you agree that the ABEL model is

 4    based on tax return data as compared with your

 5    analysis using financial statements?

 6        A.    I don't necessarily agree with that.  I

 7    know that -- I don't know that you have to use

 8    it.  I know you don't have to use tax data.

 9    They might suggest that you use tax data.

10        Q.    Why do you choose not to use the tax

11    data in this instance?

12        A.    I had Teck Cominco Alaska,

13    Incorporated's annual reports.  I didn't have

14    their tax data.

15        Q.    If you would have had the tax data,

16    would you have used the tax data?

17        A.    No.  I think I would have gone with the

18    annual reports.

19        Q.    What if the tax data would have made a

20    significant difference in your calculation?

21        A.    I would like to know why they are

22    telling their shareholders one thing and the
```